Matthew A. Feldman
Rachel C. Strickland
Jennifer J. Hardy
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Counsel for the Debtors and
Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

| | | |
|---|---|---|
| In Re: | : | |
| | : | |
| MPM SILICONES, LLC, *et al.*,[1] | : | |
| | : | Chapter 11 |
| Debtors, | : | Case No. 14-22503 (RDD) |
| ------------------------------------------------------ | : | (Jointly Administered) |
| U.S. BANK NATIONAL ASSOCIATION, AS | : | Adv. Proc. No. 14-8238 (RDD) |
| INDENTURE TRUSTEE, | : | |
| | : | |
| Plaintiff, | : | |
| -against- | : | |
| | : | |
| WILMINGTON SAVINGS FUND SOCIETY, FSB, | : | |
| AS INDENTURE TRUSTEE; MOMENTIVE | : | |
| PERFORMANCE MATERIALS INC., | : | |
| MOMENTIVE PERFORMANCE MATERIALS | : | |
| WORLDWIDE INC., MOMENTIVE | : | |
| PERFORMANCE MATERIALS USA INC., | : | |
| JUNIPER BOND HOLDINGS I LLC, JUNIPER | : | |
| BOND HOLDINGS II LLC, JUNIPER BOND | : | |
| HOLDINGS III LLC, JUNIPER BOND HOLDINGS | : | |

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Juniper Bond Holdings I LLC (9631), Juniper Bond Holdings II LLC (9692), Juniper Bond Holdings III LLC (9765), Juniper Bond Holdings IV LLC (9836), Momentive Performance Materials China SPV Inc. (8469), Momentive Performance Materials Holdings Inc. (8246), Momentive Performance Materials Inc. (8297), Momentive Performance Materials Quartz, Inc. (9929), Momentive Performance Materials South America Inc. (4895), Momentive Performance Materials USA Inc. (8388), Momentive Performance Materials Worldwide Inc. (8357), and MPM Silicones, LLC (5481).

IV LLC, MOMENTIVE PERFORMANCE                    :
MATERIALS QUARTZ, INC., MPM SILICONES,  :
LLC, MOMENTIVE PERFORMANCE                     :
MATERIALS SOUTH AMERICA INC.,                    :
MOMENTIVE PERFORMANCE MATERIALS      :
CHINA SPV INC.                                                      :
                                                                                :
                                                                                :
                            Defendants.                         :
                                                                                :
---------------------------------------------------------------**X**

# MEMORANDUM OF LAW IN SUPPORT OF
## ANSWER AND AFFIRMATIVE DEFENSES OF THE
## <u>DEBTORS TO PLAINTIFF'S COMPLAINT FOR DECLARATORY JUDGMENT</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND ......................................................................................................2

ARGUMENT ..............................................................................................................................9

I.      The Subordinated Notes Trustee's Argument Must Fail in Light of a Careful Reading of
        the Fourth Proviso and the Subordinated Notes Indenture ...............................................10

        A.      The Subordinated Notes Trustee's Interpretation Is Inconsistent with the
                Plain Language of the Fourth Proviso ..................................................................10

        B.      The Fourth Proviso Can Be Interpreted Without Resorting to Adding
                Words to the Subordinated Notes Indenture ........................................................11

        C.      The Subordinated Notes Trustee's Argument Fails When the Subordinated
                Notes Indenture is Considered as a Whole ..........................................................13

II.     The Subordinates Notes Trustee's Argument Fails As it Would Give Rise to Absurd
        Results ...............................................................................................................................14

III.    The Equitable Doctrine of Laches Prevents the Subordinated Notes Trustee from
        Reinterpreting the Fourth Proviso .....................................................................................17

CONCLUSION ..........................................................................................................................21

i

# TABLE OF AUTHORITIES

Cases

Caldor Corp. v. S. Plaza Assocs. (In re Caldor Inc.),
   217 B.R. 121 (Bankr. S.D.N.Y. 1998) ...............................................................................18

Greenwich Capital Fin. Prods., Inc. v. Negrin,
   903 N.Y.S.2d 346 (1st Dep't 2010) ..................................................................................15

Interdigital Commc'ns Corp. v. Nokia Corp.,
   407 F. Supp. 2d 522 (S.D.N.Y. 2005)...............................................................................14

Lightsquared LP v. SP Special Opportunities LLC (In re Lightsquared),
   No. 12-12080, 2014 WL 2612312 (Bankr. S.D.N.Y. June 10, 2014) ...............................17

In re Lipper Holdings, LLC,
   766 N.Y.S.2d 561 (1st Dep't 2003) .............................................................................13, 14

The Mineola Garden City Co., Ltd. v. Bank of Am.,
   13-CV-5615, 2014 U.S. Dist. LEXIS 88118 (E.D.N.Y. June 26, 2014) ..........................14

Reape v. New York News, Inc.,
   504 N.Y.S.2d 469 (2d Dep't 1986)....................................................................................15

Rentways, Inc. v. O'Neill Milk & Cream Co., Inc.,
   126 N.E.2d 271 (N.Y. 1955)..............................................................................................13

Skrodelis v. Nordbergs,
   272 A.D. 2d 316 (2d Dep't 2000)......................................................................................17

Tal v. Superior Vending, LLC,
   867 N.Y.S.2d 21 (Sup. Ct. Westchester Cnty. 2008)........................................................18

Vickery v. Village of Saugerties,
   106 A.D. 2d 721 (3d Dep't 1984)......................................................................................17


Other Authorities

Dee Martin Calligar, Subordination Agreements,
   70 Yale L. J. 376 (1961) ....................................................................................................12

Defendants Momentive Performance Materials Inc., Momentive Performance Materials Worldwide Inc., Momentive Performance Materials USA Inc., Juniper Bond Holdings I LLC, Juniper Bond Holdings II LLC, Juniper Bond Holdings III LLC, Juniper Bond Holdings IV LLC, Momentive Performance Materials Quartz, Inc., MPM Silicones, LLC, Momentive Performance Materials South America Inc., and Momentive Performance Materials China SPV Inc., the debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "**Debtors**"), submit this memorandum of law in support of their answer and affirmative defenses in response to Plaintiff's Complaint for Declaratory Judgment, dated May 30, 2014 (the "**Complaint**").

## PRELIMINARY STATEMENT

1.      Despite the tale spun by the Subordinated Notes Trustee, this is decidedly not a story of misapplication of a contractual subordination agreement; rather, this is the story of latecomer creditors buying into debt and speculating on their ability to turn a profit based on a novel and incorrect interpretation of an indenture, all the while fully aware of the more traditional, holistic interpretation as set forth in the Debtors' position, publicly articulated for years, that the Subordinated Notes were, and would be, subordinated to the Second Lien Notes.[2] Plaintiff argues, only by reading new words into the indenture, that the "plain language reading" of the Subordinated Notes Indenture supports its position that the Second Lien Notes are not "Senior Indebtedness" of the Debtors.  However, this reading flatly ignores other portions of the indenture and would result, if the Plaintiff had its way, in truly absurd outcomes neither intended by the parties nor justified by the language.  Such absurd outcomes would include, among others,

---

[2]      Although not technically champerty, it is uncontested that certain of the noteholders purchased their debt shortly before the commencement of the chapter 11 cases with the express intention to cause the Subordinated Notes Trustee to commence this litigation.

the Debtors being in covenant default of the Subordinated Notes Indenture for years with no

comment from noteholders or the indenture trustee, and the Subordinated Notes not being

subordinate in right of payment to any tranche of debt outstanding as of the Petition Date.

2.    Moreover, the Subordinated Notes Trustee's argument that the

Subordinated Notes are not subordinated in right of payment to the Second Lien Notes has been

asserted after five years of consistent public disclosure by the Debtors stating that in fact the

tranches of second lien notes issued by the Debtors are "Senior Indebtedness."  Despite having

ample, obvious notice of the priority of the Second Lien Notes *vis à vis* the Subordinated Notes,

no party contested the priority of payment of the Subordinated Notes until the Complaint was

filed.  In the intervening years, the Debtors and numerous creditors relied on the otherwise

obvious priority status of the Subordinated Notes and the Second Lien Notes.  Plaintiff's attempt

to upend such reliance at this point in time, and on these facts, is baseless.  Simply put, the plain

language of the Subordinated Notes Indenture supports the Debtors' interpretation of the

Subordinated Notes Indenture and confirms that the Second Lien Notes are, indeed, "Senior

Indebtedness."  As a matter of both law and equity, the Subordinated Notes Trustee's request for

a declaratory judgment must be denied.

## **FACTUAL BACKGROUND**

3.    The Debtors are one of the world's largest producers of silicones and

silicone derivatives.  Their business is in developing and manufacturing products derived from

quartz and specialty ceramics.  The Debtors' business has a 70-year history, and was formerly

the advanced materials business of General Electric Company ("**GE**").

4.    In 2006, the Debtors were purchased from GE by certain investment funds

affiliated with Apollo Global Management, LLC.  When the Debtors were purchased from GE,

the Debtors entered into a senior secured $300 million revolving credit facility and issued senior

secured loans in a principal amount of $525 million and €400 million, and a $35 million

synthetic letter of credit facility (together, the "**Bank Indebtedness**"), and also issued various

series of unsecured notes consisting of (a) $500 million in principal amount of senior

subordinated notes (the "**Subordinated Notes**") pursuant to an indenture dated December 4,

2006 (the "**Subordinated Notes Indenture**", which is attached to the Complaint as Exhibit A)

with Wells Fargo, National Association acting as indenture trustee ("**Wells Fargo**"),[3] and (b)

three classes of unsecured senior notes (the "**2006 Senior Notes**") with a combined principal

amount of $1.065 billion and €275 million.  The Subordinated Notes Indenture provided that the

Subordinated Notes would be subordinated in right of payment to all "Senior Indebtedness." The

Subordinated Notes Indenture defines Senior Indebtedness as:

> "all Indebtedness and any Receivables Repurchase Obligation of
> the Company or any Restricted Subsidiary [...] *unless the
> instrument creating or evidencing the same or pursuant to which
> the same is outstanding expressly provides that such obligations
> are subordinated in right of payment* to any other Indebtedness of
> the Company or such Restricted Subsidiary; provided, however,
> that Senior Indebtedness shall not include, as applicable:
>
> . . . .
>
> (4) any *Indebtedness or obligation* of the Company or any
> Restricted Subsidiary [...] that by its terms *is subordinate or
> junior in any respect* to any other *Indebtedness or obligation* of
> the company . . . (the "**Fourth Proviso**")

Momentive Performance Materials, Inc., Registration Statement (Form S-4) (September 14,
2007), Exh. 4.3 at 32 (emphasis added).

     5.     The Subordinated Notes Indenture makes clear that the 2006 Senior Notes

and the Bank Indebtedness were each Senior Indebtedness.  Id. at 13.  Therefore, there was a

---

[3]     The Bank of New York Mellon Trust Company, N.A. ("**BNY Mellon**") replaced Wells Fargo as indenture
trustee for the Subordinated Notes on June 8, 2009.

combined amount of approximately $2.87 billion[4] of Senior Indebtedness when the Subordinated Notes were issued.

6.      In September 2007, the Debtors offered to exchange the 2006 Senior Notes and the Subordinated Notes (the "**2007 Exchange Offer**") which were originally issued in December 2006 for new notes which were substantially identical to the original notes, but were registered under the Securities Act of 1933 (the "**Exchange Act**"), and therefore were not subject to transfer restrictions or entitled to registration rights.  The prospectus for the 2007 Exchange Offer disclosed that as of July 1, 2007 there was "a total of $2.997 billion of Senior Indebtedness."  Id. at 30.  The exchange of the notes contemplated by the 2007 Exchange Offer was consummated in January, 2008.  Momentive Performance Materials, Annual Report (Form 10-K) (Mar. 8, 2010) at 6.

7.      The Debtors privately exchanged certain of the 2006 Senior Unsecured Notes (at a 37.5% discount) and Subordinated Notes (at a 60% discount) for new Second-Lien Senior Secured Notes (the "**2009 Second-Lien Notes**") in a principal amount of $200 million pursuant to an indenture dated June 15, 2009 (the "**2009 Second-Lien Notes Indenture**").  Momentive Performance Materials Inc., Current Report (Form 8-K) (June 10, 2009).  The 2009 Second-Lien Notes Indenture provided that the 2009 Second-Lien Notes were Senior Indebtedness of the Debtors, and were therefore senior in right of payment to all existing and future Subordinated Indebtedness of the Debtors.  Momentive Performance Materials, Inc., Current Report (Form 8-K) (June 15, 2009) Exh. 4.1 at A-11, B-7.  The next annual report disclosed an outstanding aggregate principal amount of (a) $1.169 billion of Bank Indebtedness, (b) $200 million of the 2009 Second-Lien Notes, (c) $1,065,000 and €275,000 of the 2006

---

[4]      Euro debt was converted to U.S. Dollars using an exchange rate of approximately 1.4 Euros per USD.

Senior Notes, and (d) $381.9 million of the Subordinated Notes.  Momentive Performance

Materials, Annual Report (Form 10-K) (Mar. 8, 2010) at 41-42.  Therefore, after the issuance of

the 2009 Second-Lien Notes, there was a total of approximately $2.81 billion in aggregate

principal amount of debt which was previously disclosed to be Senior Indebtedness.

8.      Pursuant to an indenture dated November 5, 2010 (the "**Second Lien**

**Notes Indenture**", which is annexed hereto as <u>Exhibit A</u>), the Debtors issued $1.16 billion of

9.0% Second-Priority Springing Lien Notes and €150 million of 9.5% Second-Priority Springing

Lien Notes (together, the "**Second Lien Notes**").  The Second Lien Indenture provides that the

Second Lien Notes are Senior Indebtedness and are senior in right of payment to all of the

subordinated debt of the Debtors.  Momentive Performance Materials, Inc., Current Report

(Form 8-K) (November 12, 2010) Exh. 4.1 at A-1-10 and A-2-10.

9.      The Second Lien Indenture further provided that the Second Lien Notes

were unsecured when they were issued initially, but would subsequently become secured by a

second-priority lien when the 2009 Second-Lien Notes were redeemed or otherwise fully paid

off (<u>i.e.</u>, the lien would "spring").[5]  <u>Id.</u> at 36.  The Debtors specifically disclosed that "[p]rior to

and following the Springing Lien Trigger Date [when the Second Lien Notes became secured by

a second-priority lien], the Notes and Note Guarantees will be senior indebtedness" and senior to

all existing and future subordinated debt, "including our existing senior subordinated notes", the

Subordinated Notes.  Momentive Performance Materials, Inc., Current Report (Form 8-K)

(November 5, 2010).  The next annual report disclosed an outstanding aggregate principal

amount of (a) approximately $1 billion of Bank Indebtedness, (b) $200 million of the 2009

Second-Lien Notes, (c) approximately $1.16 billion and €197.7 of the Second Lien Notes, and

---

[5]      Interestingly, even the Plaintiff concedes that had the lien never sprung, the Second Lien Notes would be
Senior Indebtedness under the Subordinated Notes Indenture.

(d) $381.9 million of the Subordinated Notes. Momentive Performance Materials, Inc., Annual

Report (Form 10-K) (Feb. 25, 2011) at F41-F42. Therefore, after the issuance of the Second

Lien Notes, there was a total of $2.636 billion in aggregate principal amount of debt which was

previously disclosed to be Senior Indebtedness.

10.     The Debtors issued $250 million of senior secured notes (the "**1.5 Lien**

**Notes**") pursuant to an indenture dated May 25, 2012. The Debtors issued $1.1 billion of first-

priority senior secured notes (the "**First Lien Notes**") pursuant to an indenture dated October 25,

2012. The prospectus that was issued when the 1.5 Lien Notes were registered under the

Exchange Act disclosed that the First Lien Notes, the 1.5 Lien Notes and the Second Lien Notes

were each Senior Indebtedness and senior in right of payment to all subordinated indebtedness.

Momentive Performance Materials, Prospectus (Form 424B3) (Dec. 10, 2012) at 12, 141-42.

The proceeds of the First Lien Notes and 1.5 Lien Notes were used to pay off the senior secured

loans under the Bank Indebtedness, leaving only the $300 million revolving credit facility (the

"**ABL Facility**").

11.     In November 2012, all of the 2009 Second-Lien Notes were redeemed,

which, pursuant to the Second Lien Indenture, caused the Second Lien Notes to become secured

automatically by a second-priority lien. See Second Lien Indenture § 11.01.

12.     After the redemption of the 2009 Second-Lien Notes and the issuance of

the First Lien Notes and the 1.5 Lien Notes, the next annual report disclosed an outstanding

aggregate principal amount of (a) $48 million of the ABL Facility, (b) $1.1 billion of the First

Lien Notes, (c) $250 million of the 1.5 Lien Notes, (d) approximately $1.335 billion of the

Second Lien Notes, (e) approximately $44 million in foreign local debt and (f) $381.9 million of

the Subordinated Notes. Momentive Performance Materials, Annual Report (Form 10-K) (Apr.

1, 2013) at 35, F41-F42.  Therefore, after the issuance of the Second Lien Notes, there was a

total of approximately $2.778 billion in aggregate principal amount of debt which was previously

disclosed to be Senior Indebtedness.

13.     In April 2013, the Debtors entered into two new senior secured revolving

credit facilities to replace the Old ABL Facility.  The Old ABL Facility was reduced and

incorporated into a new $75 million cash flow facility (the "**Cash Flow Facility**") with an

affiliate of GE, and the Debtors entered into a new $270 million ABL facility (the "**New ABL**

**Facility**") with a syndicate of lenders.  Momentive Performance Materials, Annual Report (Form

10-K) (Apr. 11, 2014) at 30.  Both the New ABL Facility and the Cash Flow Facility are secured

by first-priority liens on certain of the Debtors' collateral, and second-priority liens on other

collateral.  Id. at 60-61.

14.     As of December 31, 2013, the Debtors had an outstanding aggregate

principal amount of (a) $135 million of the New ABL Facility and Cash Flow Facility, (b) $1.1

billion of the First Lien Notes, (c) $250 million of the 1.5 Lien Notes, (d) $1.335 billion of the

Second Lien Notes, (e) approximately $46 million of foreign local debt, and (f) $381.9 million of

the Subordinated Notes.  Momentive Performance Materials, Annual Report (Form 10-K) (Apr.

1, 2013) at 35, 60, F41-F42.  Therefore, at the end of 2013, the Subordinated Notes were

subordinated to $2.866 billion of Senior Indebtedness.

15.     On May 13, 2013, the Debtors filed a prospectus to cover resales by

holders of the Subordinated Notes.  The prospectus was clear that the New ABL Facility, the

Cash Flow Facility, the First Lien Notes, the 1.5 Lien Notes, and the Second Lien Notes were all

Senior Indebtedness, and that the Subordinated Notes were subordinated to each of the

foregoing.  Momentive Performance Materials, Prospectus (Form 424B3) (May 13, 2013) at 8-9,

13.  Neither at that time nor any prior time did BNY Mellon (the indenture trustee for the Subordinated Notes at the time) nor any holder of Subordinated Notes contact the Debtors or communicate in any way that the Debtors' statements or interpretation were inaccurate.

16.     On April 13, 2014 (the "**Petition Date**"), MPM Silicones, LLC and each of the other Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are continuing in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only.

17.     The Subordinated Notes Trustee replaced BNY Mellon as indenture trustee for the Subordinated Notes on April 17, 2014.

18.     On April 22, 2014, an official committee of unsecured creditors (the "**Committee**") was appointed in these cases.  As of the date hereof, no trustee or examiner has been appointed in any of the Debtors' cases.

19.     On May 12, 2014, the Debtors filed their initial versions of the chapter 11 plan [Docket No. 172] (as the same may be amended, modified and/or supplemented, the "**Plan**") and related disclosure statement [Docket No. 173] (as the same may be amended, modified and/or supplemented, the "**Disclosure Statement**").  The Debtors filed revised versions of the Plan and Disclosure Statement on June 18, 2014 [Docket Nos. 435 and 457, respectively] and June 23, 2014 [Docket Nos. 515 and 516, respectively].  On June 23, 2014, the Court entered an order [Docket No. 508] approving the Disclosure Statement.  The hearing to consider confirmation of the Plan is scheduled to commence on August 18, 2014.

20.     On June 23, 2014, the Court entered orders approving the Debtors'

assumption of a restructuring support agreement [Docket No. 507] (the "**RSA**") and entry into a

backstop commitment agreement [Docket No. 509] (the "**BCA**") with certain holders of Second

Lien Notes (the "**Plan Support Parties**").  The RSA provides that the Plan Support Parties will

support the Debtors' Plan, and the BCA provides that the Plan Support Parties will backstop the

$600 million rights offerings contemplated by the Plan.

21.     The Plan provides that holders of Second Lien Notes will receive 100% of

the new equity of the reorganized Debtors through a combination of direct equity and

participation in the $600 million rights offerings for the remaining equity.  Plan, § 5.6.

22.     The Plan provides that the holders of Subordinated Notes will not receive

any distributions under the Plan.  Plan, § 5.8.

23.     On May 30, 2014, the Subordinated Notes Trustee filed a Complaint for

Declaratory Judgment in this adversary proceeding, for the first time alleging in writing that the

Subordinated Notes were *pari passu* in right of payment with the Second Lien Notes.

## ARGUMENT

24.     The Subordinated Notes Trustee's argument set forth in the Complaint

relies on the contention that because the Second Lien Notes have a junior <u>lien</u>, then the Second

Lien Notes constitute <u>Indebtedness</u> that is subordinate or junior to other Indebtedness of the

Debtors.[6]  As discussed herein, the Subordinated Notes Trustee's interpretation is both incorrect

and too late.

---

[6]     The Second Lien Notes would constitute "Indebtedness" under the terms of the Subordinated Notes
Indenture, as such term includes"(1) the principal and premium (if any) of any indebtedness of such Person,
whether or not contingent, (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or
similar instruments . . ."

I.      **The Subordinated Notes Trustee's Argument Must Fail in Light of a Careful Reading of the Fourth Proviso and the Subordinated Notes Indenture**

      A.      **The Subordinated Notes Trustee's Interpretation Is Inconsistent with the Plain Language of the Fourth Proviso**

          25.      The Subordinated Notes Trustee's entire argument that holders of Subordinated Notes are entitled to a declaratory judgment boils down to reading a word into the Subordinated Notes Indenture that is simply not there.

          26.      The Fourth Proviso provides that the following does not constitute Senior Indebtedness: "any *Indebtedness or obligation of the Company . . .* that by its terms is subordinate or junior in any respect to any other *Indebtedness or obligation of the Company . . .*" By the plain meaning of the Fourth Proviso, "subordinate or junior in any respect" modifies "Indebtedness or obligation of the Company."  Therefore, the Fourth Proviso only refers to subordinate or junior Indebtedness or obligations (i.e., payment subordination), and not subordinate or junior liens.  The Second Lien Notes are secured by a junior lien.  However, the Indebtedness comprising the Second Lien Notes is not subordinated — it is *pari passu* in right of payment to other Senior Indebtedness.  See Intercreditor Agreement, dated November 16, 2012 § 5.4, attached to the Complaint as Exhibit B.  In other words, the Subordinated Notes Trustee's argument rests on this Court reading in the word "Lien" in the Fourth Proviso where it does not exist.

          27.      A Lien is not an "Indebtedness or obligation of the Company."  The distinction between the use of the definition "Lien" and the use of "Indebtedness" and "obligation" throughout the Subordinated Notes Indenture makes that clear.  "Lien" is both separately defined and specifically used, where applicable, in the Subordinated Notes Indenture. Again and again, when the term "Lien" is used in the Subordinated Notes Indenture, it is distinct from the use of "Indebtedness" or "obligation."  For example, the definition of "Secured

Indebtedness" is "any Indebtedness secured by a Lien."  The definition of "Permitted Liens"

includes "Liens securing obligations."  <u>See</u> <u>Exhibit B</u> hereto (listing each use of Lien and

Indebtedness or obligation).  Nowhere in the Subordinated Notes Indenture is Indebtedness or

obligation used in a way to conflate it with "Lien" in the way suggested by the Subordinated

Notes Trustee.  The Subordinated Notes Trustee's attempt to shoehorn it into the Fourth Proviso

is inconsistent with the balance of the document.

28.     Further, the Subordinated Notes Trustee does not explain why, if the

parties to the Subordinated Notes Indenture specifically bargained for the result that <u>lien</u>

subordination would act to carve Indebtedness, which otherwise would constitute Senior

Indebtedness, from the scope of the Senior Indebtedness definition, the parties did not explicitly

say so.  Instead of making it explicit, the parties supposedly hid this unexpected result in the

words, "in any respect," and never indicate anywhere else in the Subordinated Notes Indenture

that this was what was intended.  Surely, if lien subordination was the intent, it would have been

a simple matter to make that plain, especially since the Subordinated Notes Indenture includes

definitions for both Lien and Secured Indebtedness which could have been used in the Fourth

Proviso to make clear this intent.  The Fourth Proviso includes no such language.

**B.      The Fourth Proviso Can Be Interpreted Without Resorting to Adding Words
           to the Subordinated Notes Indenture**

29.     The Subordinated Notes Trustee claims that the "in any respect" language

in the Fourth Proviso carves out any debt or obligation that is secured by a subordinated or junior

lien from the definition of Senior Indebtedness.  Complaint ¶ 25.

30.     However, the Fourth Proviso instead provides additional *payment*

subordination carve-outs from the definition of Senior Indebtedness to the very narrow payment

subordination exception set forth in the lead-in to the proviso.  The lead-in carve-out provides

-11-

that Indebtedness constitutes Senior Indebtedness "***unless the instrument creating or evidencing the same or pursuant to which the same is outstanding expressly provides that such obligations are subordinated in right of payment*** to any other Indebtedness of the Company or such Restricted Subsidiary. . ." (emphasis added).  Because the lead-in carve-out is narrow, only encompassing express payment subordination set forth in the instrument creating or evidence the indebtedness, the Fourth Proviso expands such carve-out to include, among other types of *payment* subordination, payment subordination accomplished through different types of agreements (and not just the instrument creating or evidence the indebtedness), such as separate triparty agreements among the lender, the subordinating lender and the debtor, or agreements just among the lenders.  See Dee Martin Calligar, *Subordination Agreements*, 70 Yale L. J. 376. 381 (1961) (discussing various forms of subordination agreements and noting that a subordination agreement can take different forms).

       31.    In the absence of the Fourth Proviso, payment subordination set forth in side agreements, which subordination is not otherwise set out in the "instrument creating or evidencing" the Indebtedness, would not be carved out of the definition of "Senior Indebtedness."  Therefore, the Fourth Proviso has a rational plain language use in the Subordinated Notes Indenture without the need to resort to the Subordinated Notes Trustee's tortured and self-serving interpretation, which includes inserting absent words, to make sense of the provision. [7]

---

[7]    In fact, the Debtors' interpretation is further bolstered by the Realogy Corp. indenture cited in the Complaint by the Subordinated Notes Trustee.  Complaint ¶¶ 45-47.  The Realogy indenture discussed in the Complaint includes an "in any respect" clause such as is contained in the Fourth Proviso, yet elsewhere in the indenture specifically carves out lien subordination from the type of subordination that could give rise to a carve-out from Senior Indebtedness, clearly indicating that "in any respect" was intended to mean something other than lien subordination.  Id.

### C.     The Subordinated Notes Trustee's Argument Fails When the Subordinated Notes Indenture is Considered as a Whole

32.     Not only does the Subordinated Notes Trustee's argument fail when the Fourth Proviso is viewed in isolation, but it also fails when the Subordinated Notes Indenture is viewed as a whole.

33.     Under New York contract law, "[a] cardinal principle governing the construction of contracts is that the entire contract must be considered . . . ." Rentways, Inc. v. O'Neill Milk & Cream Co., Inc., 126 N.E.2d 271, 273 (N.Y. 1955); see also In re Lipper Holdings, LLC, 766 N.Y.S.2d 561, 562 (1st Dep't 2003) (citing Rentways for the proposition that an agreement is read as a whole).[8]

34.     When the Fourth Proviso is viewed from the perspective of the entirety of the Subordinated Notes Indenture, the shortcomings of the Subordinated Notes Trustee's argument becomes even more apparent.  Not only does no other provision in the Subordinated Note Indenture conflate "Lien" and "Indebtedness" in the way that the Subordinated Notes Trustee is suggesting, but no other provision in the indenture indicates that the priority, or even the *existence*, of a Lien securing Senior Indebtedness should be taken into account in provisions governing Liens and Senior Indebtedness.  For instance:

- "Permitted Liens" (Definitions Section) sets out twenty-seven examples of Permitted Liens without once referencing lien priority.

- Section 1.04(f) (Rules of Construction) provides that merely the absence of a Lien will not cause Indebtedness to be deemed subordinate or junior Indebtedness.

- Section 4.03 (Limitation on Incurrence of Indebtedness) limits the types of Indebtedness and obligations that the Debtors may incur, without reference to Lien priority or existence.

---

[8]     New York law is the governing law under the Subordinated Notes Indenture.  See Subordinated Notes Indenture § 13.09.

-13-

- Section 4.12 (Liens) restricts the incurrence of Liens other than Permitted Liens, but does not differentiate among Liens of different priority.

35.     If Lien priority was such an important point in the negotiation of the Subordinated Notes Indenture such that the presence of a junior lien could completely change the outcome of claim priority for the lien holder, one would have expected that lien subordination would play an important role elsewhere in the Subordinated Notes Indenture.  However, only a single reference to the priority of liens can be found in the Subordinated Notes Indenture — and that only provides that if the Company were to permit Liens other than the Permitted Liens, then the Subordinated Notes would have to be "equally and ratably secured…"  Lien priority is never otherwise mentioned.

36.     The fact that the priority of Liens securing Indebtedness is nowhere explicitly referenced in the Subordinated Notes Indenture is a further indication that the Subordinated Notes Indenture Trustee's argument has been created only through the lens of hindsight, contrary to the expectation of the parties or the reasonable interpretation of the Subordinated Notes Indenture.

## II.    The Subordinates Notes Trustee's Argument Fails As it Would Give Rise to Absurd Results

37.     "A contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." Interdigital Comm'ns Corp. v. Nokia Corp., 407 F. Supp. 2d 522, 530 (S.D.N.Y. 2005) (quoting In re Lipper Holdings, LLC, 766 N.Y.S.2d 561, 562 (1st Dep't 2003) (collecting cases)); The Mineola Garden City Co., Ltd. v. Bank of Am., 13-CV-5615, 2014 U.S. Dist. LEXIS 88118, at *12-13 (E.D.N.Y. June 26, 2014); Reape v. New York News, Inc., 504 N.Y.S.2d 469, 470 (2d Dep't 1986).

38.    Courts must reject contract interpretation dependent on "'formalistic literalism,' [which] ignores common sense, and could lead to absurd results . . . ."  See, e.g., Greenwich Capital Fin. Prods., Inc., 903 N.Y.S.2d 346, 348 (1ˢᵗ Dep't 2010) (citation omitted).

39.    As discussed above, the Subordinated Notes Trustee's interpretation of the Fourth Proviso is not only inconsistent with a plain read of the Fourth Proviso, and inconsistent with a holistic read of the Subordinated Notes Indenture, but it would also give rise to surprising, commercially unreasonable, and absurd results.  For instance:

- Indebtedness would constitute Senior Indebtedness if it was unsecured, but if the exact same Indebtedness is provided with a junior lien, the Indebtedness would automatically become *pari passu* in right of payment with the Subordinated Notes.[9]  This surprising result is particularly relevant here, where the Second Lien Notes were originally issued as unsecured Indebtedness, and acquired a lien only once the 2009 Second-Lien Notes were paid in full.  Therefore, if the Subordinated Notes Trustee interpretation is to be followed, absurdly, the holders of Second Lien Notes would have been better off should their lien not ever have "sprung," when they were undoubtedly, even under the Subordinated Notes Trustee's interpretation, "Senior Indebtedness."

- Not a single tranche of Indebtedness of the Debtors outstanding as of the Petition Date would constitute "Senior Indebtedness" under the Subordinated Notes Indenture.  Even the Indebtedness at the top of the Debtors' capital structure, including the New ABL Facility and First Lien Notes, had junior liens on some collateral and senior liens on other collateral.  Therefore, by adopting the Subordinated Notes Trustee's "in any respect" interpretation, the Subordinated Notes are magically not subordinated in right of payment to any Indebtedness at all.[10]

- Holders of Subordinated Notes that in 2009 exchanged their Subordinated Notes for the 2009 Second-Lien Notes at a 60% discount to face value made a commercially unreasonable decision since they were only gaining

---

[9]    This belies the assertion by the Subordinated Notes Trustee that the Fourth Proviso was intended to provide "anti-layering" protection to holders of Subordinated Notes.  See Complaint ¶ 5.  Unsecured "Senior Indebtedness" could still be layered on top of the Subordinated Notes.  If this were the correct interpretation, the likely result would only be to increase the cost of such financing if it could not also receive the benefit of a junior lien.

[10]    Attached as Exhibit C is a chart setting for the various lien priorities in existence as of the Petition Date.

a junior lien and one percentage point of interest as compensation for the 60% discount, without otherwise moving up in the capital structure.[11]

- If the Subordinated Notes Trustee is to be believed, then the Debtors have been in <u>default</u> of the Subordinated Notes Indenture <u>continuously</u> since at least June 2009 when the 2009 Second-Lien Notes were first issued, despite the fact that no notice of default was ever delivered to the Debtors by holders of the Subordinated Notes or any indenture trustee in the intervening five years.[12]

- The Debtors' public disclosure has routinely and explicitly said the opposite of what the Subordinated Notes Trustee is contending. <u>See</u> <u>Exhibit E</u> hereto.

40.    The Subordinated Notes Trustee has failed to put forward any justification for these absurd, unexpected and commercially unreasonable results.  In particular, the Subordinated Notes Trustee cannot justify why it would be commercially reasonable for the Subordinated Notes Indenture to distinguish between unsecured Senior Indebtedness and the exact same Indebtedness, simply secured by a junior lien.  In one instance, the Indebtedness would receive the benefits of the "pay over" provisions in the Subordinated Notes Indenture, in the other instance, by virtue of gaining an additional protection in the form of a lien, the holder would have given up the "pay over" provisions in their entirety.  Under the Subordinated Notes Trustee's interpretation, prior to November 2012, the Second Lien Notes would constitute Senior Indebtedness; after November 2012, they would not.

---

[11]    Press Release, Momentive Performance Materials, Inc., *Momentive Announces Final Results of its Notes Exchange Offers* (June 10, 2009), annexed hereto as <u>Exhibit D</u>.

[12]    Section 4.12 of the Subordinated Notes Indenture restricts the granting of Liens by the Company or any of its restricted subsidiaries other than "Permitted Liens" as defined in Section 1.01 of the Subordinated Notes Indenture.  The only basket under the "Permitted Liens" definition which would permit the liens securing the 2009 Second-Lien Notes (and subsequently the Second Lien Notes) is clause 6(B), which permits "Liens securing Senior Indebtedness."  Subordinated Notes Indenture § 1.01.  If the 2009 Second-Lien Notes and the Second Lien Notes are not Senior Indebtedness by virtue of lien subordination, then the Company has been in violation of the Lien covenant in Section 4.12 of the Subordinated Notes Indenture since at least 2009.

41.    Further, if the Subordinated Notes Trustee's interpretation was correct, the term "Subordinated Notes" would be a misnomer because every tranche of secured Indebtedness in the Debtors' capital structure includes some type of lien subordination.  Reading "in any respect" as urged by the Subordinated Notes Trustee would *de facto* convert the Subordinated Notes into senior unsecured notes.  Twist the meaning of three little words and suddenly subordination provisions are wiped away, with the Subordinated Notes going from being explicitly and unequivocally subordinated to nearly $3 billion in Indebtedness when they were issued, to being subordinated in right of payment to $0 as of the Petition Date.  Such a result is on its face absurd, ignores common sense, is commercially unreasonable and contrary to the reasonable expectations of the parties.

## III.    The Equitable Doctrine of Laches Prevents the Subordinated Notes Trustee from Reinterpreting the Fourth Proviso

42.    Even if the Subordinated Notes Trustee's argument could stand up to scrutiny, it is long past the time any such argument could be put forward with legal consequences due to the doctrine of laches.  Laches is an affirmative defense which "bars the enforcement of a right where there has been an unreasonable and inexcusable delay that results in prejudice to a party."  Skrodelis v. Nordbergs, 272 A.D. 2d 316, 316 (2d Dept. 2000); see also Vickery v. Village of Saugerties, 106 A.D. 2d 721, 723 (3d Dept. 1984) (laches bars recovery where delay and prejudice would "mak[e] it inequitable to permit recovery.").  Under New York law, to establish laches, a party must show:  "(i) conduct giving rise to the situation complained of, (ii) delay by the plaintiff in asserting a claim despite the opportunity to do so, (iii) lack of knowledge on the defendant's part that a claim would be asserted, and (iv) injury or prejudice to the defendant if relief is granted to the plaintiff."  LightSquared LP v. SP Special Opportunities LLC, (In re LightSquared Inc.), No. 12-12080, 2014 WL 2612312, at *74 (Bankr. S.D.N.Y. June

10, 2014) (citing Caldor Corp. v. S. Plaza Assocs. (In re Caldor Inc.), 217 B.R. 121, 134 (Bankr.

S.D.N.Y. 1998)); Tal v. Superior Vending, LLC, 867 N.Y.S.2d 21 (Sup. Ct. Westchester Cnty.

2008).

         43.     If the Subordinated Notes Trustee's interpretation is to be believed, the

Debtors have been in constant covenant violation of the Subordinated Notes Indenture, and have

consistently disclosed such violations, since at least 2009.  During the intervening years, under

the new interpretation of the Fourth Proviso, the previous indenture trustee, BNY Mellon, could

have issued a notice of default to the Company at any point.  See Subordinated Notes Indenture §

6.01.  Further, regardless of whether BNY Mellon took action, holders of 25% of the

Subordinated Notes could have at any time issued such a notice of default.  Id.  No notice of

default was ever issued.

         44.     Since 2009, in numerous publicly available documents, including the

Second Lien Indenture, the 2009 Second-Lien Indenture and various related public filings, the

Debtors have explicitly and publicly taken the position that holders of 2009 Second-Lien Notes

and, subsequently, the Second Lien Notes, were senior in right of payment to the Subordinated

Notes.[13]  At the time of the issuance of the Second Lien Notes, the Debtors specifically disclosed

that both "[p]rior to and following" the Second Lien Notes being secured by a second-priority

lien, the Second Lien Notes would be Senior Indebtedness and senior in right of payment to the

Subordinated Notes.  Momentive Performance Materials, Inc., Current Report (Form 8-K)

(November 5, 2010).  The Second Lien Notes also stated that they were "senior Indebtedness of

the company" and "after the springing of the Second Lien, [the Second Lien Notes] will be

---

[13]     The Company made similar public statements with respect to the 1.5 Lien Notes, which, if the
Subordinated Notes Trustee is to be believed, would also not constitute Senior Indebtedness.  A chart of
various public documents in which the Debtors historically took the position that Indebtedness with junior
Liens still constitutes Senior Indebtedness is set forth in Exhibit E hereto.

senior in right of payment to all existing and future Subordinated Indebtedness of the Company."

Second Lien Notes §§ 4, 9.  Therefore, the Debtors' interpretation of the Fourth Proviso has been

abundantly clear for years.

        45.     The Subordinated Notes Trustee cannot credibly take a contrary position

today.  The failure by any holder or previous indenture trustee to raise or pursue such an

argument in the intervening years, the failure of such parties to even put others on notice of this

argument, has created a situation where for years the Debtors and its creditors, including current

holders of Second Lien Notes, have reasonably relied on the Debtors' public disclosure regarding

the interpretation of the subordination provisions.  Even in the unlikely event that the Debtors'

interpretation is incorrect, holders of Second Lien Notes have been prejudiced by the delay —

have made investment decisions relying on the position of the Second Lien Notes in the Debtors

capital structure.  Further, if such position had been made known prior to the springing of the

liens securing the Second Lien Notes, the holders of the Second Lien Notes may have

determined to forgo their lien in favor of unsecured Indebtedness that constitutes Senior

Indebtedness.[14]  In addition, the Debtors have incurred significant costs putting forward a chapter

11 plan which embraces the Debtors' interpretation of the Fourth Proviso, five years after any

contrary argument could have first been raised.  It is long past the time for the Subordinated

Notes Trustee (or holders of Subordinated Notes) to complain.

        46.     Accordingly, the Debtors respectfully submit that, regardless of the

ultimate interpretation of the Fourth Proviso, that the Subordinated Notes Trustee's request for a

declaratory judgment must be barred by the equitable doctrine of laches.

---

[14]     In a further twist to the absurdity of both the argument and the harm caused by the delay, had the
Subordinated Notes Trustee made its position known before the filing, the holders of Second Lien Notes
could have released their liens and become "Senior Indebtedness" and relied on the turnover provisions in
the Subordinated Notes Indenture.

## <u>CONCLUSION</u>

47.    For the foregoing reasons, the Debtors respectfully request that the Court

determine that the Subordinated Notes Trustee is not entitled to the declaratory judgment it seeks

pursuant to the Complaint.

Dated:  July 14, 2014                    WILLKIE FARR & GALLAGHER LLP

By: /s/ Matthew A. Feldman
    Matthew A. Feldman
    Rachel C. Strickland
    Jennifer J. Hardy
    787 Seventh Avenue
    New York, New York 10019
    Telephone: (212) 728-8000

    *Counsel for the Debtors and
    Debtors in Possession*

# **EXHIBIT A**

**Second Lien Notes Indenture**

**Exhibit 4.1**

EXECUTION VERSION

MOMENTIVE PERFORMANCE MATERIALS INC.

and the Note Guarantors named herein

$1,160,687,000 9.0% Second-Priority Springing Lien Notes due 2021

€150,000,000 9.5% Second-Priority Springing Lien Notes due 2021

_____

INDENTURE

Dated as of November 5, 2010

_____

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,
AS TRUSTEE AND COLLATERAL AGENT

**Bloomberg Law**®

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS AND INCORPORATION BY REFERENCE | | 1 |
| SECTION 1.01. | Definitions | 1 |
| SECTION 1.02. | Other Definitions | 39 |
| SECTION 1.03. | Incorporation by Reference of Trust Indenture Act | 41 |
| SECTION 1.04. | Rules of Construction | 41 |
| ARTICLE II THE NOTES | | 42 |
| SECTION 2.01. | Amount of Notes | 42 |
| SECTION 2.02. | Form and Dating | 43 |
| SECTION 2.03. | Execution and Authentication | 43 |
| SECTION 2.04. | Registrar and Paying Agent | 44 |
| SECTION 2.05. | Paying Agent to Hold Money in Trust | 45 |
| SECTION 2.06. | Holder Lists | 45 |
| SECTION 2.07. | Transfer and Exchange | 45 |
| SECTION 2.08. | Replacement Notes | 46 |
| SECTION 2.09. | Outstanding Notes | 47 |
| SECTION 2.10. | Temporary Notes | 47 |
| SECTION 2.11. | Cancellation | 47 |
| SECTION 2.12. | Defaulted Interest | 47 |
| SECTION 2.13. | CUSIP Numbers, ISINs, etc | 48 |
| SECTION 2.14. | Calculation of Principal Amount of Notes | 48 |
| ARTICLE III REDEMPTION | | 48 |
| SECTION 3.01. | Redemption | 48 |
| SECTION 3.02. | Applicability of Article | 48 |
| SECTION 3.03. | Notices to Trustee | 48 |
| SECTION 3.04. | Selection of Notes to Be Redeemed | 49 |
| SECTION 3.05. | Notice of Optional Redemption | 49 |
| SECTION 3.06. | Effect of Notice of Redemption | 50 |
| SECTION 3.07. | Deposit of Redemption Price | 50 |
| SECTION 3.08. | Notes Redeemed in Part | 50 |
| ARTICLE IV COVENANTS | | 51 |
| SECTION 4.01. | Payment of Notes | 51 |
| SECTION 4.02. | Reports and Other Information | 51 |
| SECTION 4.03. | Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock | 52 |
| SECTION 4.04. | Limitation on Restricted Payments | 59 |
| SECTION 4.05. | Dividend and Other Payment Restrictions Affecting Subsidiaries | 64 |
| SECTION 4.06. | Asset Sales | 66 |
| SECTION 4.07. | Transactions with Affiliates | 69 |
| SECTION 4.08. | Change of Control | 72 |

-i-

## TABLE OF CONTENTS
(continued)

|  |  | **Page** |
|---|---|---|
| SECTION 4.09. | Compliance Certificate | 74 |
| SECTION 4.10. | Further Instruments and Acts | 74 |
| SECTION 4.11. | Future Note Guarantors | 74 |
| SECTION 4.12. | Liens | 74 |
| SECTION 4.13. | After-Acquired Property | 75 |
| SECTION 4.14. | Maintenance of Office or Agency | 76 |
| SECTION 4.15. | [Reserved] | 76 |
| SECTION 4.16. | [Reserved] | 76 |
| SECTION 4.17. | Suspension of Certain Covenants | 76 |
| ARTICLE V SUCCESSOR COMPANY |  | 78 |
| SECTION 5.01. | When Company May Merge or Transfer Assets | 78 |
| ARTICLE VI DEFAULTS AND REMEDIES |  | 80 |
| SECTION 6.01. | Events of Default | 80 |
| SECTION 6.02. | Acceleration | 82 |
| SECTION 6.03. | Other Remedies | 83 |
| SECTION 6.04. | Waiver of Past Defaults | 83 |
| SECTION 6.05. | Control by Majority | 83 |
| SECTION 6.06. | Limitation on Suits | 83 |
| SECTION 6.07. | Rights of the Holders to Receive Payment | 84 |
| SECTION 6.08. | Collection Suit by Trustee | 84 |
| SECTION 6.09. | Trustee May File Proofs of Claim | 84 |
| SECTION 6.10. | Priorities | 84 |

Bloomberg Law®

| | | |
|---|---|---|
| SECTION 6.11. | Undertaking for Costs | 85 |
| SECTION 6.12. | Waiver of Stay or Extension Laws | 85 |
| **ARTICLE VII TRUSTEE** | | **85** |
| SECTION 7.01. | Duties of Trustee | 85 |
| SECTION 7.02. | Rights of Trustee | 86 |
| SECTION 7.03. | Individual Rights of Trustee | 88 |
| SECTION 7.04. | Trustee's Disclaimer | 88 |
| SECTION 7.05. | Notice of Defaults | 88 |
| SECTION 7.06. | Reports by Trustee to the Holders | 88 |
| SECTION 7.07. | Compensation and Indemnity | 89 |
| SECTION 7.08. | Replacement of Trustee | 90 |
| SECTION 7.09. | Successor Trustee by Merger | 90 |
| SECTION 7.10. | Eligibility; Disqualification | 91 |
| SECTION 7.11. | Preferential Collection of Claims Against the Company | 91 |
| **ARTICLE VIII DISCHARGE OF INDENTURE; DEFEASANCE** | | **91** |
| SECTION 8.01. | Discharge of Liability on Notes; Defeasance | 91 |
| SECTION 8.02. | Conditions to Defeasance | 93 |
| SECTION 8.03. | Application of Trust Money | 94 |

-ii-

**TABLE OF CONTENTS**
(continued)

| | | **Page** |
|---|---|---|
| SECTION 8.04. | Repayment to Company | 94 |
| SECTION 8.05. | Indemnity for Government Obligations | 94 |
| SECTION 8.06. | Reinstatement | 94 |
| ARTICLE IX AMENDMENTS AND WAIVERS | | 95 |
| SECTION 9.01. | Without Consent of the Holders | 95 |
| SECTION 9.02. | With Consent of the Holders | 96 |
| SECTION 9.03. | Compliance with Trust Indenture Act | 97 |
| SECTION 9.04. | Revocation and Effect of Consents and Waivers | 97 |
| SECTION 9.05. | Notation on or Exchange of Notes | 98 |
| SECTION 9.06. | Trustee to Sign Amendments | 98 |
| SECTION 9.07. | Payment for Consent | 98 |
| SECTION 9.08. | Additional Voting Terms; Calculation of Principal Amount | 98 |
| ARTICLE X RANKING OF NOTE LIENS | | 98 |
| SECTION 10.01. | Relative Rights | 98 |
| ARTICLE XI COLLATERAL | | 99 |
| SECTION 11.01. | Security Documents | 99 |
| SECTION 11.02. | Collateral Agent | 100 |
| SECTION 11.03. | Authorization of Actions to Be Taken | 101 |
| SECTION 11.04. | Release of Collateral | 102 |
| SECTION 11.05. | Filing, Recording and Opinions | 104 |
| SECTION 11.06. | [Reserved] | 105 |
| SECTION 11.07. | Release Upon Termination of the Company's Obligations | 105 |
| SECTION 11.08. | Designations | 105 |
| SECTION 11.09. | Amendment of Security Documents | 105 |
| ARTICLE XII NOTE GUARANTEES | | 105 |
| SECTION 12.01. | Note Guarantees | 105 |
| SECTION 12.02. | Limitation on Liability | 108 |
| SECTION 12.03. | Successors and Assigns | 108 |
| SECTION 12.04. | No Waiver | 108 |
| SECTION 12.05. | Modification | 109 |
| SECTION 12.06. | Execution of Supplemental Indenture for Future Note Guarantors | 109 |
| SECTION 12.07. | Non-Impairment | 109 |
| ARTICLE XIII MISCELLANEOUS | | 109 |
| SECTION 13.01. | Trust Indenture Act Controls | 109 |
| SECTION 13.02. | Notices | 109 |
| SECTION 13.03. | Communication by the Holders with Other Holders | 111 |
| SECTION 13.04. | Certificate and Opinion as to Conditions Precedent | 111 |
| SECTION 13.05. | Statements Required in Certificate or Opinion | 111 |

-iii-

## TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| SECTION 13.06. | When Notes Disregarded | 112 |
| SECTION 13.07. | Rules by Trustee, Paying Agent and Registrar | 112 |
| SECTION 13.08. | Legal Holidays | 112 |
| SECTION 13.09. | GOVERNING LAW | 112 |
| SECTION 13.10. | No Recourse Against Others | 112 |
| SECTION 13.11. | Successors | 112 |
| SECTION 13.12. | Multiple Originals | 112 |
| SECTION 13.13. | Table of Contents; Headings | 113 |
| SECTION 13.14. | Indenture Controls | 113 |
| SECTION 13.15. | Severability | 113 |
| SECTION 13.16. | Force Majeure | 113 |
| SECTION 13.17. | Currency Indemnity and Calculation of Euro-denominated Restrictions | 113 |

Appendix A    —    Provisions Relating to Initial Notes, Exchange Notes and Private Exchange Notes

EXHIBIT INDEX

| Exhibit A-1 | — | Initial Dollar Note |
|---|---|---|
| Exhibit A-2 | — | Initial Euro Note |
| Exhibit B-1 | — | Exchange Note or Private Exchange Note for Dollar Notes |
| Exhibit B-2 | — | Exchange Note or Private Exchange Note for Euro Notes |
| Exhibit C | — | Form of Transferee Letter of Representation |
| Exhibit D | — | Form of Supplemental Indenture |

-iv-

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

CROSS-REFERENCE TABLE

| TIA Section | Indenture Section |
| --- | --- |
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (b) | 7.08; 7.10 |
| (c) | N.A. |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312(a) | 2.06 |
| (b) | 13.03 |
| (c) | 13.03 |
| 313(a) | 7.06 |
| (b)(1) | N.A. |
| (b)(2) | 7.06 |
| (c) | 7.06 |
| (d) | 4.02; 4.09 |
| 314(a) | 4.02; 4.09 |
| (b) | N.A. |
| (c)(1) | 13.04 |
| (c)(2) | 13.04 |
| (c)(3) | N.A. |
| (d) | N.A. |
| (e) | 13.05 |
| (f) | 4.10 |
| 315(a) | 7.01 |
| (b) | 7.05 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.11 |
| 316(a)(last sentence) | 13.06 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.05 |
| 318(a) | 13.01 |

N.A. Means Not Applicable.

Note: This Cross-Reference Table shall not, for any purposes, be deemed to be part of this Indenture.

-v-

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 7

INDENTURE dated as of November 5, 2010 among Momentive Performance Materials Inc., a Delaware corporation (the "Company"), the Note Guarantors (as defined herein) and THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., a national banking association, as trustee (the "Trustee") and collateral agent (the "Collateral Agent").

Each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders of (a) $1,160,687,000 aggregate principal amount of the Company's 9.0% Second-Priority Springing Lien Notes due 2021 issued on the date hereof (the "Original Dollar Notes"), (b) €150,000,000 aggregate principal amount of the Company's 9.5% Second-Priority Springing Lien Notes due 2021 issued on the date hereof (the "Original Euro Notes" and, together with the Original Dollar Notes, the "Original Notes"), (c) any Additional Notes (as defined herein) that may be issued after the date hereof (all such notes in clauses (a), (b) and (c) being referred to collectively as the "Initial Notes") and (d) the Notes of the Company issued pursuant to this Indenture in exchange for, and in an aggregate principal amount equal to, the Initial Notes, in compliance with the terms of a Registration Rights Agreement (as defined herein), including any Private Exchange Notes (as defined in Appendix A, the "Appendix"), and issued in the form of Exhibit B to the Appendix (the "Exchange Notes" and, together with the Initial Notes, the "Notes"). Subject to the conditions and compliance with the covenants set forth herein, the Company may issue an unlimited aggregate principal amount of Additional Notes.

## ARTICLE I

### Definitions and Incorporation by Reference

SECTION 1.01. Definitions.

"2009 Transactions" means the exchange of the Old Second Lien Notes for certain Old Senior Notes and Old Subordinated Notes pursuant to the offering memorandum pursuant to which the Old Second Lien Notes were issued and the transactions contemplated thereby.

"Acquired Indebtedness" means, with respect to any specified Person:

(1) Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person, and

(2) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"Acquisition Documents" means the Stock and Asset Purchase Agreement and any other document entered into in connection with the Acquisition Transactions, in each case as amended, supplemented or modified from time to time prior to the Issue Date or thereafter (so long as any amendment, supplement or modification after the Issue Date, together with all other amendments, supplements and modifications after the Issue Date, taken as a whole, is not more disadvantageous to the Holders of the Notes in any material respect than the Acquisition Documents as in effect on the Issue Date).

1

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

"Acquisition Transactions" means the transactions described under "The Acquisition" in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2008.

"Additional Dollar Notes" means additional Dollar Notes (other than the Original Dollar Notes and other than Exchange Notes for such Original Dollar Notes) issued from time to time under the terms of this Indenture subsequent to the Issue Date.

"Additional Euro Notes" means additional Euro Notes (other than the Original Euro Notes and other than Exchange Notes for such Original Euro Notes) issued from time to time under the terms of this Indenture subsequent to the Issue Date.

"Additional Notes" means Additional Dollar Notes and Additional Euro Notes.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"Applicable Premium" means,

(1) with respect to any Dollar Note on any applicable redemption date, the greater of:

(a) 1% of the then outstanding principal amount of such Dollar Note; and

(b) the excess of:

(i) the present value at such redemption date of (i) the redemption price of such Dollar Note, at January 15, 2016 (such redemption price being set forth in paragraph 5 of the applicable Dollar Note) plus (ii) all required interest payments due on such Dollar Note through January 15, 2016 (excluding accrued but unpaid interest), computed using a discount rate equal to the Treasury Rate as of such redemption date plus 50 basis points; over

(ii) the then outstanding principal amount of such Dollar Note; and

(2) with respect to any Euro Note on any applicable redemption date, the greater of:

(a) 1% of the then outstanding principal amount of such Euro Note; and

(b) the excess of:

2

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 9

(i) the present value at such redemption date of (i) the redemption price of such Euro Note, at January 15, 2016 (such redemption price being set forth in paragraph 5 of the applicable Euro Note) plus (ii) all required interest payments due on such Euro Note through January 15, 2016 (excluding accrued but unpaid interest), computed using a discount rate equal to the Bund Rate as of such redemption date plus 50 basis points; over

(ii) the then outstanding principal amount of such Euro Note.

"Asset Sale" means:

(1) the sale, conveyance, transfer or other disposition (whether in a single transaction or a series of related transactions) of property or assets (including by way of a Sale/Leaseback Transaction) outside the ordinary course of business of the Company or any Restricted Subsidiary (each referred to in this definition as a "disposition") or

(2) the issuance or sale of Equity Interests (other than directors' qualifying shares and shares issued to foreign nationals or other third parties to the extent required by applicable law) of any Restricted Subsidiary (other than to the Company or another Restricted Subsidiary) (whether in a single transaction or a series of related transactions),

in each case other than:

(a) a disposition of Cash Equivalents or Investment Grade Securities or damaged, obsolete or worn out property or equipment or disposals of equipment in connection with reinvestment in or replacement of equipment, in each case, in the ordinary course of business;

(b) the disposition of all or substantially all of the assets of the Company in a manner permitted pursuant to Section 5.01 or any disposition that constitutes a Change of Control;

(c) any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under Section 4.04;

(d) any disposition of assets of the Company or any Restricted Subsidiary or issuance or sale of Equity Interests of any Restricted Subsidiary, which assets or Equity Interests so disposed or issued have an aggregate Fair Market Value of less than $12.5 million;

(e) any disposition of property or assets, or the issuance of securities, by a Restricted Subsidiary to the Company or by the Company or a Restricted Subsidiary to a Restricted Subsidiary;

(f) any exchange of assets (including a combination of assets and Cash Equivalents) for assets related to a Similar Business of comparable or greater market value or usefulness to the business of the Company and the Restricted Subsidiaries as a whole, as determined in good faith by the Company;

3

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 10

(g) foreclosure on assets of the Company or any of the Restricted Subsidiaries;

(h) any disposition of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary;

(i) the lease, assignment or sublease of any real or personal property in the ordinary course of business;

(j) any disposition of inventory or other assets in the ordinary course of business;

(k) any grant in the ordinary course of business of any license of patents, trademarks, know-how or any other intellectual property;

(l) any disposition of accounts receivable and related assets of the type specified in the definition of "Receivables Financing" to a Receivables Subsidiary in a Qualified Receivables Financing or in factoring or similar transactions;

(m) any swap of assets, or any lease, assignment or sublease of any real or personal property, in exchange for services (including in connection with any outsourcing arrangements) of comparable or greater value or usefulness to the business of the Company and the Restricted Subsidiaries taken as a whole, as determined in good faith by the Company; *provided*, that any cash or Cash Equivalents received must be applied in accordance with Section 4.06;

(n) any financing transaction with respect to property built or acquired by the Company or any Restricted Subsidiary after the Issue Date, including any Sale/Leaseback Transaction or asset securitization permitted under this Indenture;

(o) any surrender or waiver of contract rights or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind;

(p) a transfer of accounts receivable and related assets of the type specified in the definition of "Receivables Financing" (or a fractional undivided interest therein) by a Receivables Subsidiary in a Qualified Receivables Financing;

(q) any agreement or arrangement involving, relating to or otherwise facilitating, (i) requirements contracts, (ii) tolling arrangements or (iii) the reservation or presale of production capacity of the Company or any of its Restricted Subsidiaries by one or more third parties;

(r) the sale of any property in a Sale/Leaseback Transaction within six months of the acquisition of such property;

4

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(s) dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(t) the sale of any intellectual property and other assets primarily related to the production of gallium nitride, including any interests in joint ventures relating thereto;

(u) dispositions in connection with Permitted Liens; and

(v) any Sale/Leaseback Transaction pursuant to which the Company or any Restricted Subsidiaries receives with respect to such transaction aggregate consideration of less than $15.0 million.

"Bank Indebtedness" means any and all amounts payable under or in respect of any Credit Agreement or the other Credit Agreement Documents as amended, restated, supplemented, waived, replaced, restructured, repaid, refunded, refinanced or otherwise modified from time to time (including after termination of the Credit Agreement), including principal, premium (if any), interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Company whether or not a claim for post-filing interest is allowed in such proceedings), fees, charges, expenses, reimbursement obligations, guarantees and all other amounts payable thereunder or in respect thereof.

"Board of Directors" means, as to any Person, the board of directors or managers, as applicable, of such Person (or, if such Person is a partnership, the board of directors or other governing body of the general partner of such Person) or any duly authorized committee thereof.

"Bund Rate" means, as of the applicable redemption date, (i) the rate borne by direct obligations of the Federal Republic of Germany (Bunds or Bundsanleihen) having a constant maturity most nearly equal to the period from the redemption date to January 15, 2016, and (ii) if there are no such obligations, the rate determined by linear interpolation between the rates borne by the two direct obligations of the Federal Republic of Germany maturing closest to, but straddling such date, in each case, as published in the Financial Times.

"Business Day" means a day other than a Saturday, Sunday or other day on which banking institutions are authorized or required by law to close in New York City or the city in which the Trustee's principal office is located; *provided, however,* that for any payments to be made under this Indenture, such day shall also be a day on which the Trans-European Automated Real-time Gross Settlement Express Transfer payment system is open for settlement for payments in euros.

"Capital Stock" means:

(1) in the case of a corporation, corporate stock or shares;

(2) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

5

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 12

(3) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Capitalized Lease Obligation" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"Cash Equivalents" means:

(1) U.S. Dollars, pounds sterling, euros, the national currency of any member state in the European Union or, in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(2) securities issued or directly and fully guaranteed or insured by the U.S. government, Australia, Great Britain, Canada, Netherlands or any other country that is a member of the European Union or any agency or instrumentality thereof in each case maturing not more than two years from the date of acquisition;

(3) in the case of any Foreign Subsidiary, securities issued or directly and fully guaranteed or insured by the government of the jurisdiction of such Foreign Subsidiary, or any agency or instrumentality thereof, in each case with maturities not exceeding 270 days after the date of acquisition and held by it from time to time in the ordinary course of business;

(4) certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits and demand deposits (in their respective local currencies), in each case with any commercial bank having capital and surplus in excess of $250.0 million and whose long-term debt is rated "A" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency);

(5) repurchase obligations for underlying securities of the types described in clauses (2) and (4) above entered into with any financial institution meeting the qualifications specified in clause (4) above;

(6) commercial paper issued by a corporation (other than an Affiliate of the Company) rated at least "A-1" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) and in each case maturing within one year after the date of acquisition;

(7) readily marketable direct obligations issued by any state of the United States of America or any political subdivision thereof having one of the two highest

6

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 13

rating categories obtainable from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(8) Indebtedness issued by Persons (other than the Sponsors or any of their Affiliates) with a rating of "A" or higher from S&P or "A-2" or higher from Moody's in each case with maturities not exceeding two years from the date of acquisition;

(9) investment funds investing at least 95% of their assets in securities of the types described in clauses (1) through (8) above; and

(10) instruments equivalent to those referred to in clauses (1) through (9) above denominated in euros or any other foreign currency comparable in credit quality and tenor to those referred to above and commonly used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction.

"Change of Control" means the occurrence of any of the following events:

(i) the sale, lease or transfer, in one or a series of related transactions, of all or substantially all the assets of the Company and its Subsidiaries, taken as a whole, to a Person other than any of the Permitted Holders; or

(ii) the Company becomes aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) of the acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), including any group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act), other than any of the Permitted Holders, in a single transaction or in a related series of transactions, by way of merger, consolidation or other business combination or purchase of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision), of more than 50% of the total voting power of the Voting Stock of the Company.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all property subject or purported to be subject, from time to time, to a Lien under any Security Document.

"Collateral Agent" means the party named in such capacity under this Indenture until a successor replaces it and, thereafter, means the successor.

"Collateral Agreement" means the collateral agreement to be entered into in connection with the occurrence of the Springing Lien Trigger Date among the Company, the Note Guarantors and the Collateral Agent, as it may be amended, restated, supplemented or otherwise modified from time to time thereafter in accordance with this Indenture. Upon execution, such Collateral Agreement shall be substantially the same as the comparable agreements in effect with

7

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 14

respect to First Priority Obligations outstanding at such time, with appropriate adjustments to reflect the second-priority status of the Notes and the terms of the Intercreditor Agreement and this Indenture and shall exclude Excluded Assets from the Collateral whether or not such assets secure the First Priority Obligations.

"Common Depositary" means The Bank of New York Mellon, London Branch, its nominee and their respective successors.

"Company" means the party named as such in the Preamble to this Indenture until a successor replaces it and, thereafter, means the successor and, for purposes of any provision contained herein and required by the TIA, each other obligor on the Notes.

"Consolidated Interest Expense" means, with respect to any Person for any period, the sum, without duplication, of:

(1) consolidated interest expense of such Person and the Restricted Subsidiaries for such period, to the extent such expense was deducted in computing Consolidated Net Income (including amortization of original issue discount, the interest component of Capitalized Lease Obligations, and net payments and receipts (if any) pursuant to interest rate Hedging Obligations and excluding amortization of deferred financing fees, debt issuance costs, commissions, fees and expenses and expensing of any bridge commitment or other financing fees); plus

(2) consolidated capitalized interest of such Person and the Restricted Subsidiaries for such period, whether paid or accrued; plus

(3) commissions, discounts, yield and other fees and charges Incurred in connection with any Receivables Financing which are payable to Persons other than the Company and the Restricted Subsidiaries; minus

(4) interest income for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by the Company to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"Consolidated Net Income" means, with respect to any Person for any period, the aggregate of the Net Income of such Person and the Restricted Subsidiaries for such period, on a consolidated basis; *provided*, *however*, that:

(1) any net after-tax extraordinary, nonrecurring or unusual gains or losses or income, expenses or charges (less all fees and expenses relating thereto), including, without limitation, (i) severance expenses, expenses related to any reconstruction, decommissioning or reconfiguration of fixed assets for alternate uses, fees, expenses or charges relating to new product lines, plant shutdown costs and acquisition integration costs, (ii) up to $30.0 million in the aggregate of transition expenses attributable to the Company becoming an independent operating company in connection with the Acquisition Transactions, (iii) expenses or charges in connection with the Acquisition

8

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 15

Transactions related to curtailments or modifications to pension or other post-employment benefit plans and (iv) any fees, expenses or charges related to any Equity Offering, Permitted Investment, acquisition or Indebtedness permitted to be Incurred by this Indenture (in each case, whether or not successful), including any such fees, expenses, charges or change in control payments made under the Acquisition Documents or otherwise related to the Acquisition Transactions, in each case, shall be excluded;

(2) any increase in amortization or depreciation or any one-time non-cash charges or increases or reductions in Net Income, in each case resulting from purchase accounting in connection with the Acquisition Transactions or any acquisition that is consummated after the Issue Date shall be excluded;

(3) the Net Income for such period shall not include the cumulative effect of a change in accounting principles during such period;

(4) any net after-tax income or loss from abandoned, closed or discontinued operations and any net after-tax gains or losses on disposal of abandoned, closed or discontinued operations shall be excluded;

(5) any net after-tax gains or losses, or any subsequent charges or expenses (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by the management of the Company) shall be excluded;

(6) any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness, Hedging Obligations or other derivative instruments shall be excluded;

(7) the Net Income for such period of any Person that is not a Subsidiary of such Person, or is an Unrestricted Subsidiary, or that is accounted for by the equity method of accounting, shall be included only to the extent of the amount of dividends or distributions or other payments paid in cash (or to the extent converted into cash) to the referent Person or a Restricted Subsidiary thereof in respect of such period;

(8) solely for the purpose of determining the amount available for Restricted Payments under clause (A) of the definition of "Cumulative Credit," the Net Income for such period of any Restricted Subsidiary (other than any Note Guarantor) shall be excluded to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary of its Net Income is not at the date of determination permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders, unless such restrictions with respect to the payment of dividends or similar distributions have been legally waived; *provided* that (without duplication) the Consolidated Net Income of such Person shall be increased by the amount of dividends or other distributions or other payments actually

9

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

paid in cash (or converted into cash) by any such Restricted Subsidiary to such Person, to the extent not already included therein;

(9) an amount equal to the amount of Tax Distributions actually made to any parent of such Person in respect of such period in accordance with Section 4.04(b)(xii) shall be included as though such amounts had been paid as income taxes directly by such Person for such period;

(10) any impairment charges or asset write-offs and amortization of intangibles in each case arising pursuant to the application of GAAP shall be excluded;

(11) any non-cash expense realized or resulting from employee benefit plans or post-employment benefit plans, grants and sales of stock, stock appreciation or similar rights, stock options or other rights shall be excluded;

(12) any (a) severance or relocation costs or expenses, (b) one-time non-cash compensation charges, (c) costs and expenses after the Issue Date related to employment of terminated employees, (d) costs or expenses realized in connection with, resulting from or in anticipation of the Acquisition Transactions or (e) costs or expenses realized in connection with or resulting from stock appreciation or similar rights, stock options or other rights existing on the Issue Date of officers, directors and employees, in each case of such Person or any of the Restricted Subsidiaries, shall be excluded;

(13) accruals and reserves that are established or adjusted, in each case as a result of the Acquisition Transactions within 12 months after the Issue Date, and that are so required to be established or adjusted in accordance with GAAP, and changes in accruals and reserves as a result of the adoption or modification of accounting policies in connection with the Acquisition Transactions, shall be excluded;

(14) solely for purposes of calculating EBITDA, (a) the Net Income of any Person and the Restricted Subsidiaries shall be calculated without deducting the income attributable to, or adding the losses attributable to, the minority equity interests of third parties in any non-wholly-owned Restricted Subsidiary except to the extent of dividends declared or paid in respect of such period or any prior period on the shares of Capital Stock of such Restricted Subsidiary held by such third parties and (b) any ordinary course dividend, distribution or other payment paid in cash and received from any Person in excess of amounts included in clause (7) above shall be included;

(15)(a) (i) the non-cash portion of "straight-line" rent expense shall be excluded and (ii) the cash portion of "straight-line" rent expense which exceeds the amount expensed in respect of such rent expense shall be included and (b) non-cash gains, losses, income and expenses resulting from fair value accounting required by Statement of Financial Accounting Standards No. 133 shall be excluded;

(16) any currency translation gains and losses related to currency remeasurements of indebtedness, and any net loss or gain resulting from hedging transactions for currency exchange risk, shall be excluded; and

10

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 17

(17) non-cash charges for deferred tax asset valuation allowances shall be excluded.

Notwithstanding the foregoing, for the purpose of Section 4.04 only, there shall be excluded from Consolidated Net Income any dividends, repayments of loans or advances or other transfers of assets from Unrestricted Subsidiaries or a Restricted Subsidiary to the extent such dividends, repayments or transfers increase the amount of Restricted Payments permitted under clauses (D) and (E) of the definition of "Cumulative Credit."

"Consolidated Non-cash Charges" means, with respect to any Person for any period, the aggregate depreciation, amortization and other non-cash expenses of such Person and the Restricted Subsidiaries reducing Consolidated Net Income of such Person for such period on a consolidated basis and otherwise determined in accordance with GAAP, but excluding any such charge which consists of or requires an accrual of, or cash reserve for, anticipated cash charges for any future period.

"Consolidated Secured Debt Ratio" means, as of any date of determination, the ratio of (1) Consolidated Total Indebtedness of the Company and its Restricted Subsidiaries on the date of determination that constitutes (a) prior to the Springing Lien Trigger Date, Secured Indebtedness and (b) on or following the Springing Lien Trigger Date, First Priority Obligations to (2) the aggregate amount of EBITDA for the then most recent four fiscal quarters for which internal financial statements of the Company and its Restricted Subsidiaries are available in each case with such pro forma adjustments to Consolidated Total Indebtedness and EBITDA as are consistent with the pro forma adjustment provisions set forth in the definition of Fixed Charge Coverage Ratio; *provided, however,* that solely for purposes of the calculation of the Consolidated Secured Debt Ratio, in connection with the incurrence of any Lien pursuant to clause (8) of the definition of "Permitted Liens," the Company or its Restricted Subsidiaries may elect, pursuant to an Officer's Certificate delivered to the Trustee, to treat all or any portion of the commitment under any Indebtedness (including any Bank Indebtedness) which is to be secured by such Lien as being Incurred at such time and any subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

"Consolidated Taxes" means provision for taxes based on income, profits or capital, including, without limitation, state, franchise and similar taxes and any Tax Distributions taken into account in calculating Consolidated Net Income.

"Consolidated Total Indebtedness" means, as of any date of determination, an amount equal to the sum (without duplication) of (1) the aggregate amount of all outstanding Indebtedness of the Company and its Restricted Subsidiaries (excluding any undrawn letters of credit) consisting of Capitalized Lease Obligations, bankers' acceptances, Indebtedness for borrowed money and Indebtedness in respect of the deferred purchase price of property or services, plus (2) the aggregate amount of all outstanding Disqualified Stock of the Company and its Restricted Subsidiaries and all Preferred Stock of Restricted Subsidiaries of the Company, with the amount of such Disqualified Stock and Preferred Stock equal to the greater of their respective voluntary or involuntary liquidation preferences, minus (3) the aggregate amount of all Unrestricted Cash on the consolidated balance sheet of the Company and its Restricted

11

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 18

Subsidiaries as of such date of determination, in each case determined on a consolidated basis in accordance with GAAP.

"Contingent Obligations" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

(1) to purchase any such primary obligation or any property constituting direct or indirect security therefor;

(2) to advance or supply funds:

(a) for the purchase or payment of any such primary obligation; or

(b) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Credit Agreement" means, collectively, (i) the credit agreement, dated as of December 4, 2006, entered into in connection with the consummation of the Acquisition Transactions, as amended, restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original agents, lenders or otherwise), renewed, restructured, repaid, refunded, refinanced or otherwise modified from time to time, including any agreement or indenture or multiple agreements and indentures extending the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the Indebtedness under such agreement or agreements or indenture or indentures or any successor or replacement agreement or agreements or indenture or indentures or increasing the amount loaned or issued thereunder or altering the maturity thereof and adding Restricted Subsidiaries as additional issuers or guarantors thereunder, among an indirect wholly owned subsidiary of the Company organized under the laws of Germany that consummated a portion of the Acquisition Transactions and Momentive Performance Materials USA Inc., a Delaware corporation and a direct wholly owned subsidiary of the Company, as borrowers, and the guarantors named therein, the financial institutions named therein, and JPMorgan Chase Bank, N.A., as Administrative Agent, and (ii) whether or not the agreement referred to in clause (i) remains outstanding, if designated by the Company to be included in the definition of "Credit Agreement," one or more (A) debt facilities or commercial paper facilities, providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to lenders or to special purpose entities formed to borrow from lenders against such receivables) or letters of credit, (B) debt securities, indentures or other forms of debt financing (including convertible or exchangeable debt instruments or bank guarantees or bankers' acceptances), or (C) instruments or agreements evidencing any other Indebtedness, in each case, with the same or different borrowers or issuers and, in each case, as amended,

12

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

supplemented, modified, extended, restructured, renewed, refinanced, restated, replaced or refunded in whole or in part from time to time.

"Credit Agreement Documents" means the collective reference to the "Credit Agreement," any notes issued pursuant thereto and the guarantees thereof, and the collateral documents relating thereto, as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified from time to time.

"Cumulative Credit" means the sum of (without duplication):

(A) 50% of the Consolidated Net Income of the Company for the period (taken as one accounting period, the "Reference Period") from October 1, 2010 to the end of the Company's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, in the case such Consolidated Net Income for such period is a deficit, minus 100% of such deficit), *plus*

(B) 100% of the aggregate net proceeds, including cash and the Fair Market Value (as determined in accordance with the next succeeding sentence) of property other than cash, received by the Company after the Issue Date (other than net proceeds to the extent such net proceeds have been used to Incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (xix) of Section 4.03(b)), from the issue or sale of Equity Interests of the Company (excluding Refunding Capital Stock, Designated Preferred Stock, Excluded Contributions and Disqualified Stock), including Equity Interests issued upon conversion of Indebtedness or Disqualified Stock or upon exercise of warrants or options (other than an issuance or sale to a Restricted Subsidiary), *plus*

(C) 100% of the aggregate amount of contributions to the capital of the Company received in cash and the Fair Market Value (as determined in accordance with the next succeeding sentence) of property other than cash after the Issue Date (other than Refunding Capital Stock, Designated Preferred Stock, Excluded Contributions, Disqualified Stock and contributions to the extent such contributions have been used to Incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (xix) of Section 4.03(b)), *plus*

(D) the principal amount of any Indebtedness, or the liquidation preference or maximum fixed repurchase price, as the case may be, of any Disqualified Stock of the Company or any Restricted Subsidiary issued after the Issue Date (other than Indebtedness or Disqualified Stock issued to a Restricted Subsidiary) which has been converted into or exchanged for Equity Interests in the Company (other than Disqualified Stock) or any direct or indirect parent of the Company (*provided* that, in the case of any parent, such Indebtedness or Disqualified Stock is retired or extinguished), *plus*

(E) 100% of the aggregate amount received by the Company or any Restricted Subsidiary in cash and the Fair Market Value (as determined in accordance with the next succeeding sentence) of property other than cash received by the Company or any Restricted Subsidiary, in each case subsequent to the Issue Date, from:

13

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

// PAGE 20

(I) the sale or other disposition (other than to the Company or a Restricted Subsidiary) of Restricted Investments made by the Company and the Restricted Subsidiaries and from repurchases and redemptions of such Restricted Investments from the Company and the Restricted Subsidiaries by any Person (other than the Company or any of the Restricted Subsidiaries) and from repayments of loans or advances (including the release of any guarantee that constituted a Restricted Investment when made) that constituted Restricted Investments (other than, in each case, to the extent that the Restricted Investment was made pursuant to clause (vii) or (x) of Section 4.04(b)),

(II) the sale (other than to the Company or a Restricted Subsidiary) of the Capital Stock of an Unrestricted Subsidiary, or

(III) a distribution or dividend from an Unrestricted Subsidiary, *plus*

(F) in the event any Unrestricted Subsidiary of the Company has been redesignated as a Restricted Subsidiary or has been merged, consolidated or amalgamated with or into, or transfers or conveys its assets to, or is liquidated into, the Company or a Restricted Subsidiary, in each case subsequent to the Issue Date, the Fair Market Value (as determined in accordance with the next succeeding sentence) of the Investment of the Company in such Unrestricted Subsidiary at the time of such redesignation, combination or transfer (or of the assets transferred or conveyed, as applicable), after taking into account any Indebtedness associated with the Unrestricted Subsidiary so designated or combined or any Indebtedness associated with the assets so transferred or conveyed (other than in each case to the extent that the designation of such Subsidiary as an Unrestricted Subsidiary was made pursuant to clause (vii) or (x) of Section 4.04(b) or constituted a Permitted Investment).

The Fair Market Value of property, other than cash, covered by clauses (B), (C), (D), (E) and (F) of this definition of "Cumulative Credit" shall be determined in good faith by the Company and

(x) in the case of property with a Fair Market Value in excess of $15.0 million, shall be set forth in an Officer's Certificate,

(y) in the case of property with a Fair Market Value in excess of $25.0 million, shall be set forth in a resolution approved by at least a majority of the Board of Directors of the Company, or

(z) in the case of property with a Fair Market Value in excess of $50.0 million, shall be set forth in writing by an Independent Financial Advisor.

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"Designated Non-cash Consideration" means the Fair Market Value of non-cash consideration received by the Company or one of the Restricted Subsidiaries in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, less the amount of Cash

14

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration.

"Designated Preferred Stock" means Preferred Stock of the Company or any direct or indirect parent of the Company, as applicable (other than Disqualified Stock), that is issued for cash (other than to the Company or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate, on the issuance date thereof.

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable), or upon the happening of any event:

(1) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (other than as a result of a change of control or asset sale; *provided* that the relevant asset sale or change of control provisions, taken as a whole, are no more favorable in any material respect to holders of such Capital Stock than the asset sale and change of control provisions applicable to the Notes and any purchase requirement triggered thereby may not become operative until compliance with the asset sale and change of control provisions applicable to the Notes (including the purchase of any Notes tendered pursuant thereto)),

(2) is convertible or exchangeable for Indebtedness or Disqualified Stock of such Person or any of its Restricted Subsidiaries, or

(3) is redeemable at the option of the holder thereof, in whole or in part,

in each case prior to 91 days after the maturity date of the Notes; *provided*, *however*, that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; *provided*, *further*, *however*, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Company or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Company in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; *provided*, *further*, that any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Capital Stock that is not Disqualified Stock shall not be deemed to be Disqualified Stock.

"Dollar Notes" means the Original Dollar Notes, any Additional Dollar Notes and the Exchange Notes issued for the Original Dollar Notes or Additional Dollar Notes.

"Domestic Subsidiary" means a Restricted Subsidiary that is not a Foreign Subsidiary.

"EBITDA" means, with respect to any Person for any period, the Consolidated Net Income of such Person for such period plus, without duplication, to the extent the same was deducted in calculating Consolidated Net Income:

(1) Consolidated Taxes; plus

15

**Bloomberg Law**®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 22

(2) Fixed Charges; *provided, however,* such amount will be included in EBITDA notwithstanding that such amount was not deducted in calculating Consolidated Net Income; plus

(3) Consolidated Non-cash Charges; plus

(4) business optimization expenses and other restructuring charges or expenses (which, for the avoidance of doubt, shall include, without limitation, the effect of inventory optimization programs, plant closures, retention, severance, systems establishment costs and excess pension charges); plus

(5) the amount of management, monitoring, consulting and advisory fees and related expenses paid to the Sponsors (or any accruals relating to such fees and related expenses) during such period; *provided, however,* that such amount shall not exceed in any four-quarter period an amount determined in accordance with Section 4.07(b)(iii); plus

(6) impairment charges, including the write down of Investments; plus

(7) non-operating expenses; plus

(8) the cost (or amortization of prior service cost) of subsidizing coverage for persons affected by amendments to medical benefit plans implemented prior to the Issue Date; *provided, however,* such amount will be included in EBITDA notwithstanding that such amount was not deducted in calculating Consolidated Net Income;

less, without duplication,

(9) non-cash items increasing Consolidated Net Income for such period (excluding the recognition of deferred revenue or any items which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges in any prior period and any items for which cash was received in a prior period, including the amortization of employee benefit plans prior service costs); minus

(10) non-operating income.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"Equity Offering" means any public or private sale after the Issue Date of common stock or Preferred Stock of the Company or any direct or indirect parent of the Company, as applicable (other than Disqualified Stock), other than:

(1) public offerings with respect to the Company's or such direct or indirect parent's common stock registered on Form S-8; and

(2) any such public or private sale that constitutes an Excluded Contribution.

16

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 23

"euro" means the single currency of participating member states of the European Union.

"Euro MTF Market" means the Euro MTF Market of the Luxembourg Stock Exchange.

"Euro Notes" means the Original Euro Notes, any Additional Euro Notes and any Exchange Notes issued for the Original Euro Notes or Additional Euro Notes.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Exchange Notes" shall have the meaning assigned to such term in the preamble hereto.

"Excluded Assets" means all assets that are to be excluded from the Collateral pursuant to the Collateral Agreement. The Excluded Assets will include all assets that do not secure First Priority Obligations at any time and from time to time, any "Excluded Securities" (as defined in the Offering Memorandum) and any assets referred to in the proviso in the last sentence of the first paragraph of Section 4.12 hereof.

"Excluded Contributions" means the Cash Equivalents or other assets (valued at their Fair Market Value as determined in good faith by senior management or the Board of Directors of the Company) received by the Company after the Issue Date from:

(1) contributions to its common equity capital, and

(2) the sale (other than to a Subsidiary of the Company or to any Subsidiary management equity plan or stock option plan or any other management or employee benefit plan or agreement) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Company,

in each case designated as Excluded Contributions pursuant to an Officer's Certificate executed on or promptly after the date such capital contributions are made or the date such Capital Stock is sold, as the case may be.

"Existing Notes" means the Company's Old Second Lien Notes, Old Senior Notes and Old Subordinated Notes, in each case to the extent outstanding after completion of the Transactions.

"Fair Market Value" means, with respect to any asset or property, the price which could be negotiated in an arm's-length, free market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction.

"First Priority After-Acquired Property" means any property of the Company or any Note Guarantor, other than Excluded Assets, that secures any First Priority Obligations that is not already subject to the Lien under the Security Documents.

"First Priority Obligations" means (i) all Obligations in respect of Secured Bank Indebtedness and (ii) all other Obligations of the Company or any of its Restricted Subsidiaries

17

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

in respect of Hedging Obligations or Obligations in respect of cash management services, in each case that are secured by Liens granted pursuant to any Credit Agreement Document.

"First Priority Representative" has the meaning given to such term in the Intercreditor Agreement.

"Fixed Charge Coverage Ratio" means, with respect to any Person for any period, the ratio of EBITDA of such Person for such period to the Fixed Charges of such Person for such period. In the event that the Company or any of the Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness (other than in the case of revolving credit borrowings or revolving advances under any Qualified Receivables Financing, in which case interest expense shall be computed based upon the average daily balance of such Indebtedness during the applicable period) or issues, repurchases or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated but prior to the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "Calculation Date"), then the Fixed Charge Coverage Ratio shall be calculated giving pro forma effect to such Incurrence, repayment, repurchase or redemption of Indebtedness, or such issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period (including in the case of any Incurrence or issuance a pro forma application of the net proceeds therefrom).

For purposes of making the computation referred to above, Investments, acquisitions (including the Acquisition Transactions), dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes, business realignment projects or initiatives, restructurings or reorganizations that the Company or any of the Restricted Subsidiaries has either determined to make or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Calculation Date (each, for purposes of this definition, a "pro forma event") shall be calculated on a pro forma basis assuming that all such Investments, acquisitions (including the Acquisition Transactions), dispositions, mergers, amalgamations, consolidations discontinued operations, operational changes, business realignment projects or initiatives, restructurings and reorganizations (and the change of any associated fixed charge obligations and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, discontinued operation, operational change, business realignment projects or initiatives, restructurings or reorganizations, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be calculated giving pro forma effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, consolidation, operational change, business realignment projects or initiatives, restructurings or reorganizations had occurred at the beginning of the applicable four-quarter period.

18

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

For purposes of this definition, whenever pro forma effect is to be given to any pro forma event, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Company. Any such pro forma calculation may include adjustments appropriate, in the reasonable good faith determination of the Company as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable pro forma event (including, to the extent applicable, from the Acquisition Transactions), and (2) all adjustments of the nature used in connection with the calculation of "Adjusted EBITDA" as set forth in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2009 to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness if such Hedging Obligation has a remaining term in excess of twelve months). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Company to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a pro forma basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Company may designate.

"Fixed Charges" means, with respect to any Person for any period, the sum, without duplication, of:

(1) Consolidated Interest Expense of such Person for such period, and

(2) all cash dividend payments (excluding items eliminated in consolidation) on any series of Preferred Stock or Disqualified Stock of such Person and the Restricted Subsidiaries.

"Flow Through Entity" means an entity that is treated as a partnership not taxable as a corporation, a grantor trust or a disregarded entity for U.S. federal income tax purposes or subject to treatment on a comparable basis for purposes of state, local or foreign tax law.

"Foreign Subsidiary" means a Restricted Subsidiary not organized or existing under the laws of the United States of America or any state or territory or the District of Columbia thereof and any direct or indirect Subsidiary of such Restricted Subsidiary.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting

19

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which were in effect as of December 4, 2006. For the purposes of this Indenture, the term "consolidated" with respect to any Person shall mean such Person consolidated with the Restricted Subsidiaries, and shall not include any Unrestricted Subsidiary, but the interest of such Person in an Unrestricted Subsidiary shall be accounted for as an Investment.

"General Electric" means General Electric Company, a New York corporation.

"Government Obligations" means securities that are:

(1) direct obligations of the United States of America or a member of the European Union, for the timely payment of which its full faith and credit is pledged, or

(2) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America or a member of the European Union, the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America or such member of the European Union,

which, in each case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act) as custodian with respect to any such Government Obligations or a specific payment of principal of or interest on any such Government Obligations held by such custodian for the account of the holder of such depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the Government Obligations or the specific payment of principal of or interest on the Government Obligations evidenced by such depository receipt.

"guarantee" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including, without limitation, letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"Hedging Obligations" means, with respect to any Person, the obligations of such Person under:

(1) currency exchange, interest rate or commodity swap agreements, currency exchange, interest rate or commodity cap agreements and currency exchange, interest rate or commodity collar agreements; and

(2) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange, interest rates or commodity prices.

"Holder" means the Person in whose name a Note is registered on the Registrar's books.

"Incur" means issue, assume, guarantee, incur or otherwise become liable for; *provided*, *however*, that any Indebtedness or Capital Stock of a Person existing at the time such Person

20

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary.

"Indebtedness" means, with respect to any Person:

(1) the principal and premium (if any) of any indebtedness of such Person, whether or not contingent, (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (c) representing the deferred and unpaid purchase price of any property (except (i) any such balance that constitutes a trade payable or similar obligation to a trade creditor Incurred in the ordinary course of business, and (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP), which purchase price is due more than six months after the date of placing the property in service or taking delivery and title thereto, (d) in respect of Capitalized Lease Obligations, or (e) representing any Hedging Obligations, if and to the extent that any of the foregoing indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2) to the extent not otherwise included, any obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the Indebtedness of another Person (other than by endorsement of negotiable instruments for collection in the ordinary course of business);

(3) to the extent not otherwise included, Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); *provided*, *however*, that the amount of such Indebtedness will be the lesser of: (a) the Fair Market Value of such asset at such date of determination, and (b) the amount of such Indebtedness of such other Person; and

(4) to the extent not otherwise included, with respect to the Company and the Restricted Subsidiaries, the amount then outstanding (*i.e.*, advanced, and received by, and available for use by, the Company or any of the Restricted Subsidiaries) under any Receivables Financing (as set forth in the books and records of the Company or any Restricted Subsidiary and confirmed by the agent, trustee or other representative of the institution or group providing such Receivables Financing);

*provided*, *however*, that notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) Contingent Obligations incurred in the ordinary course of business and not in respect of borrowed money; (2) deferred or prepaid revenues; (3) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller; (4) Obligations under or in respect of Qualified Receivables Financing; or (5) obligations under the Acquisition Documents.

Notwithstanding anything in this Indenture to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting

21

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 28

Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Indenture as a result of accounting for any embedded derivatives created by the terms of such Indebtedness; and any such amounts that would have constituted Indebtedness under this Indenture but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under this Indenture.

"Indenture" means this Indenture as amended or supplemented from time to time.

"Independent Financial Advisor" means an accounting, appraisal or investment banking firm or consultant, in each case of nationally recognized standing, that is, in the good faith determination of the Company, qualified to perform the task for which it has been engaged.

"Initial Dollar Notes" means the Original Dollar Notes and any Additional Dollar Notes.

"Initial Euro Notes" means the Original Euro Notes and any Additional Euro Notes.

"Intercreditor Agreement" means (i) any intercreditor agreement to be entered into in connection with the occurrence of the Springing Lien Trigger Date among the Company, the Note Guarantors, the First Priority Representative and the Collateral Agent that is consistent with the terms contemplated by this Indenture and the description of the Intercreditor Agreement in the Offering Memorandum, as it may be amended from time to time thereafter in accordance with this Indenture and (ii) any other intercreditor agreement entered into by the Collateral Agent pursuant to Section 11.02(g).

"Investment Grade Rating" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"Investment Grade Securities" means:

(1) securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents);

(2) securities that have a rating equal to or higher than Baa3 (or equivalent) by Moody's or BBB- (or equivalent) by S&P, or an equivalent rating by any other Rating Agency, but excluding any debt securities or loans or advances between and among the Company and its Subsidiaries;

(3) investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2), which fund may also hold immaterial amounts of cash pending investment and/or distribution; and

(4) corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

22

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

"Investments" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet of the Company in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. For purposes of the definition of "Unrestricted Subsidiary" and Section 4.04:

(1) "Investments" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of a Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided*, *however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to:

(a) the Company's "Investment" in such Subsidiary at the time of such redesignation; less

(b) the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation; and

(2) any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer, in each case as determined in good faith by the Board of Directors of the Company.

"Issue Date" means November 5, 2010, the date on which the Original Notes are issued.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction); *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"Management Group" means the group consisting of the directors, executive officers and other management personnel of the Company or any direct or indirect parent of the Company, as the case may be, on the Issue Date together with (1) any new directors whose election by such boards of directors or whose nomination for election by the shareholders of the Company or any direct or indirect parent of the Company, as applicable, was approved by (x) a vote of a majority of the directors of the Company or any direct or indirect parent of the Company, as applicable, then still in office who were either directors on the Issue Date or whose election or nomination was previously so approved or (y) the Permitted Holders and (2) executive officers and other management personnel of the Company or any direct or indirect parent of the Company, as

23

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

applicable, hired at a time when the directors on the Issue Date together with the directors so approved constituted a majority of the directors of the Company or any direct or indirect parent of the Company, as applicable.

"Moody's" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"Net Income" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"Net Proceeds" means the aggregate cash proceeds received by the Company or any of the Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received in respect of or upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale and any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding the assumption by the acquiring Person of Indebtedness relating to the disposed assets or other consideration received in any other non-cash form), net of the direct costs relating to such Asset Sale and the sale or other disposition of such Designated Non-cash Consideration (including, without limitation, legal, accounting and investment banking fees, and brokerage and sales commissions), and any relocation expenses Incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements related thereto), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required (other than pursuant to Section 4.06(b)(i)) to be paid as a result of such transaction (including to obtain any required consent therefore), and any deduction of appropriate amounts to be provided by the Company as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Company after such sale or other disposition thereof, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"Note Documents" means, collectively, this Indenture, the Notes, the Security Documents, the Intercreditor Agreement and all other documents and instruments executed and delivered in connection herewith, in each case as such agreements may be amended, restated, supplemented or otherwise modified from time to time.

"Note Guarantee" means any guarantee of the obligations of the Company under this Indenture and the Notes by any Note Guarantor in accordance with the provisions of this Indenture.

"Note Guarantor" means any Person that Incurs a Note Guarantee; *provided* that upon the release or discharge of such Person from its Note Guarantee with respect to the Notes in accordance with this Indenture, such Person ceases to be a Note Guarantor with respect to the Notes.

24

"Obligations" means any principal, interest, penalties, fees, indemnifications, reimbursements (including, without limitation, reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Indebtedness; *provided* that Obligations with respect to the Notes shall not include fees or indemnifications in favor of the Trustee and other third parties other than the Holders of the Notes.

"Offering Memorandum" means the offering memorandum relating to the offering of the Original Notes dated October 27, 2010.

"Officer" means the Chairman of the Board, Chief Executive Officer, Chief Financial Officer, President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of the Company or a Note Guarantor, as applicable.

"Officer's Certificate" means a certificate signed on behalf of the Company by an Officer of the Company or on behalf of a Note Guarantor by an Officer of such Note Guarantor, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Company or such Note Guarantor, as applicable, that meets the requirements set forth in this Indenture.

"Old Second Lien Notes" means the Company's 12 $1/2$% Second-Lien Senior Secured Notes due 2014.

"Old Senior Notes" means the Company's 9% Senior Notes due 2014, 9 $3/4$% Notes due 2014 and 10 $1/8$ / 10 $7/8$ Senior Toggle Notes due 2014.

"Old Subordinated Notes" means the Company's 11 $1/2$% Senior Subordinated Notes due 2016.

"Opinion of Counsel" means a written opinion from legal counsel who is acceptable to the Trustee. The counsel may be an employee of or counsel to the Company or the Trustee.

"Other Second Priority Obligations" means other Indebtedness of the Company and its Restricted Subsidiaries that is, following the Springing Lien Trigger Date, equally and ratably secured with the Notes as permitted by this Indenture and is designated by the Company as an Other Second Priority Obligation.

"Pari Passu Indebtedness" means:

(1) with respect to the Company, the Notes and any Indebtedness which ranks *pari passu* in right of payment to the Notes; and

(2) with respect to any Note Guarantor, its Note Guarantee and any Indebtedness which ranks *pari passu* in right of payment to such Note Guarantor's Note Guarantee.

"Permitted Holders" means, at any time, each of (i) the Sponsors, (ii) General Electric and its controlled Affiliates, (iii) the Management Group, (iv) any Person that has no material

25

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 32

assets other than Capital Stock of the Company and, directly or indirectly, holds or acquires 100% of the total voting power of the Voting Stock of the Company, and of which no other Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), other than any of the other Permitted Holders specified in clauses (i), (ii) and (iii) above, holds more than 50% of the total voting power of the Voting Stock thereof, and (v) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) the members of which include any of the Permitted Holders specified in clauses (i), (ii) and (iii) above and that, directly or indirectly, hold or acquire beneficial ownership of the Voting Stock of the Company (a "Permitted Holder Group"), so long as (1) each member of the Permitted Holder Group has voting rights proportional to the percentage of ownership interests held or acquired by such member and (2) no Person or other "group" (other than Permitted Holders specified in clauses (i), (ii) and (iii) above) beneficially owns more than 50% on a fully diluted basis of the Voting Stock held by the Permitted Holder Group. Any Person or group whose acquisition of beneficial ownership constitutes a Change of Control in respect of which a Change of Control Offer is made in accordance with the requirements of this Indenture will thereafter, together with its Affiliates, constitute an additional Permitted Holder.

"Permitted Investments" means:

(1) any Investment in the Company or any Restricted Subsidiary;

(2) any Investment in Cash Equivalents or Investment Grade Securities;

(3) any Investment by the Company or any Restricted Subsidiary in a Person if as a result of such Investment (a) such Person becomes a Restricted Subsidiary, or (b) such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys all or substantially all of its assets to, or is liquidated into, the Company or a Restricted Subsidiary;

(4) any Investment in securities or other assets not constituting Cash Equivalents and received in connection with an Asset Sale made pursuant to the provisions of Section 4.06 or any other disposition of assets not constituting an Asset Sale;

(5) any Investment existing on, or made pursuant to binding commitments existing on, the Issue Date or an Investment consisting of any extension, modification or renewal of any Investment existing on the Issue Date; *provided*, that the amount of any such Investment may be increased (x) as required by the terms of such Investment as in existence on the Issue Date or (y) as otherwise permitted under this Indenture;

(6) advances to directors, officers or employees not in excess of $25.0 million outstanding at any one time in the aggregate;

(7) any Investment acquired by the Company or any of the Restricted Subsidiaries (a) in exchange for any other Investment or accounts receivable held by the Company or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other

26

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Investment or accounts receivable, or (b) as a result of a foreclosure by the Company or any of the Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(8) Hedging Obligations permitted under Section 4.03(b)(x);

(9) any Investment by the Company or any of the Restricted Subsidiaries in a Similar Business having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (9) that are at that time outstanding, not to exceed the greater of (x) $150.0 million and (y) 4.5% of Total Assets at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); *provided*, *however*, that if any Investment pursuant to this clause (9) is made in any Person that is not a Restricted Subsidiary at the date of the making of such Investment and such Person becomes a Restricted Subsidiary after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (9) for so long as such Person continues to be a Restricted Subsidiary;

(10) additional Investments by the Company or any of the Restricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (10) that are at that time outstanding, not to exceed the greater of (x) $150.0 million and (y) 4.5% of Total Assets at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(11) loans and advances to officers, directors and employees for business-related travel expenses, moving expenses and other similar expenses, in each case Incurred in the ordinary course of business;

(12) Investments the payment for which consists of Equity Interests of the Company (other than Disqualified Stock) or any direct or indirect parent of the Company, as applicable; *provided*, *however*, that such Equity Interests will not increase the amount available for Restricted Payments under clause (C) of the definition of "Cumulative Credit;"

(13) any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of Section 4.07(b) (except transactions described in clauses (ii), (vi), (vii), (xi)(b), (xvii) and (xviii) of such Section);

(14) Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(15) guarantees issued in accordance with Sections 4.03 and 4.11;

(16) Investments consisting of or to finance purchases and acquisitions of inventory, supplies, materials, services and equipment or purchases of contract rights or licenses or leases of intellectual property;

27

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(17) any Investment in a Receivables Subsidiary or any Investment by a Receivables Subsidiary in any other Person in connection with a Qualified Receivables Financing, including Investments of funds held in accounts permitted or required by the arrangements governing such Qualified Receivables Financing or any related Indebtedness; *provided*, *however*, that any Investment in a Receivables Subsidiary is in the form of a Purchase Money Note, contribution of additional receivables or an equity interest;

(18) Investments resulting from the receipt of non-cash consideration in an Asset Sale received in compliance with Section 4.06;

(19) additional Investments in joint ventures of the Company or any of the Restricted Subsidiaries in an aggregate amount outstanding not to exceed $50.0 million;

(20) any Investment in an entity which is not a Restricted Subsidiary to which a Restricted Subsidiary sells accounts receivable pursuant to a Qualified Receivables Financing; and

(21) Investments of a Restricted Subsidiary acquired after the Issue Date or of an entity merged into, amalgamated with, or consolidated with the Company or a Restricted Subsidiary in a transaction that is not prohibited by Section 5.01 after the Issue Date to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation.

"Permitted Liens" means, with respect to any Person:

(1) pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case Incurred in the ordinary course of business;

(2) Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet due or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review;

(3) Liens for taxes, assessments or other governmental charges not yet due or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings;

(4) Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit (or deposits to secure

28

letters of credit or surety bonds for the same purpose) issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5) minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not Incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6) Liens securing Indebtedness (including Capitalized Lease Obligations) Incurred to finance the purchase, lease or improvement of property (real or personal) or equipment (whether through the direct purchase of assets or Capital Stock of any Person owning such assets) of such Person; *provided, however,* that the Lien may not extend to any other property owned by such Person or any of its Restricted Subsidiaries at the time the Lien is Incurred (other than assets and property affixed or appurtenant thereto and except for customary cross collateral arrangements with respect to property or equipment financed by the same financing source pursuant to the same financing scheme), and the Indebtedness (other than any interest thereon) secured by the Lien may not be Incurred more than 270 days after the latest of the (i) acquisition of the property subject to the Lien, (ii) completion of construction, repair, improvement or addition of the property subject to the Lien and (iii) commencement of full operation of the property subject to the Lien;

(7) Liens securing Indebtedness of a Foreign Subsidiary permitted to be Incurred pursuant to Section 4.03; *provided, however,* that such Liens do not extend to the property or assets of the Company or any Domestic Subsidiary;

(8) Liens incurred to secure Indebtedness Incurred pursuant to Section 4.03(a) or clauses (i) or (xii) (or (xiii) to the extent it guarantees any such Indebtedness) of Section 4.03(b) to the extent such Lien is incurred pursuant to this clause (8) as designated by the Company; *provided, however*, that, other than with respect to Liens incurred to secure Indebtedness Incurred pursuant to clauses (i) or (xii) (or (xiii) to the extent it guarantees such Indebtedness) of Section 4.03(b), at the time of incurrence and after giving pro forma effect thereto (including a pro forma application of the net proceeds therefrom), the Consolidated Secured Debt Ratio would be no greater than 4.0 to 1.0; *provided further, however,* that the immediately preceding proviso shall not apply to any Lien which is deemed to be incurred under this clause (8) by reason of the second proviso to clause (22) of this definition of "Permitted Liens" (except to the extent such Lien also secures Indebtedness in addition to the Indebtedness permitted to be secured thereby under clause (22));

(9) Liens existing on the Issue Date including the Liens securing the Old Second Lien Notes and the guarantees in respect thereof (excluding, for the avoidance of doubt, Liens securing Bank Indebtedness Incurred or deemed Incurred pursuant to clause (i) of Section 4.03(b)) and Liens securing the Notes and the Note Guarantees;

29

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(10) Liens on assets, property or shares of stock of a Person at the time such Person becomes a Subsidiary; *provided*, *however*, that such Liens are not created or Incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided*, *further*, *however*, that such Liens may not extend to any other property owned by the Company or any Restricted Subsidiary (other than such Person becoming a Subsidiary and Subsidiaries of such Person);

(11) Liens on assets or property at the time the Company or a Restricted Subsidiary acquired the assets or property, including any acquisition by means of a merger, amalgamation or consolidation with or into the Company or any Restricted Subsidiary; *provided*, *however*, that such Liens (other than Liens to secure Indebtedness Incurred pursuant to clause (xv) of Section 4.03(b)) are not created or Incurred in connection with, or in contemplation of, such acquisition; *provided*, *further*, *however*, that the Liens (other than Liens to secure Indebtedness Incurred pursuant to clause (xv) of Section 4.03(b)) may not extend to any other property owned by the Company or any Restricted Subsidiary (other than pursuant to after acquired property clauses in effect with respect to such Lien at the time of acquisition on property of the type that would have been subject to such Lien notwithstanding the occurrence of such acquisition);

(12) Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Company or another Restricted Subsidiary permitted to be Incurred in accordance with Section 4.03;

(13) Liens securing Hedging Obligations not incurred in violation of this Indenture; *provided* that with respect to Hedging Obligations relating to Indebtedness, such Lien extends only to the property securing such Indebtedness;

(14) Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(15) licenses, sublicenses and leases and subleases of real property which do not materially interfere with the ordinary conduct of the business of the Company or any of the Restricted Subsidiaries;

(16) Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Company and the Restricted Subsidiaries in the ordinary course of business;

(17) Liens in favor of the Company or any Note Guarantor or Liens on assets of a Restricted Subsidiary of the Company that is not a Note Guarantor in favor solely of another Restricted Subsidiary of the Company that is not a Note Guarantor;

(18) Liens on accounts receivable and related assets of the type specified in the definition of "Receivables Financing" Incurred in connection with a Qualified Receivables Financing;

30

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(19) deposits made in the ordinary course of business to secure liability to insurance carriers;

(20) Liens on the Equity Interests of Unrestricted Subsidiaries;

(21) grants of software and other technology licenses in the ordinary course of business;

(22) Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6) (7), (8), (9), (10) and (11); *provided*, *however*, that (x) such new Lien shall be limited to all or part of the same property (including any after acquired property to the extent it would have been subject to the original Lien) that secured the original Lien (plus improvements on such property), and (y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), (9), (10) and (11) at the time the original Lien became a Permitted Lien under this Indenture, and (B) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement; *provided further, however,* that in the case of any Liens to secure any refinancing, refunding, extension or renewal of Indebtedness secured by a Lien referred to in clause (8), the principal amount of any Indebtedness Incurred for such refinancing, refunding, extension or renewal shall be deemed secured by a Lien under clause (8) and not this clause (22) for purposes of determining the principal amount of Indebtedness outstanding under clause (8) and for purposes of the definition of Secured Bank Indebtedness;

(23) Liens on equipment of the Company or any Restricted Subsidiary granted in the ordinary course of business to the Company's or such Restricted Subsidiary's client at which such equipment is located;

(24) judgment and attachment Liens not giving rise to an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(25) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with importation of goods;

(26) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(27) Liens securing insurance premium financing arrangements; *provided* that such Lien is limited to the applicable insurance carriers;

(28) Liens incurred to secure cash management services or to implement cash pooling arrangements in the ordinary course of business;

31

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(29) Liens arising by virtue of any statutory or common law provisions relating to banker's liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depository or financial institution;

(30) any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(31) any amounts held by a trustee in the funds and accounts under an indenture securing any revenue bonds issued for the benefit of the Company or any Restricted Subsidiary; and

(32) other Liens securing obligations in an aggregate principal amount not to exceed $30.0 million at any one time outstanding.

Any provider of additional extensions of credit shall be entitled to rely on the determination of an Officer that Liens incurred satisfy clause (8) above if such determination is set forth in an Officer's Certificate delivered to such provider; *provided, however,* that such determination will not affect whether such Lien actually was incurred as permitted by clause (8).

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"Preferred Stock" means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding up.

"Presumed Tax Rate" means the highest effective marginal statutory combined U.S. federal, state and local income tax rate prescribed for an individual residing in New York City (taking into account (i) the deductibility of state and local income taxes for U.S. federal income tax purposes, assuming the limitation of Section 68(a)(2) of the Code applies and taking into account any impact of Section 68(f) of the Code, and (ii) the character (long-term or short-term capital gain, dividend income or other ordinary income) of the applicable income).

"Purchase Money Note" means a promissory note of a Receivables Subsidiary evidencing a line of credit, which may be irrevocable, from the Company or any Subsidiary of the Company to a Receivables Subsidiary in connection with a Qualified Receivables Financing, which note is intended to finance that portion of the purchase price that is not paid by cash or a contribution of equity.

"Qualified Receivables Financing" means any Receivables Financing of a Receivables Subsidiary that meets the following conditions:

(1) the Board of Directors of the Company shall have determined in good faith that such Qualified Receivables Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Company and the Receivables Subsidiary;

32

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Bloomberg Law®

(2) all sales of accounts receivable and related assets to the Receivables Subsidiary are made at Fair Market Value (as determined in good faith by the Company); and

(3) the financing terms, covenants, termination events and other provisions thereof shall be market terms (as determined in good faith by the Company) and may include Standard Securitization Undertakings.

The grant of a security interest in any accounts receivable of the Company or any of the Restricted Subsidiaries (other than a Receivables Subsidiary) to secure Bank Indebtedness, Indebtedness in respect of the Notes or any Indebtedness Incurred to refinance the Notes shall not be deemed a Qualified Receivables Financing.

"Rating Agency" means (1) each of Moody's and S&P and (2) if Moody's or S&P ceases to rate the Notes for reasons outside of the Company's control, a "nationally recognized statistical rating organization" within the meaning of Rule 15c3-1(c)(2)(vi)(F) under the Exchange Act selected by the Company or any direct or indirect parent of the Company as a replacement agency for Moody's or S&P, as the case may be.

"Receivables Fees" means distributions or payments made directly or by means of discounts with respect to any participation interests issued or sold in connection with, and all other fees paid to a Person that is not a Restricted Subsidiary in connection with, any Receivables Financing.

"Receivables Financing" means any transaction or series of transactions that may be entered into by the Company or any of its Subsidiaries pursuant to which the Company or any of its Subsidiaries may sell, convey or otherwise transfer to (a) a Receivables Subsidiary (in the case of a transfer by the Company or any of its Subsidiaries); and (b) any other Person (in the case of a transfer by a Receivables Subsidiary), or may grant a security interest in, any accounts receivable (whether now existing or arising in the future) of the Company or any of its Subsidiaries, and any assets related thereto including, without limitation, all collateral securing such accounts receivable, all contracts and all guarantees or other obligations in respect of such accounts receivable, proceeds of such accounts receivable and other assets which are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving accounts receivable and any Hedging Obligations entered into by the Company or any such Subsidiary in connection with such accounts receivable.

"Receivables Repurchase Obligation" means any obligation of a seller of receivables in a Qualified Receivables Financing to repurchase receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, off-set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"Receivables Subsidiary" means a Wholly Owned Restricted Subsidiary (or another Person formed for the purposes of engaging in Qualified Receivables Financing with the Company in which the Company or any Subsidiary of the Company makes an Investment and to

33

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 40

which the Company or any Subsidiary of the Company transfers accounts receivable and related assets) which engages in no activities other than in connection with the financing of accounts receivable of the Company and its Subsidiaries, all proceeds thereof and all rights (contractual or other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the Board of Directors of the Company (as provided below) as a Receivables Subsidiary and:

(a) no portion of the Indebtedness or any other obligations (contingent or otherwise) of which (i) is guaranteed by the Company or any other Subsidiary of the Company (excluding guarantees of obligations (other than the principal of and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is recourse to or obligates the Company or any other Subsidiary of the Company in any way other than pursuant to Standard Securitization Undertakings, or (iii) subjects any property or asset of the Company or any other Subsidiary of the Company, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings;

(b) with which neither the Company nor any other Subsidiary of the Company has any material contract, agreement, arrangement or understanding other than on terms which the Company reasonably believes to be no less favorable to the Company or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Company; and

(c) to which neither the Company nor any other Subsidiary of the Company has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.

Any such designation by the Board of Directors of the Company shall be evidenced to the Trustee by filing with the Trustee a certified copy of the resolution of the Board of Directors of the Company giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing conditions.

"Registration Rights Agreement" means (a) with respect to the Original Notes issued on the Issue Date, (i) the Registration Rights Agreement, dated the Issue Date, among the Company, the Note Guarantors and Initial Purchasers and (ii) the Registration Rights Agreement, dated the Issue Date, among the Company, the Note Guarantors and the Sponsors, and (b) with respect to each issuance of Additional Notes issued in a transaction exempt from the registration requirements of the Securities Act, the registration rights agreement, if any, among the Company, the Note Guarantors and the Persons purchasing such Additional Notes.

"Restricted Investment" means an Investment other than a Permitted Investment.

"Restricted Subsidiary" means, with respect to any Person, any Subsidiary of such Person other than an Unrestricted Subsidiary of such Person. Unless otherwise indicated in this Indenture, all references to Restricted Subsidiaries shall mean Restricted Subsidiaries of the Company.

34

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 41

"Sale/Leaseback Transaction" means an arrangement relating to property now owned or hereafter acquired by the Company or a Restricted Subsidiary whereby the Company or a Restricted Subsidiary transfers such property to a Person and the Company or such Restricted Subsidiary leases it from such Person, other than leases between the Company and a Restricted Subsidiary or between Restricted Subsidiaries.

"S&P" means Standard & Poor's Ratings Group or any successor to the rating agency business thereof.

"SEC" means the Securities and Exchange Commission.

"Second Priority Lien" means (i) the Liens securing the Obligations of the Company and the Note Guarantors in respect of the Notes and this Indenture and (ii) any Other Second Priority Obligations.

"Secured Bank Indebtedness" means any Bank Indebtedness that is secured by a Permitted Lien incurred or deemed incurred pursuant to clause (8) of the definition of "Permitted Lien."

"Secured Indebtedness" means any Indebtedness secured by a Lien.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security Documents" means the security agreements (including the Collateral Agreement), pledge agreements, collateral assignments, mortgages and related agreements entered into in connection with the occurrence of the Springing Lien Trigger Date, creating the security interests in the Collateral as contemplated by this Indenture, in each case as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified from time to time thereafter.

"Significant Subsidiary" means any Restricted Subsidiary that would be a "Significant Subsidiary" of the Company within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC.

"Similar Business" means a business, the majority of whose revenues are derived from the activities of the Company and its Subsidiaries as of the Issue Date or any business or activity that is reasonably similar or complementary thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

"Sponsors" means (1) Apollo Management, L.P., one or more investment funds controlled by Apollo Management, L.P. and any of their respective Affiliates (collectively, the "Apollo Sponsors") and (2) any Person that forms a group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) with any Apollo Sponsors, *provided* that any Apollo Sponsor (x) owns a majority of the voting power and (y) controls a majority of the Board of Directors of the Company.

35

"Springing Lien Trigger Date" shall mean the date that is the earlier of (i) 30 days following the date upon which there are no restrictions on the Incurrence of Secured Indebtedness under the Old Second Lien Notes (including through the retirement or discharge of such notes) so long as, on such date, the grant of a security interest in the assets and property of the Company and the Note Guarantors to secure the Notes is permitted under the agreements governing the First Priority Obligations outstanding on such date (and, if not so permitted on such date, the Springing Lien Trigger Date shall be the earliest date thereafter on which such grant of a security interest in such assets to secure the Notes is permitted under all agreements governing outstanding First Priority Obligations), (ii) the date on which the Company or any Note Guarantors Incurs any Secured Indebtedness (other than First Priority Obligations) secured by junior priority Liens on the collateral securing First Priority Obligations and (iii) a date designated by the Company in its sole discretion.

"Standard Securitization Undertakings" means representations, warranties, covenants, indemnities and guarantees of performance entered into by the Company or any Subsidiary of the Company which the Company has determined in good faith to be customary in a Receivables Financing including without limitation, those relating to the servicing of the assets of a Receivables Subsidiary, it being understood that any Receivables Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency beyond the control of the issuer unless such contingency has occurred).

"Stock and Asset Purchase Agreement" means the Stock and Asset Purchase Agreement, dated as of September 14, 2006, between General Electric and Momentive Performance Materials Holdings Inc., a Delaware corporation, as amended, supplemented or modified from time to time prior to the Issue Date or thereafter (so long as any amendment, supplement or modification after the Issue Date, together with all other amendments, supplements and modifications after the Issue Date, taken as a whole, is not more disadvantageous to the Holders of the Notes in any material respect than the Stock and Asset Purchase Agreement as in effect on the Issue Date).

"Subordinated Indebtedness" means (a) with respect to the Company, any Indebtedness of the Company which is by its terms subordinated in right of payment to the Notes, and (b) with respect to any Note Guarantor, any Indebtedness of such Note Guarantor which is by its terms subordinated in right of payment to its Note Guarantee.

"Subsidiary" means, with respect to any Person, (1) any corporation, association or other business entity (other than a partnership, joint venture or limited liability company) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, and (2) any

36

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 43

partnership, joint venture or limited liability company of which (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (y) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"Tax Distributions" means any distributions described in Section 4.04(b)(xii).

"TIA" means the Trust Indenture Act of 1939 (15 U.S.C. Sections 77aaa-77bbbb) as in effect on the date of this Indenture.

"Total Assets" means the total consolidated assets of the Company and the Restricted Subsidiaries, as shown on the most recent balance sheet of the Company.

"Transactions" refers collectively to (1) the offering of the Original Notes, (2) the Cash Tender Offers described under the heading "Summary" in the Offering Memorandum, (3) if necessary, discharge or the redemption of any remaining Old Senior Notes, (4) the transaction described in the Offering Memorandum under the heading "Summary—Apollo Notes Exchange" and (5) the use of the proceeds of the offering of the Original Notes as described in further detail under the heading "Use of proceeds" in the Offering Memorandum.

"Treasury Rate" means, as of the applicable redemption date, the yield to maturity as of such redemption date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to such redemption date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such redemption date to January 15, 2016; *provided*, *however*, that if no published maturity exactly corresponds with such date, then the Treasury Rate shall be interpolated or extrapolated on a straight-line basis from the arithmetic mean of the yields for the next shortest and next longest published maturities; *provided further, however,* that if the period from such redemption date to January 15, 2016 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"Trust Officer" means:

(1) any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject, and

(2) who shall have direct responsibility for the administration of this Indenture.

37

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 44

"Trustee" means the party named as such in this Indenture until a successor replaces it and, thereafter, means the successor.

"Uniform Commercial Code" means the New York Uniform Commercial Code as in effect from time to time.

"Unrestricted Cash" means cash or Cash Equivalents of the Company or any of its Restricted Subsidiaries that would not appear as "restricted" on a consolidated balance sheet of the Company or any of its Restricted Subsidiaries.

"Unrestricted Subsidiary" means:

(1) any Subsidiary of the Company that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors of such Person in the manner provided below; and

(2) any Subsidiary of an Unrestricted Subsidiary.

The Board of Directors of the Company may designate any Subsidiary of the Company (including any newly acquired or newly formed Subsidiary of the Company) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the Subsidiary to be so designated; *provided, however*, that the Subsidiary to be so designated and its Subsidiaries do not at the time of designation have and do not thereafter Incur any Indebtedness pursuant to which the lender has recourse to any of the assets of the Company or any of the Restricted Subsidiaries; *provided*, *further*, *however*, that either:

(a) the Subsidiary to be so designated has total consolidated assets of $1,000 or less; or

(b) if such Subsidiary has consolidated assets greater than $1,000, then such designation would be permitted under Section 4.04.

The Board of Directors of the Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided, however*, that immediately after giving effect to such designation:

(x) (1) the Company could Incur $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a) or (2) the Fixed Charge Coverage Ratio for the Company and the Restricted Subsidiaries would be greater than such ratio for the Company and the Restricted Subsidiaries immediately prior to such designation, in each case on a pro forma basis taking into account such designation, and

(y) no Event of Default shall have occurred and be continuing.

Any such designation by the Board of Directors of the Company shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the resolution of the Board of Directors of

38

the Company giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

Notwithstanding anything to the contrary herein, and without any further condition, qualification or action hereunder, Subsidiaries designated as Unrestricted Subsidiaries as of the Issue Date under the indentures for the Existing Notes will be Unrestricted Subsidiaries.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness or Disqualified Stock, as the case may be, at any date, the quotient obtained by dividing (1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock multiplied by the amount of such payment, by (2) the sum of all such payments.

"Wholly Owned Restricted Subsidiary" is any Wholly Owned Subsidiary that is a Restricted Subsidiary.

"Wholly Owned Subsidiary" of any Person means a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares required to be held by Foreign Subsidiaries) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

SECTION 1.02. Other Definitions.

| Term | Defined in Section |
|---|---|
| "Additional Interest" | Appendix A |
| "Affiliate Transaction" | 4.07(a) |
| "Appendix" | Preamble |
| "Asset Sale Offer" | 4.06(b) |
| "Bankruptcy Law" | 6.01 |
| "Change of Control Offer" | 4.08(b) |
| "Clearstream" | Appendix A |
| "covenant defeasance option" | 8.01(c) |
| "Custodian" | 6.01 |
| "Definitive Note" | Appendix A |
| "Depository" | Appendix A |
| "Euroclear" | Appendix A |
| "Excess Proceeds" | 4.06(b) |
| "Exchange Notes" | Preamble |
| "Global Notes Legend" | Appendix A |
| "Guaranteed Obligations" | 12.01(a) |

39

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 46

| Term | Defined in Section |
|------|--------------------|
| "IAI" | Appendix A |
| "incorporated provision" | 13.01 |
| "Initial Notes" | Preamble |
| "Initial Purchasers" | Appendix A |
| "legal defeasance option" | 8.01(c) |
| "Notes" | Preamble |
| "Notes Custodian" | Appendix A |
| "Notice of Default" | 6.01 |
| "Offer Period" | 4.06(d) |
| "Original Notes" | Preamble |
| "Paying Agent" | 2.04(a) |
| "Private Exchange" | Appendix A |
| "Private Exchange Note" | Appendix A |
| "protected purchaser" | 2.08 |
| "Purchase Agreement" | Appendix A |
| "QIB" | Appendix A |
| "Refinancing Indebtedness" | 4.03(b) |
| "Refunding Capital Stock" | 4.04(b) |
| "Registered Exchange Offer" | Appendix A |
| "Registrar" | 2.04(a) |
| "Regulation S" | Appendix A |
| "Regulation S Notes" | Appendix A |
| "Restricted Notes Legend" | Appendix A |
| "Restricted Payments" | 4.04(a) |
| "Restricted Period" | Appendix A |
| "Retired Capital Stock" | 4.04(b) |
| "Reversion Date" | 4.17(b) |
| "Rule 144A" | Appendix A |
| "Rule 144A Notes" | Appendix A |
| "Rule 501" | Appendix A |
| "Shelf Registration Statement" | Appendix A |
| "Successor Company" | 5.01(a) |
| "Successor Note Guarantor" | 5.01(b) |
| "Suspended Covenants" | 4.17(a) |
| "Suspension Period" | 4.17(b) |
| "Suspension Date" | 4.17(a) |
| "Transfer" | 5.01(b) |
| "Transfer Restricted Definitive Notes" | Appendix A |
| "Transfer Restricted Global Notes" | Appendix A |
| "Unrestricted Definitive Notes" | Appendix A |
| "Unrestricted Global Notes" | Appendix A |

40

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 47

SECTION 1.03. <u>Incorporation by Reference of Trust Indenture Act</u>. This Indenture incorporates by reference certain provisions of the TIA. The following TIA terms have the following meanings:

"Commission" means the SEC.

"indenture securities" means the Notes and the Note Guarantees.

"indenture security holder" means a Holder.

"indenture to be qualified" means this Indenture.

"indenture trustee" or "institutional trustee" means the Trustee.

"obligor" on the indenture securities means the Company, the Guarantors and any other obligor on the Notes.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule have the meanings assigned to them by such definitions.

SECTION 1.04. <u>Rules of Construction</u>. Unless the context otherwise requires:

(a) a term has the meaning assigned to it;

(b) an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c) "or" is not exclusive;

(d) "including" means including without limitation;

(e) words in the singular include the plural and words in the plural include the singular;

(f) unsecured Indebtedness shall not be deemed to be subordinate or junior to Secured Indebtedness merely by virtue of its nature as unsecured Indebtedness;

(g) the principal amount of any non-interest bearing or other discount security at any date shall be the principal amount thereof that would be shown on a balance sheet of the issuer dated such date prepared in accordance with GAAP;

(h) the principal amount of any Preferred Stock shall be (i) the maximum liquidation value of such Preferred Stock or (ii) the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock, whichever is greater;

(i) unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP;

41

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(j) "$" and "U.S. Dollars" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts and "€" and "euro" each refer to the single currency of participating member states of the European Union that at the time of payment is legal tender for payment of public and private debts; and

(k) whenever in this Indenture or the Notes there is mentioned, in any context, principal, interest or any other amount payable under or with respect to any Notes, such mention shall be deemed to include mention of the payment of Additional Interest, to the extent that, in such context, Additional Interest are, were or would be payable in respect thereof.

ARTICLE II

The Notes

SECTION 2.01. <u>Amount of Notes</u>. The aggregate principal amount of Original Dollar Notes which may be authenticated and delivered under this Indenture on the Issue Date is $1,160,687,000 (including Dollar Notes issued pursuant to an exchange with the Sponsors). All Dollar Notes shall be substantially identical except as to denomination. The aggregate principal amount of Original Euro Notes which may be authenticated and delivered under this Indenture on the Issue Date is €150,000,000. All Euro Notes shall be substantially identical except as to denomination.

The Company may from time to time after the Issue Date issue Additional Notes under this Indenture in an unlimited principal amount, so long as (i) the Incurrence of the Indebtedness represented by such Additional Notes is at such time permitted by Section 4.03 and (ii) such Additional Notes are issued in compliance with the other applicable provisions of this Indenture. With respect to any Additional Notes issued after the Issue Date (except for Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.07, 2.08, 2.09, 2.10, 3.08, 4.06(e), 4.08(c) or the Appendix), there shall be (a) established in or pursuant to a resolution of the Board of Directors of the Company and (b) (i) set forth or determined in the manner provided in an Officer's Certificate or (ii) established in one or more indentures supplemental hereto, prior to the issuance of such Additional Notes:

(1) the aggregate principal amount of such Additional Notes which may be authenticated and delivered under this Indenture,

(2) the issue price and issuance date of such Additional Notes, including the date from which interest on such Additional Notes shall accrue;

(3) if applicable, that such Additional Notes shall be issuable in whole or in part in the form of one or more Global Notes and, in such case, the respective depositaries for such Global Notes, the form of any legend or legends which shall be borne by such Global Notes in addition to or in lieu of those set forth in Exhibit A-1 and Exhibit A-2 hereto, as applicable, and any circumstances in addition to or in lieu of those set forth in Section 2.2 of the Appendix in which any such Global Note may be exchanged in whole or in part for Additional Notes registered, or any transfer of such

42

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 49

Global Note in whole or in part may be registered, in the name or names of Persons other than the depositary for such Global Note or a nominee thereof; and

(4) if applicable, that such Additional Notes that are not Transfer Restricted Definitive Notes shall not be issued in the form of Initial Notes as set forth in Exhibit A-1 (in the case of Dollar Notes) and Exhibit A-2 (in the case of Euro Notes), but shall be issued in the form of Exchange Notes as set forth in Exhibit B-1 (in the case of Dollar Notes) and Exhibit B-2 (in the case of Euro Notes).

If any of the terms of any Additional Notes are established by action taken pursuant to a resolution of the Board of Directors of the Company, a copy of an appropriate record of such action shall be certified by the Secretary or any Assistant Secretary of the Company and delivered to the Trustee at or prior to the delivery of the Officer's Certificate or the indenture supplemental hereto setting forth the terms of the Additional Notes.

The Dollar Notes, the Euro Notes and any Additional Notes, shall all be treated as a single class for all purposes under this Indenture, including, without limitation, waivers, amendments, redemptions and offers to purchase.

SECTION 2.02. Form and Dating. Provisions relating to the Initial Notes and the Exchange Notes are set forth in the Appendix, which is hereby incorporated in and expressly made a part of this Indenture. The (i) Initial Notes and the Trustee's certificate of authentication and (ii) any Additional Notes (if issued as Transfer Restricted Definitive Notes) and the Trustee's certificate of authentication shall each be substantially in the form of Exhibit A-1 (in the case of the Dollar Notes) and Exhibit A-2 (in the case of the Euro Notes) hereto, which is hereby incorporated in and expressly made a part of this Indenture. The (i) Exchange Notes and the Trustee's certificate of authentication and (ii) any Additional Notes issued other than as Transfer Restricted Definitive Notes and the Trustee's certificate of authentication shall each be substantially in the form of Exhibit B-1 hereto (in the case of Dollar Notes) and Exhibit B-2 hereto (in the case of Euro Notes), which is hereby incorporated in and expressly made a part of this Indenture. The Notes may have notations, legends or endorsements required by law, stock exchange rule, agreements to which the Company or any Note Guarantor is subject, if any, or usage (provided that any such notation, legend or endorsement is in a form acceptable to the Company). Each Note shall be dated the date of its authentication. The Dollar Notes shall be issuable only in registered form without interest coupons and in denominations of $2,000 and any integral multiples of $1,000 in excess thereof, provided that the Dollar Notes may be issued in denominations of less than $1,000 solely to accommodate the book-entry positions that have any been created by the Depository in denominations of less than $1,000. The Euro Notes shall be issuable only in registered form without interest coupons and in denominations of €100,000 and any integral multiples of €1,000 in excess thereof, provided that the Euro Notes may be issued in denominations of less than €1,000 solely to accommodate book-entry positions that have been created by Euroclear or Clearstream in denominations of less than €1,000.

SECTION 2.03. Execution and Authentication. The Trustee shall authenticate and make available for delivery upon a written order of the Company signed by one Officer (a) Original Dollar Notes for original issue on the date hereof in an aggregate principal amount of $1,160,687,000, (b) Original Euro Notes for original issue on the date hereof in an aggregate

43

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 50

principal amount of €150,000,000, (c) subject to the terms of this Indenture, Additional Notes in an aggregate principal amount to be determined at the time of issuance and specified therein and (d) as applicable, the Exchange Notes for issue in a Registered Exchange Offer pursuant to the Registration Rights Agreement for a like principal amount of Initial Notes exchanged pursuant thereto or otherwise pursuant to an effective registration statement under the Securities Act. Such order shall specify the amount of the Notes to be authenticated, the date on which the original issue of Notes is to be authenticated and whether the Notes are to be Initial Notes or Exchange Notes. Notwithstanding anything to the contrary in this Indenture or the Appendix, (x) any issuance of Additional Dollar Notes after the Issue Date shall be in a principal amount of at least $2,000 and integral multiples of $1,000 in excess of $2,000 and (y) any issuance of Additional Euro Notes after the Issue Date shall be in a principal amount of at least €100,000 and integral multiples of €1,000 in excess of €100,000.

One Officer shall sign the Notes for the Company by manual or facsimile signature.

If an Officer whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

A Note shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Note. The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee may appoint one or more authenticating agents reasonably acceptable to the Company to authenticate the Notes. The Trustee hereby appoints The Bank of New York Mellon, London Branch as authenticating agent for the Euro Notes and the Company agrees to such appointment. Any such appointment (other than as set forth above) shall be evidenced by an instrument signed by a Trust Officer, a copy of which shall be furnished to the Company. Unless limited by the terms of such appointment, an authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as any Registrar, Paying Agent or agent for service of notices and demands.

SECTION 2.04. Registrar and Paying Agent. (a) The Company shall maintain (i) one or more paying agents (each, a "Paying Agent") for the Notes in the United States of America in respect of the Dollar Notes and in the City of London in respect of the Euro Notes, in each case where Notes may be presented for payment and (ii) a registrar (the "Registrar") with offices in the United States of America in respect of the Dollar Notes and in the City of London in respect of the Euro Notes, in each case where the Notes may be presented for registration of transfer or for exchange. If and for as long as the Euro Notes are listed on the Official List of the Luxembourg Stock Exchange and traded on the Euro MTF Market, the Company will also maintain a Paying Agent and a Registrar in Luxembourg. The Registrar shall keep a register of the Notes and of their transfer and exchange. The Company may have one or more additional co-registrars and one or more additional paying agents. The term "Registrar" includes the Registrar and any additional co-registrars. The term "Paying Agent" includes the Paying Agent and any additional paying agents. The Company initially appoints the Trustee as Registrar, Paying Agent and the Notes Custodian with respect to the Global Notes representing Dollar Notes. The Company initially appoints The Bank of New York Mellon, London Branch as

44

Registrar, Paying Agent and the Notes Custodian with respect to the Global Notes representing Euro Notes. The Company and The Bank of New York Mellon, London Branch have entered into a Paying Agency Agreement dated as of the Issue Date.

(b) The Company may enter into an appropriate agency agreement with any Registrar or Paying Agent not a party to this Indenture, which shall incorporate the terms of the TIA. The agreement shall implement the provisions of this Indenture that relate to such agent. The Company shall notify the Trustee of the name and address of any such agent. If the Company fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.07. The Company or any of its Wholly Owned Subsidiaries may act as Paying Agent or Registrar.

(c) The Company may remove any Registrar or Paying Agent upon written notice to such Registrar or Paying Agent and to the Trustee; *provided*, *however*, that no such removal shall become effective until (i) if applicable, acceptance of an appointment by a successor as evidenced by an appropriate agreement entered into by the Company and such successor Registrar or Paying Agent, as the case may be, and delivered to the Trustee or (ii) notification to the Trustee that the Trustee shall serve as Registrar or Paying Agent until the appointment of a successor in accordance with clause (i) above. The Registrar or Paying Agent may resign at any time upon written notice to the Company and the Trustee; *provided*, *however*, that the Trustee may resign as Paying Agent or Registrar only if the Trustee also resigns as Trustee in accordance with Section 7.08.

SECTION 2.05. Paying Agent to Hold Money in Trust. Prior to each due date of the principal of and interest on any Note, the Company shall deposit with each Paying Agent (or if the Company or a Wholly Owned Subsidiary is acting as Paying Agent, segregate and hold in trust for the benefit of the Persons entitled thereto) a sum sufficient to pay such principal and interest when so becoming due. The Company shall require each Paying Agent (other than the Trustee) to agree in writing that a Paying Agent shall hold in trust for the benefit of Holders or the Trustee all money held by a Paying Agent for the payment of principal of and interest on the Notes, and shall notify the Trustee of any default by the Company in making any such payment. If the Company or a Wholly Owned Subsidiary acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it in trust for the benefit of the Persons entitled thereto. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by such Paying Agent. Upon complying with this Section, a Paying Agent shall have no further liability for the money delivered to the Trustee.

SECTION 2.06. Holder Lists. The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Holders. If the Trustee is not the Registrar, the Company shall furnish, or cause the Registrar to furnish, to the Trustee, in writing annually at least five Business Days before December 4 and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Holders.

SECTION 2.07. Transfer and Exchange. The Notes shall be issued in registered form and shall be transferable only upon the surrender of a Note for registration of transfer and in compliance with the Appendix. When a Note is presented to the Registrar with a request to

45

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

// PAGE 52

register a transfer, the Registrar shall register the transfer as requested if its requirements therefor are met. When Notes are presented to the Registrar with a request to exchange them for an equal principal amount of Notes of the same type of other denominations, the Registrar shall make the exchange as requested if the same requirements are met. To permit registration of transfers and exchanges, the Company shall execute and the Trustee shall authenticate Notes at the Registrar's request. The Company may require payment of a sum sufficient to pay all taxes, assessments or other governmental charges in connection with any transfer or exchange pursuant to this Section. The Company shall not be required to make, and the Registrar need not register, transfers or exchanges of Notes selected for redemption (except, in the case of Notes to be redeemed in part, the portion thereof not to be redeemed) or of any Notes for a period of 15 days before a selection of Notes to be redeemed.

Prior to the due presentation for registration of transfer of any Notes, the Company, the Note Guarantors, the Trustee, the Paying Agent and the Registrar may deem and treat the Person in whose name a Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest, if any, on such Note and for all other purposes whatsoever, whether or not such Note is overdue, and none of the Company, any Note Guarantor, the Trustee, the Paying Agent or the Registrar shall be affected by notice to the contrary.

Any Holder of a beneficial interest in a Global Note shall, by acceptance of such beneficial interest, agree that transfers of beneficial interests in such Global Note may be effected only through a book-entry system maintained by (a) the Holder of such Global Note (or its agent) or (b) any Holder of a beneficial interest in such Global Note, and that ownership of a beneficial interest in such Global Note shall be required to be reflected in a book entry.

All Notes issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such transfer or exchange.

SECTION 2.08. Replacement Notes. If a mutilated Note is surrendered to the Registrar or if the Holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Company shall issue and the Trustee shall authenticate a replacement Note of the same type if the requirements of Section 8-405 of the Uniform Commercial Code are met, such that the Holder (a) satisfies the Company or the Trustee within a reasonable time after such Holder has notice of such loss, destruction or wrongful taking and the Registrar does not register a transfer prior to receiving such notification, (b) makes such request to the Company or the Trustee prior to the Note being acquired by a protected purchaser as defined in Section 8-303 of the Uniform Commercial Code (a "protected purchaser") and (c) satisfies any other reasonable requirements of the Trustee. If required by the Trustee or the Company, such Holder shall furnish an indemnity bond sufficient in the judgment of the Trustee or the Company to protect the Company, the Trustee, a Paying Agent and the Registrar from any loss that any of them may suffer if a Note is replaced. The Company and the Trustee may charge the Holder for their expenses in replacing a Note (including without limitation, attorneys' fees and disbursements in replacing such Note). In the event any such mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Company in its discretion may pay such Note instead of issuing a new Note in replacement thereof. Any mutilated, defaced, destroyed, lost or stolen Euro Notes may also be surrendered at the office of the Luxembourg Paying Agent.

46

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 53

Every replacement Note is an additional obligation of the Company.

The provisions of this Section 2.08 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, lost, destroyed or wrongfully taken Notes.

SECTION 2.09. Outstanding Notes. Notes outstanding at any time are all Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation and those described in this Section as not outstanding. Subject to Section 13.06, a Note does not cease to be outstanding because the Company or an Affiliate of the Company holds the Note.

If a Note is replaced pursuant to Section 2.08 (other than a mutilated Note surrendered for replacement), it ceases to be outstanding unless the Trustee and the Company receive proof satisfactory to them that the replaced Note is held by a protected purchaser. A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to Section 2.08.

If a Paying Agent segregates and holds in trust, in accordance with this Indenture, on a redemption date or maturity date money sufficient to pay all principal and interest payable on that date with respect to the Notes (or portions thereof) to be redeemed or maturing, as the case may be, and no Paying Agent is prohibited from paying such money to the Holders on that date pursuant to the terms of this Indenture, then on and after that date such Notes (or portions thereof) cease to be outstanding and interest on them ceases to accrue.

SECTION 2.10. Temporary Notes. In the event that Definitive Notes are to be issued under the terms of this Indenture, until such Definitive Notes are ready for delivery, the Company may prepare and the Trustee shall authenticate temporary Notes. Temporary Notes shall be substantially in the form of Definitive Notes of the appropriate type but may have variations that the Company considers appropriate for temporary Notes. Without unreasonable delay, the Company shall prepare and the Trustee shall authenticate Definitive Notes of the same type and make them available for delivery in exchange for temporary Notes upon surrender of such temporary Notes at the office or agency of the Company, without charge to the Holder. Until such exchange, temporary Notes shall be entitled to the same rights, benefits and privileges as Definitive Notes.

SECTION 2.11. Cancellation. The Company at any time may deliver Notes to the Trustee for cancellation. The Registrar and each Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment or cancellation and shall dispose of canceled Notes in accordance with its customary procedures. The Company may not issue new Notes to replace Notes it has redeemed, paid or delivered to the Trustee for cancellation. The Trustee shall not authenticate Notes in place of canceled Notes other than pursuant to the terms of this Indenture.

SECTION 2.12. Defaulted Interest. If the Company defaults in a payment of interest on the Notes, the Company shall pay the defaulted interest then borne by the Notes (plus interest on such defaulted interest to the extent lawful) in any lawful manner. The Company may

47

pay the defaulted interest to the Persons who are Holders on a subsequent special record date. The Company shall fix or cause to be fixed any such special record date and payment date to the reasonable satisfaction of the Trustee and shall promptly deliver or cause to be delivered to each affected Holder a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 2.13. <u>CUSIP Numbers, ISINs, etc</u>. The Company in issuing the Notes may use CUSIP numbers, ISINs and "Common Code" numbers (if then generally in use) and, if so, the Trustee shall use CUSIP numbers, ISINs and "Common Code" numbers in notices of redemption as a convenience to Holders; *provided*, *however*, that any such notice may state that no representation is made as to the correctness of such numbers, either as printed on the Notes or as contained in any notice of a redemption that reliance may be placed only on the other identification numbers printed on the Notes and that any such redemption shall not be affected by any defect in or omission of such numbers. The Company shall advise the Trustee of any change in the CUSIP numbers, ISINs and "Common Code" numbers.

SECTION 2.14. <u>Calculation of Principal Amount of Notes</u>. The aggregate principal amount of the Notes, at any date of determination, shall be the principal amount of the Notes at such date of determination. With respect to any matter requiring consent, waiver, approval or other action of the Holders of a specified percentage of the principal amount of all the Notes, such percentage shall be calculated, on the relevant date of determination, by dividing (a) the principal amount, as of such date of determination, of Notes, the Holders of which have so consented, by (b) the aggregate principal amount, as of such date of determination, of the Notes then outstanding, in each case, as determined in accordance with the preceding sentence, Section 2.09, Section 13.06 and Section 13.17 of this Indenture. Any such calculation made pursuant to this Section 2.14 shall be made by the Company and delivered to the Trustee pursuant to an Officer's Certificate.

ARTICLE III

Redemption

SECTION 3.01. <u>Redemption</u>. The Notes may be redeemed, in whole, or from time to time in part, subject to the conditions and at the redemption prices set forth in paragraph 5 of the form of Notes set forth in Exhibit A-1, Exhibit A-2, Exhibit B-1 and Exhibit B-2 hereto, which are hereby incorporated by reference and made a part of this Indenture, together with accrued and unpaid interest to the redemption date.

SECTION 3.02. <u>Applicability of Article</u>. Redemption of Notes at the election of the Company or otherwise, as permitted or required by any provision of this Indenture, shall be made in accordance with such provision and this Article.

SECTION 3.03. <u>Notices to Trustee</u>. If the Company elects to redeem Dollar Notes and/or Euro Notes pursuant to the optional redemption provisions of paragraph 5 of the applicable Note, it shall notify the Trustee in writing of (i) the Section of this Indenture pursuant to which the redemption shall occur, (ii) the redemption date, (iii) the principal amount of Dollar Notes or Euro Notes, as the case may be, to be redeemed and (iv) the redemption price. The

48

Company shall give notice to the Trustee provided for in this paragraph at least 40 days but not more than 60 days before a redemption date if the redemption is pursuant to paragraph 5 of the applicable Note, unless a shorter period is acceptable to the Trustee. Such notice shall be accompanied by an Officer's Certificate and Opinion of Counsel from the Company to the effect that such redemption will comply with the conditions herein. If fewer than all the Notes are to be redeemed, the record date relating to such redemption shall be selected by the Company and given to the Trustee, which record date shall be not fewer than 15 days after the date of notice to the Trustee. Any such notice may be canceled at any time prior to notice of such redemption being delivered to any Holder and shall thereby be void and of no effect.

SECTION 3.04. <u>Selection of Notes to Be Redeemed</u>. In the case of any partial redemption of Dollar Notes and/or Euro Notes, the Trustee will select the Notes of such series to be redeemed on a pro rata basis to the extent practicable; *provided* that no Dollar Notes of $2,000 or less and no Euro Notes of €100,000 or less shall be redeemed in part. The Trustee shall make the selection from outstanding Notes not previously called for redemption. The Trustee may select for redemption portions of the principal of Dollar Notes that have denominations larger than $2,000 or Euro Notes that have denominations larger than €100,000. Dollar Notes and portions of them the Trustee selects shall be in amounts of $2,000 or any integral multiple of $1,000. Euro Notes and portions of them the Trustee selects shall be in amounts of €100,000 or any integral multiple of €1,000. Provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption. The Trustee shall notify the Company promptly of the Notes or portions of Notes to be redeemed.

SECTION 3.05. <u>Notice of Optional Redemption</u>. (a) At least 30 days but not more than 60 days before a redemption date pursuant to paragraph 5 of the applicable Note, the Company shall deliver or cause to be delivered by electronic transmission or mailed by first-class mail a notice of redemption to each Holder whose Notes are to be redeemed.

Any such notice shall identify the Notes to be redeemed and shall state:

(i) the redemption date;

(ii) the redemption price and the amount of accrued interest to the redemption date;

(iii) the name and address of the applicable Paying Agent;

(iv) that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price, plus accrued interest;

(v) if fewer than all the outstanding Notes are to be redeemed, the certificate numbers and principal amounts of the particular Notes to be redeemed, the aggregate principal amount of Notes to be redeemed and the aggregate principal amount of Notes to be outstanding after such partial redemption;

(vi) that, unless the Company defaults in making such redemption payment or the Paying Agent is prohibited from making such payment pursuant to the terms of this

49

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 56

Indenture, interest on Notes (or portion thereof) called for redemption ceases to accrue on and after the redemption date;

(vii) the CUSIP number, ISIN and/or "Common Code", if any, printed on the Notes being redeemed; and

(viii) that no representation is made as to the correctness or accuracy of the CUSIP number, ISIN and/or "Common Code", if any, listed in such notice or printed on the Notes.

(b) When and so long as the Euro Notes are listed on the Official List of the Luxembourg Stock Exchange and may be traded on the Luxembourg Stock Exchange's Euro MTF Market and the rules of the Luxembourg Stock Exchange so require, the Company will inform the Luxembourg Stock Exchange of any such redemption and will publish a notice regarding such redemption in a leading newspaper having a general circulation in Luxembourg (which is expected to be *d'Wort*) or on the Luxembourg Stock Exchange's website, *www.bourse.lu.*

(c) At the Company's request, the Trustee shall give the notice of redemption in the Company's name and at the Company's expense. In such event, the Company shall provide the Trustee with the information required by this Section at least one Business Day prior to the date such notice is to be provided to Holders and such notice may not be canceled.

SECTION 3.06. <u>Effect of Notice of Redemption</u>. Once notice of redemption is delivered in accordance with Section 3.05, Notes called for redemption become due and payable on the redemption date and at the redemption price stated in the notice, except as provided in the final sentence of paragraph 5 of the Notes. Upon surrender to the Paying Agent, such Notes shall be paid at the redemption price stated in the notice, plus accrued interest, to, but not including, the redemption date; *provided*, *however*, that if the redemption date is after a regular record date and on or prior to the interest payment date, the accrued interest shall be payable to the Holder of the redeemed Notes registered on the relevant record date. Failure to give notice or any defect in the notice to any Holder shall not affect the validity of the notice to any other Holder.

SECTION 3.07. <u>Deposit of Redemption Price</u>. With respect to any Notes, prior to 10:00 a.m., New York City time, on the redemption date, the Company shall deposit with the Paying Agent (or, if the Company or a Wholly Owned Subsidiary is the Paying Agent, shall segregate and hold in trust) money sufficient to pay the redemption price of and accrued interest on all Notes or portions thereof to be redeemed on that date other than Notes or portions of Notes called for redemption that have been delivered by the Company to the Trustee for cancellation. On and after the redemption date, interest shall cease to accrue on Notes or portions thereof called for redemption so long as the Company has deposited with the Paying Agent funds sufficient to pay the principal of, plus accrued and unpaid interest on, the Notes to be redeemed.

SECTION 3.08. <u>Notes Redeemed in Part.</u> Upon surrender of a Note that is redeemed in part, the Company shall execute and the Trustee shall authenticate for the Holder (at the Company's expense) a new Note equal in principal amount to the unredeemed portion of the Note surrendered.

50

Bloomberg Law®          © 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 57

## ARTICLE IV

### Covenants

SECTION 4.01. <u>Payment of Notes</u>. The Company shall promptly pay the principal of and interest on the Notes on the dates and in the manner provided in the Notes and in this Indenture. An installment of principal of or interest shall be considered paid on the date due if on such date the Trustee or the Paying Agent holds, as of 12:00 p.m. New York City time with respect to the Dollar Notes and as of 12:00 p.m. London time with respect to the Euro Notes, money sufficient to pay all principal and interest then due and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the Holders on that date pursuant to the terms of this Indenture.

The Company shall pay interest on overdue principal at the rate specified therefor in the Notes, and it shall pay interest on overdue installments of interest at the same rate borne by the Notes to the extent lawful.

SECTION 4.02. <u>Reports and Other Information</u>. Notwithstanding that the Company may not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or otherwise report on an annual and quarterly basis on forms provided for such annual and quarterly reporting pursuant to rules and regulations promulgated by the SEC, the Company shall file with the SEC (and provide the Trustee and Holders with copies thereof, without cost to each Holder, within 15 days after it files them with the SEC),

(i) within 90 days after the end of each fiscal year (or such shorter period as may be required by the SEC, or such longer period as may be permitted by Rule 12b-25 of the Exchange Act), annual reports on Form 10-K (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form),

(ii) within 45 days after the end of each of the first three fiscal quarters of each fiscal year (or such shorter period as may be required by the SEC, or such longer period as may be permitted by Rule 12b-25 of the Exchange Act), reports on Form 10-Q (or any successor or comparable form),

(iii) promptly from time to time after the occurrence of an event required to be therein reported (and in any event within the time period specified for filing current reports on Form 8-K by the SEC), such other reports on Form 8-K (or any successor or comparable form), and

(iv) any other information, documents and other reports which the Company would be required to file with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act;

*provided*, *however*, that the Company shall not be so obligated to file such reports with the SEC if the SEC does not permit such filing, in which event the Company shall make available such information to prospective purchasers of Notes, including by posting such reports on the primary website of the Company or its Subsidiaries in addition to providing such information to the

51

Trustee and the Holders, in each case within 15 days after the time the Company would be required to file such information with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act.

(b) In the event that:

(i) the rules and regulations of the SEC permit the Company and any direct or indirect parent of the Company to report at such parent entity's level on a consolidated basis and such parent entity is not engaged in any business in any material respect other than incidental to its ownership, directly or indirectly, of the Capital Stock of the Company, or

(ii) any direct or indirect parent of the Company becomes a Note Guarantor,

the Company shall be permitted to satisfy its foregoing obligations with respect to financial information relating to the Company by furnishing financial information relating to such parent; *provided* that such financial information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent and any of its Subsidiaries other than the Company and its Subsidiaries, on the one hand, and the information relating to the Company, the Note Guarantors, if any, and the other Subsidiaries on a standalone basis, on the other hand.

(c) The Company shall, for so long as any Notes remain outstanding during any period when it is not subject to Section 13 or 15(d) of the Exchange Act, or otherwise permitted to furnish the SEC with certain information pursuant to Rule 12g3-2(b) of the Exchange Act, furnish to the Holders of the Notes, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

Notwithstanding the foregoing, the Company will be deemed to have furnished such reports referred to above to the Trustee and the Holders if the Company has filed such reports with the SEC via the EDGAR filing system and such reports are publicly available.

In addition, if and for so long as the Euro Notes are admitted to listing on the Official List of the Luxembourg Stock Exchange and to trading on the Euro MTF Market and the rules of the Luxembourg Stock Exchange so require, copies of such reports and information furnished to the Trustee will also be made available at the specified office of the Paying Agent in Luxembourg.

SECTION 4.03. <u>Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock</u>. (a) (i) The Company shall not, and shall not permit any of the Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness) or issue any shares of Disqualified Stock; and (ii) the Company shall not permit any of the Restricted Subsidiaries (other than a Note Guarantor) to issue any shares of Preferred Stock; *provided*, *however*, that the Company and any Restricted Subsidiary may Incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock and any Restricted Subsidiary may issue shares of Preferred Stock, in each case if the Fixed Charge Coverage Ratio of the Company for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is Incurred or such Disqualified Stock or Preferred Stock is issued would

52

have been at least 2.00 to 1.00 determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness had been Incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four-quarter period.

(b) The limitations set forth in Section 4.03(a) shall not apply to:

(i) the Incurrence by the Company or the Restricted Subsidiaries of Indebtedness under any Credit Agreement and the issuance and creation of letters of credit and bankers' acceptances thereunder (with letters of credit and bankers' acceptances being deemed to have a principal amount equal to the face amount thereof) up to an aggregate principal amount of $1,500.0 million plus an aggregate additional principal amount of Consolidated Total Indebtedness constituting First Priority Obligations outstanding at any one time that does not cause the Consolidated Secured Debt Ratio of the Company to exceed 3.75 to 1.00, determined on a pro forma basis (including a pro forma application of the net proceeds therefrom);

(ii) the Incurrence by the Company and the Note Guarantors of Indebtedness represented by the Notes (not including any Additional Notes) and the Note Guarantees (including the Exchange Notes and related guarantees thereof);

(iii) Indebtedness existing on the Issue Date (other than Indebtedness described in clauses (i) and (ii) of this Section 4.03(b)), including the Existing Notes and the guarantees thereof;

(iv) (a) Indebtedness (including Capitalized Lease Obligations) Incurred by the Company or any of the Restricted Subsidiaries, Disqualified Stock issued by the Company or any of the Restricted Subsidiaries and Preferred Stock issued by any Restricted Subsidiaries to finance (whether prior to or within 270 days after) the purchase, lease, construction or improvement of property (real or personal) or equipment (whether through the direct purchase of assets or the Capital Stock of any Person owning such assets) and (b) Acquired Indebtedness; in an aggregate principal amount that, when aggregated with the principal amount of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding that was Incurred pursuant to this clause (iv), does not exceed the greater of $150.0 million and 5.0% of Total Assets at the time of Incurrence;

(v) Indebtedness Incurred by the Company or any of the Restricted Subsidiaries constituting reimbursement obligations with respect to letters of credit and bank guarantees issued in the ordinary course of business, including, without limitation, letters of credit in respect of workers' compensation claims, health, disability or other benefits to employees or former employees or their families or property, casualty or liability insurance or self-insurance, and letters of credit in connection with the maintenance of, or pursuant to the requirements of, environmental or other permits or licenses from governmental authorities, or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims;

53

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(vi) Indebtedness arising from agreements of the Company or a Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations, in each case, Incurred in connection with the Acquisition Transactions or any other acquisition or disposition of any business, assets or a Subsidiary of the Company in accordance with the terms of this Indenture, other than guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition;

(vii) Indebtedness of the Company to a Restricted Subsidiary; *provided* that any such Indebtedness owed to a Restricted Subsidiary that is not a Note Guarantor is subordinated in right of payment to the obligations of the Company under the Notes; *provided, further*, that any subsequent issuance or transfer of any Capital Stock or any other event that results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary) shall be deemed, in each case, to be an Incurrence of such Indebtedness;

(viii) shares of Preferred Stock of a Restricted Subsidiary issued to the Company or another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event that results in any Restricted Subsidiary that holds such shares of Preferred Stock of another Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to the Company or another Restricted Subsidiary) shall be deemed, in each case, to be an issuance of shares of Preferred Stock;

(ix) Indebtedness of a Restricted Subsidiary to the Company or another Restricted Subsidiary; *provided* that if a Note Guarantor Incurs such Indebtedness to a Restricted Subsidiary that is not a Note Guarantor, such Indebtedness is subordinated in right of payment to the Note Guarantee of such Note Guarantor; *provided, further*, that any subsequent issuance or transfer of any Capital Stock or any other event that results in any Restricted Subsidiary holding such Indebtedness ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary) shall be deemed, in each case, to be an Incurrence of such Indebtedness;

(x) Hedging Obligations that are not Incurred for speculative purposes and are either: (1) for the purpose of fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of this Indenture to be outstanding; (2) for the purpose of fixing or hedging currency exchange rate risk with respect to any currency exchanges; or (3) for the purpose of fixing or hedging commodity price risk with respect to any commodity purchases or sales;

(xi) obligations (including reimbursement obligations with respect to letters of credit and bank guarantees) in respect of performance, bid, appeal and surety bonds, including surety bonds issued in respect of workers' compensation claims, and completion guarantees provided by the Company or any Restricted Subsidiary in the ordinary course of business or consistent with past practice or industry practice;

54

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(xii) Indebtedness or Disqualified Stock of the Company or any Restricted Subsidiary and Preferred Stock of any Restricted Subsidiary not otherwise permitted hereunder in an aggregate principal amount or liquidation preference, as applicable, which when aggregated with the principal amount or liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and Incurred pursuant to this clause (xii), does not exceed the greater of $150.0 million and 5.0% of Total Assets at the time of Incurrence (it being understood that any Indebtedness Incurred under this clause (xii) shall cease to be deemed Incurred or outstanding for purposes of this clause (xii) but shall be deemed Incurred for purposes of Section 4.03(a) from and after the first date on which the Company, or the Restricted Subsidiary, as the case may be, could have Incurred such Indebtedness under Section 4.03(a) without reliance upon this clause (xii));

(xiii) any guarantee by the Company or any of its Restricted Subsidiaries of Indebtedness or other obligations of the Company or any of the Restricted Subsidiaries so long as the Incurrence of such Indebtedness Incurred by the Company or such Restricted Subsidiary is permitted under the terms of this Indenture; *provided* that if such Indebtedness is by its express terms subordinated in right of payment to the Notes or the Note Guarantee of such Restricted Subsidiary, as applicable, any such guarantee of such Note Guarantor with respect to such Indebtedness shall be subordinated in right of payment to such Note Guarantor's Note Guarantee with respect to the Notes substantially to the same extent as such Indebtedness is subordinated to the Notes or the Note Guarantee of such Restricted Subsidiary, as applicable;

(xiv) the Incurrence by the Company or any of the Restricted Subsidiaries of Indebtedness or Disqualified Stock or Preferred Stock of a Restricted Subsidiary that serves to refund, refinance or defease any Indebtedness Incurred or Disqualified Stock or Preferred Stock issued as permitted under Section 4.03(a) and clauses (ii), (iii), (iv), (xiv), (xv), and/or (xx) of this Section 4.03(b) or any Indebtedness, Disqualified Stock or Preferred Stock Incurred to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock, including, in each case, any Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay premiums (including tender premiums), expenses, defeasance costs and fees in connection therewith (subject to the following proviso, "Refinancing Indebtedness"); *provided*, *however*, that such Refinancing Indebtedness:

(1) has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded or refinanced or defeased and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Indebtedness, Disqualified Stock and Preferred Stock being refunded or refinanced that were due on or after the date one year following the maturity date of any Notes then outstanding were instead due on such date one year following the maturity date of such Notes;

(2) has a Stated Maturity which is not earlier than the earlier of (x) the Stated Maturity of the Indebtedness being refunded or refinanced or defeased or (y) 91 days following the maturity date of the Notes;

55

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(3) to the extent such Refinancing Indebtedness refinances (a) Indebtedness junior to the Notes or the Note Guarantee of such Restricted Subsidiary, as applicable, such Refinancing Indebtedness is junior to the Notes or the Note Guarantee of such Restricted Subsidiary, as applicable, or (b) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness is Disqualified Stock or Preferred Stock;

(4) is Incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount (or if issued with original issue discount, the aggregate accreted value) then outstanding of the Indebtedness being refinanced plus premium, expenses, costs and fees Incurred in connection with such refinancing;

(5) shall not include (x) Indebtedness of a Restricted Subsidiary that is not a Note Guarantor that refinances Indebtedness of the Company or a Restricted Subsidiary that is a Note Guarantor (unless such Restricted Subsidiary is an obligor with respect to such Indebtedness being refinanced), or (y) Indebtedness of the Company or a Restricted Subsidiary that refinances Indebtedness of an Unrestricted Subsidiary; and

(6) in the case of any Refinancing Indebtedness Incurred to refinance Indebtedness outstanding under clause (iv) or (xx) of this Section 4.03(b), shall be deemed to have been Incurred and to be outstanding under such clause (iv) or (xx) of this Section 4.03(b), as applicable, and not this clause (xiv) for purposes of determining amounts outstanding under such clauses (iv) or (xx) of this Section 4.03(b);

*provided*, *further*, that subclauses (1), (2) and (3) of this clause (xiv) shall not apply to any refunding or refinancing of (A) the Notes, (B) prior to the Springing Lien Trigger Date, any Secured Indebtedness and (C) on or following the Springing Lien Trigger Date, any Bank Indebtedness constituting First Priority Obligations.

(xv) Indebtedness, Disqualified Stock or Preferred Stock of (x) the Company or any of the Restricted Subsidiaries Incurred to finance an acquisition or (y) Persons that are acquired by the Company or any of the Restricted Subsidiaries or merged or amalgamated with or into the Company or a Restricted Subsidiary in accordance with the terms of this Indenture; *provided*, *however*, that after giving effect to such acquisition, merger or amalgamation and the Incurrence of such Indebtedness either:

(1) the Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first sentence of Section 4.03(a); or

(2) the Fixed Charge Coverage Ratio would be greater than immediately prior to such acquisition, merger or amalgamation;

(xvi) Indebtedness Incurred by a Receivables Subsidiary in a Qualified Receivables Financing that is not recourse to the Company or any Restricted Subsidiary other than a Receivables Subsidiary (except for Standard Securitization Undertakings);

56

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(xvii) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five Business Days of its Incurrence;

(xviii) Indebtedness of the Company or any Restricted Subsidiary supported by a letter of credit or bank guarantee issued pursuant to the Credit Agreement, in a principal amount not in excess of the stated amount of such letter of credit;

(xix) Indebtedness or Disqualified Stock of the Company or any Restricted Subsidiary and Preferred Stock of any Restricted Subsidiary not otherwise permitted hereunder in an aggregate principal amount or liquidation preference not exceeding at any time outstanding 200% of the net cash proceeds received by the Company and the Restricted Subsidiaries since immediately after the Issue Date from the issue or sale of Equity Interests of the Company or any direct or indirect parent entity of the Company (which proceeds are contributed to the Company or a Restricted Subsidiary) or cash contributed to the capital of the Company (in each case other than proceeds of Disqualified Stock or sales of Equity Interests to, or contributions received from, the Company or any of its Subsidiaries), as determined in accordance with clauses (B) and (C) of the definition of Cumulative Credit, to the extent such net cash proceeds or cash have not been applied pursuant to such clauses to make Restricted Payments or to make other Investments, payments or exchanges pursuant to Section 4.04(b) or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof);

(xx) Indebtedness of Foreign Subsidiaries for working capital purposes or any other purposes; *provided, however*, that the aggregate principal amount of Indebtedness Incurred under this clause (xx), other than for working capital purposes, when aggregated with the principal amount of all other Indebtedness then outstanding and Incurred pursuant to this clause (xx), does not exceed the greater of $150.0 million and 5.0% of Total Assets at the time of Incurrence (it being understood that any Indebtedness Incurred under this clause (xx) shall cease to be deemed Incurred or outstanding for purposes of this clause (xx) but shall be deemed Incurred for purposes of Section 4.03(a) from and after the first date on which the Foreign Subsidiary could have Incurred such Indebtedness under Section 4.03(a), and the other provisions of this Indenture, without reliance upon this clause (xx));

(xxi) Indebtedness of the Company or any Restricted Subsidiary consisting of (x) the financing of insurance premiums or (y) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(xxii) Indebtedness Incurred on behalf of, or representing guarantees of Indebtedness of, joint ventures of the Company or any Restricted Subsidiary not in excess, at any one time outstanding, of $7.5 million; and

(xxiii) Indebtedness issued by the Company or a Restricted Subsidiary to current or former officers, directors and employees thereof or any direct or indirect parent

57

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 64

thereof, or their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Company or any of its direct or indirect parent companies to the extent permitted pursuant to clause (iv) of Section 4.04(b).

For purposes of determining compliance with this Section 4.03, (A) Indebtedness need not be Incurred solely by reference to one category of permitted Indebtedness described in clauses (i) through (xxiii) above or pursuant to Section 4.03(a) but is permitted to be Incurred in part under any combination thereof and (B) in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of one or more of the categories of permitted Indebtedness described in clauses (i) through (xxiii) above or is entitled to be Incurred pursuant to Section 4.03(a), the Company shall, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such item of Indebtedness (or any portion thereof) in any manner that complies with this Section 4.03 and will only be required to include the amount and type of such item of Indebtedness in one of the above clauses and such item of Indebtedness will be treated as having been Incurred pursuant to only one of such clauses or pursuant to Section 4.03(a). Accrual of interest, the accretion of accreted value, the amortization of original issue discount, the payment of interest in the form of additional Indebtedness with the same terms or in the form of common stock of the Company, the payment of dividends on Preferred Stock in the form of additional shares of Preferred Stock of the same class, accretion of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies or increases in the value of property securing Indebtedness described in clause (3) of the definition of "Indebtedness" shall not be deemed to be an Incurrence of Indebtedness or an issuance of Disqualified Stock or Preferred Stock for purposes of this Section 4.03. Note Guarantees of, or obligations in respect of letters of credit relating to, Indebtedness which is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; *provided* that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this Section 4.03.

For purposes of determining compliance with any U.S. Dollar-denominated restriction on the Incurrence of Indebtedness, the U.S. Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower U.S. Dollar equivalent), in the case of revolving credit debt; *provided* that if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

Notwithstanding any other provision of this Section 4.03, the maximum amount of Indebtedness that the Company and its Restricted Subsidiaries may Incur pursuant to this Section 4.03 shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any

58

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

SECTION 4.04. Limitation on Restricted Payments. (a) The Company shall not, and shall not permit any of the Restricted Subsidiaries to, directly or indirectly:

(i) declare or pay any dividend or make any distribution on account of the Company's or any of the Restricted Subsidiaries' Equity Interests, including any payment with respect to such Equity Interests made in connection with any merger, amalgamation or consolidation involving the Company (other than (A) dividends or distributions payable solely in Equity Interests (other than Disqualified Stock) of the Company; or (B) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any Equity Interests issued by a Restricted Subsidiary other than a Wholly Owned Restricted Subsidiary, the Company or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution in accordance with its ownership percentage of such Equity Interests);

(ii) purchase or otherwise acquire or retire for value any Equity Interests of the Company or any direct or indirect parent of the Company;

(iii) make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case prior to any scheduled repayment or scheduled maturity, any Subordinated Indebtedness of the Company or any of the Note Guarantors (other than the payment, redemption, repurchase, defeasance, acquisition or retirement of (A) Subordinated Indebtedness in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such payment, redemption, repurchase, defeasance, acquisition or retirement and (B) Indebtedness permitted under clauses (vii) and (ix) of Section 4.03(b)); or

(iv) make any Restricted Investment (all such payments and other actions set forth in clauses (i) through (iv) above being collectively referred to as "Restricted Payments"), unless, at the time of such Restricted Payment:

(1) no Default shall have occurred and be continuing or would occur as a consequence thereof;

(2) immediately after giving effect to such transaction on a pro forma basis, the Company could Incur $1.00 of additional Indebtedness under Section 4.03(a);

(3) such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Company and the Restricted Subsidiaries after the Issue Date (including Restricted Payments permitted by clauses (i), (iv) (only to the extent of one-half of the amounts paid pursuant to such clause), (vi) and (viii) of Section 4.04(b)), but excluding all other Restricted Payments permitted by Section 4.04(b), is less than the amount equal to the Cumulative Credit.

59

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(b) The provisions of Section 4.04(a) shall not prohibit:

(i) the payment of any dividend or distribution within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Indenture;

(ii) (1) the redemption, repurchase, retirement or other acquisition of any Equity Interests ("Retired Capital Stock") or Subordinated Indebtedness of the Company, any direct or indirect parent of the Company or any Note Guarantor in exchange for, or out of the proceeds of, the substantially concurrent sale of Equity Interests of the Company or any direct or indirect parent of the Company or contributions to the equity capital of the Company (other than any Disqualified Stock or any Equity Interests sold to a Subsidiary of the Company) (collectively, including any such contributions, "Refunding Capital Stock"); and

(2) the declaration and payment of dividends on the Retired Capital Stock out of the proceeds of the substantially concurrent sale (other than to a Subsidiary of the Company) of Refunding Capital Stock;

(iii) the redemption, repurchase, defeasance or other acquisition or retirement of Subordinated Indebtedness of the Company or any Note Guarantor made by exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Company or a Note Guarantor that is Incurred in accordance with Section 4.03 so long as:

(1) the principal amount (or accreted value, if applicable) of such new Indebtedness does not exceed the principal amount (or accreted value, if applicable), plus any accrued and unpaid interest, of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired for value (plus the amount of any premium required to be paid under the terms of the instrument governing the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired plus any tender premiums, defeasance costs or other fees and expenses incurred in connection therewith),

(2) such Indebtedness is subordinated to the Notes or the related Note Guarantees, as the case may be, at least to the same extent as such Subordinated Indebtedness so purchased, exchanged, redeemed, repurchased, defeased, acquired or retired for value,

(3) such Indebtedness has a final scheduled maturity date equal to or later than the earlier of (x) the final scheduled maturity date of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired and (y) 91 days following the maturity date of the Notes, and

(4) such Indebtedness has a Weighted Average Life to Maturity at the time Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Subordinated Indebtedness being so redeemed, defeased, acquired or retired and (y) the Weighted Average Life to Maturity that would result if all

60

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

payments of principal on the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired that were due on or after the date one year following the maturity date of any Notes then outstanding were instead due on such date one year following the maturity date of such Notes;

(iv) a Restricted Payment to pay for the redemption, repurchase, retirement or other acquisition for value of Equity Interests of the Company or any direct or indirect parent of the Company held by any future, present or former employee, director or consultant of the Company or any direct or indirect parent of the Company or any Subsidiary of the Company pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or other agreement or arrangement; *provided*, *however*, that the aggregate amounts paid under this clause (iv) do not exceed $15.0 million in any calendar year (with unused amounts in any calendar year being permitted to be carried over for the two succeeding calendar years; *provided*, *further*, *however*, that such amount in any calendar year may be increased by an amount not to exceed:

(1) the cash proceeds received by the Company or any of the Restricted Subsidiaries from the sale of Equity Interests (other than Disqualified Stock) of the Company or any direct or indirect parent of the Company (to the extent contributed to the Company) to members of management, directors or consultants of the Company and the Restricted Subsidiaries or any direct or indirect parent of the Company that occurs after the Issue Date (*provided* that the amount of such cash proceeds utilized for any such repurchase, retirement, other acquisition or dividend shall not increase the amount available for Restricted Payments under Section 4.04(a)(iv)(4); plus

(2) the cash proceeds of key man life insurance policies received by the Company or any direct or indirect parent of the Company (to the extent contributed to the Company) or the Restricted Subsidiaries after the Issue Date;

*provided* that the Company may elect to apply all or any portion of the aggregate increase contemplated by clauses (1) and (2) above in any calendar year and, to the extent any payment described under this clause (iv) is made by delivery of Indebtedness and not in cash, such payment shall be deemed to occur only when, and to the extent, the obligor on such Indebtedness makes payments with respect to such Indebtedness;

(v) the declaration and payment of dividends or distributions to holders of any class or series of Disqualified Stock of the Company or any of the Restricted Subsidiaries issued or Incurred in accordance with Section 4.03;

(vi) (a) the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date, (b) a Restricted Payment to any direct or indirect parent of the Company, the proceeds of which will be used to fund the payment of dividends to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) of any direct or indirect parent of the Company issued after the Issue Date and (c) the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock

61

in excess of the dividends declarable and payable thereon pursuant to clause (ii) of this Section 4.04(b); *provided*, *however*, that, (A) for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock or Refunding Capital Stock, after giving effect to such issuance (and the payment of dividends or distributions) on a pro forma basis (including a pro forma application of the net proceeds therefrom), the Company would have had a Fixed Charge Coverage Ratio of at least 2.00 to 1.00 and (B) the aggregate amount of dividends declared and paid pursuant to subclauses (a) and (b) of this clause (vi) does not exceed the net cash proceeds actually received by the Company from any such sale of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date;

(vii) Investments in Unrestricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (vii), that are at that time outstanding, not to exceed the greater of $40.0 million and 1.0% of Total Assets at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(viii) the payment of dividends on the Company's common stock (or a Restricted Payment to any direct or indirect parent of the Company to fund the payment by such direct or indirect parent of the Company of dividends on such entity's common stock) of up to 6% per annum of the net proceeds received by the Company from any public offering of common stock of the Company or any direct or indirect parent of the Company;

(ix) Restricted Payments that are made with Excluded Contributions;

(x) other Restricted Payments in an aggregate amount not to exceed the greater of $50.0 million and 1.0% of Total Assets at the time made;

(xi) the distribution, as a dividend or otherwise, of shares of Capital Stock of, or Indebtedness owed to the Company or a Restricted Subsidiary by, Unrestricted Subsidiaries;

(xii) (1) with respect to each tax year or portion thereof that any direct or indirect parent of the Company qualifies as a Flow Through Entity, the distribution by the Company to the holders of Capital Stock of such direct or indirect parent of the Company of an amount equal to the product of (x) the amount of aggregate net taxable income of the Company allocated to the holders of Capital Stock of the Company for such period and (y) the Presumed Tax Rate for such period; and (2) with respect to any tax year or portion thereof that any direct or indirect parent company of the Company does not qualify as a Flow Through Entity, the payment of dividends or other distributions to any direct or indirect parent of the Company that files a consolidated U.S. federal tax return that includes the Company and its subsidiaries in an amount not to exceed the amount that the Company and its Restricted Subsidiaries would have been required to pay in respect of federal, state or local taxes (as the case may be) in respect of such year if the

62

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 69

Company and its Restricted Subsidiaries paid such taxes directly as a stand-alone taxpayer (or stand-alone group);

(xiii) the payment of any Restricted Payment, if applicable:

(A) in amounts required for any direct or indirect parent of the Company, if applicable, to pay fees and expenses (including franchise or similar taxes) required to maintain its corporate existence, customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, officers and employees of any direct or indirect parent of the Company, if applicable, and general corporate overhead expenses of any direct or indirect parent of the Company, if applicable, in each case to the extent such fees, expenses, salaries, bonuses, benefits and indemnities are attributable to the ownership or operation of the Company, if applicable, and its Subsidiaries;

(B) in amounts required for any direct or indirect parent of the Company, if applicable, to pay interest and/or principal on Indebtedness the proceeds of which have been contributed to the Company or any of the Restricted Subsidiaries and that has been guaranteed by, or is otherwise considered Indebtedness of, the Company Incurred in accordance with Section 4.03; and

(C) in amounts required for any direct or indirect parent of the Company to pay fees and expenses, other than to Affiliates of the Company, related to any unsuccessful equity or debt offering of such parent;

(xiv) Restricted Payments used to fund the 2009 Transactions and the payment of fees and expenses incurred in connection with the Acquisition Transactions, the 2009 Transactions and the Transactions or in respect of amounts owed by the Company or any direct or indirect parent of the Company, as the case may be, or Restricted Subsidiaries to Affiliates, in each case to the extent permitted by Section 4.07;

(xv) repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(xvi) purchases of receivables pursuant to a Receivables Repurchase Obligation in connection with a Qualified Receivables Financing and the payment or distribution of Receivables Fees;

(xvii) Restricted Payments by the Company or any Restricted Subsidiary to allow the payment of cash in lieu of the issuance of fractional shares upon the exercise of options or warrants or upon the conversion or exchange of Capital Stock of any such Person;

(xviii) the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness pursuant to the provisions similar to those described under Sections 4.06 and 4.08; *provided* that all Notes tendered by Holders in connection

63

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 70

with a Change of Control Offer or Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value;

(xix) any payments made, including any such payments made to any direct or indirect parent of the Company to enable it to make payments, in connection with the consummation of the Acquisition Transactions, the 2009 Transactions and the Transactions or as contemplated by the Acquisition Documents (other than payments to any Permitted Holder or any Affiliate thereof); and

(xx) cash dividends or other distributions in respect of the Company's Capital Stock used to, or the making of loans to any direct or indirect parent of the Company in order to, fund the payment of expenses of the type and in the amount described in clauses (iii) and (v) of Section 4.07(b) to the extent that such amounts are not paid directly by the Company or any its Subsidiaries.

*provided*, *however*, that at the time of, and after giving effect to, any Restricted Payment permitted under clause (vi), (vii), (x) or (xi) of this Section 4.04(b), no Default shall have occurred and be continuing or would occur as a consequence thereof.

(c) As of the Issue Date, all of the Company's Subsidiaries shall be Restricted Subsidiaries, other than Momentive Performance Materials (Nantong) Co., Ltd. The Company shall not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the definition of "Unrestricted Subsidiary." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by the Company and the Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated shall be deemed to be Restricted Payments in an amount determined as set forth in the last sentence of the definition of "Investments." Such designation shall only be permitted if a Restricted Payment or Permitted Investment in such amount would be permitted at such time and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.

SECTION 4.05. <u>Dividend and Other Payment Restrictions Affecting Subsidiaries</u>. The Company shall not, and shall not permit any of the Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(a) (i) pay dividends or make any other distributions to the Company or any of the Restricted Subsidiaries (1) on its Capital Stock or (2) with respect to any other interest or participation in, or measured by, its profits; or (ii) pay any Indebtedness owed to the Company or any of the Restricted Subsidiaries;

(b) make loans or advances to the Company or any of the Restricted Subsidiaries; or

(c) sell, lease or transfer any of its properties or assets to the Company or any of the Restricted Subsidiaries;

except in each case for such encumbrances or restrictions existing under or by reason of:

64

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(1) contractual encumbrances or restrictions in effect on the Issue Date, including pursuant to the Credit Agreement and the other Credit Agreement Documents and the Existing Notes and the guarantees thereof and the indentures relating thereto;

(2) this Indenture and the Notes (and any Exchange Notes and guarantees thereof);

(3) applicable law or any applicable rule, regulation or order;

(4) any agreement or other instrument of a Person acquired by the Company or any Restricted Subsidiary which was in existence at the time of such acquisition (but not created in contemplation thereof or to provide all or any portion of the funds or credit support utilized to consummate such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or its Subsidiaries, or the property or assets of the Person or its Subsidiaries, so acquired;

(5) contracts or agreements for the sale of assets, including any restriction with respect to a Restricted Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Capital Stock or assets of such Restricted Subsidiary pending the closing of such sale or disposition;

(6) Secured Indebtedness otherwise permitted to be Incurred pursuant to Sections 4.03 and 4.12 that limit the right of the debtor to dispose of the assets securing such Indebtedness;

(7) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(8) customary provisions in joint venture agreements and other similar agreements entered into in the ordinary course of business;

(9) purchase money obligations and Capitalized Lease Obligations, in each case for property acquired or leased in the ordinary course of business that impose restrictions of the nature discussed in clause (c) above on the property so acquired or leased;

(10) customary provisions contained in leases, licenses and other similar agreements entered into in the ordinary course of business that impose restrictions of the nature discussed in clause (c) above on the property subject to such lease;

(11) any encumbrance or restriction of a Receivables Subsidiary effected in connection with a Qualified Receivables Financing; *provided*, *however*, that such restrictions apply only to such Receivables Subsidiary;

(12) other Indebtedness, Disqualified Stock or Preferred Stock (i) of the Company or any Restricted Subsidiary of the Company (x) that is Incurred subsequent to the Issue Date pursuant to Section 4.03 and (y) in the case of a Restricted Subsidiary that is not a Note Guarantor, an Officer reasonably determines in good faith that any such

65

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

encumbrance or restriction will not materially adversely affect the Company's ability to make anticipated principal or interest payments on the Notes, or (ii) that is Incurred by a Foreign Subsidiary of the Company subsequent to the Issue Date pursuant to Section 4.03;

(13) any Restricted Investment not prohibited by Section 4.04 and any Permitted Investment; or

(14) any encumbrances or restrictions of the type referred to in clauses (a), (b) and (c) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (1) through (13) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Company, no more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

For purposes of determining compliance with this Section 4.05, (i) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock shall not be deemed a restriction on the ability to make distributions on Capital Stock and (ii) the subordination of loans or advances made to the Company or a Restricted Subsidiary to other Indebtedness Incurred by the Company or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

SECTION 4.06. Asset Sales. (a) The Company shall not, and shall not permit any of the Restricted Subsidiaries to, cause or make an Asset Sale, unless (x) the Company or any of the Restricted Subsidiaries, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value (as determined in good faith by the Company) of the assets sold or otherwise disposed of, and (y) at least 75% of the consideration therefor received by the Company or such Restricted Subsidiary, as the case may be, is in the form of Cash Equivalents; *provided* that the amount of:

(i) any liabilities (as shown on the Company's or such Restricted Subsidiary's most recent balance sheet or in the notes thereto) of the Company or any Restricted Subsidiary (other than liabilities that are by their terms subordinated to the Notes or any Note Guarantee) that are assumed by the transferee of any such assets,

(ii) any notes or other obligations or other securities or assets received by the Company or such Restricted Subsidiary from such transferee that are converted by the Company or such Restricted Subsidiary into cash within 180 days of the receipt thereof (to the extent of the cash received), and

(iii) any Designated Non-cash Consideration received by the Company or any of the Restricted Subsidiaries in such Asset Sale having an aggregate Fair Market Value,

66

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

taken together with all other Designated Non-cash Consideration received pursuant to this clause (iii) that is at that time outstanding, not to exceed the greater of 3.0% of Total Assets and $70.0 million at the time of the receipt of such Designated Non-cash Consideration (with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value) shall be deemed to be Cash Equivalents for the purposes of this Section 4.06(a).

(b) Within 365 days after the Company's or any Restricted Subsidiary's receipt of the Net Proceeds of any Asset Sale, the Company or such Restricted Subsidiary may apply the Net Proceeds from such Asset Sale, at its option to any one or more of the following:

(i) to repay (A)(1) prior to the Springing Lien Trigger Date, any Secured Indebtedness and (2) on or following the Springing Lien Trigger Date, any First Priority Obligations (and, if the Indebtedness repaid is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto), (B) Indebtedness of a Restricted Subsidiary that is not a Note Guarantor; (C) the Notes; or (D) Pari Passu Indebtedness (provided that if the Company or any Note Guarantor shall so reduce Obligations under Pari Passu Indebtedness pursuant to this clause (D), the Company shall equally and ratably reduce Obligations under the Notes as provided pursuant to Article III, through open market purchases (provided that such purchases are at or above 100% of the principal amount thereof) and/or by making an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all Holders to purchase at a purchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, the pro rata principal amount of the Notes),

(ii) to make an investment in any one or more businesses (*provided* that if such investment is in the form of the acquisition of Capital Stock of a Person, such acquisition results in such Person becoming a Restricted Subsidiary of the Company or, if such Person is a Restricted Subsidiary of the Company, in an increase in the percentage ownership of such Person by the Company or any Restricted Subsidiary of the Company), assets, or property or capital expenditures, in each case used or useful in a Similar Business; or

(iii) to make an investment in any one or more businesses (provided that if such investment is in the form of the acquisition of Capital Stock of a Person, such acquisition results in such Person becoming a Restricted Subsidiary of the Company or, if such Person is a Restricted Subsidiary of the Company, in an increase in the percentage ownership of such Person by the Company or any Restricted Subsidiary of the Company), properties or assets that replace the properties and assets that are the subject of such Asset Sale.

In the case of Sections 4.06(b)(ii) and (iii), a binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment; *provided* that in the event such binding commitment is later canceled or terminated for any reason before such Net Proceeds are so applied, the Company or such Restricted Subsidiary may satisfy its obligation as to any Net Proceeds by entering into another binding commitment within nine

67

months of such cancellation or termination of the prior binding commitment; *provided*, *further* that the Company or such Restricted Subsidiary may only enter into such a commitment under the foregoing provision one time with respect to each Asset Sale.

Pending the final application of any such Net Proceeds, the Company or such Restricted Subsidiary may temporarily reduce Indebtedness under a revolving credit facility, if any, or otherwise invest such Net Proceeds in any manner not otherwise prohibited by this Indenture. Any Net Proceeds from any Asset Sale that are not applied as provided and within the time period set forth in the first sentence of this Section 4.06(b) (it being understood that any portion of such Net Proceeds used to make an offer to purchase Notes, as described in clause (i) of this Section 4.06(b), shall be deemed to have been invested whether or not such offer is accepted) shall be deemed to constitute "Excess Proceeds." When the aggregate amount of Excess Proceeds exceeds $20.0 million, the Company shall make an offer to all Holders of Notes (and, at the option of the Company, to holders of any Pari Passu Indebtedness) (an "Asset Sale Offer") to purchase the maximum principal amount of (x) Dollar Notes, that is at least $2,000 and an integral multiple of $1,000, and/or (y) Euro Notes, that is at least €100,000 and an integral multiple of €1,000 (and for each of (x) and (y), such Pari Passu Indebtedness), in each case that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof (or, in the event such Pari Passu Indebtedness was issued with significant original issue discount, 100% of the accreted value thereof), plus accrued and unpaid interest and Additional Interest, if any (or, in respect of such Pari Passu Indebtedness, such lesser price, if any, as may be provided for by the terms of such Indebtedness), to the date fixed for the closing of such offer, in accordance with the procedures set forth in this Section 4.06. The Company shall commence an Asset Sale Offer with respect to Excess Proceeds within ten Business Days after the date that Excess Proceeds exceeds $20.0 million by electronically delivering, or mailing by first class mail, the notice required pursuant to the terms of Section 4.06(f), with a copy to the Trustee. To the extent that the aggregate amount of Notes (and such Pari Passu Indebtedness) tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Company may use any remaining Excess Proceeds for general corporate purposes. If the aggregate principal amount of Notes (and such Pari Passu Indebtedness, as applicable) surrendered by holders thereof exceeds the amount of Excess Proceeds, the Trustee shall select the Notes to be purchased in the manner described in Section 4.06(e) . Upon completion of any such Asset Sale Offer, the amount of Excess Proceeds shall be reset at zero.

(c) The Company shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in this Indenture by virtue thereof.

(d) Not later than the date upon which written notice of an Asset Sale Offer is delivered to the Trustee as provided above, the Company shall deliver to the Trustee an Officer's Certificate as to (i) the amount of the Excess Proceeds, (ii) the allocation of the Net Proceeds from the Asset Sales pursuant to which such Asset Sale Offer is being made and (iii) the compliance of such allocation with the provisions of Section 4.06(b) . On such date, the Company shall also irrevocably deposit with the Trustee or with a paying agent (or, if the

68

Company or a Wholly Owned Subsidiary is acting as the Paying Agent, segregate and hold in trust) an amount equal to the Excess Proceeds to be invested in Cash Equivalents, as directed in writing by the Company, and to be held for payment in accordance with the provisions of this Section 4.06. Upon the expiration of the period for which the Asset Sale Offer remains open (the "Offer Period"), the Company shall deliver to the Trustee for cancellation the Notes or portions thereof that have been properly tendered to and are to be accepted by the Company. The Trustee (or the Paying Agent, if not the Trustee) shall, on the date of purchase, mail or deliver payment to each tendering Holder in the amount of the purchase price. In the event that the Excess Proceeds delivered by the Company to the Trustee are greater than the purchase price of the Notes tendered, the Trustee shall deliver the excess to the Company immediately after the expiration of the Offer Period for application in accordance with this Section 4.06.

(e) Holders electing to have a Note purchased shall be required to surrender the Note, with an appropriate form duly completed, to the Company at the address specified in the notice at least three Business Days prior to the purchase date. Holders shall be entitled to withdraw their election if the Trustee or the Company receives not later than one Business Day prior to the purchase date, a telegram, telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note which was delivered by the Holder for purchase and a statement that such Holder is withdrawing his election to have such Note purchased. If at the end of the Offer Period more Notes (and Pari Passu Indebtedness, as applicable) are tendered pursuant to an Asset Sale Offer than the Company is required to purchase, the principal amount of Notes (and Pari Passu Indebtedness) to be purchased will be determined pro rata based on the principal amounts so tendered and the selection of the actual Notes of each series for purchase will be made by the Trustee on a pro rata basis to the extent practicable; *provided* that no Dollar Notes of $2,000 or less shall be purchased in part and no Euro Notes of €100,000 or less shall be purchased in part. Selection of such Pari Passu Indebtedness shall be made pursuant to the terms of such Pari Passu Indebtedness.

(f) Notices of an Asset Sale Offer shall be delivered electronically or mailed by first class mail, postage prepaid, at least 30 but not more than 60 days before the purchase date to each Holder of Notes at such Holder's registered address. If any Note is to be purchased in part only, any notice of purchase that relates to such Note shall state the portion of the principal amount thereof that has been or is to be purchased.

SECTION 4.07. <u>Transactions with Affiliates</u>. (a) The Company shall not, and shall not permit any of the Restricted Subsidiaries to, directly or indirectly, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each of the foregoing, an "Affiliate Transaction") involving aggregate consideration in excess of $7.5 million, unless:

(i) such Affiliate Transaction is on terms that are not materially less favorable to the Company or the relevant Restricted Subsidiary than those that could reasonably have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unaffiliated Person; and

69

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(ii) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $25.0 million, the Company delivers to the Trustee a resolution adopted in good faith by the majority of the Board of Directors of the Company approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (i) above.

(b) The provisions of Section 4.07(a) shall not apply to the following:

(i) transactions between or among the Company and/or any of the Restricted Subsidiaries (or an entity that becomes a Restricted Subsidiary as a result of such transaction) and any merger, consolidation or amalgamation of the Company and any direct parent of the Company; *provided* that such parent shall have no material liabilities and no material assets other than cash, Cash Equivalents and the Capital Stock of the Company and such merger, consolidation or amalgamation is otherwise in compliance with the terms of this Indenture and effected for a bona fide business purpose;

(ii) Restricted Payments permitted by Section 4.04 and Permitted Investments;

(iii) (x) the entering into of any agreement (and any amendment or modification of any such agreement) to pay, and the payment of, annual management, consulting, monitoring and advisory fees and expenses to the Sponsors in an aggregate amount in any fiscal year not to exceed the greater of (A) $6.0 million and (B) 2.0% of EBITDA of the Company and the Restricted Subsidiaries for the immediately preceding fiscal year, and out-of-pocket expense reimbursement; *provided, however,* that any payment not made in any fiscal year may be carried forward and paid in the following two fiscal years and (y) the payment of the present value of all amounts payable pursuant to any agreement described in clause (iii)(x) of Section 4.07(b) in connection with the termination of such agreement;

(iv) the payment of reasonable and customary fees and reimbursement of expenses paid to, and indemnity provided on behalf of, officers, directors, employees or consultants of the Company or any Restricted Subsidiary or any direct or indirect parent of the Company;

(v) payments by the Company or any of the Restricted Subsidiaries to the Sponsors made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, without limitation, in connection with acquisitions or divestitures, which payments are (x) made pursuant to the agreements with the Sponsors described in the Offering Memorandum (including the documents incorporated therein by reference) or (y) approved by a majority of the Board of Directors of the Company in good faith;

(vi) transactions in which the Company or any of the Restricted Subsidiaries, as the case may be, delivers to the Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to the Company or such Restricted Subsidiary from a financial point of view or meets the requirements of clause (i) of Section 4.07(a);

70

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 77

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

(vii) payments or loans (or cancellation of loans) to directors, officers, employees or consultants that are approved by a majority of the Board of Directors of the Company in good faith;

(viii) the existence of, or the performance by the Company or any of its Restricted Subsidiaries under the terms of, any agreement as in effect as of the Issue Date or any amendment thereto (so long as any such agreement together with all amendments thereto, taken as a whole, is not more disadvantageous to the Holders of the Notes in any material respect than the original agreement as in effect on the Issue Date) or any transaction contemplated thereby as determined in good faith by senior management or the Board of Directors of the Company;

(ix) the existence of, or the performance by the Company or any of the Restricted Subsidiaries of its obligations under the terms of, Acquisition Documents, any stockholders agreement or investors rights agreement (including any registration rights agreement or purchase agreement related thereto) to which it is a party as of the Issue Date, and any agreement described in the Offering Memorandum (including the documents incorporated therein by reference), and, in each case, any amendment thereto or similar agreements that it may enter into thereafter; *provided*, *however*, that the existence of, or the performance by the Company or any of the Restricted Subsidiaries of its obligations under, any future amendment to any such existing agreement or under any similar agreement entered into after the Issue Date shall only be permitted by this clause (ix) to the extent that the terms of any such existing agreement together with all amendments thereto, taken as a whole, or any such new agreement are not otherwise more disadvantageous to the Holders of the Notes in any material respect than the original agreement as in effect on the Issue Date;

(x) the execution of the Transactions and the payment of all fees and expenses related to the Transactions, the 2009 Transactions and the Acquisition Transactions, including fees to the Sponsors, which are described in the Offering Memorandum (including the documents incorporated therein by reference) or contemplated by the Acquisition Documents;

(xi) (A) transactions with customers, clients, suppliers, toll manufacturers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Indenture, which are fair to the Company and the Restricted Subsidiaries in the reasonable determination of the Board of Directors or the senior management of the Company, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party or (B) transactions with joint ventures or Unrestricted Subsidiaries entered into in the ordinary course of business;

(xii) any transaction effected as part of a Qualified Receivables Financing;

(xiii) the issuance of Equity Interests (other than Disqualified Stock) of the Company to any Person;

71

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(xiv) the issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock option and stock ownership plans or similar employee benefit plans approved by the Board of Directors of the Company or any direct or indirect parent of the Company or of a Restricted Subsidiary, as appropriate, in good faith;

(xv) the entering into of any tax sharing agreement or arrangement and any payments permitted by Section 4.04(b)(xii);

(xvi) any contribution to the capital of the Company;

(xvii) transactions permitted by, and complying with, Section 5.01;

(xviii) transactions between the Company or any of the Restricted Subsidiaries and any Person, a director of which is also a director of the Company or any direct or indirect parent of the Company; *provided*, *however*, that such director abstains from voting as a director of the Company or such direct or indirect parent, as the case may be, on any matter involving such other Person;

(xix) pledges of Equity Interests of Unrestricted Subsidiaries;

(xx) any employment agreements entered into by the Company or any of the Restricted Subsidiaries in the ordinary course of business; and

(xxi) intercompany transactions undertaken in good faith (as certified by a responsible financial or accounting officer of the Company in an Officer's Certificate) for the purpose of improving the consolidated tax efficiency of the Company and its Subsidiaries and not for the purpose of circumventing any covenant set forth in this Indenture.

SECTION 4.08. <u>Change of Control</u>. (a) Upon a Change of Control, each Holder shall have the right to require the Company to repurchase all or any part of such Holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, plus accrued and unpaid interest, if any, and Additional Interest, if any, to the date of repurchase (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date), in accordance with the terms contemplated in this Section 4.08; *provided*, *however*, that notwithstanding the occurrence of a Change of Control, the Company shall not be obligated to purchase any Notes pursuant to this Section 4.08 in the event that the Company has exercised its right to redeem such Notes in accordance with Article 3 of this Indenture.

(b) Within 30 days following any Change of Control, except to the extent that the Company has exercised its right to redeem the Notes by delivery of a notice of redemption in accordance with Article 3 of this Indenture, the Company shall electronically deliver or mail by first-class mail a notice (a "Change of Control Offer") to each Holder with a copy to the Trustee stating:

(i) that a Change of Control has occurred and that such Holder has the right to require the Company to repurchase such Holder's Notes at a repurchase price in cash

72

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 79

equal to 101% of the principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to the date of repurchase (subject to the right of the Holders of record on the relevant record date to receive interest on the relevant interest payment date);

(ii) the circumstances and relevant facts and financial information regarding such Change of Control;

(iii) the repurchase date (which shall be no earlier than 30 days nor later than 60 days from the date such notice is electronically delivered or mailed by first-class mail); and

(iv) the instructions determined by the Company, consistent with this Section 4.08, that a Holder must follow in order to have its Notes purchased.

(c) Holders electing to have a Note purchased shall be required to surrender the Note, with an appropriate form duly completed, to the Company at the address specified in the notice at least three Business Days prior to the purchase date. The Holders shall be entitled to withdraw their election if the Trustee or the Company receives not later than one Business Day prior to the purchase date a telegram, telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note which was delivered for purchase by the Holder and a statement that such Holder is withdrawing his election to have such Note purchased. Holders whose Notes are purchased only in part shall be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered.

(d) On the purchase date, all Notes purchased by the Company under this Section shall be delivered to the Trustee for cancellation, and the Company shall pay the purchase price plus accrued and unpaid interest to the Holders entitled thereto.

(e) A Change of Control Offer may be made in advance of a Change of Control, and conditioned upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

(f) Notwithstanding the foregoing provisions of this Section, the Company shall not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 4.08 applicable to a Change of Control Offer made by the Company and purchases all Notes properly tendered and not withdrawn under such Change of Control Offer.

(g) At the time the Company delivers Notes to the Trustee which are to be accepted for purchase, the Company shall also deliver an Officer's Certificate stating that such Notes are to be accepted by the Company pursuant to and in accordance with the terms of this Section 4.08. A Note shall be deemed to have been accepted for purchase at the time the Trustee, directly or through an agent, mails or delivers payment therefor to the surrendering Holder.

73

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(h) Prior to any Change of Control Offer, the Company shall deliver to the Trustee an Officer's Certificate stating that all conditions precedent contained herein to the right of the Company to make such offer have been complied with.

(i) The Company shall comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes pursuant to this Section. To the extent that the provisions of any securities laws or regulations conflict with provisions of this Section 4.08, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section by virtue thereof.

SECTION 4.09. Compliance Certificate. The Company shall deliver to the Trustee within 120 days after the end of each fiscal year of the Company, beginning with the fiscal year end on December 31, 2010, an Officer's Certificate stating that in the course of the performance by the signer of his or her duties as an Officer of the Company he or she would normally have knowledge of any Default and whether or not the signer knows of any Default that occurred during such period. If he or she does, the certificate shall describe the Default, its status and what action the Company is taking or proposes to take with respect thereto. The Company also shall comply with Section 314(a)(4) of the TIA.

SECTION 4.10. Further Instruments and Acts. Upon request of the Trustee, the Company shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

SECTION 4.11. Future Note Guarantors. After the Issue Date, the Company shall cause each Restricted Subsidiary that is a Domestic Subsidiary (unless such Subsidiary is a (a) Receivables Subsidiary or (b) Subsidiary of a Foreign Subsidiary) that guarantees any Indebtedness of the Company or any of the Note Guarantors to execute and deliver to the Trustee a supplemental indenture substantially in the form of Exhibit D pursuant to which such Subsidiary shall guarantee the Company's Obligations under the Notes and this Indenture.

SECTION 4.12. Liens. The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create, Incur or suffer to exist any Lien (the "Initial Lien") on any asset or property of the Company or such Restricted Subsidiary (i) that secures any Indebtedness of the Company or any Restricted Subsidiary (other than Permitted Liens) unless the Notes are equally and ratably secured with (or on a senior basis to, in the case of Subordinated Indebtedness) such Indebtedness so long as such Indebtedness is so secured and (ii) following the Springing Lien Trigger Date, that secures any First Priority Obligation of the Company or any Note Guarantor without effectively providing that the Notes or the obligations of such Note Guarantor in respect of the Notes, as the case may be, shall be secured by a second-priority security interest (subject to the Intercreditor Agreement and Permitted Liens) in such assets or property constituting the collateral for such First Priority Obligations (except with respect to Excluded Assets); *provided, however,* that if granting such second-priority security interest requires the consent of a third party, the Company will use commercially reasonable efforts to obtain such consent with respect to the second-priority security interest for the benefit of the Collateral Agent on behalf of the Holders of the Notes; *provided further, however,* that if such third party does not consent to the granting of such second-priority security interest after the

74

Bloomberg Law®          © 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 81

use of commercially reasonable efforts, the Company will not be required to provide such security interest.

Any Lien created for the benefit of the Holders of the Notes pursuant to clause (i) of the preceding paragraph shall provide by its terms that such Lien shall be automatically and unconditionally released and discharged upon the release and discharge of the Initial Lien.

For purposes of determining compliance with this Section 4.12, (A) a Lien securing an item of Indebtedness need not be permitted solely by reference to one category of permitted Liens described in clauses (1) through (32) of the definition of "Permitted Liens" or pursuant to the first paragraph of this covenant but may be permitted in part under any combination thereof and (B) in the event that a Lien securing an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of one or more of the categories of permitted Liens described in clauses (1) through (32) of the definition of "Permitted Liens" or pursuant to the first paragraph of this Section 4.12, the Company shall, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such Lien securing such item of Indebtedness (or any portion thereof) in any manner that complies with this Section 4.12 and will only be required to include the amount and type of such Lien or such item of Indebtedness secured by such Lien in one of the clauses of the definition of "Permitted Liens" and such Lien securing such item of Indebtedness will be treated as being Incurred or existing pursuant to only one of such clauses or pursuant to the first paragraph hereof.

With respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the Incurrence of such Indebtedness, such Lien shall also be permitted to secure any Increased Amount of such Indebtedness. The "Increased Amount" of any Indebtedness shall mean any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount, the payment of interest in the form of additional Indebtedness with the same terms or in the form of common stock of the Company, the payment of dividends on Preferred Stock in the form of additional shares of Preferred Stock of the same class, accretion of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies or increases in the value of property securing Indebtedness described in clause (3) of the definition of "Indebtedness".

SECTION 4.13. <u>After-Acquired Property</u>. Following the Springing Lien Trigger Date, subject to the Intercreditor Agreement and the Security Documents, if at any time the Company or any Note Guarantor owns any First Priority After-Acquired Property, the Company or such Note Guarantor shall, as promptly as practicable after such property is acquired or such Subsidiary becomes a Note Guarantor, execute and deliver such mortgages, deeds of trust, deeds to secure debt, security instruments, financing statements and certificates or such other documentation as shall be reasonably necessary to vest in the Collateral Agent, for the benefit of the Holders and the Trustee, a perfected Second Priority Lien, subject only to Permitted Liens, in such First Priority After-Acquired Property and to have such First Priority After-Acquired Property added to the Collateral, and thereupon all provisions of this Indenture relating to the Collateral shall be deemed to relate to such First Priority After-Acquired Property to the same extent and with the same force and effect; *provided, however*, that if granting a security interest in such property, including property acquired in connection with an Asset Sale involving non-

75

**Bloomberg Law**®

cash consideration, requires the consent of a third party, the Company will use commercially reasonable efforts to obtain such consent with respect to such security interest in favor of the Collateral Agent for the benefit of the Holders and the Trustee; *provided further, however,* that if such party does not consent to the granting of such security interest after the use of such commercially reasonable efforts, the applicable entity will not be required to provide such security interest.

SECTION 4.14. Maintenance of Office or Agency. (a) The Company shall maintain one or more offices or agencies where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served. If and for as long as the Euro Notes are listed on the Official List of the Luxembourg Stock Exchange and traded on the Euro MTF Market and the rules of the Luxembourg Stock Exchange so require, the Company shall maintain an office or agency in Luxembourg (which may be an office of the Luxembourg Paying Agent or its affiliates) where the Euro Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Company in respect of the Euro Notes and this Indenture may be served. The Company shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the corporate trust office of the Trustee as set forth in Section 13.02.

(b) The Company may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided*, *however*, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency for such purposes. The Company shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

(c) The Company hereby designates the corporate trust office of the Trustee or its Agent as such office or agency of the Company in accordance with Section 2.04.

SECTION 4.15. [Reserved].

SECTION 4.16. [Reserved].

SECTION 4.17. Suspension of Certain Covenants. (a) Following the first day (the "Suspension Date") that:

(1) the Notes have an Investment Grade Rating from both of the Rating Agencies, and the Company has delivered written notice of such Investment Grade Ratings to the Trustee, and

(2)    no Default has occurred and is continuing hereunder,

the Company and the Restricted Subsidiaries will not be subject to Sections 4.03, 4.04, 4.05, 4.06, 4.07, 4.11 and Section 5.01(a)(4) (collectively, the "Suspended Covenants"). In addition, in such

76

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

event, the Company may also elect to release any or all of the Collateral from the Liens securing the Notes and the Note Guarantees by electronically delivering or mailing by first-class mail a notice of such election to the Collateral Agent.

(b) In the event that the Company and the Restricted Subsidiaries are not subject to the Suspended Covenants for any period of time as a result of the foregoing, and on any subsequent date (the "Reversion Date") (1) one or both of the Rating Agencies withdraws their Investment Grade Rating or downgrades the rating assigned to the Notes below an Investment Grade Rating and/or (2) the Company or any of its Affiliates enters into an agreement to effect a transaction that would result in a Change of Control and one or more of the Rating Agencies indicate that if consummated, such transaction (alone or together with any related recapitalization or refinancing transactions) would cause such Rating Agency to withdraw its Investment Grade Rating or downgrade the ratings assigned to the Notes below an Investment Grade Rating, then the Company and its Restricted Subsidiaries shall thereafter again be subject to the Suspended Covenants under this Indenture with respect to future events, including, without limitation, a proposed transaction described in clause (b)(2) above, and any Collateral that was released from Liens securing the Notes and Note Guarantees as a result of the suspension of covenants, as well as any Collateral acquired since the Suspension Date, will be restored and pledged to secure the Notes and Note Guarantees, as applicable. The period of time between the Suspension Date and the Reversion Date is referred to herein as the "Suspension Period."

(c) Notwithstanding that the Suspended Covenants may be reinstated, no Default or Event of Default shall be deemed to have occurred as a result of a failure to comply with the Suspended Covenants during the Suspension Period. During any Suspension Period, the Company shall not designate any Subsidiary to be an Unrestricted Subsidiary unless the Company would have been permitted to designate such Subsidiary to be an Unrestricted Subsidiary if a Suspension Period had not been in effect for any period.

(d) On the Reversion Date, all Indebtedness Incurred, or Disqualified Stock or Preferred Stock issued, during the Suspension Period shall be classified to have been Incurred or issued pursuant to Section 4.03(a) or one of the clauses set forth in Section 4.03(b) (to the extent such Indebtedness or Disqualified Stock or Preferred Stock would be permitted to be Incurred or issued thereunder as of the Reversion Date and after giving effect to Indebtedness Incurred or issued prior to the Suspension Period and outstanding on the Reversion Date). To the extent such Indebtedness or Disqualified Stock or Preferred Stock would not be so permitted to be Incurred or issued pursuant to Section 4.03(a) or Section 4.03(b), such Indebtedness or Disqualified Stock or Preferred Stock shall be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under Section 4.03(b)(iii) . For purposes of Section 4.11, all Indebtedness Incurred, or Disqualified Stock or Preferred Stock issued, during the Suspension Period and outstanding on the Reversion Date by any Restricted Subsidiary that is not a Note Guarantor will be deemed to have been Incurred on the Reversion Date. Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under Section 4.04 shall be made as though Section 4.04 had been in effect since the Issue Date and throughout the Suspension Period. Accordingly, Restricted Payments made during the Suspension Period shall reduce the amount available to be made as Restricted Payments under Section 4.04(a) and the items specified in clauses (A) through (F) of the definition of "Cumulative Credit" shall increase

77

the amount available to be made as Restricted Payments under Section 4.04(a) . For purposes of determining compliance with Section 4.06 on the Reversion Date, the Net Proceeds from all Asset Sales not applied in accordance with Section 4.06 shall be deemed to be reset to zero.

ARTICLE V

Successor Company

SECTION 5.01. When Company May Merge or Transfer Assets. (a) The Company shall not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Company is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(i) the Company is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Company) or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (the Company or such Person, as the case may be, being herein called the "Successor Company"); provided that in the case where the surviving Person is not a corporation, a co-obligor of the Notes is a corporation;

(ii) the Successor Company (if other than the Company) expressly assumes all the obligations of the Company under this Indenture and the Notes pursuant to supplemental indentures or other documents or instruments in form reasonably satisfactory to the Trustee;

(iii) immediately after giving effect to such transaction (and treating any Indebtedness that becomes an obligation of the Successor Company or any of the Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Company or such Restricted Subsidiary at the time of such transaction), no Default shall have occurred and be continuing;

(iv) immediately after giving pro forma effect to such transaction, as if such transaction had occurred at the beginning of the applicable four-quarter period (and treating any Indebtedness that becomes an obligation of the Successor Company or any of the Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Company or such Restricted Subsidiary at the time of such transaction), either

(1) the Successor Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a); or

(2) the Fixed Charge Coverage Ratio for the Successor Company and the Restricted Subsidiaries would be greater than such ratio for the

78

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 85

Company and the Restricted Subsidiaries immediately prior to such transaction; and

(v) the Company shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indentures (if any) comply with this Indenture.

The Successor Company (if other than the Company) shall succeed to, and be substituted for, the Company under this Indenture and the Notes, and in such event the Company will automatically be released and discharged from its obligations under this Indenture and the Notes. Notwithstanding the foregoing clauses (iii) and (iv) of this Section 5.01, (x) subject to the restrictions on Note Guarantors described in Section 5.01(b), any Restricted Subsidiary may merge, consolidate or amalgamate with or transfer all or part of its properties and assets to the Company or to another Restricted Subsidiary, and (y) the Company may merge, consolidate or amalgamate with an Affiliate incorporated solely for the purpose of reincorporating the Company in another state of the United States, the District of Columbia or any territory of the United States or may convert into a limited liability company, so long as the amount of Indebtedness of the Company and the Restricted Subsidiaries is not increased thereby. This Article 5 will not apply to a sale, assignment, transfer, conveyance or other disposition of assets between or among the Company and the Restricted Subsidiaries.

(b) Subject to the provisions of Section 12.02(b) (which govern the release of a Note Guarantee upon the sale or disposition of a Restricted Subsidiary that is a Note Guarantor), each Note Guarantor shall not, and the Company shall not permit any Note Guarantor to, consolidate, amalgamate or merge with or into or wind up into (whether or not such Note Guarantor is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, any Person unless:

(i) either (A) such Note Guarantor is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation or merger (if other than such Note Guarantor) or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Note Guarantor or such Person, as the case may be, being herein called the "Successor Note Guarantor") and the Successor Note Guarantor (if other than such Note Guarantor) expressly assumes all the obligations of such Note Guarantor under this Indenture and such Note Guarantor's Note Guarantee pursuant to a supplemental indenture or other documents or instruments in form reasonably satisfactory to the Trustee, or (b) such sale or disposition or consolidation, amalgamation or merger is not in violation of Section 4.06; and

(ii) the Successor Note Guarantor (if other than such Note Guarantor) shall have delivered or caused to be delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, amalgamation, merger or transfer and such supplemental indenture (if any) comply with this Indenture.

79

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 86

Except as otherwise provided in this Indenture, the Successor Note Guarantor (if other than such Note Guarantor) will succeed to, and be substituted for, such Note Guarantor under this Indenture and such Note Guarantor's Note Guarantee, and such Note Guarantor will automatically be released and discharged from its obligations under this Indenture and such Note Guarantor's Note Guarantee. Notwithstanding the foregoing, (1) a Note Guarantor may merge, amalgamate or consolidate with an Affiliate incorporated solely for the purpose of reincorporating such Note Guarantor in another state of the United States, the District of Columbia or any territory of the United States so long as the amount of Indebtedness of the Note Guarantor is not increased thereby and (2) a Note Guarantor may merge, amalgamate or consolidate with another Note Guarantor or the Company.

In addition, notwithstanding the foregoing, any Note Guarantor may consolidate, amalgamate or merge with or into or wind up into, or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets (collectively, a "Transfer") to, (x) the Company or any Note Guarantor or (y) any Restricted Subsidiary that is not a Note Guarantor; *provided* that at the time of each such Transfer pursuant to clause (y) the aggregate amount of all such Transfers since the Issue Date shall not exceed 5.0% of Total Assets as shown on the most recent available balance sheet of the Company and the Restricted Subsidiaries after giving effect to each such Transfer and including all Transfers occurring from and after the Issue Date.

ARTICLE VI

Defaults and Remedies

SECTION 6.01. Events of Default. An "Event of Default" occurs if:

(a) there is a default in any payment of interest (including any Additional Interest) on any Note when the same becomes due and payable, and such default continues for a period of 30 days,

(b) there is a default in the payment of principal or premium, if any, of any Note when due at its Stated Maturity, upon optional redemption, upon required repurchase, upon declaration or otherwise,

(c) the Company fails to comply with its obligations under Section 5.01,

(d) the Company or any Restricted Subsidiary fails to comply with any of its agreements contained in the Notes or this Indenture (other than those referred to in clause (a), (b) or (c) above) and such failure continues for 60 days after the notice specified below,

(e) the Company or any Significant Subsidiary fails to pay any Indebtedness (other than Indebtedness owing to the Company or a Restricted Subsidiary) within any applicable grace period after final maturity or the acceleration of any such Indebtedness by the holders thereof because of a default, in each case, if the total amount of such Indebtedness unpaid or accelerated exceeds $35.0 million or its foreign currency equivalent,

80

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 87

(f) the Company or any Significant Subsidiary pursuant to or within the meaning of any Bankruptcy Law:

(i) commences a voluntary case;

(ii) consents to the entry of an order for relief against it in an involuntary case;

(iii) consents to the appointment of a Custodian of it or for any substantial part of its property; or

(iv) makes a general assignment for the benefit of its creditors or takes any comparable action under any foreign laws relating to insolvency,

(g) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i) is for relief against the Company or any Significant Subsidiary in an involuntary case;

(ii) appoints a Custodian of the Company or any Significant Subsidiary or for any substantial part of its property; or

(iii) orders the winding up or liquidation of the Company or any Significant Subsidiary;

or any similar relief is granted under any foreign laws and the order or decree remains unstayed and in effect for 60 days,

(h) the Company or any Significant Subsidiary fails to pay final judgments aggregating in excess of $35.0 million or its foreign currency equivalent (net of any amounts which are covered by enforceable insurance policies issued by solvent carriers), which judgments are not discharged, waived or stayed for a period of 60 days following the entry thereof,

(i) any Note Guarantee of a Significant Subsidiary ceases to be in full force and effect (except as contemplated by the terms thereof) or any Note Guarantor denies or disaffirms its obligations under this Indenture or any Note Guarantee and such Default continues for 10 days,

(j) following the Springing Lien Trigger Date, unless such Liens have been released in accordance with the provisions of the Security Documents, the Intercreditor Agreement and this Indenture, the Second Priority Liens with respect to all or substantially all of the Collateral cease to be valid or enforceable, or the Company shall assert or any Note Guarantor shall assert, in any pleading in any court of competent jurisdiction, that any such security interest is invalid or unenforceable and, in the case of any such Person that is a Subsidiary of the Company, the Company fails to cause such Subsidiary to rescind such assertions within 30 days after the Company has actual knowledge of such assertions, or

81

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(k) following the Springing Lien Trigger Date, the failure by the Company or any Note Guarantor to comply for 60 days after notice with its other agreements contained in the Security Documents except for a failure that would not be material to the holders of the Notes and would not materially affect the value of the Collateral taken as a whole.

Each of the foregoing shall constitute an Event of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

The term "Bankruptcy Law" means Title 11, United States Code, or any similar Federal or state law for the relief of debtors. The term "Custodian" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

A Default under clause (d) or (k) above shall not constitute an Event of Default until the Trustee or the Holders of at least 25% in principal amount of the outstanding Notes notify the Company and the Trustee of the Default and the Company does not cure such Default within the time specified in clause (d) or (k) above after receipt of such notice. Such notice must specify the Default, demand that it be remedied and state that such notice is a "Notice of Default." The Company shall deliver to the Trustee, within five (5) Business Days after the occurrence thereof, written notice in the form of an Officer's Certificate of any event which is, or with the giving of notice or the lapse of time or both would become, an Event of Default, its status and what action the Company is taking or proposes to take with respect thereto.

SECTION 6.02. Acceleration. If an Event of Default (other than an Event of Default specified in Section 6.01(f) or (g) with respect to the Company) occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of outstanding Notes, by notice to the Company may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable. Upon such a declaration, such principal and interest shall be due and payable immediately. If an Event of Default specified in Section 6.01(f) or (g) with respect to the Company occurs, the principal of, premium, if any, and interest on all the Notes shall ipso facto become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holders. The Holders of a majority in principal amount of outstanding Notes by notice to the Trustee may rescind any such acceleration with respect to the Notes and its consequences.

In the event of any Event of Default specified in Section 6.01(e), such Event of Default and all consequences thereof (excluding, however, any resulting payment default) shall be annulled, waived and rescinded, automatically and without any action by the Trustee or the Holders of the Notes, if within 20 days after such Event of Default arose the Company delivers an Officer's Certificate to the Trustee stating that (x) the Indebtedness or guarantee that is the basis for such Event of Default has been discharged or (y) the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default or (z) the Default that is the basis for such Event of Default has been cured, it being understood that in no event shall an acceleration of the principal amount of the Notes as described above be annulled, waived or rescinded upon the happening of any such events.

82

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

SECTION 6.03. Other Remedies. If an Event of Default occurs and is continuing, subject to the terms of the Intercreditor Agreement, the Trustee may pursue any available remedy at law or in equity to collect the payment of principal of or interest on the Notes or to enforce the performance of any provision of the Notes, this Indenture or the Security Documents.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. No remedy is exclusive of any other remedy. To the extent required by law, all available remedies are cumulative.

SECTION 6.04. Waiver of Past Defaults. Provided the Notes are not then due and payable by reason of a declaration of acceleration, the Holders of a majority in principal amount of the Notes by written notice to the Trustee may waive an existing Default and its consequences except (a) a Default in the payment of the principal of or interest on a Note, (b) a Default arising from the failure to redeem or purchase any Note when required pursuant to the terms of this Indenture or (c) a Default in respect of a provision that under Section 9.02 cannot be amended without the consent of each Holder affected. When a Default is waived, it is deemed cured and the Company, the Trustee and the Holders will be restored to their former positions and rights under this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any consequent right.

SECTION 6.05. Control by Majority. The Holders of a majority in principal amount of the Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture or, subject to Section 7.01, that the Trustee determines is unduly prejudicial to the rights of any other Holder or that would involve the Trustee in personal liability. Prior to taking any action under this Indenture, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

SECTION 6.06. Limitation on Suits. (a) Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no Holder may pursue any remedy with respect to this Indenture or the Notes unless:

(i) the Holder gives to the Trustee written notice stating that an Event of Default is continuing;

(ii) the Holders of at least 25% in principal amount of the outstanding Notes make a written request to the Trustee to pursue the remedy;

(iii) such Holder or Holders offer to the Trustee security or indemnity reasonably satisfactory to it against any loss, liability or expense;

(iv) the Trustee does not comply with such request within 60 days after receipt of the request and the offer of security or indemnity; and

83

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 90

(v) the Holders of a majority in principal amount of the outstanding Notes do not give the Trustee a direction inconsistent with such request during such 60-day period.

(b) A Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder.

SECTION 6.07. Rights of the Holders to Receive Payment. Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of principal of and interest on the Notes held by such Holder, on or after the respective due dates expressed or provided for in the Notes, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

SECTION 6.08. Collection Suit by Trustee. If an Event of Default specified in Section 6.01(a) or (b) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Company or any other obligor on the Notes for the whole amount then due and owing (together with interest on overdue principal and (to the extent lawful) on any unpaid interest at the rate provided for in the Notes) and the amounts provided for in Section 7.07.

SECTION 6.09. Trustee May File Proofs of Claim. The Trustee may file such proofs of claim, statements of interest and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation, expenses disbursements and advances of the Trustee (including counsel, accountants, experts or such other professionals as the Trustee deems necessary, advisable or appropriate)) and the Holders allowed in any judicial proceedings relative to the Company or any Note Guarantor, their creditors or their property, shall be entitled to participate as a member, voting or otherwise, of any official committee of creditors appointed in such matters and, unless prohibited by law or applicable regulations, may vote on behalf of the Holders in any election of a trustee in bankruptcy or other Person performing similar functions, and any Custodian in any such judicial proceeding is hereby authorized by each Holder to make payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and its counsel, and any other amounts due the Trustee under Section 7.07.

SECTION 6.10. Priorities. Subject to the terms of the Intercreditor Agreement and the Security Documents, if the Trustee or the Collateral Agent, as the case may be, collects any money or property pursuant to this Article 6 (including proceeds from the exercise of any remedies on the Collateral), they shall pay out the money or property in the following order:

FIRST: to the payment of all amounts due to the Trustee under Section 7.07 and the Collateral Agent under Section 11.02;

SECOND: to the Holders for payment of amounts due and unpaid on the Notes for principal, premium, if any, interest and Additional Interest, if any, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and interest and Additional Interest, if any, respectively; and

84

Bloomberg Law®
© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

THIRD: the balance, if any, to the Company or, to the extent the Trustee or the Collateral Agent, as the case may be, collects any amount for any Note Guarantor, to such Note Guarantor.

The Trustee or the Collateral Agent, as the case may be, may fix a record date and payment date for any payment to the Holders pursuant to this Section. At least 15 days before such record date, the Trustee or the Collateral Agent, as the case may be, shall deliver to each Holder and the Company a notice that states the record date, the payment date and amount to be paid.

SECTION 6.11. Undertaking for Costs. In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.07 or a suit by Holders of more than 10% in principal amount of the Notes.

SECTION 6.12. Waiver of Stay or Extension Laws. Neither the Company nor any Note Guarantor (to the extent it may lawfully do so) shall at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Company and each Note Guarantor (to the extent that it may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

ARTICLE VII

Trustee

SECTION 7.01. Duties of Trustee. (a) If an Event of Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b) Except during the continuance of an Event of Default:

(i) the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee (it being agreed that the permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty); and

(ii) in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. The Trustee shall be under no duty to make any investigation as to any

85

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

statement contained in any such instance, but may accept the same as conclusive evidence of the truth and accuracy of such statement or the correctness of such opinions. However, in the case of certificates or opinions required by any provision hereof to be provided to it, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

(c) The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i) this paragraph does not limit the effect of paragraph (b) of this Section;

(ii) the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii) the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05; and

(iv) no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers.

(d) Every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this Section.

(e) The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company.

(f) Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(g) Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section and to the provisions of the TIA.

SECTION 7.02. Rights of Trustee. (a) The Trustee may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper person. The Trustee need not investigate any fact or matter stated in the document.

(b) Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel or both. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officer's Certificate or Opinion of Counsel. The Trustee may request that the Company and any Note Guarantor deliver an Officer's Certificate setting forth the names of individuals and/or titles of officers (with specimen signatures) authorized at such times to take specific actions pursuant to this Indenture, which Officer's Certificate may be signed by any person specified as so authorized in any such certificate previously delivered and not superseded.

86

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(c) The Trustee may act through agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d) The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; *provided*, *however*, that the Trustee's conduct does not constitute willful misconduct or negligence.

(e) The Trustee may consult with counsel of its own selection and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(f) The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture, note or other paper or document unless requested in writing to do so by the Holders of not less than a majority in principal amount of the Notes at the time outstanding, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney, at the expense of the Company and shall incur no liability of any kind by reason of such inquiry or investigation.

(g) The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders pursuant to this Indenture, unless such Holders shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

(h) The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(i) The Trustee shall not be liable for any action taken or omitted by it in good faith at the direction of the Holders of not less than a majority in principal amount of the Notes as to the time, method and place of conducting any proceedings for any remedy available to the Trustee or the exercising of any power conferred by this Indenture.

(j) Any action taken, or omitted to be taken, by the Trustee in good faith pursuant to this Indenture upon the request or authority or consent of any person who, at the time of making such request or giving such authority or consent, is the Holder of any Note shall be conclusive and binding upon future Holders of Notes and upon Notes executed and delivered in exchange therefor or in place thereof.

(k) In no event shall the Trustee be responsible for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective

87

**Bloomberg Law**®    © 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(l) In the event the Company is required to pay Additional Interest, the Company will provide written notice to the Trustee of the Company's obligation to pay Additional Interest no later than 15 days prior to the next interest payment date, which notice shall set forth the amount of the Additional Interest to be paid by the Company. The Trustee shall not at any time be under any duty or responsibility to any Holders to determine whether the Additional Interest is payable and the amount thereof.

SECTION 7.03. Individual Rights of Trustee. The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not Trustee. Any Paying Agent or Registrar may do the same with like rights. However, the Trustee must comply with Sections 7.10 and 7.11.

SECTION 7.04. Trustee's Disclaimer. The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture, any Note Guarantee or the Notes, it shall not be accountable for the Company's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Company or any Note Guarantor in this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Trustee's certificate of authentication. The Trustee shall not be charged with knowledge of any Default or Event of Default under Sections 6.01(c), (d), (e), (h), (i), (j) or (k) or of the identity of any Significant Subsidiary unless either (a) a Trust Officer shall have actual knowledge thereof or (b) the Trustee shall have received written notice thereof in accordance with Section 13.02 hereof from the Company, any Note Guarantor or any Holder. Delivery of reports to the Trustee pursuant to Section 4.03 hereof shall not constitute actual knowledge of, or notice to, the Trustee of the information contained therein. In accepting the trust hereby created, the Trustee acts solely as Trustee for the Holders of the Notes and not in its individual capacity and all Persons, including without limitation the Holders of Notes and the Company having any claim against the Trustee arising from this Indenture shall look only to the funds and accounts held by the Trustee hereunder for payment except as otherwise provided herein.

SECTION 7.05. Notice of Defaults. If a Default occurs and is continuing and if it is actually known to the Trustee, the Trustee shall deliver to each Holder notice of the Default within the earlier of 90 days after it occurs or 30 days after it is actually known to a Trust Officer or written notice of it is received by the Trustee. Except in the case of a Default in the payment of principal of, premium (if any) or interest on any Note, the Trustee may withhold the notice if and so long as a committee of its Trust Officers in good faith determines that withholding the notice is in the interests of the Holders.

SECTION 7.06. Reports by Trustee to the Holders. As promptly as practicable after each June 30 beginning with the June 30 following the date of this Indenture, and in any event prior to June 30 in each year, the Trustee shall deliver to each Holder a brief report dated as of such June 30 that complies with Section 313(a) of the TIA if and to the extent required thereby. The Trustee shall also comply with Section 313(b) of the TIA.

88

A copy of each report at the time of its delivery to the Holders shall be filed with the SEC and each stock exchange (if any) on which the Notes are listed. The Company agrees to notify promptly the Trustee whenever the Notes become listed on any stock exchange and of any delisting thereof.

SECTION 7.07. Compensation and Indemnity. The Company shall pay to the Trustee from time to time reasonable compensation for its services. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Company shall reimburse the Trustee upon request for all reasonable out-of-pocket expenses incurred or made by it, including costs of collection, in addition to the compensation for its services. Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Trustee's agents, counsel, accountants and experts. The Company and each Note Guarantor, jointly and severally shall indemnify the Trustee against any and all loss, liability, claim, damage or expense (including reasonable attorneys' fees and expenses) incurred by or in connection with the acceptance or administration of this trust and the performance of its duties hereunder, including the costs and expenses of enforcing this Indenture or Note Guarantee against the Company or a Note Guarantor (including this Section 7.07) and defending itself against or investigating any claim (whether asserted by the Company, any Note Guarantor, any Holder or any other Person). The obligation to pay such amounts shall survive the payment in full or defeasance of the Notes or the removal or resignation of the Trustee. The Trustee shall notify the Company of any claim for which it may seek indemnity promptly upon obtaining actual knowledge thereof; *provided*, *however*, that any failure so to notify the Company shall not relieve the Company or any Note Guarantor of its indemnity obligations hereunder. The Company shall defend the claim and the indemnified party shall provide reasonable cooperation at the Company's expense in the defense. Such indemnified parties may have separate counsel and the Company and the Note Guarantors, as applicable shall pay the fees and expenses of such counsel; *provided*, *however*, that the Company shall not be required to pay such fees and expenses if it assumes such indemnified parties' defense and, in such indemnified parties' reasonable judgment, there is no conflict of interest between the Company and the Note Guarantors, as applicable, and such parties in connection with such defense. The Company need not reimburse any expense or indemnify against any loss, liability or expense incurred by an indemnified party through such party's own willful misconduct, negligence or bad faith.

To secure the Company's and the Note Guarantors' payment obligations in this Section, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee other than money or property held in trust to pay principal of and interest on particular Notes.

The Company's and the Note Guarantors' payment obligations pursuant to this Section shall survive the satisfaction or discharge of this Indenture, any rejection or termination of this Indenture under any Bankruptcy Law or the resignation or removal of the Trustee. Without prejudice to any other rights available to the Trustee under applicable law, when the Trustee incurs expenses after the occurrence of a Default specified in Section 6.01(f) or (g) with respect to the Company, the expenses are intended to constitute expenses of administration under the Bankruptcy Law.

89

No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if repayment of such funds or adequate indemnity against such risk or liability is not assured to its satisfaction.

SECTION 7.08. Replacement of Trustee. (a) The Trustee may resign at any time by so notifying the Company. The Holders of a majority in principal amount of the Notes may remove the Trustee by so notifying the Trustee and may appoint a successor Trustee. The Company shall remove the Trustee if:

(i) the Trustee fails to comply with Section 7.10;

(ii) the Trustee is adjudged bankrupt or insolvent;

(iii) a receiver or other public officer takes charge of the Trustee or its property; or

(iv) the Trustee otherwise becomes incapable of acting.

(b) If the Trustee resigns, is removed by the Company or by the Holders of a majority in principal amount of the Notes and such Holders do not reasonably promptly appoint a successor Trustee, or if a vacancy exists in the office of Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee), the Company shall promptly appoint a successor Trustee.

(c) A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company. Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall deliver a notice of its succession to the Holders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the Lien provided for in Section 7.07.

(d) If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee or the Holders of 10% in principal amount of the Notes may petition at the expense of the Company any court of competent jurisdiction for the appointment of a successor Trustee.

(e) If the Trustee fails to comply with Section 7.10, unless the Trustee's duty to resign is stayed as provided in Section 310(b) of the TIA, any Holder who has been a bona fide holder of a Note for at least six months may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f) Notwithstanding the replacement of the Trustee pursuant to this Section, the Company's obligations under Section 7.07 shall continue for the benefit of the retiring Trustee.

SECTION 7.09. Successor Trustee by Merger. If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets

90

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have.

SECTION 7.10. <u>Eligibility; Disqualification</u>. The Trustee shall at all times satisfy the requirements of Section 310(a) of the TIA. The Trustee shall have a combined capital and surplus of at least $100 million as set forth in its most recent published annual report of condition. The Trustee shall comply with Section 310(b) of the TIA, subject to its right to apply for a stay of its duty to resign under the penultimate paragraph of Section 310(b) of the TIA; *provided*, *however*, that there shall be excluded from the operation of Section 310(b)(1) of the TIA any series of securities issued under this Indenture and any indenture or indentures under which other securities or certificates of interest or participation in other securities of the Company are outstanding if the requirements for such exclusion set forth in Section 310(b)(1) of the TIA are met.

SECTION 7.11. <u>Preferential Collection of Claims Against the Company</u>. The Trustee shall comply with Section 311(a) of the TIA, excluding any creditor relationship listed in Section 311(b) of the TIA. A Trustee who has resigned or been removed shall be subject to Section 311(a) of the TIA to the extent indicated.

ARTICLE VIII

Discharge of Indenture; Defeasance

SECTION 8.01. <u>Discharge of Liability on Notes; Defeasance</u>. This Indenture shall be discharged and shall cease to be of further effect (except as to surviving rights of registration or transfer or exchange of Notes, as expressly provided for in this Indenture) as to all outstanding Notes when:

(a) either (i) all the Notes theretofore authenticated and delivered (other than Notes pursuant to Section 2.08 that have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Company and thereafter repaid to the Company or discharged from such trust) have been delivered to the Trustee for cancellation or (ii) all of the Notes (a) have become due and payable, (b) will become due and payable at their Stated Maturity within one year or (c) if redeemable at the option of the Company, are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Company, and the Company has irrevocably deposited or caused to be deposited with the

91

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. <u>Terms of Service</u>

Trustee, in the case of the Dollar Notes, cash in U.S. Dollars, U.S. Dollar-denominated Government Obligations or a combination thereof, and in the case of Euro Notes, cash in euros, euro-denominated Government Obligations of any member nation of the European Union whose official currency is the euro, in each case or a combination thereof, in an amount sufficient in the written opinion of a firm of independent public accountants delivered to the Trustee (which delivery shall only be required if U.S. Dollar-denominated Government Obligations or euro-denominated Government Obligations have been so deposited) to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of deposit together with irrevocable instructions from the Company directing the Trustee to apply such funds to the payment thereof at maturity or redemption, as the case may be;

(b) the Company and/or the Note Guarantors have paid all other sums payable under this Indenture; and

(c) the Company has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent under this Indenture relating to the satisfaction and discharge of this Indenture have been complied with.

Subject to Sections 8.01(c) and 8.02, the Company at any time may terminate (i) all of its obligations under the Notes, this Indenture (with respect to such Notes) and the Security Documents ("legal defeasance option") or (ii) its obligations under Sections 4.02, 4.03, 4.04, 4.05, 4.06, 4.07, 4.08, 4.09, 4.11, 4.12 and 4.13 and the operation of Section 5.01 and Sections 6.01(c), 6.01(d), 6.01(e), 6.01(f) (with respect to Significant Subsidiaries of the Company only), 6.01(g) (with respect to Significant Subsidiaries of the Company only), 6.01(h), 6.01(i), 6.01(j) and 6.01(k) ("covenant defeasance option"). The Company may exercise its legal defeasance option notwithstanding its prior exercise of its covenant defeasance option. In the event that the Company terminates all of its obligations under the Notes and this Indenture (with respect to such Notes) by exercising its legal defeasance option or its covenant defeasance option, the obligations of each Note Guarantor with respect to the Notes, this Indenture and the Security Documents shall be terminated simultaneously with the termination of such obligations.

If the Company exercises its legal defeasance option, payment of the Notes so defeased may not be accelerated because of an Event of Default. If the Company exercises its covenant defeasance option with respect to the Notes, payment of the Notes so defeased may not be accelerated because of an Event of Default specified in Section 6.01(c), 6.01(d), 6.01(e), 6.01(f) (with respect to Significant Subsidiaries of the Company only), 6.01(g) (with respect to Significant Subsidiaries of the Company only), 6.01(h), 6.01(i), 6.01(j) or 6.01(k) or because of the failure of the Company to comply with Section 5.01(a)(4).

Upon satisfaction of the conditions set forth herein and upon request of the Company, the Trustee shall acknowledge in writing the discharge of those obligations that the Company terminates.

(d) Notwithstanding clauses (a) and (b) above, the Company's obligations in Sections 2.04, 2.05, 2.06, 2.07, 2.08, 2.09, 7.07, 7.08 and in this Article 8 shall survive until the Notes

92

Bloomberg Law®

have been paid in full. Thereafter, the Company's obligations in Sections 7.07, 8.05 and 8.06 shall survive such satisfaction and discharge.

SECTION 8.02. Conditions to Defeasance. (a) The Company may exercise its legal defeasance option or its covenant defeasance option only if:

(i) the Company irrevocably deposits in trust with the Trustee, in the case of the Dollar Notes, cash in U.S. Dollars, U.S. Dollar-denominated Government Obligations or a combination thereof, and in the case of the Euro Notes, euros, euro-denominated Government Obligations or a combination thereof, in an amount sufficient or, in the case of Government Obligations, the principal of and interest on which will be sufficient, to pay the principal of and premium (if any) and interest on the Notes when due at maturity or redemption, as the case may be, including interest thereon to maturity or such redemption date;

(ii) the Company delivers to the Trustee a certificate from a nationally recognized firm of independent accountants expressing their opinion that the payments of principal and interest when due and without reinvestment on the deposited U.S. Dollar-denominated Government Obligations, in the case of the Dollar Notes, or euro-denominated Government Obligations, in the case of the Euro Notes, plus any deposited money without investment will provide cash at such times and in such amounts as will be sufficient to pay principal, premium, if any, and interest when due on all the Notes to maturity or redemption, as the case may be;

(iii) 123 days pass after the deposit is made and during the 123-day period no Default specified in Section 6.01(f) or (g) with respect to the Company occurs which is continuing at the end of the period;

(iv) the deposit does not constitute a default under any other agreement binding on the Company;

(v) in the case of the legal defeasance option, the Company shall have delivered to the Trustee an Opinion of Counsel stating that (1) the Company has received from, or there has been published by, the Internal Revenue Service a ruling, or (2) since the date of this Indenture there has been a change in the applicable Federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Holders will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred. Notwithstanding the foregoing, the Opinion of Counsel required with respect to a legal defeasance need not be delivered if all Notes not theretofore delivered to the Trustee for cancellation have become due and payable;

(vi) in the case of the covenant defeasance option, the Company shall have delivered to the Trustee an Opinion of Counsel to the effect that the Holders will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit

93

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

and defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred; and

(vii) the Company delivers to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent to the defeasance and discharge of the Notes to be so defeased and discharged as contemplated by this Article 8 have been complied with.

(b) Before or after a deposit, the Company may make arrangements satisfactory to the Trustee for the redemption of such Notes at a future date in accordance with Article 3.

SECTION 8.03. Application of Trust Money. The Trustee shall hold in trust money, U.S. Dollar-denominated Government Obligations in the case of the Dollar Notes, or euro-denominated Government Obligations in the case of the Euro Notes (in each case, including proceeds thereof) deposited with it pursuant to this Article 8. It shall apply the deposited money and the money from U.S. Dollar-denominated Government Obligations or euro-denominated Government Obligations through each Paying Agent and in accordance with this Indenture to the payment of principal of and interest on the Notes so discharged or defeased.

SECTION 8.04. Repayment to Company. Each of the Trustee and each Paying Agent shall promptly turn over to the Company upon request any money, U.S. Dollar-denominated Government Obligations or euro-denominated Government Obligations, as applicable, held by it as provided in this Article which, in the written opinion of nationally recognized firm of independent public accountants delivered to the Trustee (which delivery shall only be required if U.S. Dollar-denominated Government Obligations or euro-denominated Government Obligations have been so deposited), are in excess of the amount thereof which would then be required to be deposited to effect an equivalent discharge or defeasance in accordance with this Article.

Subject to any applicable abandoned property law, the Trustee and each Paying Agent shall pay to the Company upon written request any money held by them for the payment of principal or interest that remains unclaimed for two years, and, thereafter, Holders entitled to the money must look to the Company for payment as general creditors, and the Trustee and each Paying Agent shall have no further liability with respect to such monies.

SECTION 8.05. Indemnity for Government Obligations. The Company shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against deposited Government Obligations or the principal and interest received on such Government Obligations.

SECTION 8.06. Reinstatement. If the Trustee or any Paying Agent is unable to apply any money or Government Obligations in accordance with this Article 8 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's obligations under this Indenture and the Notes so discharged or defeased shall be revived and reinstated as though no deposit had occurred pursuant to this Article 8 until such time as the Trustee or any

94

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Paying Agent is permitted to apply all such money, U.S. Dollar-denominated Government Obligations or euro-denominated Government Obligations in accordance with this Article 8; *provided*, *however*, that, if the Company has made any payment of principal of or interest on, any such Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Obligations held by the Trustee or any Paying Agent.

ARTICLE IX

Amendments and Waivers

SECTION 9.01. <u>Without Consent of the Holders</u>. The Company and the Trustee may amend this Indenture, the Notes, the Intercreditor Agreement or any Security Document without notice to or consent of any Holder:

(i) to cure any ambiguity, omission, defect, mistake or inconsistency;

(ii) to comply with Article 5;

(iii) to provide for uncertificated Notes in addition to or in place of certificated Notes; *provided*, *however*, that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code;

(iv) to add a Note Guarantee with respect to the Notes;

(v) to secure the Notes and the Note Guarantees, to add additional assets as Collateral, to release Collateral as permitted under this Indenture, the Security Documents or the Intercreditor Agreement and to add additional secured creditors holding Other Second Priority Obligations or additional First Priority Obligations so long as such obligations are not prohibited by this Indenture or the Security Documents;

(vi) to add to the covenants of the Company for the benefit of the Holders or to surrender any right or power herein conferred upon the Company;

(vii) to comply with any requirement of (A) the SEC in connection with qualifying or maintaining the qualification of, this Indenture under the TIA or (B) the Intercreditor Agreement;

(viii) to make any change that does not adversely affect the rights of any Holder; or

(ix) to provide for the issuance of the Exchange Notes or Additional Notes, which shall have terms substantially identical in all material respects to the Initial Notes, and which shall be treated, together with any outstanding Initial Notes, as a single issue of securities.

95

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

In addition, pursuant to the Intercreditor Agreement, any amendment, waiver or consent to any of the collateral documents with respect to First Priority Obligations will also apply automatically to the comparable Security Documents with respect to the Notes.

After an amendment under this Section 9.01 becomes effective, the Company shall electronically deliver or mail by first-class mail to the respective Holders a notice briefly describing such amendment. However, the failure to give such notice to all Holders entitled to receive such notice, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.01.

SECTION 9.02. <u>With Consent of the Holders</u>. (a) The Company and the Trustee may amend this Indenture, the Notes, the Intercreditor Agreement or the Security Documents with the written consent of the Holders of at least a majority in principal amount of the Notes then outstanding voting as a single class (including consents obtained in connection with a tender offer or exchange for the Notes) and any past Default or compliance with any provisions may be waived with the consent of the Holders of a majority in principal amount of the Notes then outstanding voting as a single class (including consents obtained in connection with a tender offer or exchange for the Notes). Notwithstanding the foregoing, without the consent of each Holder of an outstanding Note affected, no amendment may:

(i) reduce the amount of Notes whose Holders must consent to an amendment,

(ii) reduce the rate of or extend the time for payment of interest on any Note,

(iii) reduce the principal of or change the Stated Maturity of any Note,

(iv) reduce the premium payable upon the redemption of any Note or change the time at which any Note may be redeemed in accordance with Article 3,

(v) make any Note payable in money other than that stated in such Note,

(vi) expressly subordinate the Notes or any Note Guarantees to any other Indebtedness of the Company or any Note Guarantor,

(vii) impair the right of any Holder to receive payment of principal of, premium, if any, and interest on such Holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Holder's Notes,

(viii) make any change in Section 6.04 or 6.07 or the second sentence of this Section 9.02,

(ix) except as otherwise expressly permitted under this Indenture, modify any Note Guarantee in any manner adverse in any material respect to the Holders, or

(x) make any change in the provisions in the Intercreditor Agreement or this Indenture or, except as provided in the Intercreditor Agreement, any material change in

96

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

the provisions in the Security Documents, in each case dealing with the application of proceeds of Collateral upon the exercise of remedies with respect to such Collateral that would adversely affect the Holders of the Notes.

In addition, subject to the terms of the Intercreditor Agreement, without the consent of the Holders of at least 66 2/3% in aggregate principal amount of the Notes then outstanding (including consents obtained in connection with a tender offer or exchange for the Notes), no amendment or waiver may, following the Springing Lien Trigger Date, release all or substantially all of the Collateral from the Lien of this Indenture and the Security Documents with respect to the Notes.

It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.02 becomes effective, the Company shall deliver to the Holders a notice briefly describing such amendment. The failure to give such notice to all Holders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.02.

SECTION 9.03. Compliance with Trust Indenture Act. From the date on which this Indenture is qualified under the TIA, every amendment, waiver or supplement to this Indenture or the Notes shall comply with the TIA as then in effect.

SECTION 9.04. Revocation and Effect of Consents and Waivers. (a) A consent to an amendment or a waiver by a Holder of a Note shall bind the Holder and every subsequent Holder of that Note or portion of the Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent or waiver is not made on the Note. However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Note or portion of the Note if the Trustee receives the notice of revocation before the date on which the Trustee receives an Officer's Certificate from the Company certifying that the requisite principal amount of Notes have consented. After an amendment or waiver becomes effective, it shall bind every Holder. An amendment or waiver becomes effective upon the (i) receipt by the Company or the Trustee of consents by the Holders of the requisite principal amount of securities, (ii) satisfaction of conditions to effectiveness as set forth in this Indenture and any indenture supplemental hereto containing such amendment or waiver and (iii) execution of such amendment or waiver (or supplemental indenture) by the Company and the Trustee.

(b) The Company may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture. If a record date is fixed, then notwithstanding the immediately preceding paragraph, those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be Holders after such record date. No such consent shall be valid or effective for more than 120 days after such record date.

97

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

SECTION 9.05. <u>Notation on or Exchange of Notes</u>. If an amendment, supplement or waiver changes the terms of a Note, the Company may require the Holder of the Note to deliver it to the Trustee. The Trustee may place an appropriate notation on the Note regarding the changed terms and return it to the Holder. Alternatively, if the Company or the Trustee so determines, the Company in exchange for the Note shall issue and the Trustee shall authenticate a new Note that reflects the changed terms. Failure to make the appropriate notation or to issue a new Note shall not affect the validity of such amendment, supplement or waiver.

SECTION 9.06. <u>Trustee to Sign Amendments</u>. The Trustee shall sign any amendment, supplement or waiver authorized pursuant to this Article 9 if the amendment does not adversely affect the rights, duties, liabilities or immunities of the Trustee. If it does, the Trustee may but need not sign it. In signing such amendment, the Trustee shall be entitled to receive indemnity reasonably satisfactory to it and shall be provided with, and (subject to Section 7.01) shall be fully protected in relying upon, an Officer's Certificate and an Opinion of Counsel stating that such amendment, supplement or waiver is authorized or permitted by this Indenture and that such amendment, supplement or waiver is the legal, valid and binding obligation of the Company and the Note Guarantors, enforceable against them in accordance with its terms, subject to customary exceptions, and complies with the provisions hereof (including Section 9.03) .

SECTION 9.07. <u>Payment for Consent</u>. Neither the Company nor any Affiliate of the Company shall, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to be paid to all Holders that so consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

SECTION 9.08. <u>Additional Voting Terms; Calculation of Principal Amount</u>. All Notes issued under this Indenture shall vote and consent together on all matters (as to which any of such Notes may vote) as one class and no Notes will have the right to vote or consent as a separate class on any matter. Determinations as to whether Holders of the requisite aggregate principal amount of Notes have concurred in any direction, waiver or consent shall be made in accordance with this Article 9, Section 2.14 and Section 13.17.


ARTICLE X

<u>Ranking of Note Liens</u>

SECTION 10.01. <u>Relative Rights</u>. Following the Springing Lien Trigger Date, the Intercreditor Agreement will define the relative rights of holders of Second Priority Liens and holders of Liens securing First Priority Obligations. Nothing in this Indenture or the Intercreditor Agreement will:

(a) impair, as between the Company and Holders of Notes, the obligation of the Company, which is absolute and unconditional, to pay principal of, premium and interest on Notes in accordance with their terms or to perform any other obligation of the Company or any other obligor under this Indenture, the Notes, the Note Guarantees and the Security Documents;

98

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(b) restrict the right of any Holder to sue for payments that are then due and owing, in a manner not inconsistent with the provisions of the Intercreditor Agreement;

(c) prevent the Trustee, the Collateral Agent or any Holder from exercising against the Company or any other obligor any of its other available remedies upon a Default or Event of Default (other than as provided in the Intercreditor Agreement); or

(d) restrict the right of the Trustee, the Collateral Agent or any Holder (in each case except as provided in the Intercreditor Agreement):

(i) to file and prosecute a petition seeking an order for relief in an involuntary bankruptcy case as to any obligor or otherwise to commence, or seek relief commencing, any insolvency or liquidation proceeding involuntarily against any obligor;

(ii) to make, support or oppose any request for an order for dismissal, abstention or conversion in any insolvency or liquidation proceeding;

(iii) to make, support or oppose, in any insolvency or liquidation proceeding, any request for an order extending or terminating any period during which the debtor (or any other Person) has the exclusive right to propose a plan of reorganization or other dispositive restructuring or liquidation plan therein;

(iv) to seek the creation of, or appointment to, any official committee representing creditors (or certain of the creditors) in any insolvency or liquidation proceedings and, if appointed, to serve and act as a member of such committee without being in any respect restricted or bound by, or liable for, any of the obligations under this Article 10;

(v) to seek or object to the appointment of any professional person to serve in any capacity in any insolvency or liquidation proceeding or to support or object to any request for compensation made by any professional person or others therein;

(vi) to make, support or oppose any request for an order appointing a trustee or examiner in any insolvency or liquidation proceedings; or

(vii) otherwise to make, support or oppose any request for relief in any insolvency or liquidation proceeding that it is permitted by law to make, support or oppose if it were a holder of unsecured claims; or as to any matter relating to any plan of reorganization or other restructuring or liquidation plan or as to any matter relating to the administration of the estate or the disposition of the case or proceeding.

## ARTICLE XI

### Collateral

SECTION 11.01. Security Documents. Following the Springing Lien Trigger Date, the payment of the principal of, accrued and unpaid interest, if any, premium, if any, and Additional Amount, if any, on the Notes when due, whether on an interest payment date, at

99

maturity, by acceleration, repurchase, redemption or otherwise and whether by the Company pursuant to the Notes or by a Note Guarantor pursuant to its Note Guarantee, the payment of all other Obligations and the performance of all other obligations of the Company and the Note Guarantors under the Note Documents and payment of any Other Second Priority Obligations, if any, will be secured as provided in the Security Documents (subject to the terms of the Intercreditor Agreement) to be entered into by the Company, the Note Guarantors and the Collateral Agent (and, to the extent applicable, the representative of the holders of Other Second Priority Obligations) in connection with the occurrence of the Springing Lien Trigger Date and will be secured as provided in the Security Documents thereafter delivered as required or permitted by this Indenture. Upon the occurrence of the Springing Lien Trigger Date, the Company shall, and shall cause each Note Guarantor to, and each Note Guarantor shall (subject to the terms of the Intercreditor Agreement), as promptly as practicable, execute such Security Documents and the Intercreditor Agreement, make all filings (including filings of continuation statements and amendments to UCC financing statements that may be necessary to continue the effectiveness of such UCC financing statements) and take all other actions as are necessary or will be required by the Security Documents to maintain (at the sole cost and expense of the Company and the Note Guarantors) the security interest created by the Security Documents in the Collateral (other than with respect to any Collateral the security interest in which is not required to be perfected under the Security Documents) as a perfected security interest.

SECTION 11.02. Collateral Agent.

(a) The Collateral Agent is authorized and empowered to appoint one or more co-Collateral Agents as it deems necessary or appropriate.

(b) Subject to Section 7.01, neither the Trustee nor the Collateral Agent nor any of their respective officers, directors, employees, attorneys or agents will be responsible or liable for the existence, genuineness, value or protection of any Collateral, for the legality, enforceability, effectiveness or sufficiency of the Security Documents, for the creation, perfection, priority, sufficiency or protection of any Second Priority Lien, or for any defect or deficiency as to any such matters, or for any failure to demand, collect, foreclose or realize upon or otherwise enforce any of the Second Priority Liens or Security Documents or any delay in doing so.

(c) Following the Springing Lien Trigger Date, the Collateral Agent (subject to the terms of the Intercreditor Agreement) will be subject to such directions as may be given it by the Trustee from time to time (as required or permitted by this Indenture). Except as directed by the Trustee as required or permitted by this Indenture and any other representatives, the Collateral Agent will not be obligated:

(i) to act upon directions purported to be delivered to it by any other Person;

(ii) to foreclose upon or otherwise enforce any Second Priority Lien; or

(iii) to take any other action whatsoever with regard to any or all of the Second Priority Liens, Security Documents or Collateral.

100

(d) Following the Springing Lien Trigger Date, the Collateral Agent will be accountable only for amounts that it actually receives as a result of the enforcement of the Second Priority Liens or Security Documents.

(e) In acting as Collateral Agent or co-Collateral Agent, the Collateral Agent and each co-Collateral Agent may rely upon and enforce each and all of the rights, powers, immunities, indemnities and benefits of the Trustee under Article 7 hereof.

(f) Following the Springing Lien Trigger Date, the Holders of Notes agree that the Collateral Agent shall be entitled to the rights, privileges, protections, immunities, indemnities and benefits provided to the Collateral Agent by the Security Documents. Furthermore, each Holder of a Note, by accepting such Note, consents to the terms of the Intercreditor Agreement and the Security Documents described herein and in the Offering Memorandum and authorizes and directs the Trustee and the Collateral Agent to enter into and perform the Intercreditor Agreement and Security Documents following the Springing Lien Trigger Date.

(g) Following the Springing Lien Trigger Date, if the Company (i) Incurs First Priority Obligations at any time when no Intercreditor Agreement is in effect or at any time when Indebtedness constituting First Priority Obligations entitled to the benefit of an existing Intercreditor Agreement is concurrently retired, and (ii) delivers to the Collateral Agent an Officer's Certificate so stating and requesting the Collateral Agent to enter into an Intercreditor Agreement in favor of a designated agent or representative for the holders of the First Priority Obligations so Incurred, the Collateral Agent shall (and is hereby authorized and directed to) enter into such Intercreditor Agreement, bind the Holders on the terms set forth therein and perform and observe its obligations thereunder.

SECTION 11.03. Authorization of Actions to Be Taken.

(a) Each Holder of Notes, by its acceptance thereof, consents and agrees to the terms of each Security Document and the Intercreditor Agreement to be entered into in connection with the occurrence of the Springing Lien Trigger Date in accordance with the terms of this Indenture, authorizes and directs the Trustee and the Collateral Agent to enter into the Intercreditor Agreement and the Security Documents to which it is a party, authorizes and empowers the Trustee to, in connection with the occurrence of the Springing Lien Trigger Date, direct the Collateral Agent to enter into, and the Collateral Agent to execute and deliver, the Intercreditor Agreement, and authorizes and empowers the Trustee and the Collateral Agent to bind the Holders of Notes and other holders of Obligations as set forth in the Security Documents to which it is a party and the Intercreditor Agreement and to perform its obligations and exercise its rights and powers thereunder.

(b) Following the Springing Lien Trigger Date, the Collateral Agent and the Trustee are authorized and empowered to receive for the benefit of the Holders of Notes any funds collected or distributed under the Security Documents to which the Collateral Agent or Trustee is a party and to make further distributions of such funds to the Holders of Notes according to the provisions of this Indenture.

101

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 108

(c) Following the Springing Lien Trigger Date, subject to the provisions of Section 7.01, Section 7.02, and the Intercreditor Agreement, the Trustee may, in its sole discretion and without the consent of the Holders, direct, on behalf of the Holders, the Collateral Agent to take all actions it deems necessary or appropriate in order to:

(i) foreclose upon or otherwise enforce any or all of the Second Priority Liens;

(ii) enforce any of the terms of the Security Documents to which the Collateral Agent or Trustee is a party; or

(iii) collect and receive payment of any and all Obligations hereunder.

Following the Springing Lien Trigger Date, subject to the Intercreditor Agreement, the Trustee is authorized and empowered to institute and maintain, or direct the Collateral Agent to institute and maintain, such suits and proceedings as it may deem expedient to protect or enforce the Second Priority Liens or the Security Documents to which the Collateral Agent or Trustee is a party or to prevent any impairment of Collateral by any acts that may be unlawful or in violation of the Security Documents to which the Collateral Agent or Trustee is a party or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent may deem expedient to preserve or protect its interests and the interests of the Holders of Notes in the Collateral, including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the Second Priority Lien on the Collateral or be prejudicial to the interests of Holders, the Trustee or the Collateral Agent.

SECTION 11.04. Release of Collateral.

(a) Following the Springing Lien Trigger Date and subject to subsections (b) and (c) of this Section 11.04, the Collateral may be released from the Second Priority Liens created by the Security Documents at any time or from time to time in accordance with the provisions of this Indenture, the Security Documents and the Intercreditor Agreement. The applicable assets included in the Collateral shall be released from the Second Priority Liens securing the Notes and the Note Guarantees at the Company's sole cost and expense, under any one or more of the following circumstances:

(i) upon the release of all Liens on such property or assets securing First Priority Obligations; provided, however, that if the Company or any Note Guarantor subsequently Incurs First Priority Obligations that are secured by Liens on property or assets of the Company or any Note Guarantor of the type constituting the Collateral and the related Liens are Incurred in reliance on clause (8) of the definition of "Permitted Liens", then the Company and its Restricted Subsidiaries will be required to reinstitute the security arrangements with respect to the Collateral in favor of the Notes and the Note Guarantees, which will be Second Priority Liens on the Collateral securing such First Priority Obligations (other than Excluded Assets) to the same extent provided under the Security Documents and on the terms and conditions of the security documents relating

102

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 109

Bloomberg Law®

to such First Priority Obligations, with the Second Priority Lien held either by the administrative agent, collateral agent or other representative for such First Priority Obligations or by a collateral agent or other representative designated by the Company to hold the Second Priority Liens for the benefit of the Holders of the Notes and the Note Guarantees and subject to an intercreditor agreement that provides the administrative agent or collateral agent for such First Priority Obligations substantially the same rights and powers as afforded under the Intercreditor Agreement;

(ii) to enable the Company and Note Guarantors to consummate the disposition of such property or assets to the extent not prohibited under the covenant described under Section 4.06;

(iii) in respect of the property and assets of a Note Guarantor, upon the designation of such Note Guarantor to be an Unrestricted Subsidiary in accordance with the covenant described under Section 4.04 and the definition of "Unrestricted Subsidiary";

(iv) in respect of the property and assets of a Note Guarantor, upon the release or discharge of the Note Guarantee of such Note Guarantor in accordance with this Indenture;

(v) in respect of the property and assets of the Company or a Note Guarantor that at any time is not subject to a Lien securing First Priority Obligations at such time; provided that if such property and assets is subsequently subject to a Lien securing First Priority Obligations (other than Excluded Assets), such property and assets shall subsequently constitute Collateral hereunder;

(vi) in the case of a Note Guarantor making a Transfer to any Restricted Subsidiary; provided that such Transfer is permitted by clause (y) of the last paragraph of Section 5.01;

(vii) pursuant to an amendment or waiver in accordance with Article 9;

(viii) if the Notes have been discharged or defeased pursuant to Section 8.01; and

(ix) upon the Company's election to release any Collateral from the Liens securing the Notes and Guarantees pursuant to Section 4.17.

Notwithstanding the foregoing, if an Event of Default under this Indenture exists on the date on which the First Priority Obligations are repaid in full and terminated (including all commitments and letters of credit thereunder), the Second Priority Liens on the Collateral securing the Notes will not be released, except to the extent the Collateral or any portion thereof was disposed of in order to repay the First Priority Obligations secured by the Collateral, and thereafter the Trustee or another designated representative (acting at the direction of the holders of a majority of outstanding principal amount of the Notes and Other Second Priority Obligations) will have the right to direct the First Priority Representative to foreclose upon the

103

Collateral (but in such event, the Liens on the Collateral securing the Notes will be released when such Event of Default and all other Events of Default under this Indenture cease to exist).

Upon the receipt of an Officer's Certificate from the Company, as described in Section 11.04(b) below, if applicable, and any necessary or proper instruments of termination, satisfaction or release prepared by the Company, the Collateral Agent shall execute, deliver or acknowledge such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Security Documents or the Intercreditor Agreement.

(b) Except as provided in the Intercreditor Agreement, in connection with (x) any release of Collateral pursuant to Section 11.04(a)(i), (iii), (iv), (v) or (vi) above, such Collateral may not be released from the Lien and security interest created by the Security Documents and (y) any release of Collateral pursuant to Section 11.04(a)(ii), the Collateral Agent shall not be required to execute, deliver or acknowledge any instruments of termination, satisfaction or release, unless, in either case (x) or (y), an Officer's Certificate and Opinion of Counsel certifying that all conditions precedent have been met and stating under which of the circumstances set forth in Section 11.04(a) above the Collateral is being released have been delivered to the Collateral Agent on or prior to the date of such release.

(c) Following the Springing Lien Trigger Date, at any time when a Default or Event of Default has occurred and is continuing and the maturity of the Notes has been accelerated (whether by declaration or otherwise) and the Trustee has delivered a notice of acceleration to the Collateral Agent, no release of Collateral pursuant to the provisions of this Indenture or the Security Documents will be effective as against the Holders, except as otherwise provided in the Intercreditor Agreement or, subject to the terms of the Intercreditor Agreement, in connection with the exercise of remedies by the Collateral Agent.

SECTION 11.05. Filing, Recording and Opinions. (a) The Company will comply with the provisions of TIA Sections 314(b), 314(c) and 314(d), in each case following qualification of this Indenture pursuant to the TIA and except to the extent not required as set forth in any SEC regulation or interpretation (including any no-action letter issued by the Staff of the SEC, whether issued to the Company or any other Person). Following such qualification, to the extent the Company is required to furnish to the Trustee and the Collateral Agent an Opinion of Counsel pursuant to TIA Section 314(b)(2), the Company will furnish such opinion not more than 60 but not less than 30 days prior to each December 30.

Following the Springing Lien Trigger Date, any release of Collateral permitted by Section 11.04 hereof will be deemed not to impair the Liens under this Indenture and the Security Documents in contravention thereof and any Person that is required to deliver an Officer's Certificate or Opinion of Counsel pursuant to Section 314(d) of the TIA shall be entitled to rely upon the foregoing as a basis for delivery of such certificate or opinion. The Trustee may, to the extent permitted by Section 7.01 and 7.02 hereof, accept as conclusive evidence of compliance with the foregoing provisions the appropriate statements contained in such documents and Opinion of Counsel.

Following the Springing Lien Trigger Date, if any Collateral is released in accordance with this Indenture, the Intercreditor Agreement or any Security Document and if the Company

104

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

has delivered the certificates and documents required by the Security Documents and Section 11.04, the Trustee will determine whether it has received all documentation required by TIA Section 314(d) in connection with such release and, based on such determination and the Opinion of Counsel delivered pursuant to Section 11.04, will, upon request, deliver a certificate to the Collateral Agent setting forth such determination.

SECTION 11.06. [Reserved].

SECTION 11.07. Release Upon Termination of the Company's Obligations. In the event that, following the Springing Lien Trigger Date, (i) the Company delivers to the Trustee, in form and substance acceptable to it, an Officer's Certificate and Opinion of Counsel certifying that all the obligations under this Indenture, the Notes and the Security Documents have been satisfied and discharged by the payment in full of the Company's obligations under the Notes, this Indenture and the Security Documents, and all such obligations have been so satisfied, or (ii) a discharge, legal defeasance or covenant defeasance of this Indenture occurs under Article 8, the Trustee shall deliver to the Company and the Collateral Agent a notice stating that the Trustee, on behalf of the Holders, disclaims and gives up any and all rights it has in or to the Collateral, and any rights it has under the Security Documents, and upon receipt by the Collateral Agent of such notice, the Collateral Agent shall be deemed not to hold a Lien in the Collateral on behalf of the Trustee and shall do or cause to be done all acts reasonably necessary to release such Lien as soon as is reasonably practicable.

SECTION 11.08. Designations. Except as provided in the next sentence, for purposes of the provisions hereof and the Intercreditor Agreement requiring the Company to designate Indebtedness for the purposes of the terms First Priority Obligations and Other Second Priority Obligations or any other such designations hereunder or under the Intercreditor Agreement, any such designation shall be sufficient if the relevant designation provides in writing that such First Priority Obligations or Other Second Priority Obligations are permitted under this Indenture and is signed on behalf of the Company by an Officer and delivered to the Trustee, the Collateral Agent and the First Priority Representative. For all purposes hereof and the Intercreditor Agreement, the Company hereby designates the Obligations pursuant to the Credit Agreement as in effect on the Issue Date as First Priority Obligations.

SECTION 11.09. Amendment of Security Documents. The Company will not amend, modify or supplement, or permit or consent to any amendment, modification or supplement of, the Security Documents in any way that would be adverse to the holders of the Notes in any material respect, except as described above under Articles III, IV and IX or under the Intercreditor Agreement.

ARTICLE XII

Note Guarantees

SECTION 12.01. Note Guarantees. (a) Each Note Guarantor hereby jointly and severally, irrevocably and unconditionally guarantees on a senior basis, as a primary obligor and not merely as a surety, to each Holder and to the Trustee and its successors and assigns (i) the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption

105

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

or otherwise, of all obligations of the Company under this Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, premium, if any, or interest on the Notes and all other monetary obligations of the Company under this Indenture and the Notes and (ii) the full and punctual performance within applicable grace periods of all other obligations of the Company whether for fees, expenses, indemnification or otherwise under this Indenture and the Notes (all the foregoing being hereinafter collectively called the "Guaranteed Obligations"). Each Note Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from each such Note Guarantor, and that each such Note Guarantor shall remain bound under this Article 12 notwithstanding any extension or renewal of any Guaranteed Obligation.

(b) Each Note Guarantor waives presentation to, demand of payment from and protest to the Company of any of the Guaranteed Obligations and also waives notice of protest for nonpayment. Each Note Guarantor waives notice of any Default under the Notes or the Guaranteed Obligations. The obligations of each Note Guarantor hereunder shall not be affected by (i) the failure of any Holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Company or any other Person under this Indenture, the Notes or any other agreement or otherwise; (ii) any extension or renewal of this Indenture, the Notes or any other agreement; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by the Collateral Agent for the benefit of the Holders and the Trustee for the Guaranteed Obligations or any Note Guarantor following the Springing Lien Trigger Date; (v) the failure of any Holder or Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (vi) any change in the ownership of such Note Guarantor, except in each case as provided in Section 12.02(b).

(c) Each Note Guarantor hereby waives any right to which it may be entitled to have its obligations hereunder divided among the Note Guarantors, such that such Note Guarantor's obligations would be less than the full amount claimed. Each Note Guarantor hereby waives any right to which it may be entitled to have the assets of the Company first be used and depleted as payment of the Company's or such Note Guarantor's obligations hereunder prior to any amounts being claimed from or paid by such Note Guarantor hereunder. Each Note Guarantor hereby waives any right to which it may be entitled to require that the Company be sued prior to an action being initiated against such Note Guarantor.

(d) Each Note Guarantor further agrees that its Note Guarantee herein constitutes a guarantee of payment, performance and compliance when due (and not a guarantee of collection) and waives any right to require that any resort be had by the Collateral Agent on behalf of the Holders and the Trustee to any security held, following the Springing Lien Trigger Date, for payment of the Guaranteed Obligations.

(e) Except as expressly set forth in Sections 8.01(b), 12.02 and 12.06, the obligations of each Note Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise. Without limiting the generality of the foregoing, the

106

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

obligations of each Note Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of any Holder or the Trustee to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Note Guarantor or would otherwise operate as a discharge of any Note Guarantor as a matter of law or equity.

(f) Each Note Guarantor agrees that its Note Guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations. Each Note Guarantor further agrees that its Note Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest on any Guaranteed Obligation is rescinded or must otherwise be restored by any Holder or the Trustee upon the bankruptcy or reorganization of the Company or otherwise.

(g) In furtherance of the foregoing and not in limitation of any other right which any Holder or the Trustee has at law or in equity against any Note Guarantor by virtue hereof, upon the failure of the Company to pay the principal of or interest on any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, by redemption or otherwise, or to perform or comply with any other Guaranteed Obligation, each Note Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the Holders or the Trustee an amount equal to the sum of (i) the unpaid principal amount of such Guaranteed Obligations, (ii) accrued and unpaid interest on such Guaranteed Obligations (but only to the extent not prohibited by applicable law) and (iii) all other monetary obligations of the Company to the Holders and the Trustee.

(h) Each Note Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any Guaranteed Obligations guaranteed hereby until payment in full of all Guaranteed Obligations. Each Note Guarantor further agrees that, as between it, on the one hand, and the Holders and the Trustee, on the other hand, (i) the maturity of the Guaranteed Obligations guaranteed hereby may be accelerated as provided in Article 6 for the purposes of any Note Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Guaranteed Obligations as provided in Article 6, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by such Note Guarantor for the purposes of this Section 12.01.

(i) Each Note Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Trustee or any Holder in enforcing any rights under this Section 12.01.

(j) Upon request of the Trustee, each Note Guarantor shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

107

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 114

SECTION 12.02. <u>Limitation on Liability</u>. (a) Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations guaranteed hereunder by any Note Guarantor shall not exceed the maximum amount that can be hereby guaranteed without rendering this Indenture, as it relates to such Note Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

(b) A Note Guarantee as to any Note Guarantor shall terminate and be of no further force or effect and such Note Guarantor shall be deemed to be released from all obligations under this Article 12 upon:

(i) the sale, disposition or other transfer (including through merger or consolidation) of the Capital Stock (including any sale, disposition or other transfer following which the applicable Note Guarantor is no longer a Restricted Subsidiary) or all or substantially all the assets of the applicable Note Guarantor if such sale, disposition or other transfer is made in compliance with this Indenture and such Note Guarantor is released from its guarantees, if any, of, and all pledges and security, if any, granted in connection with, the Credit Agreement and any other Indebtedness of the Company or any Note Guarantor,

(ii) the Company designating such Note Guarantor to be an Unrestricted Subsidiary in accordance with the provisions set forth under Section 4.04 and the definition of "Unrestricted Subsidiary,"

(iii) in the case of any Restricted Subsidiary that after the Issue Date is required to guarantee the Notes pursuant to Section 4.11, the release or discharge of the guarantee by such Restricted Subsidiary of Indebtedness or the repayment of the Indebtedness, in each case, which resulted in the obligation to guarantee the Notes, and

(iv) the Company's exercise of its defeasance options under Article 8, or if the Company's obligations under this Indenture are discharged in accordance with the terms of this Indenture.

A Note Guarantee also shall be automatically released upon the applicable Subsidiary ceasing to be a Subsidiary as a result of any foreclosure of any pledge or security interest securing Bank Indebtedness or other exercise of remedies in respect thereof.

SECTION 12.03. <u>Successors and Assigns</u>. This Article 12 shall be binding upon each Note Guarantor and its successors and assigns and shall inure to the benefit of the successors and assigns of the Trustee and the Holders and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Notes shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture.

SECTION 12.04. <u>No Waiver</u>. Neither a failure nor a delay on the part of either the Trustee or the Holders in exercising any right, power or privilege under this Article 12 shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege. The rights, remedies and benefits of the Trustee

108

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

and the Holders herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which either may have under this Article 12 at law, in equity, by statute or otherwise.

SECTION 12.05. Modification. No modification, amendment or waiver of any provision of this Article 12, nor the consent to any departure by any Note Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Trustee, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on any Note Guarantor in any case shall entitle such Note Guarantor to any other or further notice or demand in the same, similar or other circumstances.

SECTION 12.06. Execution of Supplemental Indenture for Future Note Guarantors. Each Subsidiary and other Person which is required to become a Note Guarantor pursuant to Section 4.11 shall promptly execute and deliver to the Trustee a supplemental indenture in the form of Exhibit D hereto pursuant to which such Subsidiary or other Person shall become a Note Guarantor under this Article 12 and shall guarantee the Guaranteed Obligations. Concurrently with the execution and delivery of such supplemental indenture, the Company shall deliver to the Trustee an Opinion of Counsel and an Officer's Certificate to the effect that such supplemental indenture has been duly authorized, executed and delivered by such Subsidiary or other Person and that, subject to the application of bankruptcy, insolvency, moratorium, fraudulent conveyance or transfer and other similar laws relating to creditors' rights generally and to the principles of equity, whether considered in a proceeding at law or in equity, the Note Guarantee of such Note Guarantor is a valid and binding obligation of such Note Guarantor, enforceable against such Note Guarantor in accordance with its terms and/or to such other matters as the Trustee may reasonably request.

SECTION 12.07. Non-Impairment. The failure to endorse a Note Guarantee on any Note shall not affect or impair the validity thereof.

ARTICLE XIII

Miscellaneous

SECTION 13.01. Trust Indenture Act Controls. If and to the extent that any provision of this Indenture limits, qualifies or conflicts with the duties imposed by, or with another provision (an "incorporated provision") included in this Indenture by operation of, Sections 310 to 318 of the TIA, inclusive, such imposed duties or incorporated provision shall control.

SECTION 13.02. Notices. (a) Any notice or communication required or permitted hereunder shall be in writing and delivered in person, via facsimile or mailed by first-class mail addressed as follows:

109

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

if to the Company or a Note Guarantor:

Momentive Performance Materials Inc.
22 Corporate Woods Blvd.
Albany, New York 12211-2374
Attention: Chief Financial Officer
Facsimile: 518-533-4609

if to the Trustee or the Collateral Agent:

The Bank of New York Mellon Trust Company, N.A.
525 William Penn Place, 38th floor
Pittsburgh, Pennsylvania 15259
Attention: Momentive Performance Materials Inc. Account Manager
Facsimile: 412-234-7535

if to The Bank of New York Mellon, London Branch:

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Attention: Corporate Trust
Facsimile: 44-207-964-2536

The Company, the Collateral Agent or the Trustee by notice to the other may designate additional or different addresses for subsequent notices or communications.

(b) Any notice or communication delivered to a Holder shall be (i) delivered electronically or mailed by first-class mail, to the Holder at the Holder's address as it appears on the registration books of the Registrar and shall be sufficiently given if so delivered within the time prescribed and (ii) if and for as long as the Euro Notes are listed on the Official List of the Luxembourg Stock Exchange, and its rules so require, upon publication in a daily newspaper of general circulation in Luxembourg. If publication in Luxembourg is impracticable, the Company (or the Paying Agent acting on the Company's instructions) will make the publication in a widely circulated newspaper in Western Europe. For purposes of this clause (b)(ii), "daily newspaper" shall mean a newspaper that is published on each day, other than a Saturday, Sunday or holiday, in Luxembourg or, when applicable, elsewhere in Western Europe. If the Company is unable to give notice as described in this paragraph because the publication of any newspaper is suspended or it is otherwise impractical for the Company to publish the notice, then the Company, or the Trustee (or the Paying Agent on its behalf) acting on the Company's instructions, will give Holders of Euro Notes notice in another form, such as by electronic transmission or publication in Luxembourg on the website of the Luxembourg Stock Exchange (www.bourse.lu).

(c) Failure to deliver a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders. If a notice or communication is delivered

110

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

in the manner provided above, it is duly given, whether or not the addressee receives it, except that notices to the Trustee, Collateral Agent or The Bank of New York Mellon, London Branch are effective only if received.

From and after the date the Euro Notes are listed on the Euro MTF Market, and for so long as a listing on the Euro MTF Market is maintained or is required by the rules of the Luxembourg Stock Exchange, all notices to Holders of the Euro Notes shall be published in English:

(i) in a leading newspaper having a general circulation in Luxembourg (which is expected to be the *Luxembourg Wort*);

(ii) if such Luxembourg publication is not practicable, in one other leading English language newspaper being published on each day in morning editions, whether or not it shall be published in Saturday, Sunday or holiday editions; or

(iii) on the Luxembourg Stock Exchange's website (www.bourse.lu).

SECTION 13.03. <u>Communication by the Holders with Other Holders</u>. The Holders may communicate pursuant to Section 312(b) of the TIA with other Holders with respect to their rights under this Indenture or the Notes. The Company, the Trustee, the Registrar and other Persons shall have the protection of Section 312(c) of the TIA.

SECTION 13.04. <u>Certificate and Opinion as to Conditions Precedent</u>. Upon any request or application by the Company to the Trustee or the Collateral Agent to take or refrain from taking any action under this Indenture, the Company shall furnish to the Trustee or the Collateral Agent at the request of the Trustee or the Collateral Agent, as applicable:

(a) an Officer's Certificate in form reasonably satisfactory to the Trustee or the Collateral Agent, as applicable stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(b) an Opinion of Counsel in form reasonably satisfactory to the Trustee or the Collateral Agent, as applicable stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 13.05. <u>Statements Required in Certificate or Opinion</u>. Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture (other than pursuant to Section 4.09) shall include:

(a) a statement that the individual making such certificate or opinion has read such covenant or condition;

(b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

111

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(c) a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d) a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with; *provided*, *however*, that with respect to matters of fact an Opinion of Counsel may rely on an Officer's Certificate or certificates of public officials.

SECTION 13.06. <u>When Notes Disregarded</u>. In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Company, any Note Guarantor or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company or any Note Guarantor shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes which the Trustee knows are so owned shall be so disregarded. Subject to the foregoing, only Notes outstanding at the time shall be considered in any such determination.

SECTION 13.07. <u>Rules by Trustee, Paying Agent and Registrar</u>. The Trustee may make reasonable rules for action by or a meeting of the Holders. The Registrar and a Paying Agent may make reasonable rules for their functions.

SECTION 13.08. <u>Legal Holidays</u>. If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue on any amount that would have been otherwise payable on such payment date if it were a Business Day for the intervening period. If a regular record date is not a Business Day, the record date shall not be affected.

SECTION 13.09. <u>GOVERNING LAW</u>. THIS INDENTURE AND THE SECURITIES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

SECTION 13.10. <u>No Recourse Against Others</u>. No affiliate, director, officer, employee, manager, incorporator or holder of any Equity Interests in the Company or of any Note Guarantor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Company or any Note Guarantor under the Notes, this Indenture, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

SECTION 13.11. <u>Successors</u>. All agreements of the Company and each Note Guarantor in this Indenture and the Notes shall bind its successors. All agreements of the Trustee and the Collateral Agent in this Indenture shall bind its successors.

SECTION 13.12. <u>Multiple Originals</u>. The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. One signed copy is enough to prove this Indenture.

112

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 119

SECTION 13.13. <u>Table of Contents; Headings</u>. The table of contents, cross-reference sheet and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 13.14. <u>Indenture Controls</u>. If and to the extent that any provision of the Notes limits, qualifies or conflicts with a provision of this Indenture, such provision of this Indenture shall control.

SECTION 13.15. <u>Severability</u>. In case any provision in this Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

SECTION 13.16. <u>Force Majeure</u>. In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

SECTION 13.17. <u>Currency Indemnity and Calculation of Euro-denominated Restrictions</u>.

(a) The euro is the sole currency of account and payment for all sums payable by the Company under or in connection with the Euro Notes including damages. Any amount received or recovered in a currency other than Euro, whether as a result of, or the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Company or otherwise, by any Holder of an Euro Note, the Trustee, the Collateral Agent, The Bank of New York Mellon, London Branch, as Paying Agent, Registrar and Notes Custodian for the Euro Notes, or the Luxembourg Paying Agent in respect of any sum expressed to be due to it from the Company will only constitute a discharge of the Company to the extent of the Euro amount which the recipient is able to purchase with the amount so received or recovered that other ordinary currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).

(b) If that euro amount is less than the euro amount expressed to be due to the recipient under any Euro Note, the Trustee, the Collateral Agent, The Bank of New York Mellon, London Branch, as Paying Agent, Registrar and Notes Custodian for the Euro Notes, or the Luxembourg Paying Agent, the Company will indemnify them against any loss sustained by such recipient as a result. In any event, the Company will indemnify the recipient against the cost of making any such purchase. For the purposes of this currency indemnity provision, it will be sufficient for the Holder of Euro Notes, the Trustee, the Collateral Agent, The Bank of New York Mellon, London Branch, as Paying Agent, Registrar and Notes Custodian for the Euro Notes, or the Luxembourg Paying Agent to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of euro been made with the amount so received in that other currency on the date of receipt or recovery

113

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 120

(or, if a purchase of euro on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above). These indemnities constitute a separate and independent obligation from the Company's other obligations, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted by any Holder of Euro Notes, the Trustee, the Collateral Agent, The Bank of New York Mellon, London Branch, as Paying Agent, Registrar and Notes Custodian for the Euro Notes, or the Luxembourg Paying Agent and will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect to any sum due under any Euro Note, to the Holder of Euro Notes, the Trustee, the Collateral Agent, The Bank of New York Mellon, London Branch, as Paying Agent, Registrar and Notes Custodian for the Euro Notes, or the Luxembourg Paying Agent.

(c) Except as otherwise specifically set forth herein, for purposes of determining compliance with any euro-denominated restriction herein, the euro-equivalent amount for purposes hereof that is denominated in a non-euro currency shall be calculated based on the relevant currency exchange rate in effect on the date such non-euro amount is incurred or made, as the case may be.

[Remainder of page intentionally left blank]

114

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

MOMENTIVE PERFORMANCE
    MATERIALS INC.

By: /s/ Authorized Signatory _____
Name:
Title:

MOMENTIVE PERFORMANCE
    MATERIALS WORLDWIDE INC.,

By: /s/ Authorized Signatory _____
Name:
Title:

MOMENTIVE PERFORMANCE
    MATERIALS USA INC.

By: /s/ Authorized Signatory _____
Name:
Title:

JUNIPER BOND HOLDINGS I LLC

By: Momentive Performance Materials Inc.,
    its sole member

By: /s/ Authorized Signatory _____
Name:
Title:

JUNIPER BOND HOLDINGS II LLC,

By: Momentive Performance Materials Inc.,
    its sole member

By: /s/ Authorized Signatory _____
Name:
Title:

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

JUNIPER BOND HOLDINGS III LLC,

By: Momentive Performance Materials Inc.,
    its sole member

By: /s/ Authorized Signatory
Name:
Title:

JUNIPER BOND HOLDINGS IV LLC,

By: Momentive Performance Materials Inc.,
    its sole member

By: /s/ Authorized Signatory
Name:
Title:

MOMENTIVE PERFORMANCE
    MATERIALS QUARTZ, INC.

By: /s/ Authorized Signatory
Name:
Title:

MPM SILICONES, LLC,

By: Momentive Performance Materials USA
    Inc., its sole member

By: /s/ Authorized Signatory
Name:
Title:

MOMENTIVE PERFORMANCE
    MATERIALS SOUTH AMERICA INC.

By: /s/ Authorized Signatory
Name:
Title:

MOMENTIVE PERFORMANCE
MATERIALS CHINA
    SPV INC.

By:    /s/ Authorized Signatory
Name:
Title:

**Bloomberg Law**®

THE BANK OF NEW YORK MELLON
    TRUST COMPANY, N.A.,
    as Trustee and Collateral Agent

By: /s/ Authorized Signatory
Name:
Title:

The undersigned agrees to act as Authenticating Agent, Paying Agent, Registrar and Notes Custodian for the Euro Notes.

THE BANK OF NEW YORK MELLON,
    LONDON BRANCH

By: /s/ Authorized Signatory
Name:
Title:

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

APPENDIX A

PROVISIONS RELATING TO INITIAL NOTES, PRIVATE EXCHANGE NOTES AND EXCHANGE NOTES

1.   Definitions.

1.1   Definitions.

For the purposes of this Appendix A the following terms shall have the meanings indicated below:

"Additional Interest" has the meaning set forth in the Registration Rights Agreement.

"Clearstream" means Clearstream Banking, société anonyme or any successor or securities clearing agency.

"Common Depositary" means The Bank of New York Mellon, London Branch, its nominees and their respective successors.

"Definitive Note" means a certificated Initial Note or Private Exchange Note or Exchange Note (bearing the Restricted Notes Legend if the transfer of such Note is restricted by applicable law) that does not include the Global Notes Legend.

"Depository" means The Depository Trust Company, its nominees and their respective successors.

"Euroclear" means Euroclear Bank S.A./N.V., as operator of the Euroclear Clearance System or any successor securities clearing agency.

"Global Notes Legend" means the legend set forth under that caption in the applicable Exhibit to this Indenture.

"IAI" means an institutional "accredited investor" as described in Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

"Initial Purchasers" means J.P. Morgan Securities Inc., Citigroup Global Markets, Inc., Credit Suisse Securities (USA) LLC, Morgan Stanley & Co. Incorporated, UBS Securities LLC, Banc of America Securities LLC, Deutsche Bank Securities Inc., Goldman Sachs & Co. and BMO Capital Markets Corp.

"Notes Custodian" means the custodian with respect to a Global Note (as appointed by the Depository or the Common Depositary, as applicable) or any successor person thereto, who shall initially be the Trustee.

"Private Exchange" means the offer by the Company, pursuant to the Registration Rights Agreement, to the Initial Purchasers and/or the Sponsors to issue and deliver to each such Initial Purchaser and/or Sponsor, in exchange for the Original Notes held by such Initial Purchaser as

Appendix A-1

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 126

part of the initial distribution of such Original Notes and/or held by such Sponsor, a like aggregate amount of Private Exchange Notes.

"Private Exchange Notes" means any private exchange notes issued in exchange for the Original Notes in connection with a Private Exchange.

"Purchase Agreement" means (a) with respect to the Original Notes issued on the Issue Date, (i) the Purchase Agreement dated October 27, 2010 among the Company, the Note Guarantors and the Representatives of the Initial Purchasers, and (ii) the Notes Exchange Agreement dated November 5, 2010 among the Company, the Note Guarantors and the Sponsors and (b) any other similar purchase agreement relating to Additional Notes.

"QIB" means a "qualified institutional buyer" as defined in Rule 144A.

"Registered Exchange Offer" means the offer by the Company, pursuant to the Registration Rights Agreement, to certain Holders of Initial Notes, to issue and deliver to such Holders, in exchange for their Initial Notes, a like aggregate principal amount of Exchange Notes registered under the Securities Act.

"Regulation S" means Regulation S under the Securities Act.

"Regulation S Notes" means all Initial Notes offered and sold outside the United States in reliance on Regulation S.

"Restricted Notes Legend" means the legend set forth in Section 2.2(f)(i) herein.

"Restricted Period," with respect to any Notes, means the period of 40 consecutive days beginning on and including the later of (a) the day on which such Notes are first offered to Persons other than distributors (as defined in Regulation S under the Securities Act) in reliance on Regulation S, notice of which day shall be promptly given by the Company, the Trustee, and (b) the Issue Date, and with respect to any Additional Notes that are Transfer Restricted Definitive Notes, it means the comparable period of 40 consecutive days.

"Rule 501" means Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

"Rule 144A" means Rule 144A under the Securities Act.

"Rule 144A Notes" means all Initial Notes offered and sold to QIBs in reliance on Rule 144A.

"Shelf Registration Statement" means a registration statement filed by the Company in connection with the offer and sale of Initial Notes or Private Exchange Notes pursuant to the Registration Rights Agreement.

"Transfer Restricted Definitive Notes" means Definitive Notes that bear or are required to bear or are subject to the Restricted Notes Legend.

Appendix A-2



"Transfer Restricted Global Notes" means Global Notes that bear or are required to bear or are subject to the Restricted Notes Legend.

"Unrestricted Definitive Notes" means Definitive Notes that are not required to bear, or are not subject to, the Restricted Notes Legend.

"Unrestricted Global Notes" means Global Notes that that are not required to bear, or are not subject to, the Restricted Notes Legend.

1.2  <u>Other Definitions</u>.

| Term | Defined in Section |
|---|---|
| Agent Members | 2.1(b) |
| Global Notes | 2.1(b) |
| IAI Global Notes | 2.1(b) |
| Regulation S Global Notes | 2.1(b) |
| Rule 144A Global Notes | 2.1(b) |
| Regulation S Permanent Global Note | 2.1(b) |
| Regulation S Temporary Global Note | 2.1(b) |

2.  <u>The Notes</u>.

2.1  <u>Form and Dating; Global Notes</u>.

(a) The Initial Notes issued on the date hereof will be offered and sold by the Company pursuant to the Purchase Agreement. The Initial Notes will be resold initially by the Initial Purchasers only (1) in the United States to Persons who are QIBs as defined in Rule 144A and (2) outside the United States to Persons other than U.S. Persons (as defined in Regulation S) in reliance on Regulation S. Such Initial Notes may thereafter be transferred to, among others, QIBs and purchasers in reliance on Regulation S and, except as set forth below and, in the case of Initial Dollar Notes only, IAIs in accordance with Rule 501. Additional Notes offered after the date hereof may be offered and sold by the Company from time to time pursuant to one or more purchase agreements or exchange offers in accordance with applicable law.

(b) <u>Global Notes</u>. (i) Rule 144A Notes initially shall be represented by one or more Notes in definitive, fully registered, global form without interest coupons (collectively, the "Rule 144A Global Notes").

Regulation S Notes initially shall be represented by one or more Notes in fully registered, global form without interest coupons (collectively, the "Regulation S Temporary Global Note" and, together with the Regulation S Permanent Global Note (defined below), the "Regulation S Global Notes"), which, in the case of Initial Dollar Notes, shall be registered in the name of the Depository or the nominee of the Depository and, in the case of Initial Euro Notes, shall be registered in the name of the Common Depositary or the nominee of the Common Depositary for the accounts of designated agents holding on behalf of Euroclear or Clearstream.

Appendix A-3

Bloomberg Law®                © 2014 The Bureau of National Affairs, Inc. All Rights Reserved. <u>Terms of Service</u>
// PAGE 128

In the case of Initial Dollar Notes, one or more Global Notes in fully registered form without interest coupons and bearing the Global Notes Legend and the Restricted Notes Legend (collectively, the "IAI Global Notes") shall also be issued on or after the Issue Date, deposited with the Notes Custodian, and registered in the name of the Depository or a nominee of the Depository, duly executed by the Company and authenticated by the Trustee as provided in the Indenture to accommodate transfers of beneficial interests in the Notes to IAIs subsequent to the initial distribution.

The Restricted Period shall be terminated upon certification in form reasonably satisfactory to the Trustee in case of Initial Dollar Notes or the Common Depositary in the case of Initial Euro Notes, if required, that beneficial ownership interests in the Regulation S Temporary Global Note are owned either by non-U.S. Persons or U.S. Persons who purchased such interests in a transaction that did not require registration under the Securities Act (except to the extent of any beneficial owners thereof who acquired an interest therein during the Restricted Period pursuant to another exemption from registration under the Securities Act and who shall take delivery of a beneficial ownership interest in a 144A Global Note bearing a Restricted Notes Legend, all as contemplated by this Appendix A).

Following the termination of the Restricted Period, beneficial interests in the Regulation S Temporary Global Note shall be exchanged for beneficial interests in a permanent Global Note (the "Regulation S Permanent Global Note") pursuant to the applicable procedures of the Depository. Simultaneously with the authentication of the Regulation S Permanent Global Note, the Trustee in the case of Initial Dollar Notes, or the Common Depositary in the case of Initial Euro Notes, shall cancel the Regulation S Temporary Global Note. In the case of Initial Dollar Notes, the aggregate principal amount of the Regulation S Temporary Global Note and the Regulation S Permanent Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee and the Depository or its nominee, as the case may be, in connection with transfers of interest as hereinafter provided. In the case of Initial Euro Notes, the aggregate principal amount of the Regulation S Temporary Global Note and the Regulation S Permanent Global Note may from time to time be increased or decreased by adjustments made on the records of the Registrar and the Common Depository or its nominee, as the case may be, in connection with transfers of interest as hereinafter provided.

In the case of Initial Euro Notes, the provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream shall be applicable to transfers of beneficial interests in the Regulation S Temporary Global Note and the Regulation S Permanent Global Note that are held by participants through Euroclear or Clearstream.

The term "Global Notes" means the Rule 144A Global Notes and the Regulation S Global Notes. The Global Notes shall bear the Global Note Legend. In the case of Initial Dollar Notes, the Global Notes initially shall (i) be registered in the name of the Depository or the nominee of such Depository, in each case for credit to an account of an Agent Member, (ii) be delivered to the Trustee as custodian for such Depository and (iii) bear the Restricted Notes Legend. In the case of Initial Euro Notes, the Global Notes initially shall bear the Restricted Notes Legend and be deposited on behalf of the purchasers of the Notes represented thereby with

Appendix A-4

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

a Common Depositary and registered in the name of the Common Depository or a nominee of the Common Depositary, for the accounts of Euroclear and Clearstream, duly executed by the Company and authenticated by the Trustee or the Authentication Agent as provided in this Indenture.

Members of, or direct or indirect participants in, the Depository, Euroclear and Clearstream ("Agent Members") shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depository or the Trustee as its custodian, the Common Depositary or under the Global Notes. The Depository and the Common Depositary may be treated by the Company, the Trustee and any agent of the Company or the Trustee as the absolute owner of the Global Notes for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depository, Euroclear or Clearstream, or impair, as between the Depository, Euroclear or Clearstream and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

(ii) Transfers of Global Notes shall be limited to transfers in whole, but not in part, to the Depository or the Common Depositary, as applicable, its successors or their respective nominees. Interests of beneficial owners in the Global Notes may be transferred or exchanged for Definitive Notes only in accordance with the applicable rules and procedures of the Depository, Euroclear or Clearstream and the provisions of Section 2.2. In addition, a Global Note shall be exchangeable for Definitive Notes if (x)(1) in the case of Initial Dollar Notes, the Depository (a) notifies the Company that it is unwilling or unable to continue as depository for such Global Note or (b) has ceased to be a clearing agency registered under the Exchange Act and in each case a successor depository is not appointed or (2) in the case of Initial Euro Notes, Euroclear or Clearstream, as applicable, acting through itself or the Common Depositary, (a) notifies the Company that it is unwilling or unable to continue as a clearing system in respect of such Global Note or (b) has ceased to be a clearing system and in each case a successor clearing system is not appointed, (y) the Company, at its option and subject to the procedures of the Depository, Euroclear or Clearstream, notifies the Trustee in writing that it elects to cause the issuance of Definitive Notes or (z) there shall have occurred and be continuing an Event of Default with respect to the Notes; *provided* that in no event shall the Regulation S Temporary Global Note be exchanged by the Company for Definitive Notes prior to (x) the expiration of the Restricted Period and (y) the receipt by the Registrar of any certificates required pursuant to Rule 903(b)(3)(ii)(B) under the Securities Act. In all cases, Definitive Notes delivered in exchange for any Global Note or beneficial interests therein shall be registered in the names, and issued in any approved denominations, requested by or on behalf of the Depository or Common Depositary in accordance with its customary procedures.

(iii) In connection with the transfer of a Global Note as an entirety to beneficial owners pursuant to subsection (i) of this Section 2.1(b), such Global Note shall be deemed to be surrendered to the Trustee for cancellation, and the Company shall execute, and the Trustee shall authenticate and make available for delivery, to each beneficial owner identified by the Depository or the Common Depositary in writing in exchange for its beneficial interest in such Global Note, an equal aggregate principal amount of Definitive Notes of authorized denominations.

Appendix A-5

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(iv) Any Transfer Restricted Definitive Note delivered in exchange for an interest in a Global Note pursuant to Section 2.2 shall, except as otherwise provided in Section 2.2, bear the Restricted Notes Legend.

(v) Notwithstanding the foregoing, through the Restricted Period, a beneficial interest in a Regulation S Global Note may be held only through Euroclear or Clearstream unless delivery is made in accordance with the applicable provisions of Section 2.2.

(vi) The Holder of any Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

2.2  Transfer and Exchange.

(a) Transfer and Exchange of Global Notes. A Global Note may not be transferred as a whole except as set forth in Section 2.1(b) . Global Notes will not be exchanged by the Company for Definitive Notes except under the circumstances described in Section 2.1(b)(ii). Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.08 and 2.10 of this Indenture. Beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.2(b) or 2.2(g).

(b) Transfer and Exchange of Beneficial Interests in Global Notes. The transfer and exchange of beneficial interests in the Global Notes shall be effected through the Depository or the Common Depositary, in accordance with the provisions of this Indenture and the applicable rules and procedures of the Depository, Euroclear or Clearstream, as applicable. Beneficial interests in Transfer Restricted Global Notes shall be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Beneficial interests in Global Notes shall be transferred or exchanged only for beneficial interests in Global Notes. Transfers and exchanges of beneficial interests in the Global Notes also shall require compliance with either subparagraph (i) or (ii) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(i) Transfer of Beneficial Interests in the Same Global Note. Beneficial interests in any Transfer Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Transfer Restricted Global Note in accordance with the transfer restrictions set forth in the Restricted Notes Legend; provided, however, that prior to the expiration of the Restricted Period, transfers of beneficial interests in a Regulation S Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person. A beneficial interest in an Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.2(b)(i).

(ii) All Other Transfers and Exchanges of Beneficial Interests in Global Notes. In connection with all transfers and exchanges of beneficial interests in any Global Note that is not subject to Section 2.2(b)(i), the transferor of such beneficial interest must deliver to the Registrar (1) a written order from an Agent Member given to the

Appendix A-6

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Depository or the Common Depositary in accordance with the applicable rules and procedures of the Depository, Euroclear or Clearstream, as applicable, directing the Registrar to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given in accordance with the applicable rules and procedures of the Depository, Euroclear or Clearstream, as applicable, containing information regarding the Agent Member account to be credited with such increase. Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note pursuant to Section 2.2(g).

(iii) <u>Transfer of Beneficial Interests to Another Transfer Restricted Global Note</u>. A beneficial interest in a Transfer Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Transfer Restricted Global Note if the transfer complies with the requirements of Section 2.2(b)(ii) above and the Registrar receives the following:

(A) if the transferee will take delivery in the form of a beneficial interest in a Rule 144A Global Note, then the transferor must deliver a certificate in the form attached to the applicable Note;

(B) in the case of Initial Dollar Notes only, if the transferee will take delivery in the form of a beneficial interest in an IAI Global Note, then the transferor must deliver a certificate in the form attached to the applicable Note; and

(C) if the transferee will take delivery in the form of a beneficial interest in a Regulation S Global Note, then the transferor must deliver a certificate in the form attached to the applicable Note.

In the case of a transfer of a beneficial interest in either the Regulation S Temporary Global Note, the Regulation S Permanent Global Note or a Rule 144A Global Note for an interest in an IAI Global Note, the transferee must furnish a signed letter in the form of Exhibit C to the Trustee.

(iv) <u>Transfer and Exchange of Beneficial Interests in a Transfer Restricted Global Note for Beneficial Interests in an Unrestricted Global Note</u>. A beneficial interest in a Transfer Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.2(b)(ii) above and the Registrar receives the following:

(A) if the holder of such beneficial interest in a Transfer Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form attached to the applicable Note; or

Appendix A-7

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. <u>Terms of Service</u>

(B) if the holder of such beneficial interest in a Transfer Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form attached to the applicable Note,

and, in each such case, if the Company or the Registrar so requests or if the applicable rules and procedures of the Depository, Euroclear or Clearstream, as applicable, so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Restricted Notes Legend are no longer required in order to maintain compliance with the Securities Act. If any such transfer or exchange is effected pursuant to this subparagraph (iv) at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of a written order of the Company in the form of an Officer's Certificate in accordance with Section 2.01, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred or exchanged pursuant to this subparagraph (iv).

(v) Transfer and Exchange of Beneficial Interests in an Unrestricted Global Note for Beneficial Interests in a Transfer Restricted Global Note. Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Transfer Restricted Global Note.

(c) Transfer and Exchange of Beneficial Interests in Global Notes for Definitive Notes. A beneficial interest in a Global Note may not be exchanged for a Definitive Note except under the circumstances described in Section 2.1(b)(ii). A beneficial interest in a Global Note may not be transferred to a Person who takes delivery thereof in the form of a Definitive Note except under the circumstances described in Section 2.1(b)(ii).

(d) Transfer and Exchange of Definitive Notes for Beneficial Interests in Global Notes. Transfers and exchanges of beneficial interests in the Global Notes also shall require compliance with either subparagraph (i), (ii) or (iii) below, as applicable:

(i) Transfer Restricted Definitive Notes to Beneficial Interests in Transfer Restricted Global Notes. If any Holder of a Transfer Restricted Definitive Note proposes to exchange such Transfer Restricted Definitive Note for a beneficial interest in a Transfer Restricted Global Note or to transfer such Transfer Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in a Transfer Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A) if the Holder of such Transfer Restricted Definitive Note proposes to exchange such Transfer Restricted Definitive Note for a beneficial interest in a Transfer Restricted Global Note, a certificate from such Holder in the form attached to the applicable Note;

Appendix A-8

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(B) if such Transfer Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A under the Securities Act, a certificate from such Holder in the form attached to the applicable Note;

(C) if such Transfer Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904 under the Securities Act, a certificate from such Holder in the form attached to the applicable Note;

(D) if such Transfer Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144 under the Securities Act, a certificate from such Holder in the form attached to the applicable Note;

(E) in the case of Initial Dollar Notes only, if such Transfer Restricted Definitive Note is being transferred to an IAI in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate from such Holder in the form attached to the applicable Note, including the certifications, certificates and Opinion of Counsel, if applicable; or

(F) if such Transfer Restricted Definitive Note is being transferred to the Company or a Subsidiary thereof, a certificate from such Holder in the form attached to the applicable Note;

the Trustee shall cancel the Transfer Restricted Definitive Note, and increase or cause to be increased the aggregate principal amount of the appropriate Transfer Restricted Global Note.

(ii) <u>Transfer Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes</u>. A Holder of a Transfer Restricted Definitive Note may exchange such Transfer Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note or transfer such Transfer Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if the Registrar receives the following:

(A) if the Holder of such Transfer Restricted Definitive Note proposes to exchange such Transfer Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, a certificate from such Holder in the form attached to the applicable Note; or

(B) if the Holder of such Transfer Restricted Definitive Notes proposes to transfer such Transfer Restricted Definitive Note to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such Holder in the form attached to the applicable Note,

and, in each such case, if the Company or the Registrar so requests or if the applicable rules and procedures of the Depository, Euroclear or Clearstream, as applicable, so

Appendix A-9

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Restricted Notes Legend are no longer required in order to maintain compliance with the Securities Act. Upon satisfaction of the conditions of this subparagraph (ii), the Trustee shall cancel the Transfer Restricted Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note. If any such transfer or exchange is effected pursuant to this subparagraph (ii) at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of a written order of the Company in the form of an Officer's Certificate, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of Transfer Restricted Definitive Notes transferred or exchanged pursuant to this subparagraph (ii).

(iii) <u>Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes</u>. A Holder of an Unrestricted Definitive Note may exchange such Unrestricted Definitive Note for a beneficial interest in an Unrestricted Global Note or transfer such Unrestricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Trustee shall cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes. If any such transfer or exchange is effected pursuant to this subparagraph (iii) at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of a written order of the Company in the form of an Officer's Certificate, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of Unrestricted Definitive Notes transferred or exchanged pursuant to this subparagraph (iii).

(iv) <u>Unrestricted Definitive Notes to Beneficial Interests in Transfer Restricted Global Notes</u>. An Unrestricted Definitive Note cannot be exchanged for, or transferred to a Person who takes delivery thereof in the form of, a beneficial interest in a Transfer Restricted Global Note.

(e) <u>Transfer and Exchange of Definitive Notes for Definitive Notes</u>. Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.2(e), the Registrar shall register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting Holder shall present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing. In addition, the requesting Holder shall provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.2(e).

(i) Transfer Restricted Definitive Notes to Transfer Restricted Definitive Notes. A Transfer Restricted Definitive Note may be transferred to and registered in the

Appendix A-10

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

name of a Person who takes delivery thereof in the form of a Transfer Restricted Definitive Note if the Registrar receives the following:

(A) if the transfer will be made pursuant to Rule 144A under the Securities Act, a certificate in the form attached to the applicable Note;

(B) if the transfer will be made pursuant to Rule 903 or Rule 904 under the Securities Act, a certificate in the form attached to the applicable Note;

(C) if the transfer will be made pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144 under the Securities Act, a certificate in the form attached to the applicable Note;

(D) in the case of Initial Dollar Notes only, if the transfer will be made to an IAI in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (A) through (D) above, a certificate in the form attached to the applicable Note; and

(E) if such transfer will be made to the Company or a Subsidiary thereof, a certificate in the form attached to the applicable Note.

(ii) Transfer Restricted Definitive Notes to Unrestricted Definitive Notes. Any Transfer Restricted Definitive Note may be exchanged by the Holder thereof for an Unrestricted Definitive Note or transferred to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note if the Registrar receives the following:

(1) if the Holder of such Transfer Restricted Definitive Note proposes to exchange such Transfer Restricted Definitive Note for an Unrestricted Definitive Note, a certificate from such Holder in the form attached to the applicable Note; or

(2) if the Holder of such Transfer Restricted Definitive Note proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Holder in the form attached to the applicable Note,

and, in each such case, if the Registrar so requests, an Opinion of Counsel in form reasonably acceptable to the Company to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Restricted Notes Legend are no longer required in order to maintain compliance with the Securities Act.

(iii) Unrestricted Definitive Notes to Unrestricted Definitive Notes. A Holder of an Unrestricted Definitive Note may transfer such Unrestricted Definitive Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note at any time. Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Holder thereof.

Appendix A-11

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

(iv) <u>Unrestricted Definitive Notes to Transfer Restricted Definitive Notes</u>. An Unrestricted Definitive Note cannot be exchanged for, or transferred to a Person who takes delivery thereof in the form of, a Transfer Restricted Definitive Note.

(f) <u>Legend</u>.

(i) Except as permitted by the following paragraphs (ii), (iii) or (iv),

(A) each Dollar Note certificate evidencing the Global Notes and the Definitive Notes (and all Notes issued in exchange therefor or in substitution thereof) shall bear a legend in substantially the following form (each defined term in the legend being defined as such for purposes of the legend only):

THIS NOTE (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND THIS NOTE MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH HOLDER OF THIS NOTE IS HEREBY NOTIFIED THAT THE SELLER OF THIS NOTE MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER. THE HOLDER OF THIS NOTE AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED NOTES, FOR THE BENEFIT OF THE COMPANY, THAT (A) THIS NOTE MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (I) IN THE UNITED STATES TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (II) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 904 UNDER THE SECURITIES ACT, (III) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF AVAILABLE), (IV) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, (V) TO THE COMPANY OR ANY OF ITS SUBSIDIARIES, OR (VI) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" (AS DEFINED IN RULE 501(A)(1), (2), (3) OR (7) OF REGULATION D UNDER THE SECURITIES ACT) THAT, PRIOR TO SUCH TRANSFER, FURNISHES THE TRUSTEE A SIGNED LETTER CONTAINING CERTAIN REPRESENTATIONS AND AGREEMENTS RELATING TO THE TRANSFER OF NOTES AND, IF SUCH TRANSFER IS IN RESPECT OF AN AGGREGATE PRINCIPAL AMOUNT OF NOTES LESS THAN $250,000, AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY AND THE TRUSTEE THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT, IN EACH OF CASES (I) THROUGH (VI) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY

Appendix A-12

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

ANY HOLDER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO IN (A) ABOVE.

[FOR REGULATION S ONLY] [THIS NOTE (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND MAY NOT BE TRANSFERRED IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON EXCEPT PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS. TERMS USED ABOVE HAVE THE MEANINGS GIVEN TO THEM IN REGULATION S UNDER THE SECURITIES ACT.]

(B) each Euro Note certificate evidencing the Global Notes and the Definitive Notes (and all Notes issued in exchange therefor or in substitution thereof) shall bear a legend in substantially the following form (each defined term in the legend being defined as such for purposes of the legend only):

THIS NOTE (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND THIS NOTE MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH HOLDER OF THIS NOTE IS HEREBY NOTIFIED THAT THE SELLER OF THIS NOTE MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER. THE HOLDER OF THIS NOTE AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED NOTES, FOR THE BENEFIT OF THE COMPANY, THAT (A) THIS NOTE MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (I) IN THE UNITED STATES TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (II) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 904 UNDER THE SECURITIES ACT, (III) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF AVAILABLE), (IV) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, OR (V) TO THE COMPANY OR ANY OF ITS SUBSIDIARIES, IN EACH OF CASES (I) THROUGH (V) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY HOLDER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO IN (A) ABOVE.

Appendix A-13

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

[FOR REGULATION S ONLY] [THIS NOTE (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND MAY NOT BE TRANSFERRED IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON EXCEPT PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS. TERMS USED ABOVE HAVE THE MEANINGS GIVEN TO THEM IN REGULATION S UNDER THE SECURITIES ACT.]

(C) Each Definitive Note shall bear the following additional legend:

IN CONNECTION WITH ANY TRANSFER, THE HOLDER WILL DELIVER TO THE REGISTRAR AND TRANSFER AGENT SUCH CERTIFICATES AND OTHER INFORMATION AS SUCH TRANSFER AGENT MAY REASONABLY REQUIRE TO CONFIRM THAT THE TRANSFER COMPLIES WITH THE FOREGOING RESTRICTIONS.

(ii) Upon any sale or transfer of a Transfer Restricted Definitive Note, the Registrar shall permit the Holder thereof to exchange such Transfer Restricted Definitive Note for a Definitive Note that does not bear the legends set forth above and rescind any restriction on the transfer of such Transfer Restricted Definitive Note if the Holder certifies in writing to the Registrar that its request for such exchange was made in reliance on Rule 144 (such certification to be in the form set forth on the reverse of the Initial Note).

(iii) After a transfer of any Initial Notes or Private Exchange Notes during the period of the effectiveness of a Shelf Registration Statement with respect to such Initial Notes or Private Exchange Notes, all requirements pertaining to the Restricted Notes Legend on such Initial Notes or Private Exchange Notes shall cease to apply and the requirements that any such Initial Notes or Private Exchange Notes be issued in global form shall continue to apply.

(iv) Upon the consummation of a Registered Exchange Offer with respect to the Initial Notes pursuant to which Holders of such Initial Notes are offered Exchange Notes in exchange for their Initial Notes, all requirements pertaining to Initial Notes that Initial Notes be issued in global form shall continue to apply, and Exchange Notes in global form without the Restricted Notes Legend shall be available to Holders that exchange such Initial Notes in such Registered Exchange Offer.

(v) Upon a sale or transfer after the expiration of the Restricted Period of any Initial Note acquired pursuant to Regulation S, all requirements that such Initial Note bear the Restricted Notes Legend shall cease to apply and the requirements requiring any such Initial Note be issued in global form shall continue to apply.

(vi) Upon the consummation of a Private Exchange with respect to the Original Notes, all requirements pertaining to such Original Notes that Original Notes issued to certain Holders be issued in global form will still apply with respect to Holders of such Original Notes that do not exchange their Original Notes, and Private Exchange Notes in global form with the global

Appendix A-14

Bloomberg Law®

notes legend and the applicable restricted notes legend set forth in Exhibit A hereto will be available to Holders that exchange such Original Notes in such Private Exchange.

(vii) Any Additional Notes sold in a registered offering shall not be required to bear the Restricted Notes Legend.

(g) Cancellation or Adjustment of Global Note. At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11 of this Indenture. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depository at the direction of the Trustee or by the Common Depositary at the direction of the Trustee, as applicable, to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depository at the direction of the Trustee or by the Common Depositary at the direction of the Trustee, as applicable, to reflect such increase.

(h) Obligations with Respect to Transfers and Exchanges of Notes.

(i) To permit registrations of transfers and exchanges, the Company shall execute and the Trustee shall authenticate, Definitive Notes and Global Notes at the Registrar's request.

(ii) No service charge shall be made for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any transfer tax, assessments, or similar governmental charge payable in connection therewith (other than any such transfer taxes, assessments or similar governmental charge payable upon exchanges pursuant to Sections 3.06, 4.06, 4.08 and 9.05 of this Indenture).

(iii) Prior to the due presentation for registration of transfer of any Note, the Company, the Trustee, a Paying Agent or the Registrar may deem and treat the Person in whose name a Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Note and for all other purposes whatsoever, whether or not such Note is overdue, and none of the Company, the Trustee, the Paying Agent or the Registrar shall be affected by notice to the contrary.

(iv) All Notes issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such transfer or exchange.

(i) No Obligation of the Trustee.

(i) The Trustee shall have no responsibility or obligation to any beneficial owner of a Global Note, a member of, or a participant in the Depository, Euroclear or Clearstream or any

Appendix A-15

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

other Person with respect to the accuracy of the records of the Depository, Euroclear or Clearstream or any nominee or of any participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any participant, member, beneficial owner or other Person (other than the Depository or the Common Depositary) of any notice (including any notice of redemption or repurchase) or the payment of any amount, under or with respect to such Notes. All notices and communications to be given to the Holders and all payments to be made to the Holders under the Notes shall be given or made only to the registered Holders (which shall be the Depository, the Common Depositary or any nominee thereof in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through the Depository or the Common Depositary, as applicable, subject to the applicable rules and procedures of the Depository or the Common Depositary, as applicable. The Trustee may rely and shall be fully protected in relying upon information furnished by the Depository or the Common Depositary with respect to any members, participants and any beneficial owners thereof.

(ii) The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among participants, members or beneficial owners of the Depository, Euroclear or Clearstream, as applicable, in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

2.3  Initial Sponsor Note.

Notwithstanding any other provision of this Appendix,

(i) the Original Note (or Original Notes) issued to the Sponsors pursuant to the Notes Exchange Agreement dated November 5, 2010 among the Company, the Note Guarantors and the Sponsors will be a Definitive Note (or Definitive Notes) in physical form bearing the first sentence of the legend relating to restrictions on transfer relating to the Securities Act set forth in Section 2.2(f) (each such Definitive Note, an "Initial Sponsor Note");

(ii) the Initial Sponsor Note (or any Private Exchange Note(s) issued in exchange therefor) may be transferred, in whole or in part, only pursuant to an effective registration statement under the Securities Act or pursuant to an applicable exemption from the registration requirements of the Securities Act; and

(iii) the Initial Sponsor Note (or any Private Exchange Note(s) issued in exchange therefor) may be exchanged, in whole or in part, for a beneficial interest in a Global Note or an Exchange Note, as applicable, in which other beneficial interests exist, only if the portion of such Initial Sponsor Note that is being exchanged (a) is being transferred pursuant to an effective registration statement under the Securities Act, (b) has not been owned by the Company or an Affiliate of the Company during the six month period preceding such exchange, (c) is being transferred in connection with a transfer pursuant to Rule 144, subject to receipt by the Trustee of such documentation as it shall reasonably request pursuant to the Indenture or (d) in the

Appendix A-16

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Opinion of Counsel delivered to the Trustee, the beneficial owner can hold a beneficial interest in the Global Note or Exchange Note, as applicable, in which other beneficial interests exist without adversely affecting the ability of beneficial owners of interests in the Global Note or Exchange Note that are not Affiliates of the Issuers to transfer such interests pursuant to Rule 144 or pursuant any other exemption from the registration requirements of the Securities Act.

If requested by one of the Sponsors, the Company and the Note Guarantors will use commercially reasonable efforts to exchange the Initial Sponsor Note(s) (or any Private Exchange Note(s) issued in exchange therefor) issued as a Definitive Note in physical form for a new global security (with its own CUSIP/ISIN number) registered in the name of The Depository Trust Company ("DTC") or a nominee thereof and otherwise subject to the same rights and restrictions on transfer or exchange as the Initial Sponsor Note(s) (or any Private Exchange Note(s) issued in exchange therefor), and will use commercially reasonable efforts to take all actions that may be necessary, and execute and deliver such documents as may be reasonably required, to deposit such global security in the DTC clearing system (including, without limitation, delivering to DTC a letter of representations in DTC's standard form). In no event shall such exchange be effected unless (i) suitable provisions shall have been made to ensure that the holders of such Initial Sponsor Note (or any Private Exchange Note(s) issued in exchange therefor) shall be, immediately after such exchange, the beneficial owners of such global security (it being understood that, thereafter, the term "holders" as used herein shall refer to such beneficial owners and their successors and assigns hereunder) and (ii) such exchange shall not violate any applicable law.

Appendix A-17

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

EXHIBIT A-1

[FORM OF FACE OF INITIAL DOLLAR NOTE]

[Global Notes Legend]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), NEW YORK, NEW YORK, TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO., OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO DTC, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

[Restricted Notes Legend]

THIS NOTE (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND THIS NOTE MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH HOLDER OF THIS NOTE IS HEREBY NOTIFIED THAT THE SELLER OF THIS NOTE MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER. THE HOLDER OF THIS NOTE AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED NOTES, FOR THE BENEFIT OF THE COMPANY, THAT (A) THIS NOTE MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (I) IN THE UNITED STATES TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (II) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 904 UNDER THE SECURITIES ACT, (III) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF AVAILABLE), (IV) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, (V) TO THE COMPANY OR ANY OF ITS

A-1-1

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

SUBSIDIARIES OR (VI) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" (AS DEFINED IN RULE 5.01(A)(1), (2), (3) OR (7) OF REGULATION D UNDER THE SECURITIES ACT) THAT, PRIOR TO SUCH TRANSFER, FURNISHES THE TRUSTEE A SIGNED LETTER CONTAINING CERTAIN REPRESENTATIONS AND AGREEMENTS RELATING TO THE TRANSFER OF NOTES AND, IF SUCH TRANSFER IS IN RESPECT OF AN AGGREGATE PRINCIPAL AMOUNT OF NOTES LESS THAN $250,000, AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY AND THE TRUSTEE THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT, IN EACH OF CASES (I) THROUGH (VI) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY HOLDER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO IN (A) ABOVE.

[FOR REGULATION S ONLY] [THIS NOTE (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND MAY NOT BE TRANSFERRED IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON EXCEPT PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS. TERMS USED ABOVE HAVE THE MEANINGS GIVEN TO THEM IN REGULATION S UNDER THE SECURITIES ACT.]

[Temporary Regulation S Global Note Legend]

EXCEPT AS SET FORTH BELOW, BENEFICIAL OWNERSHIP INTERESTS IN THIS TEMPORARY REGULATION S GLOBAL NOTE SHALL NOT BE EXCHANGEABLE FOR INTERESTS IN THE PERMANENT REGULATION S GLOBAL NOTE OR ANY OTHER NOTE REPRESENTING AN INTEREST IN THE NOTES REPRESENTED HEREBY THAT DO NOT CONTAIN A LEGEND CONTAINING RESTRICTIONS ON TRANSFER, UNTIL THE EXPIRATION OF THE "40-DAY DISTRIBUTION COMPLIANCE PERIOD" (WITHIN THE MEANING OF RULE 903(b)(2) OF REGULATION S UNDER THE SECURITIES ACT) AND THEN ONLY UPON CERTIFICATION IN FORM REASONABLY SATISFACTORY TO THE TRUSTEE THAT SUCH BENEFICIAL INTERESTS ARE OWNED EITHER BY NON-U.S. PERSONS OR U.S. PERSONS WHO PURCHASED SUCH INTERESTS IN A TRANSACTION THAT DID NOT REQUIRE REGISTRATION UNDER THE SECURITIES ACT. DURING SUCH 40-DAY DISTRIBUTION COMPLIANCE PERIOD, BENEFICIAL OWNERSHIP INTERESTS IN THIS TEMPORARY REGULATION S GLOBAL NOTE MAY ONLY BE SOLD, PLEDGED OR TRANSFERRED (A) TO THE COMPANY, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE NOTES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), IN THE UNITED STATES TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (D) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 904 UNDER THE SECURITIES ACT OR

A-1-2

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 144

(E) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE COMPANY'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D) OR (E) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM, IN EACH OF CASES (A) THROUGH (E) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND OTHER JURISDICTIONS. HOLDERS OF INTERESTS IN THIS TEMPORARY REGULATION S GLOBAL NOTE SHALL NOTIFY ANY PURCHASER OF THIS NOTE OF THE RESALE RESTRICTIONS REFERRED TO ABOVE, IF THEN APPLICABLE.

BENEFICIAL INTERESTS IN THIS TEMPORARY REGULATION S GLOBAL NOTE MAY BE EXCHANGED FOR INTERESTS IN A RULE 144A GLOBAL NOTE ONLY IF (1) SUCH EXCHANGE OCCURS IN CONNECTION WITH A TRANSFER OF THE NOTES IN COMPLIANCE WITH RULE 144A AND (2) THE TRANSFEROR OF THE REGULATION S GLOBAL NOTE FIRST DELIVERS TO THE TRUSTEE A WRITTEN CERTIFICATE (IN THE FORM ATTACHED TO THIS CERTIFICATE) TO THE EFFECT THAT THE REGULATION S GLOBAL NOTE IS BEING TRANSFERRED (A) TO A PERSON WHO THE TRANSFEROR REASONABLY BELIEVES TO BE A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A, (B) TO A PERSON WHO IS PURCHASING FOR ITS OWN ACCOUNT OR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, AND (C) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS.

BENEFICIAL INTERESTS IN A RULE 144A GLOBAL NOTE MAY BE TRANSFERRED TO A PERSON WHO TAKES DELIVERY IN THE FORM OF AN INTEREST IN THE REGULATION S GLOBAL NOTE, WHETHER BEFORE OR AFTER THE EXPIRATION OF THE 40-DAY DISTRIBUTION COMPLIANCE PERIOD, ONLY IF THE TRANSFEROR FIRST DELIVERS TO THE TRUSTEE A WRITTEN CERTIFICATE (IN THE FORM ATTACHED TO THIS CERTIFICATE) TO THE EFFECT THAT SUCH TRANSFER IS BEING MADE IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S, RULE 144 (IF AVAILABLE) OR ANOTHER APPLICABLE EXEMPTION UNDER THE SECURITIES ACT (IF AVAILABLE).

Each Definitive Note shall bear the following additional legends:

IN CONNECTION WITH ANY TRANSFER, THE HOLDER WILL DELIVER TO THE REGISTRAR AND TRANSFER AGENT SUCH CERTIFICATES AND OTHER INFORMATION AS SUCH TRANSFER AGENT MAY REASONABLY REQUIRE TO CONFIRM THAT THE TRANSFER COMPLIES WITH THE FOREGOING RESTRICTIONS.

A-1-3

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

[FORM OF INITIAL DOLLAR NOTE]

9.0% Second-Priority Springing Lien Notes due 2021

144A CUSIP No. [          ]
144A ISIN No. [          ]
Reg S CUSIP No. [          ]
Reg S ISIN No. [          ]*

MOMENTIVE PERFORMANCE MATERIALS INC., A DELAWARE CORPORATION, PROMISES TO PAY TO CEDE & CO., OR ITS REGISTERED ASSIGNS, THE PRINCIPAL SUM OF [ ] DOLLARS, AS THE SAME MAY BE REVISED FROM TIME TO TIME ON THE SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE ATTACHED HERETO, ON JANUARY 15, 2021.

Interest Payment Dates: January 15 and July 15

Record Dates: January 1 and July 1

Additional provisions of this Dollar Note are set forth on the other side of this Dollar Note.

_____

* The Original Note issued to the Sponsor pursuant to the Notes Exchange Agreement dated November 5, 2010 among the Company, the Note Guarantors and the Sponsors will be a Definitive Note in physical form, and may have its own CUSIP/ISIN number if requested by the Sponsors.

A-1-4

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

MOMENTIVE PERFORMANCE MATERIALS INC.

By: _____

Name:

Title:

Dated:

A-1-5

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

TRUSTEE'S CERTIFICATE OF
   AUTHENTICATION

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A,
      as Trustee, certifies that this is
      one of the Notes referred to in the Indenture.


By: _____
         Authorized Signatory

Dated:

*/    If the Note is to be issued in global form, add the Global Notes
      Legend and the attachment from Exhibit A-1 captioned "[TO BE
      ATTACHED TO GLOBAL NOTES]—SCHEDULE OF
      INCREASES OR DECREASES IN GLOBAL NOTE".

                                        A-1-6

Bloomberg Law®        © 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
                                                                                    // PAGE 148

[FORM OF REVERSE SIDE OF INITIAL DOLLAR NOTE]

9.0% Second-Priority Springing Lien Notes due 2021

1.  <u>Interest</u>

(a) Momentive Performance Materials Inc., a Delaware corporation (such corporation, and its successors and assigns under the Indenture hereinafter referred to, being herein called the "Company"), promises to pay interest on the principal amount of this Dollar Note at the rate per annum shown above. The Company shall pay interest semiannually on January 15 and July 15 of each year, commencing January 15, 2011. Interest on the Dollar Notes shall accrue from the most recent date to which interest has been paid or duly provided for or, if no interest has been paid or duly provided for, from November 5, 2010 until the principal hereof is due. Interest shall be computed on the basis of a 360-day year of twelve 30-day months. The Company shall pay interest on overdue principal at the rate borne by the Dollar Notes, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

(b) The Holder of this Note is entitled to the benefits of the Registration Rights Agreement. As more fully set forth therein, the Registration Rights Agreement provides that the Company will pay Additional Interest to each Holder under certain circumstances. All accrued Additional Interest shall be paid to Holders in the same manner as interest payments on the Notes on semi-annual payment dates that correspond to interest payment dates for the Notes. All references in this Note for the payment of interest shall be deemed to include any Additional Interest payable pursuant to the Registration Rights Agreement. The Trustee shall have no responsibility with respect to the determination of the amount of any such Additional Interest.

2.  <u>Method of Payment</u>

The Company shall pay interest on the Dollar Notes (except defaulted interest) to the Persons who are registered Holders at the close of business on the January 1 or July 1 next preceding the interest payment date even if Dollar Notes are canceled after the record date and on or before the interest payment date (whether or not a Business Day). Holders must surrender Dollar Notes to the Paying Agent to collect principal payments. The Company shall pay principal, premium, if any, and interest in money of the United States of America that at the time of payment is legal tender for payment of public and private debts. Payments in respect of the Dollar Notes represented by a Global Note (including principal, premium, if any, and interest) shall be made by wire transfer of immediately available funds to the accounts specified by The Depository Trust Company or any successor depositary. The Company shall make all payments in respect of a certificated Dollar Note (including principal, premium, if any, and interest) at the office of the Paying Agent, except that, at the option of the Company, payment of interest may be made by mailing a check to the registered address of each Holder thereof; *provided, however*, that payments on the Dollar Notes may also be made, in the case of a Holder of at least $1,000,000 aggregate principal amount of Dollar Notes, by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such Holder elects payment by wire transfer by giving written notice to the Trustee or Paying Agent to such effect designating such account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion).

A-1-7

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

3.  Paying Agent and Registrar

Initially, The Bank of New York Mellon Trust Company, N.A., a national banking association (the "Trustee"), will act as Paying Agent and Registrar. The Company may appoint and change any Paying Agent or Registrar without notice. The Company or any of its Wholly Owned Subsidiaries may act as Paying Agent or Registrar.

4.  Indenture

The Company issued the Dollar Notes under an Indenture dated as of November 5, 2010 (the "Indenture"), among the Company, the Note Guarantors, the Trustee and the Collateral Agent. The terms of the Dollar Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbbb) as in effect on the date of the Indenture (the "TIA"). Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture. The Dollar Notes are subject to all terms and provisions of the Indenture, and the Holders (as defined in the Indenture) are referred to the Indenture and the TIA for a statement of such terms and provisions.

Prior to the Springing Lien Trigger Date, the Dollar Notes are senior unsecured obligations of the Company. Following the Springing Lien Trigger Date, the Dollar Notes will be senior secured obligations of the Company. This Dollar Note is one of the Initial Notes referred to in the Indenture. The Notes include the Initial Dollar Notes and any Exchange Notes issued in exchange for the Initial Dollar Notes pursuant to the Indenture. The Dollar Notes (including any Exchange Notes issued in exchange therefor) and the Euro Notes issued under the Indenture (including any Exchange Notes issued in exchange therefor) are separate series of Notes but will be treated as a single class of securities under the Indenture, except as otherwise stated therein. The Indenture imposes certain limitations on the ability of the Company and the Restricted Subsidiaries to, among other things, make certain Investments and other Restricted Payments, pay dividends and other distributions, incur Indebtedness, enter into consensual restrictions upon the payment of certain dividends and distributions by such Restricted Subsidiaries, issue or sell shares of Capital Stock of the Company and such Restricted Subsidiaries, enter into or permit certain transactions with Affiliates, create or incur Liens and make Asset Sales. The Indenture also imposes limitations on the ability of the Company and each Note Guarantor to consolidate or merge with or into any other Person or convey, transfer or lease all or substantially all of its property.

To guarantee the due and punctual payment of the principal and interest on the Dollar Notes and all other amounts payable by the Company under the Indenture and the Dollar Notes when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Dollar Notes and the Indenture, the Note Guarantors have, jointly and severally, unconditionally guaranteed the Guaranteed Obligations on a senior secured basis pursuant to the terms of the Indenture.

5.  Optional Redemption

Except as set forth in the following two paragraphs, the Dollar Notes shall not be redeemable at the option of the Company prior to January 15, 2016. Thereafter, the Dollar Notes

A-1-8

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 150

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

shall be redeemable at the option of the Company, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice delivered electronically or mailed by first-class mail to each Dollar Notes Holder's registered address, at the following redemption prices (expressed as a percentage of principal amount), plus accrued and unpaid interest, if any, and Additional Interest, if any, to the redemption date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on January 15 of the years set forth below:

| Year | Redemption Price |
|------|------------------|
| 2016 | 104.500% |
| 2017 | 103.000% |
| 2018 | 101.500% |
| 2019 and thereafter | 100.000% |

In addition, prior to January 15, 2016, the Company may redeem the Dollar Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice delivered electronically or mailed by first-class mail to each Holder's registered address, at a redemption price equal to 100% of the principal amount of the Dollar Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest, if any, to, the applicable redemption date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date).

Notwithstanding the foregoing, at any time and from time to time on or prior to January 15, 2014, the Company may redeem in the aggregate up to 35% of the original aggregate principal amount of the Dollar Notes (calculated after giving effect to any issuance of Additional Dollar Notes), with the net cash proceeds of one or more Equity Offerings (1) by the Company or (2) by any direct or indirect parent of the Company, in each case, to the extent the net cash proceeds thereof are contributed to the common equity capital of the Company or used to purchase Capital Stock (other than Disqualified Stock) of the Company from it, at a redemption price equal to 109.0% of the principal amount thereof, plus accrued and unpaid interest, if any, and Additional Interest, if any, to the redemption date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date); provided, however, that at least 65% of the original aggregate principal amount of the Dollar Notes (calculated after giving effect to any issuance of Additional Dollar Notes after the Issue Date) must remain outstanding after each such redemption; and provided, further, that such redemption shall occur within 90 days after the date on which any such Equity Offering is consummated upon not less than 30 nor more than 60 days' notice electronically delivered or mailed to each Holder of Dollar Notes being redeemed and otherwise in accordance with the procedures set forth in the Indenture. Notice of any redemption upon any Equity Offering may be given prior to the completion thereof, and any such redemption or notice may, at the Company's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of the related Equity Offering.

6.   Sinking Fund

The Dollar Notes are not subject to any sinking fund.

A-1-9

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

7.   <u>Notice of Redemption</u>

Notice of redemption will be delivered electronically or mailed by first-class mail at least 30 days but not more than 60 days before the redemption date to each Holder of Dollar Notes to be redeemed at his, her or its registered address. Dollar Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000. If money sufficient to pay the redemption price of and accrued and unpaid interest on all Dollar Notes (or portions thereof) to be redeemed on the redemption date is deposited with a Paying Agent on or before the redemption date and certain other conditions are satisfied, on and after such date interest ceases to accrue on such Dollar Notes (or such portions thereof) called for redemption.

8.   <u>Repurchase of Dollar Notes at the Option of the Holders upon Change of Control and Asset Sales</u>

Upon the occurrence of a Change of Control, each Holder shall have the right, subject to certain conditions specified in the Indenture, to cause the Company to repurchase all or any part of such Holder's Dollar Notes at a purchase price in cash equal to 101% of the principal amount thereof, plus accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date), as provided in, and subject to the terms of, the Indenture.

In accordance with Section 4.06 of the Indenture, the Company will be required to offer to purchase Dollar Notes upon the occurrence of certain events.

9.   <u>Ranking and Collateral</u>

The indebtedness evidenced by the Dollar Notes and the applicable Note Guarantees, respectively, is senior Indebtedness of the Company and Note Guarantors, respectively, ranks (i) equal in right of payment with all existing and future Pari Passu Indebtedness of the Company and Note Guarantors, as applicable, (ii) senior in right of payment to all existing and future Subordinated Indebtedness of the Company and Note Guarantors and (iii) structurally subordinated to all existing and future indebtedness and other liabilities of Subsidiaries that do not guarantee the Notes. Prior to the Springing Lien Trigger Date, the Dollar Notes and the applicable Note Guarantees are unsecured obligations of the Company and the Note Guarantors, respectively, and are effectively subordinated to all existing and future Secured Indebtedness of the Company and the Note Guarantors, as applicable, to the extent of the value of the assets securing such Indebtedness. Following the Springing Lien Trigger Date, the Dollar Notes and the applicable Note Guarantees will have the benefit of a second-priority security interest on the Collateral that, pursuant to the Intercreditor Agreement, will be (i) junior in priority and subordinated to the Liens securing the First Priority Obligations, (ii) pari passu in priority to Liens securing the Other Second Priority Obligations, (iii) senior to any senior unsecured obligations (to the extent of the value of the Collateral) and (iv) senior to the Company's and the Note Guarantors' existing and future Subordinated Indebtedness, and is further subject to Permitted Liens and the exceptions provided in the Security Documents.

A-1-10

**Bloomberg Law**®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

10.  Denominations; Transfer; Exchange

The Dollar Notes are in registered form, without coupons, in denominations of $2,000 and any integral multiple of $1,000. A Holder shall register the transfer of or exchange of Dollar Notes in accordance with the Indenture. Upon any transfer or exchange, the Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes required by law or permitted by the Indenture. The Registrar need not register the transfer of or exchange any Dollar Notes selected for redemption (except, in the case of a Dollar Note to be redeemed in part, the portion of the Dollar Note not to be redeemed) or to transfer or exchange any Dollar Notes for a period of 15 days prior to a selection of Dollar Notes to be redeemed.

11.  Persons Deemed Owners

The registered Holder of this Dollar Note shall be treated as the owner of it for all purposes.

12.  Unclaimed Money

If money for the payment of principal or interest remains unclaimed for two years, the Trustee and a Paying Agent shall pay the money back to the Company at its written request unless an abandoned property law designates another Person. After any such payment, the Holders entitled to the money must look to the Company for payment as general creditors and the Trustee and a Paying Agent shall have no further liability with respect to such monies.

13.  Discharge and Defeasance

Subject to certain conditions, the Company at any time may terminate some of or all its obligations under the Dollar Notes and the Indenture if the Company deposits with the Trustee cash in U.S. Dollars, U.S. Dollar-denominated Government Obligations or a combination thereof for the payment of principal and interest on the Dollar Notes to redemption or maturity, as the case may be.

14.  Amendment; Waiver

Subject to certain exceptions set forth in the Indenture, (i) the Indenture, Notes, the Intercreditor Agreement or the Security Documents may be amended with the written consent of the Holders of at least a majority in aggregate principal amount of the outstanding Notes (voting as a single class) (which consents may be obtained in connection with a tender offer or exchange for the Notes) and (ii) any past default or compliance with any provisions may be waived with the written consent of the Holders of at least a majority in principal amount of the outstanding Notes (which consents may be obtained in connection with a tender offer or exchange for the Notes). Subject to certain exceptions set forth in the Indenture, without the consent of any Holder, the Company and the Trustee may amend the Indenture, Notes, the Intercreditor Agreement or any Security Document (i) to cure any ambiguity, omission, defect, mistake or inconsistency; (ii) to comply with Article 5 of the Indenture; (iii) to provide for uncertificated Notes in addition to or in place of certificated Notes (provided that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated

A-1-11

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

Notes are described in Section 163(f)(2)(B) of the Code); (iv) to add Note Guarantees with respect to the Notes; (v) to secure the Notes, to add additional asset as Collateral, to release Collateral as permitted under the Indenture, the Security Documents or the Intercreditor Agreement, to add additional secured creditors holding Other Second Priority Obligations or additional First Priority Obligations so long as such obligations are not prohibited by the Indenture or the Security Documents; (vi) to add additional covenants of the Company for the benefit of the Holders or to surrender rights and powers conferred on the Company; (vii) to comply with the requirements of (A) the SEC in order to effect or maintain the qualification of the Indenture under the TIA or (B) the Intercreditor Agreement; (viii) to make any change that does not adversely affect the rights of any Holder; or (ix) to provide for the issuance of the Exchange Notes or Additional Notes.

Without the consent of the Holders of at least 66 2/3% in aggregate principal amount of the Notes then outstanding (which consents may be obtained in connection with a tender offer or exchange for the Notes), no amendment or waiver may release all or substantially all of the Collateral from the Lien of the Indenture and the Security Documents with respect to the Notes, subject to the terms of the Intercreditor Agreement.

## 15. Defaults and Remedies

If an Event of Default occurs (other than an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Company) and is continuing, the Trustee or the Holders of at least 25% in principal amount of the outstanding Notes, in each case, by notice to the Company, may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Company occurs, the principal of, premium, if any, and interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any Holders. Under certain circumstances, the Holders of a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the Holders unless such Holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense and certain other conditions are complied with. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no Holder may pursue any remedy with respect to the Indenture or the Notes unless (i) such Holder has previously given the Trustee notice that an Event of Default is continuing, (ii) the Holders of at least 25% in principal amount of the outstanding Notes have requested the Trustee in writing to pursue the remedy, (iii) such Holders have offered the Trustee security or indemnity reasonably satisfactory to it against any loss, liability or expense, (iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity and (v) the Holders of a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period. Subject to certain restrictions, the Holders of a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred

A-1-12

**Bloomberg Law®**

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
**// PAGE 154**

on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other Holder or that would involve the Trustee in personal liability. Prior to taking any action under the Indenture, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

16.  Trustee Dealings with the Company

Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Dollar Notes and may otherwise deal with and collect obligations owed to it by the Company or its Affiliates and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not Trustee.

17.  No Recourse Against Others

No affiliate, director, officer, employee, manager, incorporator or holder of any Equity Interests in the Company or of any Note Guarantor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Company or the Note Guarantors under the Dollar Notes, the Indenture, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Dollar Notes by accepting a Dollar Note waives and releases all such liability.

18.  Authentication

This Dollar Note shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Dollar Note.

19.  Abbreviations

Customary abbreviations may be used in the name of a Holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

20.  Governing Law

**THIS DOLLAR NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

21.  CUSIP Numbers; ISINs

The Company has caused CUSIP numbers and ISINs to be printed on the Dollar Notes and has directed the Trustee to use CUSIP numbers and ISINs in notices of redemption as a convenience to the Holders. No representation is made as to the accuracy of such numbers either

A-1-13

Bloomberg Law®
© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 155

as printed on the Dollar Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Company will furnish to any Holder of Dollar Notes upon written request and without charge to the Holder a copy of the Indenture which has in it the text of this Dollar Note.

A-1-14

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

ASSIGNMENT FORM

To assign this Dollar Note, fill in the form below:

I or we assign and transfer this Dollar Note to:

_____

(Print or type assignee's name, address and zip code)

_____

(Insert assignee's soc. sec. or tax I.D. No.)

and irrevocably appoint _____ agent to transfer this Dollar Note on the books of the Company. The agent may substitute another to act for him.

_____

Date: _____                              Your Signature:
_____

_____

Sign exactly as your name appears on the other side of this Dollar Note.

Signature Guarantee:

Date: _____
_____
Signature must be guaranteed by a participant
in a recognized signature guaranty medallion
program or other signature guarantor program      _____
reasonably acceptable to the Trustee               Signature of Signature Guarantee

A-1-15

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Bloomberg Law**®

CERTIFICATE TO BE DELIVERED UPON EXCHANGE OR
REGISTRATION OF TRANSFER RESTRICTED DEFINITIVE NOTES

This certificate relates to $        principal amount of Dollar Notes held in (check applicable space)
book-entry or        definitive form by the undersigned.

The undersigned (check one box below):

¨        has requested the Trustee by written order to deliver in exchange for its beneficial interest in the
Global Note held by the Depository a Dollar Note or Dollar Notes in definitive, registered form of
authorized denominations and an aggregate principal amount equal to its beneficial interest in such
Global Note (or the portion thereof indicated above);

¨        has requested the Trustee by written order to exchange or register the transfer of a Dollar Note or
Dollar Notes.

In connection with any transfer of any of the Dollar Notes evidenced by this certificate occurring prior to the
expiration of the period referred to in Rule 144(d) under the Securities Act, the undersigned confirms that such
Notes are being transferred in accordance with its terms:

CHECK ONE BOX BELOW

(1)    ¨    to the Company; or

(2)    ¨    to the Registrar for registration in the name of the Holder, without transfer; or

(3)    ¨    pursuant to an effective registration statement under the Securities Act of 1933; or

(4)    ¨    inside the United States to a "qualified institutional buyer" (as defined in Rule 144A under the
Securities Act of 1933) that purchases for its own account or for the account of a qualified
institutional buyer to whom notice is given that such transfer is being made in reliance on Rule
144A, in each case pursuant to and in compliance with Rule 144A under the Securities Act of
1933; or

(5)    ¨    outside the United States in an offshore transaction within the meaning of Regulation S under the
Securities Act in compliance with Rule 904 under the Securities Act of 1933; or

(6)    ¨    to an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the
Securities Act of 1933) that has furnished to the Trustee a signed letter containing certain
representations and agreements; or

(7)    ¨    pursuant to another available exemption from registration provided by Rule 144 under the
Securities Act of 1933.

A-1-16

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 158

Unless one of the boxes is checked, the Trustee will refuse to register any of the Dollar Notes evidenced by this certificate in the name of any Person other than the registered Holder thereof; provided, however, that if box (5), (6) or (7) is checked, the Company or the Trustee may require, prior to registering any such transfer of the Dollar Notes, such legal opinions, certifications and other information as the Company or the Trustee have reasonably requested to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act of 1933.

Date:                                                           Your Signature:

Signature Guarantee:

Date:
Signature must be guaranteed by a participant in a              Signature of Signature Guarantee
recognized signature guaranty medallion program
or other signature guarantor program reasonably
acceptable to the Trustee

TO BE COMPLETED BY PURCHASER IF (4) ABOVE IS CHECKED.

The undersigned represents and warrants that it is purchasing this Dollar Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Company as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Dated:

NOTICE: To be executed by an
executive officer

A-1-17

[TO BE ATTACHED TO GLOBAL NOTES]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE

The initial principal amount of this Global Note is $          . The following increases or decreases in this Global Note have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Notes Custodian |
|---|---|---|---|---|

A-1-18

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

---

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Dollar Note purchased by the Company pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, check the box:

Asset Sale ¨        Change of Control ¨

If you want to elect to have only part of this Dollar Note purchased by the Company pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, state the amount ($2,000 or any integral multiple of $1,000):

$

Date:                                   Your Signature:

(Sign exactly as your name appears on the other side of this security)

Signature Guarantee:

Signature must be guaranteed by a participant in a recognized signature guaranty medallion program or other signature guarantor program reasonably acceptable to the Trustee

A-1-19

**Bloomberg Law**®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

EXHIBIT A-2

[FORM OF FACE OF INITIAL EURO NOTE]

[Global Notes Legend]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR BANK S.A./N.V., AS OPERATOR OF THE EUROCLEAR SYSTEM ("EUROCLEAR"), OR CLEARSTREAM BANKING, SOCIÉTÉ ANONYME ("CLEARSTREAM"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF ITS AUTHORIZED NOMINEE OR SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR OR CLEARSTREAM (AND ANY PAYMENT IS MADE TO ITS AUTHORIZED NOMINEE, OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR OR CLEARSTREAM), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, ITS AUTHORIZED NOMINEE, HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF EUROCLEAR OR CLEARSTREAM OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

[Restricted Notes Legend]

THIS NOTE (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND THIS NOTE MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH HOLDER OF THIS NOTE IS HEREBY NOTIFIED THAT THE SELLER OF THIS NOTE MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER. THE HOLDER OF THIS NOTE AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED NOTES, FOR THE BENEFIT OF THE COMPANY, THAT (A) THIS NOTE MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (I) IN THE UNITED STATES TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (II) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 904 UNDER THE SECURITIES ACT, (III) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF

A-2-1

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

AVAILABLE), (IV) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, OR (V) TO THE COMPANY OR ANY OF ITS SUBSIDIARIES, IN EACH OF CASES (I) THROUGH (V) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY HOLDER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO IN (A) ABOVE.

[FOR REGULATION S ONLY] [THIS NOTE (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND MAY NOT BE TRANSFERRED IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON EXCEPT PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS. TERMS USED ABOVE HAVE THE MEANINGS GIVEN TO THEM IN REGULATION S UNDER THE SECURITIES ACT.]

[Temporary Regulation S Global Note Legend]

EXCEPT AS SET FORTH BELOW, BENEFICIAL OWNERSHIP INTERESTS IN THIS TEMPORARY REGULATION S GLOBAL NOTE SHALL NOT BE EXCHANGEABLE FOR INTERESTS IN THE PERMANENT REGULATION S GLOBAL NOTE OR ANY OTHER NOTE REPRESENTING AN INTEREST IN THE NOTES REPRESENTED HEREBY THAT DO NOT CONTAIN A LEGEND CONTAINING RESTRICTIONS ON TRANSFER, UNTIL THE EXPIRATION OF THE "40-DAY DISTRIBUTION COMPLIANCE PERIOD" (WITHIN THE MEANING OF RULE 903(b)(2) OF REGULATION S UNDER THE SECURITIES ACT) AND THEN ONLY UPON CERTIFICATION IN FORM REASONABLY SATISFACTORY TO THE TRUSTEE THAT SUCH BENEFICIAL INTERESTS ARE OWNED EITHER BY NON-U.S. PERSONS OR U.S. PERSONS WHO PURCHASED SUCH INTERESTS IN A TRANSACTION THAT DID NOT REQUIRE REGISTRATION UNDER THE SECURITIES ACT. DURING SUCH 40-DAY DISTRIBUTION COMPLIANCE PERIOD, BENEFICIAL OWNERSHIP INTERESTS IN THIS TEMPORARY REGULATION S GLOBAL NOTE MAY ONLY BE SOLD, PLEDGED OR TRANSFERRED (A) TO THE COMPANY, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE NOTES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), IN THE UNITED STATES TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (D) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 904 UNDER THE SECURITIES ACT OR (E) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE COMPANY'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D) OR (E) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF

A-2-2

THEM, IN EACH OF CASES (A) THROUGH (E) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND OTHER JURISDICTIONS. HOLDERS OF INTERESTS IN THIS TEMPORARY REGULATION S GLOBAL NOTE SHALL NOTIFY ANY PURCHASER OF THIS NOTE OF THE RESALE RESTRICTIONS REFERRED TO ABOVE, IF THEN APPLICABLE.

BENEFICIAL INTERESTS IN THIS TEMPORARY REGULATION S GLOBAL NOTE MAY BE EXCHANGED FOR INTERESTS IN A RULE 144A GLOBAL NOTE ONLY IF (1) SUCH EXCHANGE OCCURS IN CONNECTION WITH A TRANSFER OF THE NOTES IN COMPLIANCE WITH RULE 144A AND (2) THE TRANSFEROR OF THE REGULATION S GLOBAL NOTE FIRST DELIVERS TO THE TRUSTEE A WRITTEN CERTIFICATE (IN THE FORM ATTACHED TO THIS CERTIFICATE) TO THE EFFECT THAT THE REGULATION S GLOBAL NOTE IS BEING TRANSFERRED (A) TO A PERSON WHO THE TRANSFEROR REASONABLY BELIEVES TO BE A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A, (B) TO A PERSON WHO IS PURCHASING FOR ITS OWN ACCOUNT OR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, AND (C) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS.

BENEFICIAL INTERESTS IN A RULE 144A GLOBAL NOTE MAY BE TRANSFERRED TO A PERSON WHO TAKES DELIVERY IN THE FORM OF AN INTEREST IN THE REGULATION S GLOBAL NOTE, WHETHER BEFORE OR AFTER THE EXPIRATION OF THE 40-DAY DISTRIBUTION COMPLIANCE PERIOD, ONLY IF THE TRANSFEROR FIRST DELIVERS TO THE TRUSTEE A WRITTEN CERTIFICATE (IN THE FORM ATTACHED TO THIS CERTIFICATE) TO THE EFFECT THAT SUCH TRANSFER IS BEING MADE IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S, RULE 144 (IF AVAILABLE) OR ANOTHER APPLICABLE EXEMPTION UNDER THE SECURITIES ACT (IF AVAILABLE).

Each Definitive Note shall bear the following additional legends:

IN CONNECTION WITH ANY TRANSFER, THE HOLDER WILL DELIVER TO THE REGISTRAR AND TRANSFER AGENT SUCH CERTIFICATES AND OTHER INFORMATION AS SUCH TRANSFER AGENT MAY REASONABLY REQUIRE TO CONFIRM THAT THE TRANSFER COMPLIES WITH THE FOREGOING RESTRICTIONS.

A-2-3

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

[FORM OF INITIAL EURO NOTE]

9.5% Second-Priority Springing Lien Notes due 2021

Common Code
ISIN No.

MOMENTIVE PERFORMANCE MATERIALS INC., A DELAWARE CORPORATION, PROMISES TO PAY TO THE BANK OF NEW YORK DEPOSITARY (NOMINEES) LIMITED, OR ITS REGISTERED ASSIGNS, THE PRINCIPAL SUM OF [ ] EUROS, AS THE SAME MAY BE REVISED FROM TIME TO TIME ON THE SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE ATTACHED HERETO, ON JANUARY 15, 2021.

Interest Payment Dates: January 15 and July 15

Record Dates: January 1 and July 1

Additional provisions of this Euro Note are set forth on the other side of this Euro Note.

A-2-4

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

MOMENTIVE PERFORMANCE
MATERIALS INC.

By:

Name:

Title:

Dated:

A-2-5

AUTHENTICATING AGENT'S
CERTIFICATE OF AUTHENTICATION
THE BANK OF NEW YORK MELLON, LONDON BRANCH,
as Authentication Agent, certifies that this is
one of the Notes referred to in the Indenture.


By:

        Authorized Signatory

Dated:

*/     If the Note is to be issued in global form, add the Global Notes
       Legend and the attachment from Exhibit A-2 captioned "[TO BE
       ATTACHED TO GLOBAL NOTES]—SCHEDULE OF
       INCREASES OR DECREASES IN GLOBAL NOTE".

                                    A-2-6

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

[FORM OF REVERSE SIDE OF INITIAL EURO NOTE]

9.5% Second-Priority Springing Lien Notes due 2021

1.   Interest

(a) Momentive Performance Materials Inc., a Delaware corporation (such corporation, and its successors and assigns under the Indenture hereinafter referred to, being herein called the "Company"), promises to pay interest on the principal amount of this Euro Note at the rate per annum shown above. The Company shall pay interest semiannually on January 15 and July 15 of each year, commencing January 15, 2011. Interest on the Euro Notes shall accrue from the most recent date to which interest has been paid or duly provided for or, if no interest has been paid or duly provided for, from November 5, 2010 until the principal hereof is due. Interest shall be computed on the basis of a 360-day year of twelve 30-day months. The Company shall pay interest on overdue principal at the rate borne by the Euro Notes, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

(b) The Holder of this Note is entitled to the benefits of the Registration Rights Agreement. As more fully set forth therein, the Registration Rights Agreement provides that the Company will pay Additional Interest to each Holder under certain circumstances. All accrued Additional Interest shall be paid to Holders in the same manner as interest payments on the Notes on semi-annual payment dates that correspond to interest payment dates for the Notes. All references in this Note for the payment of interest shall be deemed to include any Additional Interest payable pursuant to the Registration Rights Agreement. The Trustee shall have no responsibility with respect to the determination of the amount of any such Additional Interest.

2.   Method of Payment

The Company shall pay interest on the Euro Notes (except defaulted interest) to the Persons who are registered Holders at the close of business on the January 1 or July 1 next preceding the interest payment date even if Euro Notes are canceled after the record date and on or before the interest payment date (whether or not a Business Day). Holders must surrender Euro Notes to the Paying Agent to collect principal payments. The Company shall pay principal, premium, if any, and interest in euros or such other lawful currency of the participating member states in the Third Stage of European Economics and Monetary Union at the Treaty Establishing the European Community that at the time of payment is legal tender for payment of public and private debts. Payments in respect of the Euro Notes represented by a Global Note (including principal, premium, if any, and interest) shall be made by wire transfer of immediately available funds to the accounts specified by the Holder or Holders thereof. The Company shall make all payments in respect of a certificated Euro Note (including principal, premium, if any, and interest) at the office of the Paying Agent, except that, at the option of the Company, payment of interest may be made by mailing a check to the registered address of each Holder thereof.

3.   Paying Agent and Registrar

Initially, The Bank of New York Mellon, London Branch will act as Paying Agent and Registrar. The Company may appoint and change any Paying Agent or Registrar in accordance with the terms of the Paying Agency Agreement between the Company and The Bank of New

A-2-7



© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

York Mellon. If and for so long as the Euro Notes are listed on the Official List of the Luxembourg Stock Exchange, the Company will also maintain a paying agent in Luxembourg. The Company or any of its Wholly Owned Subsidiaries may act as Paying Agent or Registrar.

4.   Indenture

The Company issued the Euro Notes under an Indenture dated as of November 5, 2010 (the "Indenture"), among the Company, the Note Guarantors, The Bank of New York Mellon Trust Company, N.A., as Trustee (the "Trustee") and the Collateral Agent. The terms of the Euro Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbbb) as in effect on the date of the Indenture (the "TIA"). Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture. The Euro Notes are subject to all terms and provisions of the Indenture, and the Holders (as defined in the Indenture) are referred to the Indenture and the TIA for a statement of such terms and provisions.

Prior to the Springing Lien Trigger Date, the Euro Notes are senior unsecured obligations of the Company. Following the Springing Lien Trigger Date, the Euro Notes will be senior secured obligations of the Company. This Euro Note is one of the Initial Euro Notes referred to in the Indenture. The Notes include the Initial Euro Notes and any Exchange Notes issued in exchange for the Initial Euro Notes pursuant to the Indenture. The Euro Notes (including any Exchange Notes issued in exchange therefor) and the Dollar Notes issued under the Indenture (including any Exchange Notes issued in exchange therefor) are separate series of Notes but will be treated as a single class of securities under the Indenture, except as otherwise stated therein. The Indenture imposes certain limitations on the ability of the Company and the Restricted Subsidiaries to, among other things, make certain Investments and other Restricted Payments, pay dividends and other distributions, incur Indebtedness, enter into consensual restrictions upon the payment of certain dividends and distributions by such Restricted Subsidiaries, issue or sell shares of Capital Stock of the Company and such Restricted Subsidiaries, enter into or permit certain transactions with Affiliates, create or incur Liens and make Asset Sales. The Indenture also imposes limitations on the ability of the Company and each Note Guarantor to consolidate or merge with or into any other Person or convey, transfer or lease all or substantially all of its property.

To guarantee the due and punctual payment of the principal and interest on the Euro Notes and all other amounts payable by the Company under the Indenture and the Euro Notes when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Euro Notes and the Indenture, the Note Guarantors have, jointly and severally, unconditionally guaranteed the Guaranteed Obligations on a senior secured basis pursuant to the terms of the Indenture.

5.   Optional Redemption

Except as set forth in the following two paragraphs, the Euro Notes shall not be redeemable at the option of the Company prior to January 15, 2016. Thereafter, the Euro Notes shall be redeemable at the option of the Company, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice delivered electronically or mailed

A-2-8

Bloomberg Law®

by first-class mail to each Euro Notes Holder's registered address, at the following redemption prices (expressed as a percentage of principal amount), plus accrued and unpaid interest, if any, and Additional Interest, if any, to the redemption date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on January 15 of the years set forth below:

| Year | Redemption Price |
|------|------------------|
| 2016 | 104.750% |
| 2017 | 103.167% |
| 2018 | 101.583% |
| 2019 and thereafter | 100.000% |

In addition, prior to January 15, 2016, the Company may redeem the Euro Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice delivered electronically or mailed by first-class mail to each Holder's registered address, at a redemption price equal to 100% of the principal amount of the Euro Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest, if any, to, the applicable redemption date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date).

Notwithstanding the foregoing, at any time and from time to time on or prior to January 15, 2014, the Company may redeem in the aggregate up to 35% of the original aggregate principal amount of the Euro Notes (calculated after giving effect to any issuance of Additional Euro Notes), with the net cash proceeds of one or more Equity Offerings (1) by the Company or (2) by any direct or indirect parent of the Company, in each case, to the extent the net cash proceeds thereof are contributed to the common equity capital of the Company or used to purchase Capital Stock (other than Disqualified Stock) of the Company from it, at a redemption price equal to 109.5% of the principal amount thereof, plus accrued and unpaid interest, if any, and Additional Interest, if any, to the redemption date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date); provided, however, that at least 65% of the original aggregate principal amount of the Euro Notes (calculated after giving effect to any issuance of Additional Euro Notes after the Issue Date) must remain outstanding after each such redemption; and provided, further, that such redemption shall occur within 90 days after the date on which any such Equity Offering is consummated upon not less than 30 nor more than 60 days' notice electronically delivered or mailed to each Holder of Euro Notes being redeemed and otherwise in accordance with the procedures set forth in the Indenture. Notice of any redemption upon any Equity Offering may be given prior to the completion thereof, and any such redemption or notice may, at the Company's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of the related Equity Offering.

6.   Sinking Fund

The Euro Notes are not subject to any sinking fund.

A-2-9

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

7.    Notice of Redemption

Notice of redemption will be delivered electronically or mailed by first-class mail at least 30 days but not more than 60 days before the redemption date to each Holder of Euro Notes to be redeemed at his, her or its registered address. Euro Notes in denominations larger than €100,000 may be redeemed in part but only in whole multiples of €1,000. If money sufficient to pay the redemption price of and accrued and unpaid interest on all Euro Notes (or portions thereof) to be redeemed on the redemption date is deposited with a Paying Agent on or before the redemption date and certain other conditions are satisfied, on and after such date interest ceases to accrue on such Euro Notes (or such portions thereof) called for redemption.

8.    Repurchase of Euro Notes at the Option of the Holders upon Change of Control and Asset Sales

Upon the occurrence of a Change of Control, each Holder shall have the right, subject to certain conditions specified in the Indenture, to cause the Company to repurchase all or any part of such Holder's Euro Notes at a purchase price in cash equal to 101% of the principal amount thereof, plus accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date), as provided in, and subject to the terms of, the Indenture.

In accordance with Section 4.06 of the Indenture, the Company will be required to offer to purchase Euro Notes upon the occurrence of certain events.

9.    Ranking and Collateral

The indebtedness evidenced by the Euro Notes and the applicable Note Guarantees, respectively, is senior Indebtedness of the Company and Note Guarantors, respectively, ranks (i) equal in right of payment with all existing and future Pari Passu Indebtedness of the Company and Note Guarantors, as applicable, (ii) senior in right of payment to all existing and future Subordinated Indebtedness of the Company and Note Guarantors and (iii) structurally subordinated to all existing and future indebtedness and other liabilities of Subsidiaries that do not guarantee the Notes. Prior to the Springing Lien Trigger Date, the Euro Notes and the applicable Note Guarantees are unsecured obligations of the Company and the Note Guarantors, respectively, and are effectively subordinated to all existing and future Secured Indebtedness of the Company and the Note Guarantors, as applicable, to the extent of the value of the assets securing such Indebtedness. Following the Springing Lien Trigger Date, the Euro Notes and the applicable Note Guarantees will have the benefit of a second-priority security interest on the Collateral that, pursuant to the Intercreditor Agreement, will be (i) junior in priority and subordinated to the Liens securing the First Priority Obligations, (ii) pari passu in priority to Liens securing the Other Second Priority Obligations, (iii) senior to any senior unsecured obligations (to the extent of the value of the Collateral) and (iv) senior to the Company's and the Note Guarantors' existing and future Subordinated Indebtedness, and is further subject to Permitted Liens and the exceptions provided in the Security Documents.

10.    Denominations; Transfer; Exchange

A-2-10

Bloomberg Law®    © 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 171

The Euro Notes are in registered form, without coupons, in denominations of €100,000 and any integral multiple of €1,000. A Holder shall register the transfer of or exchange of Euro Notes in accordance with the Indenture. Upon any transfer or exchange, the Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes required by law or permitted by the Indenture. The Registrar need not register the transfer of or exchange any Euro Notes selected for redemption (except, in the case of an Euro Note to be redeemed in part, the portion of the Euro Note not to be redeemed) or to transfer or exchange any Euro Notes for a period of 15 days prior to a selection of Euro Notes to be redeemed.

11.  Persons Deemed Owners

The registered Holder of this Euro Note shall be treated as the owner of it for all purposes.

12.  Unclaimed Money

If money for the payment of principal or interest remains unclaimed for two years, the Trustee and a Paying Agent shall pay the money back to the Company at its written request unless an abandoned property law designates another Person. After any such payment, the Holders entitled to the money must look to the Company for payment as general creditors and the Trustee and a Paying Agent shall have no further liability with respect to such monies.

13.  Discharge and Defeasance

Subject to certain conditions, the Company at any time may terminate some of or all its obligations under the Euro Notes and the Indenture if the Company deposits with the Trustee cash in euros or euro-denominated Government Obligations for the payment of principal and interest on the Euro Notes to redemption or maturity, as the case may be.

14.  Amendment; Waiver

Subject to certain exceptions set forth in the Indenture, (i) the Indenture, Notes, the Intercreditor Agreement or the Security Documents may be amended with the written consent of the Holders of at least a majority in aggregate principal amount of the outstanding Notes (voting as a single class) (which consents may be obtained in connection with a tender offer or exchange for the Notes) and (ii) any past default or compliance with any provisions may be waived with the written consent of the Holders of at least a majority in principal amount of the outstanding Notes (which consents may be obtained in connection with a tender offer or exchange for the Notes). Subject to certain exceptions set forth in the Indenture, without the consent of any Holder, the Company and the Trustee may amend the Indenture, Notes, the Intercreditor Agreement or any Security Document (i) to cure any ambiguity, omission, defect, mistake or inconsistency; (ii) to comply with Article 5 of the Indenture; (iii) to provide for uncertificated Notes in addition to or in place of certificated Notes (provided that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code); (iv) to add Note Guarantees with respect to the Notes; (v) to secure the Notes, to add additional asset as Collateral, to release Collateral as permitted under the Indenture, the Security Documents or the Intercreditor Agreement, to add additional secured creditors holding Other Second Priority Obligations or

A-2-11

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

additional First Priority Obligations so long as such obligations are not prohibited by the Indenture or the Security Documents; (vi) to add additional covenants of the Company for the benefit of the Holders or to surrender rights and powers conferred on the Company; (vii) to comply with the requirements of (A) the SEC in order to effect or maintain the qualification of the Indenture under the TIA or (B) the Intercreditor Agreement; (viii) to make any change that does not adversely affect the rights of any Holder; or (ix) to provide for the issuance of the Exchange Notes or Additional Notes.

Without the consent of the Holders of at least 66 2/3% in aggregate principal amount of the Notes then outstanding (which consents may be obtained in connection with a tender offer or exchange for the Notes), no amendment or waiver may release all or substantially all of the Collateral from the Lien of the Indenture and the Security Documents with respect to the Notes, subject to the terms of the Intercreditor Agreement.

15. <u>Defaults and Remedies</u>

If an Event of Default occurs (other than an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Company) and is continuing, the Trustee or the Holders of at least 25% in principal amount of the outstanding Notes, in each case, by notice to the Company, may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Company occurs, the principal of, premium, if any, and interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any Holders. Under certain circumstances, the Holders of a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the Holders unless such Holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense and certain other conditions are complied with. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no Holder may pursue any remedy with respect to the Indenture or the Notes unless (i) such Holder has previously given the Trustee notice that an Event of Default is continuing, (ii) the Holders of at least 25% in principal amount of the outstanding Notes have requested the Trustee in writing to pursue the remedy, (iii) such Holders have offered the Trustee security or indemnity reasonably satisfactory to it against any loss, liability or expense, (iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity and (v) the Holders of a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period. Subject to certain restrictions, the Holders of a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other Holder or that would involve the Trustee in personal liability. Prior to taking any action under

A-2-12

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

the Indenture, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

16. <u>Trustee Dealings with the Company</u>

Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Euro Notes and may otherwise deal with and collect obligations owed to it by the Company or its Affiliates and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not Trustee.

17. <u>No Recourse Against Others</u>

No affiliate, director, officer, employee, manager, incorporator or holder of any Equity Interests in the Company or of any Note Guarantor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Company or the Note Guarantors under the Euro Notes, the Indenture, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Euro Notes by accepting an Euro Note waives and releases all such liability.

18. <u>Authentication</u>

This Euro Note shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Euro Note.

19. <u>Abbreviations</u>

Customary abbreviations may be used in the name of a Holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

20. <u>Governing Law</u>

**THIS EURO NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

21. <u>Common Code; ISINs</u>

The Company has caused the Common Code and ISINs to be printed on the Euro Notes and has directed the Trustee to use the Common Code and ISINs in notices of redemption as a convenience to the Holders. No representation is made as to the accuracy of such numbers either as printed on the Euro Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

A-2-13

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

The Company will furnish to any Holder of Euro Notes upon written request and without charge to the Holder a copy of the Indenture which has in it the text of this Euro Note.

A-2-14

ASSIGNMENT FORM

To assign this Euro Note, fill in the form below:

I or we assign and transfer this Euro Note to:

_____
(Print or type assignee's name, address and zip code)

_____
(Insert assignee's soc. sec. or tax I.D. No.)

and irrevocably appoint _____ agent to transfer this Euro Note on the books of the Company. The agent may substitute another to act for him.

_____

Date: _____                                    Your Signature:
_____

_____
Sign exactly as your name appears on the other side of this Euro Note.

Signature Guarantee:

Date: _____
_____
Signature must be guaranteed by a participant
in a recognized signature guaranty medallion
program or other signature guarantor program          _____
reasonably acceptable to the Trustee                  Signature of Signature Guarantee

A-2-15

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Bloomberg Law**®

CERTIFICATE TO BE DELIVERED UPON EXCHANGE OR
REGISTRATION OF TRANSFER RESTRICTED DEFINITIVE NOTES

This certificate relates to €          principal amount of Euro Notes held in (check applicable space) book-entry or          definitive form by the undersigned.

The undersigned (check one box below):

¨          has requested the Trustee by written order to deliver in exchange for its beneficial interest in the Global Note held by the Common Depositary a Euro Note or Euro Notes in definitive, registered form of authorized denominations and an aggregate principal amount equal to its beneficial interest in such Global Note (or the portion thereof indicated above);

¨          has requested the Trustee by written order to exchange or register the transfer of an Euro Note or Euro Notes.

In connection with any transfer of any of the Euro Notes evidenced by this certificate occurring prior to the expiration of the period referred to in Rule 144(d) under the Securities Act, the undersigned confirms that such Euro Notes are being transferred in accordance with its terms:

CHECK ONE BOX BELOW

(1)      ¨      to the Company; or

(2)      ¨      to the Registrar for registration in the name of the Holder, without transfer; or

(3)      ¨      pursuant to an effective registration statement under the Securities Act of 1933; or

(4)      ¨      inside the United States to a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act of 1933) that purchases for its own account or for the account of a qualified institutional buyer to whom notice is given that such transfer is being made in reliance on Rule 144A, in each case pursuant to and in compliance with Rule 144A under the Securities Act of 1933; or

(5)      ¨      outside the United States in an offshore transaction within the meaning of Regulation S under the Securities Act in compliance with Rule 904 under the Securities Act of 1933; or

(6)      ¨      pursuant to another available exemption from registration provided by Rule 144 under the Securities Act of 1933.

Unless one of the boxes is checked, the Trustee will refuse to register any of the Euro Notes evidenced by this certificate in the name of any Person other than the registered Holder thereof; provided, however, that if box (5) or (6) is checked, the Company or the Trustee may require, prior to registering any such transfer of the Euro Notes, such legal opinions, certifications and other information as the Company or the Trustee have reasonably requested to

A-2-16

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 177

confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act of 1933.

Date:                                                            Your Signature:

Signature Guarantee:

Date:
Signature must be guaranteed by a participant in a                    Signature of Signature Guarantee
recognized signature guaranty medallion program
or other signature guarantor program reasonably
acceptable to the Trustee

TO BE COMPLETED BY PURCHASER IF (4) ABOVE IS CHECKED.

The undersigned represents and warrants that it is purchasing this Euro Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Company as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Dated:

                                                                NOTICE: To be executed by an
                                                                executive officer

A-2-17

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

[TO BE ATTACHED TO GLOBAL NOTES]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE

The initial principal amount of this Global Note is € _____. The following increases or decreases in this Global Note have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Notes Custodian |
|---|---|---|---|---|

A-2-18

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Euro Note purchased by the Company pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, check the box:

Asset Sale ¨        Change of Control ¨

If you want to elect to have only part of this Euro Note purchased by the Company pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, state the amount (€100,000 or any integral multiple of €1,000):

$

Date:                                        Your Signature:

(Sign exactly as your name appears on the other side of this security)

Signature Guarantee:

Signature must be guaranteed by a participant in a recognized signature guaranty medallion program or other signature guarantor program reasonably acceptable to the Trustee

A-2-19

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

EXHIBIT B-1

[FORM OF FACE OF EXCHANGE NOTE OR PRIVATE EXCHANGE NOTE
FOR DOLLAR NOTES]*/

[Global Notes Legend]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), NEW YORK, NEW YORK, TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO., OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO DTC, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

---

*/ If the Note is a Private Exchange Note issued in a Private Exchange to an Initial Purchaser holding an unsold portion of its initial allotment or to a Sponsor, add the Restricted Notes Legend from Exhibit A-1 to Appendix A and replace the Assignment Form included in this Exhibit B-1 with the Assignment Form included in such Exhibit A-1.

B-1-1

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

9.0% Second-Priority Springing Lien Notes due 2021

CUSIP No.
ISIN No.

MOMENTIVE PERFORMANCE MATERIALS INC., A DELAWARE CORPORATION, PROMISES TO PAY TO CEDE & CO., OR ITS REGISTERED ASSIGNS, THE PRINCIPAL SUM OF [ ] DOLLARS, AS THE SAME MAY BE REVISED FROM TIME TO TIME ON THE SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE ATTACHED HERETO, JANUARY 15, 2021.

Interest Payment Dates: January 15 and July 15

Record Dates: January 1 and July 1

Additional provisions of this Dollar Note are set forth on the other side of this Dollar Note.

B-1-2

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

MOMENTIVE PERFORMANCE MATERIALS INC.

By: _____
Name:
Title:

Dated:

B-1-3

TRUSTEE'S CERTIFICATE OF
   AUTHENTICATION

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,
   as Trustee, certifies that this is
   one of the Notes referred to in the Indenture.

By:_____
                      Authorized Signatory

Dated:_____
_____
*/      If the Note is to be issued in global form, add the Global Notes
        Legend and the attachment from Exhibit B-1 captioned "TO BE
        ATTACHED TO GLOBAL NOTES - SCHEDULE OF
        INCREASES OR DECREASES IN GLOBAL NOTE".

                                          B-1-4

[FORM OF REVERSE SIDE OF EXCHANGE NOTE OR PRIVATE EXCHANGE NOTE
FOR DOLLAR NOTES]

9.0% Second-Priority Springing Lien Notes due 2021

1.   Interest

(a) Momentive Performance Materials Inc., a Delaware corporation (such corporation, and its successors and assigns under the Indenture hereinafter referred to, being herein called the "Company"), promises to pay interest on the principal amount of this Dollar Note at the rate per annum shown above. The Company shall pay interest semiannually on January 15 and July 15 of each year, commencing January 15, 2011. Interest on the Dollar Notes shall accrue from the most recent date to which interest has been paid or duly provided for or, if no interest has been paid or duly provided for, from November 5, 2010 until the principal hereof is due. Interest shall be computed on the basis of a 360-day year of twelve 30-day months. The Company shall pay interest on overdue principal at the rate borne by the Dollar Notes, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

(b) The Holder of this Note is entitled to the benefits of the Registration Rights Agreement. As more fully set forth therein, the Registration Rights Agreement provides that the Company will pay Additional Interest to each Holder under certain circumstances. All accrued Additional Interest shall be paid to Holders in the same manner as interest payments on the Notes on semi-annual payment dates that correspond to interest payment dates for the Notes. All references in this Note for the payment of interest shall be deemed to include any Additional Interest payable pursuant to the Registration Rights Agreement. The Trustee shall have no responsibility with respect to the determination of the amount of any such Additional Interest.

2.   Method of Payment

The Company shall pay interest on the Dollar Notes (except defaulted interest) to the Persons who are registered Holders at the close of business on the January 1 or July 1 next preceding the interest payment date even if Dollar Notes are canceled after the record date and on or before the interest payment date (whether or not a Business Day). Holders must surrender Dollar Notes to the Paying Agent to collect principal payments. The Company shall pay principal, premium, if any, and interest in money of the United States of America that at the time of payment is legal tender for payment of public and private debts. Payments in respect of the Dollar Notes represented by a Global Note (including principal, premium, if any, and interest) shall be made by wire transfer of immediately available funds to the accounts specified by The Depository Trust Company or any successor depositary. The Company shall make all payments in respect of a certificated Dollar Note (including principal, premium, if any, and interest) at the office of the Paying Agent, except that, at the option of the Company, payment of interest may be made by mailing a check to the registered address of each Holder thereof; *provided, however,* that payments on the Dollar Notes may also be made, in the case of a Holder of at least $1,000,000 aggregate principal amount of Dollar Notes, by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such Holder elects payment by wire transfer by giving written notice to the Trustee or Paying Agent to such effect designating such

B-1-5

Bloomberg Law®                    © 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 185

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion).

3.   Paying Agent and Registrar

Initially, The Bank of New York Mellon Trust Company, N.A., a national banking association (the "Trustee"), will act as Paying Agent and Registrar. The Company may appoint and change any Paying Agent or Registrar without notice. The Company or any of its Wholly Owned Subsidiaries may act as Paying Agent or Registrar.

4.   Indenture

The Company issued the Dollar Notes under an Indenture dated as of November 5, 2010 (the "Indenture"), among the Company, the Note Guarantors and the Trustee. The terms of the Dollar Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbbb) as in effect on the date of the Indenture (the "TIA"). Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture. The Dollar Notes are subject to all terms and provisions of the Indenture, and the Holders (as defined in the Indenture) are referred to the Indenture and the TIA for a statement of such terms and provisions.

Prior to the Springing Lien Trigger Date, the Dollar Notes are senior unsecured obligations of the Company. Following the Springing Lien Trigger Date, the Dollar Notes will be senior secured obligations of the Company. This Dollar Note is one of the Initial Notes referred to in the Indenture. The Notes include the Initial Notes and any Exchange Notes issued in exchange for the Initial Notes pursuant to the Indenture. The Dollar Notes (including any Exchange Notes issued in exchange therefor) and the Euro Notes issued under the Indenture (including any Exchange Notes issued in exchange therefor) are separate series of Notes but will be treated as a single class of securities under the Indenture, except as otherwise stated therein. The Indenture imposes certain limitations on the ability of the Company and the Restricted Subsidiaries to, among other things, make certain Investments and other Restricted Payments, pay dividends and other distributions, incur Indebtedness, enter into consensual restrictions upon the payment of certain dividends and distributions by such Restricted Subsidiaries, issue or sell shares of Capital Stock of the Company and such Restricted Subsidiaries, enter into or permit certain transactions with Affiliates, create or incur Liens and make Asset Sales. The Indenture also imposes limitations on the ability of the Company and each Note Guarantor to consolidate or merge with or into any other Person or convey, transfer or lease all or substantially all of its property.

To guarantee the due and punctual payment of the principal and interest on the Dollar Notes and all other amounts payable by the Company under the Indenture and the Dollar Notes when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Dollar Notes and the Indenture, the Note Guarantors have, jointly and severally, unconditionally guaranteed the Guaranteed Obligations on a senior secured basis pursuant to the terms of the Indenture.

B-1-6

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

5.    Optional Redemption

Except as set forth in the following two paragraphs, the Dollar Notes shall not be redeemable at the option of the Company prior to January 15, 2016. Thereafter, the Dollar Notes shall be redeemable at the option of the Company, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice delivered electronically or mailed by first-class mail to each Dollar Notes Holder's registered address, at the following redemption prices (expressed as a percentage of principal amount), plus accrued and unpaid interest, if any, and Additional Interest, if any, to the redemption date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on December 15 of the years set forth below:

| Year | Redemption Price |
| --- | --- |
| 2016 | 104.500% |
| 2017 | 103.000% |
| 2018 | 101.500% |
| 2019 and thereafter | 100.000% |

In addition, prior to January 15, 2016, the Company may redeem the Dollar Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice delivered electronically or mailed by first-class mail to each Holder's registered address, at a redemption price equal to 100% of the principal amount of the Dollar Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest, if any, to, the applicable redemption date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date).

Notwithstanding the foregoing, at any time and from time to time on or prior to January 15, 2014, the Company may redeem in the aggregate up to 35% of the original aggregate principal amount of the Dollar Notes (calculated after giving effect to any issuance of Additional Dollar Notes), with the net cash proceeds of one or more Equity Offerings (1) by the Company or (2) by any direct or indirect parent of the Company, in each case, to the extent the net cash proceeds thereof are contributed to the common equity capital of the Company or used to purchase Capital Stock (other than Disqualified Stock) of the Company from it, at a redemption price equal to 109.0% of the principal amount thereof, plus accrued and unpaid interest, if any, and Additional Interest, if any, to the redemption date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date); provided, however, that at least 65% of the original aggregate principal amount of the Dollar Notes (calculated after giving effect to any issuance of Additional Dollar Notes after the Issue Date) must remain outstanding after each such redemption; and provided, further, that such redemption shall occur within 90 days after the date on which any such Equity Offering is consummated upon not less than 30 nor more than 60 days' notice electronically delivered or mailed to each Holder of Dollar Notes being redeemed and otherwise in accordance with the procedures set forth in the Indenture. Notice of any redemption upon any Equity Offering may be given prior to the completion thereof, and any such redemption or notice may, at the Company's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of the related Equity Offering.

B-1-7

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

6.   Sinking Fund

The Dollar Notes are not subject to any sinking fund.

7.   Notice of Redemption

Notice of redemption will be delivered electronically or mailed by first-class mail at least 30 days but not more than 60 days before the redemption date to each Holder of Dollar Notes to be redeemed at his, her or its registered address. Dollar Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000. If money sufficient to pay the redemption price of and accrued and unpaid interest on all Dollar Notes (or portions thereof) to be redeemed on the redemption date is deposited with a Paying Agent on or before the redemption date and certain other conditions are satisfied, on and after such date interest ceases to accrue on such Dollar Notes (or such portions thereof) called for redemption.

8.   Repurchase of Dollar Notes at the Option of the Holders upon Change of Control and Asset Sales

Upon the occurrence of a Change of Control, each Holder shall have the right, subject to certain conditions specified in the Indenture, to cause the Company to repurchase all or any part of such Holder's Dollar Notes at a purchase price in cash equal to 101% of the principal amount thereof, plus accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date), as provided in, and subject to the terms of, the Indenture.

In accordance with Section 4.06 of the Indenture, the Company will be required to offer to purchase Dollar Notes upon the occurrence of certain events.

9.   Ranking and Collateral

The indebtedness evidenced by the Dollar Notes and the applicable Note Guarantees, respectively, is senior Indebtedness of the Company and Note Guarantors, respectively, ranks (i) equal in right of payment with all existing and future Pari Passu Indebtedness of the Company and Note Guarantors, as applicable, (ii) senior in right of payment to all existing and future Subordinated Indebtedness of the Company and Note Guarantors and (iii) structurally subordinated to all existing and future indebtedness and other liabilities of Subsidiaries that do not guarantee the Notes. Prior to the Springing Lien Trigger Date, the Dollar Notes and the applicable Note Guarantees are unsecured obligations of the Company and the Note Guarantors, respectively, and are effectively subordinated to all existing and future Secured Indebtedness of the Company and the Note Guarantors, as applicable, to the extent of the value of the assets securing such Indebtedness. Following the Springing Lien Trigger Date, the Dollar Notes and the applicable Note Guarantees will have the benefit of a second-priority security interest on the Collateral that, pursuant to the Intercreditor Agreement, will be (i) junior in priority and subordinated to the Liens securing the First Priority Obligations, (ii) pari passu in priority to Liens securing the Other Second Priority Obligations, (iii) senior to any senior unsecured obligations (to the extent of the value of the Collateral) and (iv) senior to the Company's and the Note Guarantors' existing and future Subordinated Indebtedness, and is further subject to Permitted Liens and the exceptions provided in the Security Documents.

B-1-8

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

10.  Denominations; Transfer; Exchange

The Dollar Notes are in registered form, without coupons, in denominations of $2,000 and any integral multiple of $1,000. A Holder shall register the transfer of or exchange of Dollar Notes in accordance with the Indenture. Upon any transfer or exchange, the Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes required by law or permitted by the Indenture. The Registrar need not register the transfer of or exchange any Dollar Notes selected for redemption (except, in the case of a Dollar Note to be redeemed in part, the portion of the Dollar Note not to be redeemed) or to transfer or exchange any Dollar Notes for a period of 15 days prior to a selection of Dollar Notes to be redeemed.

11.  Persons Deemed Owners

The registered Holder of this Dollar Note shall be treated as the owner of it for all purposes.

12.  Unclaimed Money

If money for the payment of principal or interest remains unclaimed for two years, the Trustee and a Paying Agent shall pay the money back to the Company at its written request unless an abandoned property law designates another Person. After any such payment, the Holders entitled to the money must look to the Company for payment as general creditors and the Trustee and a Paying Agent shall have no further liability with respect to such monies.

13.  Discharge and Defeasance

Subject to certain conditions, the Company at any time may terminate some of or all its obligations under the Dollar Notes and the Indenture if the Company deposits with the Trustee cash in U.S. Dollars, U.S. Dollar-denominated Government Obligations or a combination thereof for the payment of principal and interest on the Dollar Notes to redemption or maturity, as the case may be.

14.  Amendment; Waiver

Subject to certain exceptions set forth in the Indenture, (i) the Indenture, Notes, the Intercreditor Agreement or the Security Documents may be amended with the written consent of the Holders of at least a majority in aggregate principal amount of the outstanding Notes (voting as a single class) (which consents may be obtained in connection with a tender offer or exchange for the Notes) and (ii) any past default or compliance with any provisions may be waived with the written consent of the Holders of at least a majority in principal amount of the outstanding Notes (which consents may be obtained in connection with a tender offer or exchange for the Notes). Subject to certain exceptions set forth in the Indenture, without the consent of any Holder, the Company and the Trustee may amend the Indenture, Notes, the Intercreditor Agreement or any Security Document (i) to cure any ambiguity, omission, defect, mistake or inconsistency; (ii) to comply with Article 5 of the Indenture; (iii) to provide for uncertificated Notes in addition to or in place of certificated Notes (provided that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated

B-1-9

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Notes are described in Section 163(f)(2)(B) of the Code); (iv) to add Note Guarantees with respect to the Notes; (v) to secure the Notes, to add additional asset as Collateral, to release Collateral as permitted under the Indenture, the Security Documents or the Intercreditor Agreement, to add additional secured creditors holding Other Second Priority Obligations or additional First Priority Obligations so long as such obligations are not prohibited by the Indenture or the Security Documents; (vi) to add additional covenants of the Company for the benefit of the Holders or to surrender rights and powers conferred on the Company; (vii) to comply with the requirements of (A) the SEC in order to effect or maintain the qualification of the Indenture under the TIA or (B) the Intercreditor Agreement; (viii) to make any change that does not adversely affect the rights of any Holder; or (ix) to provide for the issuance of the Exchange Notes or Additional Notes.

Without the consent of the Holders of at least 66 2/3% in aggregate principal amount of the Notes then outstanding (which consents may be obtained in connection with a tender offer or exchange for the Notes), no amendment or waiver may release all or substantially all of the Collateral from the Lien of the Indenture and the Security Documents with respect to the Notes, subject to the terms of the Intercreditor Agreement.

15.  Defaults and Remedies

If an Event of Default occurs (other than an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Company) and is continuing, the Trustee or the Holders of at least 25% in principal amount of the outstanding Notes, in each case, by notice to the Company, may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Company occurs, the principal of, premium, if any, and interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any Holders. Under certain circumstances, the Holders of a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the Holders unless such Holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense and certain other conditions are complied with. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no Holder may pursue any remedy with respect to the Indenture or the Notes unless (i) such Holder has previously given the Trustee notice that an Event of Default is continuing, (ii) the Holders of at least 25% in principal amount of the outstanding Notes have requested the Trustee in writing to pursue the remedy, (iii) such Holders have offered the Trustee security or indemnity reasonably satisfactory to it against any loss, liability or expense, (iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity and (v) the Holders of a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period. Subject to certain restrictions, the Holders of a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred

B-1-10

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other Holder or that would involve the Trustee in personal liability. Prior to taking any action under the Indenture, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

16.  Trustee Dealings with the Company

Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Dollar Notes and may otherwise deal with and collect obligations owed to it by the Company or its Affiliates and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not Trustee.

17.  No Recourse Against Others

No affiliate, director, officer, employee, manager, incorporator or holder of any Equity Interests in the Company or of any Note Guarantor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Company or the Note Guarantors under the Dollar Notes, the Indenture, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Dollar Notes by accepting a Dollar Note waives and releases all such liability.

18.  Authentication

This Dollar Note shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Dollar Note.

19.  Abbreviations

Customary abbreviations may be used in the name of a Holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

20.  Governing Law

**THIS DOLLAR NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

21.  CUSIP Numbers; ISINs

The Company has caused CUSIP numbers and ISINs to be printed on the Dollar Notes and has directed the Trustee to use CUSIP numbers and ISINs in notices of redemption as a convenience to the Holders. No representation is made as to the accuracy of such numbers either

B-1-11

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 191

as printed on the Dollar Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Company will furnish to any Holder of Dollar Notes upon written request and without charge to the Holder a copy of the Indenture which has in it the text of this Dollar Note.

B-1-12

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

ASSIGNMENT FORM

To assign this Dollar Note, fill in the form below:

I or we assign and transfer this Dollar Note to:

_____

    (Print or type assignee's name, address and zip code)

_____

    (Insert assignee's soc. sec. or tax I.D. No.)

and irrevocably appoint agent to transfer this Dollar Note on the books of the Company. The agent may substitute another to act for him.

_____

Date:

_____

_____

Your Signature: _____

    Sign exactly as your name
    appears on the other side of
    this Dollar Note.

Signature Guarantee:

Date: _____

_____

Signature must be guaranteed by a participant
in a recognized signature guaranty medallion
program or other signature guarantor program
reasonably acceptable to the Trustee

_____

Signature of Signature Guarantee

B-1-13

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Dollar Note purchased by the Company pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, check the box:

Asset Sale ¨          Change of Control ¨

If you want to elect to have only part of this Dollar Note purchased by the Company pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, state the amount ($2,000 or any integral multiple of $1,000):
$

Date:                                        Your Signature:

(Sign exactly as your name appears on the other side of this security)

Signature Guarantee:

Signature must be guaranteed by a participant in a recognized signature guaranty medallion program or other signature guarantor program reasonably acceptable to the Trustee

B-1-14

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

[TO BE ATTACHED TO GLOBAL NOTES]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE

The initial principal amount of this Global Note is $ _____ . The following increases or decreases in this Global Note have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Notes Custodian |
|---|---|---|---|---|

B-1-15

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

EXHIBIT B-2

[FORM OF FACE OF EXCHANGE NOTE OR PRIVATE EXCHANGE NOTE
FOR EURO NOTES]*/

[Global Notes Legend]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR OR CLEARSTREAM, TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF ITS AUTHORIZED NOMINEE OR SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR OR CLEARSTREAM (AND ANY PAYMENT IS MADE TO ITS AUTHORIZED NOMINEE, OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF EUROCLEAR OR CLEARSTREAM), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, ITS AUTHORIZED NOMINEE, HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO EUROCLEAR OR CLEARSTREAM, TO NOMINEES OF EUROCLEAR OR CLEARSTREAM OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

_____

*/ If the Note is a Private Exchange Note issued in a Private Exchange to an Initial Purchaser holding an unsold portion of its initial allotment or to a Sponsor, add the Restricted Notes Legend from Exhibit A-2 to Appendix A and replace the Assignment Form included in this Exhibit B-2 with the Assignment Form included in such Exhibit A-2.

B-2-1

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

9.5% Second-Priority Springing Lien Notes due 2021

Common Code
ISIN No.

MOMENTIVE PERFORMANCE MATERIALS INC., A DELAWARE CORPORATION, PROMISES TO PAY TO THE BANK OF NEW YORK DEPOSITARY (NOMINEES) LIMITED, OR ITS REGISTERED ASSIGNS, THE PRINCIPAL SUM OF [ ] EUROS, AS THE SAME MAY BE REVISED FROM TIME TO TIME ON THE SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE ATTACHED HERETO, JANUARY 15, 2021.

Interest Payment Dates: January 15 and July 15

Record Dates: January 1 and July 1

Additional provisions of this Euro Note are set forth on the other side of this Euro Note.

B-2-2

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

MOMENTIVE PERFORMANCE MATERIALS INC.

By:
Name:
Title:

Dated:

B-2-3

AUTHENTICATING AGENT'S
CERTIFICATE OF AUTHENTICATION
THE BANK OF NEW YORK MELLON, LONDON BRANCH,
as Authentication Agent, certifies that this is
one of the Notes referred to in the Indenture.

By:

      Authorized Signatory

Dated:

_____

*/    If the Note is to be issued in global form, add the Global Notes Legend and the attachment from Exhibit B-2 captioned "TO BE ATTACHED TO GLOBAL NOTES—SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE".

B-2-4

[FORM OF REVERSE SIDE OF EXCHANGE NOTE OR PRIVATE EXCHANGE NOTE FOR EURO NOTES]

9.5% Second-Priority Springing Lien Notes due 2021

1.  Interest

(a) Momentive Performance Materials Inc., a Delaware corporation (such corporation, and its successors and assigns under the Indenture hereinafter referred to, being herein called the "Company"), promises to pay interest on the principal amount of this Euro Note at the rate per annum shown above. The Company shall pay interest semiannually on January 15 and July 15 of each year, commencing January 15, 2011. Interest on the Euro Notes shall accrue from the most recent date to which interest has been paid or duly provided for or, if no interest has been paid or duly provided for, from November 5, 2010 until the principal hereof is due. Interest shall be computed on the basis of a 360-day year of twelve 30-day months. The Company shall pay interest on overdue principal at the rate borne by the Euro Notes, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

(b) The Holder of this Note is entitled to the benefits of the Registration Rights Agreement. As more fully set forth therein, the Registration Rights Agreement provides that the Company will pay Additional Interest to each Holder under certain circumstances. All accrued Additional Interest shall be paid to Holders in the same manner as interest payments on the Notes on semi-annual payment dates that correspond to interest payment dates for the Notes. All references in this Note for the payment of interest shall be deemed to include any Additional Interest payable pursuant to the Registration Rights Agreement. The Trustee shall have no responsibility with respect to the determination of the amount of any such Additional Interest.

2.  Method of Payment

The Company shall pay interest on the Euro Notes (except defaulted interest) to the Persons who are registered Holders at the close of business on the January 1 or July 1 next preceding the interest payment date even if Euro Notes are canceled after the record date and on or before the interest payment date (whether or not a Business Day). Holders must surrender Euro Notes to the Paying Agent to collect principal payments. The Company shall pay principal, premium, if any, and interest in euros or such other lawful currency of the participating member states in the Third Stage of European Economics and Monetary Union at the Treaty Establishing the European Community that at the time of payment is legal tender for payment of public and private debts. Payments in respect of the Euro Notes represented by a Global Note (including principal, premium, if any, and interest) shall be made by wire transfer of immediately available funds to the accounts specified by the Holder or Holders thereof. The Company shall make all payments in respect of a certificated Euro Note (including principal, premium, if any, and interest) at the office of the Paying Agent, except that, at the option of the Company, payment of interest may be made by mailing a check to the registered address of each Holder thereof.

B-2-5

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

3.   Paying Agent and Registrar

Initially, The Bank of New York Mellon, London Branch will act as Paying Agent and Registrar. The Company may appoint and change any Paying Agent or Registrar in accordance with the terms of the Paying Agency Agreement between the Company and The Bank of New York Mellon. If and for so long as the Euro Notes are listed on the Official List of the Luxembourg Stock Exchange, the Company will also maintain a paying agent in Luxembourg. The Company or any of its Wholly Owned Subsidiaries may act as Paying Agent or Registrar.

4.   Indenture

The Company issued the Euro Notes under an Indenture dated as of November 5, 2010 (the "Indenture"), among the Company, the Note Guarantors, The Bank of New York Mellon Trust Company, N.A., as Trustee (the "Trustee") and the Collateral Agent. The terms of the Euro Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbbb) as in effect on the date of the Indenture (the "TIA"). Terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture. The Euro Notes are subject to all terms and provisions of the Indenture, and the Holders (as defined in the Indenture) are referred to the Indenture and the TIA for a statement of such terms and provisions.

Prior to the Springing Lien Trigger Date, the Euro Notes are senior unsecured obligations of the Company. Following the Springing Lien Trigger Date, the Euro Notes will be senior secured obligations of the Company. This Euro Note is one of the Initial Notes referred to in the Indenture. The Notes include the Initial Notes and any Exchange Notes issued in exchange for the Initial Notes pursuant to the Indenture. The Euro Notes (including any Exchange Notes issued in exchange therefor) and the Dollar Notes issued under the Indenture (including any Exchange Notes issued in exchange therefor) are separate series of Notes but will be treated as a single class of securities under the Indenture, except as otherwise stated therein. The Indenture imposes certain limitations on the ability of the Company and the Restricted Subsidiaries to, among other things, make certain Investments and other Restricted Payments, pay dividends and other distributions, incur Indebtedness, enter into consensual restrictions upon the payment of certain dividends and distributions by such Restricted Subsidiaries, issue or sell shares of Capital Stock of the Company and such Restricted Subsidiaries, enter into or permit certain transactions with Affiliates, create or incur Liens and make Asset Sales. The Indenture also imposes limitations on the ability of the Company and each Note Guarantor to consolidate or merge with or into any other Person or convey, transfer or lease all or substantially all of its property.

To guarantee the due and punctual payment of the principal and interest on the Euro Notes and all other amounts payable by the Company under the Indenture and the Euro Notes when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Euro Notes and the Indenture, the Note Guarantors have, jointly and severally, unconditionally guaranteed the Guaranteed Obligations on a senior secured basis pursuant to the terms of the Indenture.

B-2-6

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

5.    Optional Redemption

Except as set forth in the following two paragraphs, the Euro Notes shall not be redeemable at the option of the Company prior to January 15, 2016. Thereafter, the Euro Notes shall be redeemable at the option of the Company, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice delivered electronically or mailed by first-class mail to each Euro Notes Holder's registered address, at the following redemption prices (expressed as a percentage of principal amount), plus accrued and unpaid interest, if any, and Additional Interest, if any, to the redemption date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on January 15 of the years set forth below:

| Year | Redemption Price |
| --- | --- |
| 2016 | 104.750% |
| 2017 | 103.167% |
| 2018 | 101.583% |
| 2019 and thereafter | 100.000% |

In addition, prior to January 15, 2016, the Company may redeem the Euro Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice delivered electronically or mailed by first-class mail to each Holder's registered address, at a redemption price equal to 100% of the principal amount of the Euro Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest, if any, to, the applicable redemption date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date).

Notwithstanding the foregoing, at any time and from time to time on or prior to January 15, 2014, the Company may redeem in the aggregate up to 35% of the original aggregate principal amount of the Euro Notes (calculated after giving effect to any issuance of Additional Euro Notes), with the net cash proceeds of one or more Equity Offerings (1) by the Company or (2) by any direct or indirect parent of the Company, in each case, to the extent the net cash proceeds thereof are contributed to the common equity capital of the Company or used to purchase Capital Stock (other than Disqualified Stock) of the Company from it, at a redemption price equal to 109.5% of the principal amount thereof, plus accrued and unpaid interest, if any, and Additional Interest, if any, to the redemption date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date); provided, however, that at least 65% of the original aggregate principal amount of the Euro Notes (calculated after giving effect to any issuance of Additional Euro Notes after the Issue Date) must remain outstanding after each such redemption; and provided, further, that such redemption shall occur within 90 days after the date on which any such Equity Offering is consummated upon not less than 30 nor more than 60 days' notice electronically delivered or mailed to each Holder of Euro Notes being redeemed and otherwise in accordance with the procedures set forth in the Indenture. Notice of any redemption upon any Equity Offering may be given prior to the completion thereof, and any such redemption or notice may, at the Company's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of the related Equity Offering.

B-2-7

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 202

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

6.   Sinking Fund

The Euro Notes are not subject to any sinking fund.

7.   Notice of Redemption

Notice of redemption will be delivered electronically or mailed by first-class mail at least 30 days but not more than 60 days before the redemption date to each Holder of Euro Notes to be redeemed at his, her or its registered address. Euro Notes in denominations larger than €100,000 may be redeemed in part but only in whole multiples of €1,000. If money sufficient to pay the redemption price of and accrued and unpaid interest on all Euro Notes (or portions thereof) to be redeemed on the redemption date is deposited with a Paying Agent on or before the redemption date and certain other conditions are satisfied, on and after such date interest ceases to accrue on such Euro Notes (or such portions thereof) called for redemption.

8.   Repurchase of Euro Notes at the Option of the Holders upon Change of Control and Asset Sales

Upon the occurrence of a Change of Control, each Holder shall have the right, subject to certain conditions specified in the Indenture, to cause the Company to repurchase all or any part of such Holder's Euro Notes at a purchase price in cash equal to 101% of the principal amount thereof, plus accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant interest payment date), as provided in, and subject to the terms of, the Indenture.

In accordance with Section 4.06 of the Indenture, the Company will be required to offer to purchase Euro Notes upon the occurrence of certain events.

9.   Ranking and Collateral

The indebtedness evidenced by the Euro Notes and the applicable Note Guarantees, respectively, is senior Indebtedness of the Company and Note Guarantors, respectively, ranks (i) equal in right of payment with all existing and future Pari Passu Indebtedness of the Company and Note Guarantors, as applicable, (ii) senior in right of payment to all existing and future Subordinated Indebtedness of the Company and Note Guarantors and (iii) structurally subordinated to all existing and future indebtedness and other liabilities of Subsidiaries that do not guarantee the Notes. Prior to the Springing Lien Trigger Date, the Euro Notes and the applicable Note Guarantees are unsecured obligations of the Company and the Note Guarantors, respectively, and are effectively subordinated to all existing and future Secured Indebtedness of the Company and the Note Guarantors, as applicable, to the extent of the value of the assets securing such Indebtedness. Following the Springing Lien Trigger Date, the Euro Notes and the applicable Note Guarantees will have the benefit of a second-priority security interest on the Collateral that, pursuant to the Intercreditor Agreement, will be (i) junior in priority and subordinated to the Liens securing the First Priority Obligations, (ii) pari passu in priority to Liens securing the Other Second Priority Obligations, (iii) senior to any senior unsecured obligations (to the extent of the value of the Collateral) and (iv) senior to the Company's and the Note Guarantors' existing and future Subordinated Indebtedness, and is further subject to Permitted Liens and the exceptions provided in the Security Documents.

B-2-8

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Bloomberg Law®

10.  Denominations; Transfer; Exchange

The Euro Notes are in registered form, without coupons, in denominations of €100,000 and any integral multiple of €1,000. A Holder shall register the transfer of or exchange of Euro Notes in accordance with the Indenture. Upon any transfer or exchange, the Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements or transfer documents and to pay any taxes required by law or permitted by the Indenture. The Registrar need not register the transfer of or exchange any Euro Notes selected for redemption (except, in the case of an Euro Note to be redeemed in part, the portion of the Euro Note not to be redeemed) or to transfer or exchange any Euro Notes for a period of 15 days prior to a selection of Euro Notes to be redeemed.

11.  Persons Deemed Owners

The registered Holder of this Euro Note shall be treated as the owner of it for all purposes.

12.  Unclaimed Money

If money for the payment of principal or interest remains unclaimed for two years, the Trustee and a Paying Agent shall pay the money back to the Company at its written request unless an abandoned property law designates another Person. After any such payment, the Holders entitled to the money must look to the Company for payment as general creditors and the Trustee and a Paying Agent shall have no further liability with respect to such monies.

13.  Discharge and Defeasance

Subject to certain conditions, the Company at any time may terminate some of or all its obligations under the Euro Notes and the Indenture if the Company deposits with the Trustee cash in euros or euro-denominated Government Obligations for the payment of principal and interest on the Euro Notes to redemption or maturity, as the case may be.

14.  Amendment; Waiver

Subject to certain exceptions set forth in the Indenture, (i) the Indenture, Notes, the Intercreditor Agreement or the Security Documents may be amended with the written consent of the Holders of at least a majority in aggregate principal amount of the outstanding Notes (voting as a single class) (which consents may be obtained in connection with a tender offer or exchange for the Notes) and (ii) any past default or compliance with any provisions may be waived with the written consent of the Holders of at least a majority in principal amount of the outstanding Notes (which consents may be obtained in connection with a tender offer or exchange for the Notes). Subject to certain exceptions set forth in the Indenture, without the consent of any Holder, the Company and the Trustee may amend the Indenture, Notes, the Intercreditor Agreement or any Security Document (i) to cure any ambiguity, omission, defect, mistake or inconsistency; (ii) to comply with Article 5 of the Indenture; (iii) to provide for uncertificated Notes in addition to or in place of certificated Notes (provided that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code); (iv) to add Note Guarantees with respect to the Notes; (v) to secure the Notes, to add additional asset as Collateral, to release

B-2-9

Collateral as permitted under the Indenture, the Security Documents or the Intercreditor Agreement, to add additional secured creditors holding Other Second Priority Obligations or additional First Priority Obligations so long as such obligations are not prohibited by the Indenture or the Security Documents; (vi) to add additional covenants of the Company for the benefit of the Holders or to surrender rights and powers conferred on the Company; (vii) to comply with the requirements of (A) the SEC in order to effect or maintain the qualification of the Indenture under the TIA or (B) the Intercreditor Agreement; (viii) to make any change that does not adversely affect the rights of any Holder; or (ix) to provide for the issuance of the Exchange Notes or Additional Notes.

Without the consent of the Holders of at least 66 2/3% in aggregate principal amount of the Notes then outstanding (which consents may be obtained in connection with a tender offer or exchange for the Notes), no amendment or waiver may release all or substantially all of the Collateral from the Lien of the Indenture and the Security Documents with respect to the Notes, subject to the terms of the Intercreditor Agreement.

15.  Defaults and Remedies

If an Event of Default occurs (other than an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Company) and is continuing, the Trustee or the Holders of at least 25% in principal amount of the outstanding Notes, in each case, by notice to the Company, may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Company occurs, the principal of, premium, if any, and interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any Holders. Under certain circumstances, the Holders of a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the Holders unless such Holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense and certain other conditions are complied with. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no Holder may pursue any remedy with respect to the Indenture or the Notes unless (i) such Holder has previously given the Trustee notice that an Event of Default is continuing, (ii) the Holders of at least 25% in principal amount of the outstanding Notes have requested the Trustee in writing to pursue the remedy, (iii) such Holders have offered the Trustee security or indemnity reasonably satisfactory to it against any loss, liability or expense, (iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity and (v) the Holders of a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period. Subject to certain restrictions, the Holders of a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other

B-2-10

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Holder or that would involve the Trustee in personal liability. Prior to taking any action under the Indenture, the Trustee shall be entitled to indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

16.  Trustee Dealings with the Company

Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Euro Notes and may otherwise deal with and collect obligations owed to it by the Company or its Affiliates and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not Trustee.

17.  No Recourse Against Others

No affiliate, director, officer, employee, manager, incorporator or holder of any Equity Interests in the Company or of any Note Guarantor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Company or the Note Guarantors under the Euro Notes, the Indenture, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Euro Notes by accepting an Euro Note waives and releases all such liability.

18.  Authentication

This Euro Note shall not be valid until an authorized signatory of the Trustee (or an authenticating agent) manually signs the certificate of authentication on the other side of this Euro Note.

19.  Abbreviations

Customary abbreviations may be used in the name of a Holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

20.  Governing Law

**THIS EURO NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

21.  Common Code; ISINs

The Company has caused the Common Code and ISINs to be printed on the Euro Notes and has directed the Trustee to use the Common Code and ISINs in notices of redemption as a convenience to the Holders. No representation is made as to the accuracy of such numbers either as printed on the Euro Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

B-2-11

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

The Company will furnish to any Holder of Euro Notes upon written request and without charge to the Holder a copy of the Indenture which has in it the text of this Euro Note.

B-2-12

ASSIGNMENT FORM

To assign this Euro Note, fill in the form below:

I or we assign and transfer this Euro Note to:

_____

(Print or type assignee's name, address and zip code)

_____

(Insert assignee's soc. sec. or tax I.D. No.)

and irrevocably appoint _____ agent to transfer this Euro Note on the books of the Company. The agent may substitute another to act for him.

_____

Date: _____
_____

_____

Your Signature:

Sign exactly as your name appears on the other side of this Euro Note.

Signature Guarantee:

Date: _____
_____

Signature must be guaranteed by a participant
in a recognized signature guaranty medallion
program or other signature guarantor program
reasonably acceptable to the Trustee

_____

Signature of Signature Guarantee

B-2-13

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

[TO BE ATTACHED TO GLOBAL NOTES]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE

The initial principal amount of this Global Note is €_____. The following increases or decreases in this Global Note have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Notes Custodian |
|---|---|---|---|---|

B-2-14

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Euro Note purchased by the Company pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, check the box:

Asset Sale ¨      Change of Control ¨

If you want to elect to have only part of this Euro Note purchased by the Company pursuant to Section 4.06 (Asset Sale) or 4.08 (Change of Control) of the Indenture, state the amount (€100,000 or any integral multiple of €1,000):

$

Date:                                                        Your Signature:

(Sign exactly as your name appears on the other side of this security)

Signature Guarantee:

Signature must be guaranteed by a participant in a recognized signature guaranty medallion program or other signature guarantor program reasonably acceptable to the Trustee

B-2-15

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

EXHIBIT C

[FORM OF]
TRANSFEREE LETTER OF REPRESENTATION

Momentive Performance Materials Inc.
c/o The Bank of New York Mellon Trust Company, N.A.
525 William Penn Plaza, 38th floor
Pittsburgh, Pennsylvania 15259
Attention: Momentive Performance Materials Inc. Account Manager

Ladies and Gentlemen:

This certificate is delivered to request a transfer of $[ ] principal amount of the 9.0% Second-Priority Springing Lien Notes due 2021 (the "Notes") of MOMENTIVE PERFORMANCE MATERIALS INC. (the "Company").

Upon transfer, the Notes would be registered in the name of the new beneficial owner as follows:

Name: _____
_____
Address: _____
_____
Taxpayer ID Number:   _____
_____

The undersigned represents and warrants to you that:

1. We are an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act of 1933, as amended (the "Securities Act")), purchasing for our own account or for the account of such an institutional "accredited investor" at least $100,000 principal amount of the Notes, and we are acquiring the Notes not with a view to, or for offer or sale in connection with, any distribution in violation of the Securities Act. We have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we invest in or purchase securities similar to the Notes in the normal course of our business. We, and any accounts for which we are acting, are each able to bear the economic risk of our or its investment.

2. We understand that the Notes have not been registered under the Securities Act and, unless so registered, may not be sold except as permitted in the following sentence. We agree on our own behalf and on behalf of any investor account for which we are purchasing Notes to offer, sell or otherwise transfer such Notes prior to the date that is one year after the later of the date of original issue and the last date on which either the Company or any affiliate of such Company was the owner of such Notes (or any predecessor thereto) (the "Resale Restriction Termination Date") only (a) in the United States to a person whom we reasonably believe is a qualified institutional buyer (as defined in Rule 144A under the Securities Act) in a transaction meeting the requirements of Rule 144A, (b) outside the United States in an offshore transaction in accordance with Rule 904 of Regulation S under the Securities Act, (c) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder (if applicable) or (d) pursuant to an effective registration statement under the Securities Act, in each

C-1

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 211

of cases (a) through (d) in accordance with any applicable securities laws of any state of the United States. In addition, we will, and each subsequent holder is required to, notify any purchaser of the Note evidenced hereby of the resale restrictions set forth above. The foregoing restrictions on resale will not apply subsequent to the Resale Restriction Termination Date. If any resale or other transfer of the Notes is proposed to be made to an institutional "accredited investor" prior to the Resale Restriction Termination Date, the transferor shall deliver a letter from the transferee substantially in the form of this letter to the Company and the Trustee, which shall provide, among other things, that the transferee is an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act and that it is acquiring such Notes for investment purposes and not for distribution in violation of the Securities Act. Each purchaser acknowledges that the Company and the Trustee reserve the right prior to the offer, sale or other transfer prior to the Resale Restriction Termination Date of the Notes pursuant to clause 1(b), 1(c) or 1(d) above to require the delivery of an opinion of counsel, certifications or other information satisfactory to the Company and the Trustee.

Dated:
_____

TRANSFEREE: _____,
By: _____

C-2

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

EXHIBIT D

[FORM OF SUPPLEMENTAL INDENTURE]

SUPPLEMENTAL INDENTURE (this "Supplemental Indenture") dated as of [ ], among [NOTE GUARANTOR] (the "New Note Guarantor"), a subsidiary of MOMENTIVE PERFORMANCE MATERIALS INC. (or its successor), a Delaware corporation (the "Company") and THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., a national banking association, as trustee (the "Trustee") and collateral agent (the "Collateral Agent") under the indenture referred to below.

W I T N E S S E T H :

WHEREAS the Company and the existing Note Guarantors have heretofore executed and delivered to the Trustee and the Collateral Agent an indenture (as amended, supplemented or otherwise modified, the "Indenture") dated as of November 5, 2010, providing for the issuance of the Company's U.S. Dollar-denominated 9.0% Second-Priority Springing Lien Notes due 2021 and euro-denominated 9.5% Second-Priority Springing Lien Notes due 2021 (together, the "Notes")

WHEREAS Section 4.11 of the Indenture provides that under certain circumstances the Company are required to cause the New Note Guarantor to execute and deliver to the Trustee and the Collateral Agent a supplemental indenture pursuant to which the New Note Guarantor shall unconditionally guarantee all the Company's Obligations under the Notes and the Indenture pursuant to a Notes Guarantee on the terms and conditions set forth herein; and

WHEREAS pursuant to Section 9.01 of the Indenture, the Trustee, the Collateral Agent, the Company and the existing Note Guarantors are authorized to execute and deliver this Supplemental Indenture;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the New Note Guarantor, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the holders of the Notes as follows:

1. Defined Terms. As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined, except that the term "Holders" in this Supplemental Indenture shall refer to the term "Holders" as defined in the Indenture and the Trustee and the Collateral Agent acting on behalf of and for the benefit of such Holders. The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

2. Agreement to Guarantee. The New Note Guarantor hereby agrees, jointly and severally with all existing Note Guarantors (if any), to unconditionally guarantee the Company's Obligations under the Notes and the Indenture on the terms and subject to the conditions set forth in Article 12 of the Indenture and to be bound by all other applicable provisions of the Indenture

D-1

and the Notes and to perform all of the obligations and agreements of a Note Guarantor under the Indenture.

3. <u>Notices</u>. All notices or other communications to the New Note Guarantor shall be given as provided in Section 13.02 of the Indenture.

4. <u>Ratification of Indenture; Supplemental Indentures Part of Indenture</u>. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

5. <u>Governing Law</u>. THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

6. <u>Trustee Makes No Representation</u>. The Trustee and the Collateral Agent make no representation as to the validity or sufficiency of this Supplemental Indenture.

7. <u>Counterparts</u>. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

8. <u>Effect of Headings</u>. The Section headings herein are for convenience only and shall not effect the construction thereof.

D-2

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

[NEW NOTE GUARANTOR]

By: _____

Name:

Title:

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., AS TRUSTEE AND
COLLATERAL AGENT

By:_____

Name:

Title:

D-3

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Momentive Performance Materials Inc.; Form 8-K; EX-4.1: INDENTURE

# General Information

**EDGAR File Number**          333-146093

**Filing Date**               12-Nov-2010

**Filer (CIK)**               Momentive Performance Materials Inc.(0001405041)

**EDGAR Form Family**         Form 8-K Current Reports

**Period Date**               05-Nov-2010

**Industry(SIC)**             Industrial Organic Chemicals [2860]

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

## **EXHIBIT B**

**Subordinated Notes Indenture Provisions Chart**

**Use of "Lien", "Indebtedness" and "obligations" in the Subordinated Notes Indenture**

| Section of Subordinated Notes Indenture | Provision |
|---|---|
| Section 1.01: Definition of "**Acquired Indebtedness**" | "Indebtedness secured by a Lien encumbering any asset" |
| Section 1.01: Definition of "**Indebtedness**" | [...] "(3) to the extent not otherwise included, Indebtedness of another Person secured by a Lien on any asset" |
| Section 1.01: Definition of "**Lien**" | "means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction); provided that in no event shall an operating lease be deemed to constitute a Lien." <br><br>[The definition of "Lien" does not mention Indebtedness or obligations at all, since it is merely a security interest and not itself evidence of debt.] |
| Section 1.01: Definition of "**Permitted Liens**" | "Permitted Lien" means [...] <br>"Liens on assets … securing Indebtedness" [...] <br>"Liens securing Senior Indebtedness" [...] <br>"Liens securing Indebtedness" [...] <br>"Liens securing Hedging Obligations" [...] <br>"Liens to secure any refinancing … or replacement of Indebtedness" [...] <br>"Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations" [...] <br>"the Indebtedness secured by such Lien" [...] <br>"Liens securing obligations incurred in the ordinary course of business" [...] <br>"Liens to secure any refinancing, refunding, refunding, extension renewal or replacement (or successive refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any lien" [...] |

1

| Section of Subordinated Notes Indenture | Provision |
|---|---|
| Section 1.01: Definition of "**Secured Indebtedness**" | "any Indebtedness secured by a Lien." |
| Section 4.12: Liens | "any Lien on any asset or property of the Company … securing Indebtedness" […] "until such time as such obligations are no longer secured by a Lien." |

## EXHIBIT C

**Pre-Petition and Post-Petition Lien Priority Chart**

**Prepetition and Postpetition Lien Priority Chart**[i][ii]

| | DIP ABL | DIP Term Loan | Prepetition ABL Facility | GE Cash Flow Facility ("**GE**") | First Lien Notes | 1.5 Lien Notes | Second Lien Notes |
|---|---|---|---|---|---|---|---|
| **U.S. Borrowers and Guarantors** | | | | | | | |
| **ABL Priority Collateral**[iii] | First priority priming | Second priority priming (second only to DIP ABL) | <u>Prepetition</u>: First priority<br><br><u>Postpetition</u>: Replaced by DIP ABL | <u>Prepetition</u>: Junior to ABL; *pari passu* with First Lien Notes<br><br><u>Postpetition</u>: Primed by DIP ABL and DIP Term Loan; *pari passu* with First Lien Notes | <u>Prepetition</u>: Junior to ABL; *pari passu* with GE<br><br><u>Postpetition</u>: Primed by DIP ABL and DIP Term Loan; junior to GE and First Lien Notes | <u>Prepetition</u>: Junior to ABL, GE, and First Lien Notes<br><br><u>Postpetition</u>: Primed by DIP ABL and DIP Term Loan; junior to GE and First Lien Notes | <u>Prepetition</u>:  Junior to ABL, GE, First Lien Notes, and 1.5 Lien Notes<br><br><u>Postpetition</u>: Primed by DIP ABL and DIP Term Loan; junior to GE, First Lien Notes, and 1.5 Lien Notes |
| **Notes Priority Collateral**[iv] | Second priority priming (second only to DIP Term Loan) | First priority priming | <u>Prepetition</u>: Second priority to GE and First Lien Notes<br><br><u>Postpetition</u>: Replaced by DIP ABL | <u>Prepetition</u>:  Senior to ABL; *pari passu* with First Lien Notes<br><br><u>Postpetition</u>: Primed by DIP ABL and DIP Term Loan; *pari passu* with First Lien Notes | <u>Prepetition</u>:  Senior to ABL; *pari passu* with GE (except upon one parcel of real property located in New York which serves as collateral for the First Lien Notes but not GE, and will not be primed or otherwise affected by the DIP ABL and DIP Term Loan)<br><br><u>Postpetition</u>: Primed by DIP ABL and DIP Term Loan; *pari passu* with GE | <u>Prepetition</u>: Junior to ABL, GE, and First Lien Notes<br><br><u>Postpetition</u>: Primed by DIP ABL and DIP Term Loan; junior to GE and First Lien Notes | <u>Prepetition</u>: Junior to ABL, GE, First Lien Notes, and 1.5 Lien Notes<br><br><u>Postpetition</u>: Primed by DIP ABL and DIP Term Loan; junior to GE, First Lien Notes, and 1.5 Lien Notes |
| **Foreign Borrowers and Guarantors** | | | | | | | |
| **ABL Priority Collateral** | First priority (non-priming) | None | <u>Prepetition</u>: First priority | <u>Prepetition</u>: Second priority to ABL | None | None | None |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Postpetition: Replaced by DIP ABL | Postpetition: Second priority to DIP ABL | | | |
| **Notes Priority Collateral** | Second priority (non-priming) (second to GE) | None | Prepetition: Second priority<br><br>Postpetition: Replaced by DIP ABL | Prepetition: First priority<br><br>Postpetition: First priority | None | None | None |

---

i    This chart is for illustrative purposes only. To the extent there is any inconsistency between this chart and the applicable credit and DIP documents, the governing credit and DIP documents shall prevail.

ii    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in either the *Debtors' Motion for Entry of a Final Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 363(d), 364(d), 364(e) and 507 and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Prepetition Secured Lenders* [Docket No. 13] or that certain ABL Intercreditor Agreement, dated as of April 24, 2013, by and among the Prepetition ABL Agent, the Cash Flow Agent, the First Lien Indenture Trustee, Holdings and certain of Holdings' subsidiaries.

iii    "ABL Priority Collateral" means (a) all Accounts; (b) all Inventory; (c) to the extent evidencing, governing, securing or otherwise related to the items referred to in the preceding clauses (a) and (b), all (i) General Intangibles, (ii) Chattel Paper, (iii) Instruments and (iv) Documents; (d) all Payment Intangibles (including corporate tax refunds), other than any Payment Intangibles that represent tax refunds in respect of or otherwise related to Real Estate Assets, Fixtures or Equipment; (e) all payments received from Grantors' credit card clearing houses and processors or otherwise in respect of all credit card charges for sales of inventory by the Grantors; (f) all collection accounts, deposit accounts, securities accounts and commodity accounts and any cash or other assets in any such accounts (other than separately identified cash proceeds of Notes Priority Collateral (as defined below)) and securities entitlements and other rights with respect thereto; (g) to the extent relating to any of the items referred to in the preceding clauses (a) through (f) constituting ABL Priority Collateral, all Supporting Obligations and letter-of-credit rights; (h) all books and records related to the foregoing; and (i) all products and proceeds of any and all of the foregoing in whatever form received, including proceeds of insurance policies related to Inventory of any Grantor and business interruption insurance (in each case, except to the extent constituting proceeds of Notes Priority Collateral).

As it relates to the foreign grantors and foreign collateral, "ABL Priority Collateral" shall also include the Equipment (as defined in the ABL Credit Agreement) of the Foreign Grantors (in an aggregate amount of up to the Foreign Equipment Cap), plus, in each case to the extent related to such Equipment, the items included in clauses (c), (d), (g), (h) and (i) above with respect to such Equipment (collectively, the "ABL Equipment Collateral").

iv    "Notes Priority Collateral" means: (a) all Real Estate Assets, Fixtures and Equipment; (b) all intellectual property; (c) all equity interests in each Grantor's subsidiaries (except as otherwise provided below for foreign grantors/collateral, limited to 65% of the voting interests of the Grantors' foreign subsidiaries); (d) all General Intangibles, Chattel Paper, Instruments and Documents (other than General Intangibles, Chattel Paper, Instruments and Documents that are ABL Priority Collateral); (e) all Payment Intangibles that represent tax refunds in respect of or otherwise relate to Real Estate Assets, Fixtures or Equipment; (f) all intercompany indebtedness of the Company and its subsidiaries; (g) all permits and licenses related to any of the foregoing (including any permits or licenses related to the ownership or operation of Real Estate Assets, Fixtures or Equipment of any Grantor); (h) all proceeds of insurance policies (excluding any such proceeds that relate to ABL Priority Collateral); (i) all books and records related to the foregoing and not relating to ABL Priority Collateral; (j) all products and proceeds of any and all of the foregoing (other than any such proceeds that are ABL Priority Collateral); and (k) all other Collateral not constituting ABL Priority Collateral.

As it relates to the foreign grantors and foreign collateral, "Notes Priority Collateral" shall (a) exclude the ABL Equipment Collateral, (b) include 100% (rather than 65%)

of the voting equity interests of the Grantor's foreign subsidiaries, to the extent such equity interests secure the Obligations of the Foreign Grantors and (c) include Equipment of the Foreign Grantors not constituting ABL Equipment Collateral.

## __EXHIBIT D__

**Momentive Performance Materials, Inc. Press Release**

EX-99.1 2 momentive8k991.htm

**Exhibit 99.1**



## Momentive Announces Final Results Of Its Notes Exchange Offers

NEW YORK, June 10, 2009 – Momentive Performance Materials Inc. ("Momentive") today announced the final results of private exchange offers to exchange certain of its outstanding 9¾% Senior Notes due 2014, 9% Senior Notes due 2014, $10\,^1/_8$ / $10\,^7/_8$ % Senior Toggle Notes due 2014 (collectively, the "old senior notes") and 11½% Senior Subordinated Notes due 2016 (the "old subordinated notes," and, together with the old senior notes, the "old notes") as specified in the table below, for approximately $200,000,000 aggregate principal amount of 12½% Second-Lien Senior Secured Notes due 2014 (the "new second lien notes"). The exchange offers expired at midnight, New York City time, on Tuesday, June 9, 2009.

Approximately $121 million in aggregate principal amount (or 16%) of 9¾% Senior Notes due 2014, €45 million in aggregate principal amount (or 16%) of 9% Senior Notes due 2014, $173 million in aggregate principal amount (or 52%) of $10\,^1/_8$ / $10\,^7/_8$ % Senior Toggle Notes due 2014 and $174 million in aggregate principal amount (or 35%) of 11½% Senior Subordinated Notes due 2016 were validly tendered and not withdrawn in the exchange offers.

| CUSIP/ISIN | Title of Old Notes Tendered | Current Outstanding Principal Amount | Approximate Aggregate Principal Amount to Be Retired | Approximate Post-Exchange Offer Outstanding Principal Amount |
|---|---|---|---|---|
| | | | (in millions) | |
| 60877U AC1 / US60877UAC18 | 9¾% Senior Notes due 2014 | $765,000,000 | $48.4 | $716.6 |
| 60877U AF4 / XS0338823601 | 9% Senior Notes due 2014 | €275,000,000 | €29.8 | €245.2 |
| 60877U AJ6 / US60877UAJ60 | $10^1/_8$ / $10^7/_8$% Senior Toggle Notes due 2014 | $333,513,000 | $140.9 | $192.6 |
| 60877U AM9 / US60877UAM99 | 11½% Senior Subordinated Notes due 2016 | $500,000,000 | $118.1 | $381.9 |

Momentive expects all old notes validly tendered (and not withdrawn) below the clearing price of (1) $625 principal amount of new second lien notes per $1,000 principal amount of old senior notes (the "senior notes clearing price") and (2) $400 principal amount of new second lien notes per $1,000 principal amount of old subordinated notes (the "old subordinated notes clearing price") to be accepted for exchange. The principal amount of any 9% Senior Notes due 2014 has been converted into U.S. dollars at the rate of 1.4079 U.S. dollars per Euro in accordance with the procedures set forth in the offering memorandum.

All old notes tendered at the applicable clearing price will be subject to proration. The proration factor for the old senior notes will be approximately 23.76% of the aggregate principal amount of such old senior notes tendered at the senior notes clearing price. The proration factor for old subordinated notes will be approximately 48.28% of the aggregate principal amount of such old

subordinated notes tendered at the subordinated notes clearing price. The balance of old notes not accepted for exchange will remain outstanding. Momentive expects that the exchange offers will settle on June 15, 2009.

The new second lien notes have not been registered under the Securities Act of 1933, as amended, and may not be offered or sold

in the United States absent registration or an applicable exemption from the registration requirements of such Act. The exchange offers were made only by, and pursuant to, the terms set forth in the confidential offering memorandum delivered to eligible holders in connection with the exchange offers.

## About Momentive

Momentive Performance Materials Inc. is a premier specialty materials company, providing high-technology materials solutions to the silicones, quartz and ceramics markets. The company, as a global leader with worldwide operations, has a robust product portfolio, an enduring tradition of service excellence, and industry-leading research and development capabilities. Momentive Performance Materials Inc. is controlled by an affiliate of Apollo Management, L.P. Additional information is available at www.momentive.com.

## Forward-Looking Statements

This press release contains various forward-looking statements within the meaning of applicable federal securities laws, including the Private Securities Litigation Reform Act of 1995, that are based upon our current expectations and assumptions concerning future events, which are subject to a number of risks and uncertainties that could cause actual results to differ materially from those anticipated.

The words "expect," "anticipate," "estimate," "forecast," "initiative," "objective," "plan," "goal," "project," "outlook," "priorities," "target," "intend," "evaluate," "pursue," "seek," "may," "would," "could," "should," "believe," "potential," "continue," or the negative of any of those words or similar expressions is intended to identify forward-looking statements. All statements contained in or incorporated by reference into this press release, other than statements of historical fact, including, without limitation, statements about our plans, strategies, prospects and expectations regarding future events and our financial performance, are forward-looking statements that involve certain risks and uncertainties.

While these statements represent our current judgment on what the future may hold, and we believe these judgments are reasonable, these statements are not guarantees of any events or financial results, and our actual results may differ materially due to numerous important factors that are described in our Annual Report on Form 10-K for the year ended December 31, 2008, as updated by our subsequent Quarterly Report on Form 10-Q, and our Current Reports on Form 8-K. Many of these risks, uncertainties and assumptions are beyond our control, and may cause our actual results and performance to differ materially from our expectations. Factors that could cause our actual results to be materially different from our expectations include, among others, the following: substantial indebtedness potentially adversely affecting our ability to raise additional capital to fund operations; restrictive covenants in our senior secured credit facilities and indentures adversely affecting our operations; an event of default under our senior secured credit facilities adversely affecting our business, results of operations and financial condition; despite our substantial indebtedness, incurring significantly more debt, intensifying the risks described above; even if the exchange offers are completed, inability to comply with the terms of

Page 2 of 3

our existing or future indebtedness; the recent global financial crisis and economic slowdown negatively affecting our business, results of operations and financial condition; changes in pricing or supply of silicon metal and/or of siloxane; downgrade in our debt ratings restricting our access to and negatively impacting the terms of current and future financings; our Quartz division's dependence upon a particular type of sand currently available from a single source; any rise in energy costs increasing our operating expenses, reducing net income and negatively affecting our financial condition; variable rate indebtedness subjecting us to interest rate risk; risks associated with our non-U.S. operations; foreign currency risk; control by Apollo and GE and the potential conflicts of interest with our investors that this may entail; unionization of employees forcing the company to spend greater time and expense dealing with employees; failure to extend or renegotiate collective bargaining agreements; uncertain enforcement of our intellectual property rights; operating hazards at our facilities; environmental, health, safety, production and product regulations or concerns affecting us; future chemical regulatory actions decreasing profitability; recent or new regulations increasing compliance costs and reducing competitiveness in certain markets; unfunded or underfunded pension plans; dependence on key executives and qualified employees; litigation risks; failure to achieve expected cost savings; failure to achieve and maintain effective internal control over financial reporting; and limitations on our use of certain product-identifying information, including the GE name and monogram, affecting our business and profitability.

Accordingly, you should not place undue reliance on the forward-looking statements contained or incorporated by reference in this press release or in other disclosure. These forward-looking statements speak only as of the date on which the statements were made. We undertake no obligation to update publicly or otherwise revise any forward-looking statements, except where expressly required by law.

###

## Investor Contact

Peter Cholakis
(914) 784-4871

peter.cholakis@momentive.com

## <u>EXHIBIT E</u>

**Debtors' Public Disclosure of Senior Indebtedness Chart**

**Debtors' Public Disclosure of Senior Indebtedness**

| Document | Disclosure of Senior Indebtedness |
|---|---|
| 2009 Second-Lien Notes Indenture | "The indebtedness evidenced by the Securities and Guarantees [the 2009 Second-Lien Notes], respectively, is senior Indebtedness of the Company and Guarantors, respectively, ranks […] senior in right of payment to all existing and future Subordinated Indebtedness of the Company and Guarantors." |
| Current Report (Form 8-K) (June 15, 2009) [filed along with the 2009 Second-Lien Notes Indenture] | "The indebtedness evidenced by the notes [the 2009 Second-Lien Notes] and the guarantees thereof is senior secured indebtedness of the Company and Guarantors, respectively." |
| Second Lien Notes Indenture | "The indebtedness evidenced by the Dollar Notes [the USD portion of the Second Lien Notes] and the applicable Note Guarantees, respectively, is senior Indebtedness of the Company and Note Guarantors, respectively, ranks […] senior in right of payment to all existing and future Subordinated Indebtedness of the Company and Note Guarantors"<br><br>"The indebtedness evidenced by the Euro Notes [the EUR portion of the Second Lien Notes] and the applicable Note Guarantees, respectively, is senior Indebtedness of the Company and Note Guarantors, respectively, ranks […] senior in right of payment to all existing and future Subordinated Indebtedness of the Company and Note Guarantors" |
| Current Report (Form 8-K) (November 5, 2010) [Issued along with the Second Lien Notes] | "Prior to and following the Springing Lien Trigger Date, the Notes [the Second Lien Notes] and Note Guarantees will be senior indebtedness of the Company and the Note Guarantors, respectively, and will rank: equal in right of payment with all existing and future senior indebtedness of the Company and the Note Guarantors, respectively; senior in right of payment to all existing and future subordinated indebtedness of the Company and the Note Guarantors, including any of the Company's existing subordinated notes and guarantees thereof"<br><br>"Following the Springing Lien Trigger Date, the Notes and Note Guarantees will have the benefit of a security interest in the collateral securing the Notes and Note Guarantees and, consequently, following the Springing Lien Trigger Date, the Notes will rank: […] effectively senior to any senior unsecured obligations (to the extent of the value of such collateral) and senior to our and |

1

| Document | Disclosure of Senior Indebtedness |
|---|---|
|  | the Note Guarantors' existing and future subordinated debt, including our existing senior subordinated notes." |
| Prospectus (Form 424B) (May 12, 2011) [Issued when the Second Lien Notes were registered under the Exchange Act] | "Prior to and following the Springing Lien Trigger Date, the Exchange Notes [the newly registered Second Lien Notes], like the Old Notes [the unregistered Second Lien Notes], and the guarantees will be senior indebtedness of the Company and the Note Guarantors, respectively, and will rank: equal in right of payment with all existing and future senior indebtedness of the Company and the Note Guarantors, respectively, senior in right of payment to all existing and future subordinated indebtedness of the Company and the Note Guarantors, including any of the Company's existing subordinated notes and guarantees thereof" "Following the Springing Lien Trigger Date, the Exchange Notes, like the Old Notes, and the guarantees will have the benefit of a security interest in the collateral securing the Notes and Note Guarantees as described above under "Collateral." Consequently, following the Springing Lien Trigger Date, the Exchange Notes will rank: […] senior to our and the Note Guarantors' existing and future subordinated debt, including our existing senior subordinated notes." |
| 1.5 Lien Notes Indenture | "The indebtedness evidenced by the Notes [the 1.5 Lien Notes] and the applicable Note Guarantees, respectively, is senior Indebtedness of the Company and Note Guarantors, respectively, ranks […] senior in right of payment to all existing and future Subordinated Indebtedness of the Company and Note Guarantors" |
| Prospectus (Form 424B) (May 24, 2012) [final prospectus for the Second Lien Notes] | "The Second Lien Notes rank equally in right of payment to all of the Company's existing and future senior indebtedness and rank senior in right of payment to all of the Company's existing and future subordinated indebtedness." |
| Current Report (Form 8-K) (May 25, 2012) [Issued along with the 1.5 Lien Notes Indenture] | "The Notes [the 1.5 Lien Notes] and Note Guarantees are senior indebtedness of the Registrant and the Note Guarantors, respectively, and rank equal in right of payment with all existing and future senior indebtedness of the Registrant and the Note Guarantors, respectively; senior in right of payment to all existing and future subordinated indebtedness of the Registrant and the Note Guarantors, including the Registrant's 11.5% Senior Subordinated Notes due 2016 [the Subordinated Notes] and guarantees thereof" |
| Registration Statement (Form S-4) (Nov. 30, 2012) [preliminary prospectus for the First | "The Senior Secured Notes [the 1.5 Lien Notes] rank equally in right of payment to all of the Company's existing and future senior indebtedness and rank senior in right of payment to all of the Company's existing and future subordinated indebtedness." |

| Document | Disclosure of Senior Indebtedness |
|---|---|
| Lien Notes] | "The Second-Priority Springing Lien Notes rank equal in right of payment with all existing and future senior indebtedness of the company, senior in right of payment to all existing and future subordinated indebtedness of the Company." |
| Prospectus (Form 424B3) (Dec. 10, 2012) [issued when the 1.5 Lien Notes were registered under the Exchange Act] | "The Notes [the 1.5 Lien Notes] and Note Guarantees are senior indebtedness of the Company and the Note Guarantors, respectively, and rank: equal in right of payment with all existing and future senior indebtedness of the Company and the Note Guarantors, respectively; senior in right of payment to all existing and future subordinated indebtedness of the Company and the Note Guarantors, including our 11 1/2 % Senior Subordinated Notes [the Subordinated Notes]"<br><br>"The Second-Priority Springing Lien Notes rank equal in right of payment with all existing and future senior indebtedness of the Company, senior in right of payment to all existing and future subordinated indebtedness of the Company" |
| Prospectus (Form 424B3) (April 23, 2013) [issued to cover resale of the Second Lien Notes] | "The indebtedness evidenced by the [Second Lien] Notes and Note Guarantees, respectively, is senior Indebtedness of the Issuer and the Note Guarantors, respectively . . . and will be senior in right of payment to all existing and future Subordinated Indebtedness of the Issuer and the Note Guarantors, as applicable, including any Old Subordinated Notes (or the guarantees thereof)." |
| Prospectus (Form 424B3) (May 13, 2013) [issued to cover resales of the Subordinated Notes] | "The Notes [the Subordinated Notes] and Note Guarantees are our and the Note Guarantors' unsecured senior subordinated obligations and rank: junior in right of payment to all our and the Note Guarantors' existing and future senior indebtedness, including the ABL Facility, the Cash Flow Facility, the Senior Notes [consisting of the First Lien Notes, the 1.5 Lien Notes, and the Second Lien Notes] and the guarantees thereof"<br><br>"Your right to receive payments on the Notes [the Subordinated Notes] will be junior to all of our and the Note Guarantors' senior indebtedness, including our and the Note Guarantors' obligations under the ABL Facility, the Cash Flow Facility, the Senior Notes and other existing and future senior debt.  The Notes are general unsecured obligations that will be junior in right of payment to all our existing and future senior indebtedness, including the ABL Facility, Cash Flow Facility and Senior Notes."<br><br>"The Senior Secured Notes [the 1.5 Lien Notes] rank equally in right of payment to all of the |

| Document | Disclosure of Senior Indebtedness |
|---|---|
|  | Company's existing and future senior indebtedness and rank senior in right of payment to all of the Company's existing and future subordinated indebtedness"<br><br>"The Second Lien Springing Notes [the Second Lien Notes] rank equal in right of payment with all existing and future senior indebtedness of the Company, senior in right of payment to all existing and future subordinated indebtedness of the Company […] The Second Lien Springing Notes rank senior as to right of payment to the Company's existing and future subordinated debt, including our existing subordinated notes." |