Seth H. Lieberman
Patrick Sibley
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036-6569
Telephone:    (212) 421-4100
Facsimile:    (212) 326-0806

*Attorneys for Wilmington Savings Fund Society, FSB,*
*as successor indenture trustee*

- and -

Dennis F. Dunne
Samuel A. Khalil
Michael L. Hirschfeld
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:    (212) 530-5000
Facsimile:    (212) 822-5670

*Attorneys for Ad Hoc Committee of Second Lien Noteholders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MPM SILICONES, LLC, <u>et al.</u>, | : | Case No. 14-22503 (RDD) |
| | : | |
| Debtors. | : | Jointly Administered |

---------------------------------------------------------------------x

| | | |
|---|---|---|
| | : | |
| U.S. BANK NATIONAL ASSOC., as Indenture Trustee, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Adversary Proceeding |
| | : | No. 14-08238 (RDD) |
| v. | : | |
| | : | |
| WILMINGTON SAVINGS FUND SOCIETY, FSB, as | : | |
| Indenture Trustee; MOMENTIVE PERFORMANCE | : | |
| MATERIALS INC., JUNIPER BOND HOLDINGS I | : | |
| LLC, JUNIPER BOND HOLDINGS II LLC, JUNIPER | : | |
| BOND HOLDINGS III LLC, JUNIPER BOND | : | |
| HOLDINGS IV LLC, MOMENTIVE PERFORMANCE | : | |

MATERIALS CHINA SPV INC., MOMENTIVE                    :
PERFORANCE MATERIALS HOLDINGS INC.,                    :
MOMENTIVE PERFORMANCE MATERIALS                        :
QUARTZ, INC., MOMENTIVE PERFORMANCE                    :
MATERIALS SOUTH AMERICA INC., MOMENTIVE                :
PERFORMANCE MATERIALS USA INC.,                        :
MOMENTIVE PERFORMANCE MATERIALS                        :
WORLDWIDE INC.; AND MPM SILICONES, LLC,                :
                                                       :
                                   Defendants.   :
-----------------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF JOINT ANSWER AND AFFIRMATIVE
DEFENSES OF WILMINGTON SAVINGS FUND SOCIETY, FSB, AS SUCCESSOR
INDENTURE TRUSTEE, AND THE AD HOC COMMITTEE OF SECOND LIEN
NOTEHOLDERS TO THE COMPLAINT FOR DECLARATORY JUDGMENT
<u>FILED BY U.S. BANK NATIONAL ASSOCIATION</u>**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 5

ARGUMENT .......................................................................................................... 17

I.    Contrary to Plaintiff's Assertion, the Fourth Proviso Cannot Be Construed
      to Strip the Second Lien Notes of Their Status as "Senior Indebtedness"
      for the Purposes of the Subordinated Notes Indenture ......................................... 17

      A.    Textual Analysis of the Fourth Proviso Itself Does Not Support
            Plaintiff's Construction ............................................................................. 18

      B.    Textual Analysis of the Full Definition of "Senior Indebtedness"
            Does Not Support Plaintiff's Construction ................................................. 20

      C.    Plaintiff's Construction Must Be Rejected Because It Leads to
            Absurd Results ........................................................................................ 22

            1.    Plaintiff's Interpretation Would Afford No Tangible Anti-
                  Layering Protection to the Subordinated Notes and Would
                  Merely Implement an Economically Pointless and Absurd
                  Distinction Favoring Unsecured Indebtedness Over
                  Secured Second Lien Indebtedness ................................................. 23

            2.    Plaintiff's Interpretation Would Mean the First Lien
                  and 1.5 Lien Notes, and Indebtedness Under the ABL and
                  Cash Flow Facilities,  All Are Not Senior Indebtedness ................... 27

            3.    Plaintiff's Interpretation Is Disfavored Because It Would
                  Create an Historical Default ........................................................... 29

      D.    Plaintiff's Construction Must Be Rejected Because It Is
            Inconsistent With Other Provisions of the Subordinated Notes
            Indenture ................................................................................................. 29

II.   Extrinsic Evidence of Prior Statements and Conduct also Confirms that the
      Parties Intended the Second Lien Notes to Constitute "Senior
      Indebtedness" and to not Forfeit That Status as a Consequence of the
      Springing Lien ......................................................................................... 34

      A.    The 2009 Exchange Offer for the Subordinated Notes Shows that
            Neither MPM nor the Subordinated Noteholders Believed the
            Existence of a Junior Lien Caused Secured Indebtedness to Fail the

              Subordinated Notes Indenture's Definition of "Senior
              Indebtedness" ........................................................................................... 35

B.      MPM's Disclosures Regarding the Second Lien Notes, All Made
         with Full Knowledge of the Terms of the Subordinated Notes
         Indenture, and the Absence of Any Objection to that Disclosure by
         Subordinated Noteholders, Show that Neither MPM nor the
         Subordinated Noteholders Believed the Existence of a Junior Lien
         Caused Secured Indebtedness to Fail the Subordinated Notes
         Indenture's Definition of "Senior Indebtedness" ...................................... 36

C.      The 2013 Subordinated Notes Resale Prospectus Shows that
         Neither MPM nor the Subordinated Noteholders Believed the
         Existence of a Junior Lien Caused Secured Indebtedness to Fail the
         Subordinated Notes Indenture's Definition of "Senior
         Indebtedness" ........................................................................................... 38

III.    Plaintiff's Interpretation of the Fourth Proviso has been Rejected by
       Market Experts ......................................................................................... 39

IV.    Plaintiff's Claim is Barred by the Doctrines of Laches and Estoppel .................. 40

CONCLUSION ........................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Convergent Wealth Advisors LLC v. Lydian Holding Co.*,
    No. 12 Civ. 1199, 2012 U.S. Dist. LEXIS 82141 (S.D.N.Y. June 13, 2012)..........................30

*Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*),
    416 F.3d 136 (2d Cir. 2005).................................................................................................31

*Galli v. Metz*,
    973 F.2d 145 (2d Cir. 1992).................................................................................................32

*In re Enron Creditors Recovery Corp.*,
    380 B.R. 307 (S.D.N.Y. 2008)............................................................................................23

*In re Envirodyne Industries, Inc.*,
    29 F.3d 301 (7th Cir. 1994) ...........................................................................................31, 36

*In re Motors Liquidation Co.*,
    447 B.R. 142 (Bankr. S.D.N.Y. 2011).................................................................................23

*In re Tribune Co.*,
    472 B.R. 223 (Bankr. D. Del. 2012) ...................................................................................31

*In re World Com, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004).................................................................................40

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
    No. 04 Civ. 7203 (DLC), 2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006) ..............................43

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
    274 F.3d 706 (2d Cir. 2001).................................................................................................45

*Med. Self Care, Inc. ex rel. Dev. Specialists, Inc. v. Nat'l Broad. Co., Inc.*,
    No. 01 Civ. 4191, 2003 U.S. Dist. LEXIS 4666 (S.D.N.Y. Mar. 28, 2003)..........................24

*Price v. Fox Entm't Grp., Inc.*,
    No. 05 Civ. 5259, 2007 U.S. Dist. LEXIS 6081 (S.D.N.Y. Jan. 26, 2007)...........................45

*S.E.C. v. Credit Bancorp., Ltd.*,
    297 F.3d 127 (2d Cir. 2002).................................................................................................21

*Saffire Corp. v. Newkidco., LLC*,
    286 F. Supp. 2d 302 (S.D.N.Y. 2003).................................................................................24

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*,
    7 F.3d 1091 (2d Cir. 1993) ................................................................32

*Stone v. Williams*,
    873 F.2d 620 (2d Cir. 1997), *vacated on other grounds*, 891 F.2d 401 (2d Cir. 1989).....42, 43

*T.G.I. Friday's Inc. v. Nat'l Rests. Mgmt., Inc.*,
    59 F.3d 368 (2d Cir. 1995) ................................................................32

### OTHER CASES

*Besicorp Grp. Inc. v. Enowitz*,
    652 N.Y.S.2d 366 (N.Y. App. Div. 3d Dep't 1997) ..............................45

*Gulbin v. Moss-Gulbin*,
    856 N.Y.S.2d 743 (N.Y. App. Div. 3d Dep't 2007) ..............................45

*Landmark Ventures Inc. v. Wave Sys. Corp.*,
    No. 11 Civ. 8440, 2012 WL 3822624 ...................................................23

*Marine Midland Bank v. Marcal Enters., Inc.*,
    398 N.Y.S.2d 782 (N.Y. County Ct. 1977).............................................21

*River Seafoods, Inc. v. JPMorgan Chase Bank*,
    796 N.Y.S.2d 71 (N.Y. App. Div. 1st Dep't 2005) ...............................44

*Triple Cities Const. Co. v. Maryland Cas. Co.*,
    176 N.Y.S.2d 292 (N.Y. 1958) ...........................................................44

### FEDERAL STATUTES

11 U.S.C. § 101(27) (2010) .......................................................................21

### OTHER AUTHORITIES

*Black's Law Dictionary* (9th ed. 2009)......................................................21

Marcel Kahan & Edward Rock, *Hedge Fund Activism in the Enforcement of Bondholder
Rights*, 103 Nw. U. L. Rev. 281 (2009) ...................................................31

Mark N. Berman & Jo Ann J. Brighton, *The Dura Decision: Junior Creditors Again
Strike Out Interpreting the Elusive X-Clause What Might This Mean for Second-Lien
Financings?* 27-2 Am. Bankr. Inst. J., Mar. 2008 ...................................22

Wilmington Savings Fund Society, FSB, as successor indenture trustee to the Second Lien Notes ("WSFS"), a defendant in the above-captioned adversary proceeding (the "Adversary Proceeding"), and the Ad Hoc Committee of Second Lien Noteholders (the "Ad Hoc Committee"), an intervenor in the Adversary Proceeding, by their respective undersigned counsel, hereby submit this Memorandum of Law in support of their Joint Answer and Affirmative Defenses to the Complaint for Declaratory Judgment Filed by U.S. Bank N.A.

## PRELIMINARY STATEMENT

1.      The Second Lien Notes are "Senior Indebtedness," as defined in the Subordinated Notes Indenture, and are not subordinated in right of payment to any other indebtedness of MPM.  Plaintiff concedes that the Second Lien Notes began as Senior Indebtedness, but claims – implausibly--that, once the lien securing the Second Lien Notes automatically "sprung" in 2012, they lost that status and dropped down in the capital structure to subordinated position without the corresponding raise in the interest rate.  The Plaintiff's position makes no commercial sense and is entirely without merit.

2.      In fact, the indenture provision on which the Plaintiff builds its whole case (the "Fourth Proviso") does not magically eliminate the seniority of the Second Lien Notes when the springing lien was triggered and did not render them *pari passu* with the Subordinated Notes. The contractual construction urged by the Plaintiff is tortured and unpersuasive for, among others, the following reasons:

- The Plaintiff conflates and confuses claim subordination with lien subordination.  The text of the Fourth Proviso deals with "indebtedness," not "liens."  The phrase "subordinate or junior in any respect" modifies solely "Indebtedness or other obligation."  For the Second Lien Notes not to constitute Senior Indebtedness, the ***indebtedness*** they represent must be subordinate or junior in some respect to other ***indebtedness*** of MPM.  But this indebtedness is ***not*** subordinated or junior in any respect to other indebtedness.  It is *pari passu* with MPM's other indebtedness with respect to any unencumbered assets.  For example, the Second Lien Notes

share on an equal basis with the holders of the First Lien Notes and the 1.5 Lien Notes in any value of the Japan Note, which is not part of their shared collateral package.   Thus, under the plain meaning of the Fourth Proviso, it does not operate to strip the Second Lien Notes of their status as Senior Indebtedness.

- Under the Plaintiff's interpretation, the Fourth Proviso produces numerous absurd results.  For example, ***none*** of the funded debt in MPM's capital structure would constitute Senior Indebtedness under the Subordinated Notes Indenture.  Instead, despite being expressly denominated as senior and not subordinated in right of payment to any other Indebtedness, it would all be *pari passu* with the Subordinated Notes because each such secured Indebtedness—the First Lien Notes, the 1.5 Lien Notes, the Second Lien Notes, the ABL Facility obligations and the Cash Flow Facility obligations (each, as defined below)—is secured by a lien junior in priority to some other lien.[1]

- Plaintiff's reading of the Fourth Proviso cannot be reconciled with other provisions of the Subordinated Notes Indenture, including: (i) the "anti-layering" provision (§ 4.13), which prohibits the layering of indebtedness that is subordinate in "right of payment" ahead of the Subordinated Notes, (ii) the lien covenant (§ 4.12) and the definition of "Permitted Liens," which expressly permit ***all*** liens, without reference to priority, to secure Senior Indebtedness, or (iii) the definition of "Pari Passu Indebtedness", which the Plaintiff argues the Second Lien Notes must constitute, but which speaks only to subordination in "right of payment".

3.     Not surprisingly, the Plaintiff's position is squarely contradicted by prospectuses and other public disclosure regarding MPM's public debt issued over several years, all of which either state unambiguously that the Second Lien Notes are Senior Indebtedness and do not rank *pari passu* with the Subordinated Notes or otherwise plainly reject the notion that Indebtedness secured by a junior lien is not Senior Indebtedness under the Subordinated Notes Indenture.  These include, among others:

- The 2009 Form 8-K disclosure for $200 million of Old Second Lien Notes (as defined below) which, despite being "secured by a second-priority security interest" are described as "rank[ing] in parity with all existing and future senior indebtedness of [MPM] and senior to all existing and future subordinated indebtedness of [MPM]."

---

[1]     As discussed in greater detail below, there are numerous, additional absurd results that flow from Plaintiff's misconstruction of the Fourth Proviso.

2

- The 2010 Form 8-K disclosure for the Second Lien Notes, which states the Second Lien Notes "will be senior indebtedness of [MPM] . . . and will rank:  equal in right of payment with all existing and future senior indebtedness of [MPM] and . . . senior in right of payment to all existing and future subordinated indebtedness of [MPM] . . . including any of [MPM's] existing subordinated notes and guarantees thereof."

- The 2013 Registration Statement to facilitate resale of the Subordinated Notes, which states that the Subordinated Notes "are subordinated to all our existing and future senior debt, including the 8.875% First-Priority Senior Secured Notes due 2020, the 10% Senior Secured Notes due 2020, the Second-Priority Springing Lien Notes due 2021 (together, the 'Senior Notes'), the ABL Facility . . . and the Cash Flow Facility."

4.      Recognizing the obvious flaws in its argument, the Plaintiff liberally, albeit pointlessly, cites to a Fitch Ratings Special Report, dated February 6, 2006 (the "Fitch Report")[2] annexed as Exhibit D to the Complaint, to justify its contrived reading of the Fourth Proviso. (Complaint, at ¶¶ 35, *et seq*.)  Specifically, the Plaintiff argues that the Fitch Report put the capital markets on notice of a potential anti-layering "loophole" concerning second-lien debt, and that the Subordinated Notes Indenture addressed that concern by employing the very language suggested by the Fitch Report.  Plaintiff's position is false in several respects.  First, the supposedly curative language suggested by Fitch ***does not appear in the anti-layering covenant*** of the Subordinated Notes Indenture.   Instead, the anti-layering covenant uses the standard language regarding subordination in "right of payment."  Subordinated Notes Indenture § 4.13. [3]

5.      Additionally, had the language suggested by the Fitch Report in fact been included in section 4.13 of the Subordinated Notes Indenture, it still would not have prevented the layering, on top of and senior to the Subordinated Notes, of unlimited amounts of debt that,

---

[2]      Attached as Exhibit A to the "*Declaration of Samuel A. Khalil in Support of the Memorandum of Law in Support of Joint Answer and Affirmative Defenses of Wilmington Savings Fund Society, FSB, as Successor Indenture Trustee, and the Ad Hoc Committee of Second Lien Noteholders to the Complaint for Declaratory Judgment Filed by U.S. Bank National Association*" ("Khalil Decl."), filed contemporaneously herewith.

[3]      In fact, as discussed in Section III *supra*, the leading experts in the debt market, with the full knowledge of the Fitch Report, and having analyzed the Subordinated Notes Indenture, have rejected the interpretation put forth by Plaintiff as a "logical conundrum" that is "odd" and "completely counter" to the Debtors' capital structure.

3

like the Second Lien Notes when issued in 2010, was unsecured but equal in right of payment with respect to MPM's unencumbered assets.  Any argument that such unsecured debt would be "subordinate or junior in any respect" to MPM's other secured indebtedness merely by virtue of being unsecured would fail, because the Subordinated Notes Indenture's rules of construction makes clear that "unsecured Indebtedness shall not be deemed to be subordinate or junior to Secured Indebtedness merely by virtue of its nature as unsecured Indebtedness."  Subordinated Notes Indenture § 1.04(f).  Thus, the Plaintiff's brandishing of the Fitch Report is a classic red herring.

6.    But even assuming, *arguendo*, that the Fourth Proviso in fact provides the anti-layering protections attributed to it by Plaintiff (and it does not), those protections are not implicated here.  The holders of Subordinated Notes (the "Subordinated Noteholders") have suffered no injury by reason of the interposition of additional indebtedness senior to them—the "wrong" the Plaintiff purports to address through its strained reading of the Fourth Proviso, and, accordingly, there is no basis for awarding any relief to the Plaintiff on their behalf.

7.    As discussed above, when originally issued in 2010, the Second Lien Notes were unsecured, but were specifically denominated as Senior Indebtedness and thus entitled to be paid in full before the Subordinated Notes received anything.  The Plaintiff does not allege—nor could it—that the issuance of this unsecured debt senior in right of payment to the Subordinated Notes was barred by the anti-layering provisions of the Subordinated Notes Indenture.  This seniority vis-à-vis the Subordinated Notes was not enhanced by anything that has occurred since the Second Lien Notes were issued, including the "springing" in 2012 of the inchoate lien securing the Indebtedness represented by the Second Lien Notes.  The emergence of that lien did not create any incremental disadvantage for the Subordinated Notes *vis-à-vis* the

Second Lien Notes.  Nor did it create one dollar of additional debt senior to the Subordinated

Notes—the "threat" warned about in the Fitch Report.  The only effect of the springing lien was

to give the Second Lien Notes priority over unsecured creditors *other than* the Subordinated

Noteholders, who, unlike the Subordinated Noteholders, previously stood *pari passu* with the

Second Lien Notes as regards the property now subject to such lien.

8.      Thus, the holders of the Subordinated Notes have suffered no injury at the

hands of the holders of Second Lien Notes (the "Second Lien Noteholders").  They are asking

the Court to award them a plainly undeserved windfall.  As noted in the June 18, 2014 letter to

the Court from counsel to the Ad Hoc Committee, the Plaintiff has manufactured a false "issue"

as the pretext to assert a pointless "claim" that seeks what amounts to a substantively

unwarranted advisory opinion.  (*Letter to the Honorable Robert D. Drain*, June 18, 2014 [Adv.

Docket. No. 12])  The Court should not expend its resources addressing this "issue."

## BACKGROUND

9.      Momentive Performance Materials, Inc. ("MPM"), together with its

subsidiaries, is one of the world's largest producers of silicones and silicone derivatives, and is a

global leader in the development and manufacture of products derived from quartz and specialty

ceramics.  (*Declaration of William H. Carter, Chief Financial Officer of Momentive*

*Performance Materials Inc., in Support of Chapter 11 Petitions and First Day Pleadings* ¶ 8,

Apr. 14. 2014 [Docket. No. 16])[4]  The Debtors' business operated as a division of General

Electric Company until 2006, when it was acquired by investment funds affiliated with Apollo

Global Management, LLC ("Apollo").  (*Id.* ¶ 10.)  In connection with Apollo's acquisition,

---

[4]      Attached as Ex. B to Khalil Decl.

MPM issued more than $3 billion of long-term indebtedness.  *See* Momentive Performance

Materials Inc., Registration Statement (Form S-4), at F-22, F-23 (Sept. 14, 2007).[5]

        10.    This indebtedness included

- a $300 million senior secured revolving credit facility, $525 million and €400 million of senior secured term loans, and a $35 million synthetic letter of credit facility (collectively, the "2006 Senior Secured Credit Facility"), secured by first priority pledges of all of the equity interests of MPM's U.S. subsidiaries and first-priority interests in and mortgages on substantially all of MPM's assets.  *Id.*

- $765 million and €275 million of senior unsecured notes, and $300 million of senior unsecured toggle notes (collectively, the "2006 Senior Unsecured Notes"), which were senior in right of payment to the Subordinated Notes and *pari passu* in right of payment to other senior indebtedness of MPM, including the 2006 Senior Secured Credit Facility.  *Id.* at 104.

- $500 million of senior subordinated notes (the "Subordinated Notes"), issued pursuant to an indenture, dated as of December 4, 2006 (the "Subordinated Notes Indenture")[6], pursuant to which Wells Fargo Bank, National Association ("Wells Fargo"), served as the initial indenture trustee.  *Id.* at F-22, F-23.  (The successor trustee for the Subordinated Notes, U.S. Bank National Association, is the Plaintiff herein.)

Thus, at the time they were first issued, the Subordinated Notes were subordinate in right of

payment to roughly $2.78 billion[7] in funded debt or available debt facilities that qualified as

"Senior Indebtedness" under the Subordinated Notes Indenture.

        11.    The post-acquisition history of the MPM indebtedness is important

because

    (1)    it shows that MPM and all holders of MPM debt consistently viewed the Second

Lien Notes[8] (and their predecessors, the Old Second Lien Notes, defined below)

---

[5]     Attached as Ex. C to Khalil Decl.

[6]     Attached as Ex. D to Khalil Decl.

[7]     Euro-denominated debt was converted to U.S. Dollars using an exchange rate of approximately 1.3 Euros per U.S. Dollar used by MPM in its contemporaneous disclosure.

as Senior Indebtedness under the Subordinated Noted Indenture, with priority in right of payment over the Subordinated Notes,

(2)      it highlights the failure of the initial indenture trustee or successor indenture trustees under the Subordinated Notes Indenture ("Subordinated Notes Indenture Trustee") and the Subordinated Noteholders to say anything when (assuming they subscribed to the position now asserted by Plaintiff) they had a clear duty to speak and warn MPM and the potential investors of the construction of the Fourth Proviso asserted by the Plaintiff, which, if credited, would have upset MPM's capital structure and pulled the rug out from under investments made over many years and presumed to be senior, and

(3)      it shows that the Subordinated Noteholders have not been harmed, because the amount of MPM's Senior Indebtedness, for purposes of the Subordinated Notes Indenture, has not changed materially since 2006.

For these reasons, the history of MPM's indebtedness is set forth in detail below.

12.      In May 2009, MPM announced private exchange offers to exchange, at a discount, 2006 Senior Unsecured Notes and Subordinated Notes for a new series of $200 million of second lien notes due 2014 (the "Old Second Lien Notes"). Momentive Performance Materials Inc., Current Report (Form 8-K/A), at 2 (May 12, 2009).[9] MPM stated that the Old Second Lien Notes would (i) be "secured by a second-priority security interest in certain assets of Momentive and the Guarantors, which interest will be junior in priority to the liens on substantially the same collateral securing Momentive's existing senior secured credit facilities"

---

[8]      Pursuant to an indenture dated as of November 10, 2010 (the "Second Lien Notes Indenture") (attached as Ex. E to Khalil Decl.), MPM issued notes consisting of $1,160 million of 9.0% Second-Priority Springing Lien Notes and €150 million of 9.5% Second Priority Springing Lien Notes (the "Second Lien Notes").

[9]      Attached as Ex. F to Khalil Decl.

and (ii) "rank in parity with all existing and future senior indebtedness of Momentive and senior to all existing and future subordinated indebtedness of Momentive." *Id.* Thus, the key characteristics of the Old Second Lien Notes matched those of the current Second Lien Notes— payment parity with senior indebtedness and a junior lien. The provisions of the Subordinated Notes Indenture currently in effect were in effect in 2009, at the time of the private exchange offer directed to Subordinated Noteholders.

13.    In response to the offer, approximately $189 million and €30 million of the 2006 Senior Unsecured Notes were exchanged at a price of $625 principal amount of Old Second Lien Notes per $1,000 principal amount of 2006 Senior Unsecured Notes (a 37.5% discount). Momentive Performance Materials Inc., Current Report (Form 8-K), at Exhibit 99.1 (June 10, 2009).[10] In addition, approximately $118 million of Subordinated Notes (roughly 24% of the total outstanding) were exchanged at a price of $400 principal amount of Old Second Lien Notes per $1,000 principal amount of Subordinated Notes (a 60% discount). *Id.* The exchange offer was oversubscribed; more than 35% of the Subordinated Notes were actually tendered. *Id.*

14.    The Old Second Lien Notes were ultimately issued pursuant to an indenture, dated as of June 15, 2009 (the "Old Second Lien Notes Indenture").[11] Momentive Performance Materials Inc., Current Report (Form 8-K), at 2 (June 15, 2009).[12] In connection therewith, MPM entered into an Intercreditor Agreement, also dated as of June 15, 2009 (the "Old Second Lien Intercreditor Agreement").[13] *Id.* The Old Second Lien Intercreditor Agreement provided that the liens securing the Old Second Lien Notes would be subordinate and

---

[10]    Attached as Ex. G to Khalil Decl.

[11]    Attached as Ex. H to Khalil Decl.

[12]    Attached as Ex. I to Khalil Decl.

[13]    Attached as Ex. J to Khalil Decl.

junior to the liens securing 2006 Senior Secured Credit Facilities.  Old Second Lien Intercreditor

Agreement § 2.1.  In addition, the form of Old Second Lien Note itself indicated that the Old

Second Lien Notes were Senior Indebtedness, stating that the indebtedness evidenced by the Old

Second Lien Notes is "senior in right of payment to all existing and future Subordinated

Indebtedness of [MPM] and the Guarantors."  Old Second Lien Notes Indenture at A-11.[14]

15.     In November 2010, MPM issued the Second Lien Notes pursuant to the

Second Lien Notes Indenture.  Momentive Performance Materials Inc., Current Report (Form 8-

K), at 2 (Nov. 12, 2010).[15]  The proceeds of the issuance were used to repay the remaining 2006

Senior Unsecured Notes.  *Id.*  The offering memorandum for the Second Lien Notes confirmed

that the Second Lien Notes were equal in right of payment with the 2006 Senior Secured Credit

Facility.  Momentive Performance Materials Inc., Offering Memorandum for the $635,000,000

9.0% Second-Priority Springing Lien Notes due 2021 and the €150,000,000 9.5% Second-

Priority Springing Lien Notes due 2021, at cover page (Oct. 27, 2010) (the "Second Lien Notes

Offering Memorandum").[16]  The terms of the Second Lien Notes provided that, on the date the

Old Second Lien Notes were retired or discharged, the Second Lien Notes would be secured by

liens on substantially the same collateral securing the 2006 Senior Secured Credit Facility, which

liens would be subordinate and junior to the liens securing the 2006 Senior Secured Credit

Facilities.  *Id.*

16.     The Form 8-K disclosing the issuance of the Second Lien Notes stated:

---

[14]     Moreover, pursuant to an Agreement of Resignation, Appointment and Acceptance, dated as of May 27, 2009, between MPM, Wells Fargo and the Bank of New York Trust Company, NA ("BNY"), Wells Fargo resigned as indenture trustee for the 2006 Senior Unsecured Notes and the Subordinated Notes, and BNY was appointed as successor trustee.  Momentive Performance Materials Inc., Current Report (Form 8-K), at 1 (June 12, 2009) (attached as Ex. K to Khalil Decl.).  BNY was also the initial indenture trustee and collateral trustee for the Old Second Lien Notes.  Thus, when the Old Second Lien Notes were issued on June 15, 2009, BNY served as indenture trustee for both the Subordinated Notes and the Old Second Lien Notes.

[15]     Attached as Ex. L to Khalil Decl.

[16]     Attached as Ex. M to Khalil Decl.

> Prior to and following the Springing Lien Trigger Date, the Notes and Note
> Guarantees will be senior indebtedness of the Company and the Note Guarantors,
> respectively, and will rank:  equal in right of payment with all existing and future
> senior indebtedness of the Company and the Note Guarantors, respectively; senior
> in right of payment to all existing and future subordinated indebtedness of the
> Company and the Note Guarantors, including any of the Company's existing
> subordinated notes and guarantees thereof; and structurally subordinated to all
> existing and future indebtedness and other liabilities of any of our subsidiaries
> that do not guarantee the Notes.

Momentive Performance Materials Inc., Current Report (Form 8-K), at 2 (Nov. 12, 2010).  The

form of Second Lien Note itself echoed these statements, providing as follows:

> The indebtedness evidenced by the [Second Lien] Notes and the applicable Note
> Guarantees, respectively, is senior Indebtedness of the Company and Note
> Guarantors, respectively, ranks (i) equal in right of payment with all existing and
> future Pari Passu Indebtedness of the Company and Note Guarantors, as
> applicable, (ii) *senior in right of payment to all existing and future
> Subordinated Indebtedness of the Company and Note Guarantors* and
> (iii) structurally subordinated to all existing and future indebtedness and other
> liabilities of Subsidiaries that do not guarantee the Notes.  Prior to the Springing
> Lien Trigger Date, the [Second Lien] Notes and the applicable Note Guarantees
> are unsecured obligations of the Company and the Note Guarantors, respectively,
> and are effectively subordinated to all existing and future Secured Indebtedness of
> the Company and the Note Guarantors, as applicable, to the extent of the value of
> the assets securing such Indebtedness.  Following the Springing Lien Trigger
> Date, the [Second Lien] Notes and the applicable Note Guarantees will have the
> benefit of a second-priority security interest on the Collateral that, pursuant to the
> Intercreditor Agreement, will be (i) junior in priority and subordinated to the
> Liens securing the First Priority Obligations, (ii) *pari passu* in priority to Liens
> securing the Other Second Priority Obligations, (iii) senior to any senior
> unsecured obligations (to the extent of the value of the Collateral) and (iv) *senior
> to the Company's and the Note Guarantors' existing and future Subordinated
> Indebtedness*, . . . .

Second Lien Notes Indenture at A-1-10 (emphasis added).  This disclosure is directly in conflict

with the position taken by Plaintiff in this adversary proceeding.  Neither BNY, which was

indenture trustee for the Subordinated Notes at the time, nor any Subordinated Noteholder voiced

any objection this characterization of the Second Lien Notes.

17.     In May 2011, MPM offered to exchange a portion of the private Second

Lien Notes for publicly registered Second Lien Notes.  Describing the "Ranking" of the Second

Lien Notes, the offer to exchange stated as follows:

> Prior to and following the Springing Lien Trigger Date, the [Second Lien] Notes,
> like the Old [Second Lien] Notes, and the guarantees will be senior indebtedness
> of the Company and the Note Guarantors, respectively, and will rank:
>
> - equal in right of payment with all existing and future senior
>   indebtedness of the Company and the Note Guarantors,
>   respectively, [and]
>
> - senior in right of payment to all existing and future subordinated
>   indebtedness of the Company and the Note Guarantors, including
>   any of the Company's existing subordinated notes and guarantees
>   thereof . . . .

Momentive Performance Materials, Inc., Offer to Exchange, at 12 (May 12, 2011) (the

"Exchange Offer for Second Lien Notes").[17]  Neither the Subordinated Notes Indenture Trustee

nor any Subordinated Noteholder objected to or questioned in any way the accuracy of these

disclosures, all of which are squarely inconsistent with the position now urged by Plaintiff.

18.     In May 2012, MPM issued $250 million of 10% Senior Secured Notes

(the "1.5 Lien Notes") pursuant to an indenture dated May 25, 2012 (the "1.5 Lien Notes

Indenture"),[18] the proceeds of which were used by MPM to repay a portion of the 2006 Senior

Secured Credit Facility.  Momentive Performance Materials Inc., Current Report (Form 8-K), at

2 (June 1, 2012).  The 1.5 Lien Notes were secured by substantially the same collateral that

secured the 2006 Senior Secured Credit Facility.  *Id.*  In connection therewith, MPM entered into

an Intercreditor Agreement, dated as of May 25, 2012 (the "1.5 Lien Intercreditor

---

[17]     Attached as Ex. N to Khalil Decl.

[18]     Attached as Ex. O  to Khalil Decl.

Agreement").[19]  *Id.* The 1.5 Lien Intercreditor Agreement provided that, among other things, the liens securing the 1.5 Lien Notes are subordinate and junior to the liens securing 2006 Senior Secured Credit Facility.  *See* 1.5 Lien Intercreditor Agreement § 2.1.  The 1.5 Lien Notes were, however, senior secured indebtedness of MPM, with a right of payment equivalent to that of the 2006 Senior Secured Credit Facility; only the liens securing the indebtedness represented by the 1.5 Lien Notes were junior.  Momentive Performance Materials Inc., Current Report (Form 8-K), at 2 (June 1, 2012).[20]

19.     The Form 8-K disclosing the issuance of the 1.5 Lien Notes states:

The [1.5 Lien] Notes and Note Guarantees are senior indebtedness of the Registrant and the Note Guarantors, respectively, and rank equal in right of payment with all existing and future senior indebtedness of the Registrant and the Note Guarantors, respectively; senior in right of payment to all existing and future subordinated indebtedness of the Registrant and the Note Guarantors, including the Registrant's 11.5% Senior Subordinated Notes due 2016 and guarantees thereof; and structurally subordinated to all existing and future indebtedness and other liabilities of any of the Registrant's subsidiaries that do not guarantee the [1.5 Lien] Notes.

*Id.*  In addition, the form of 1.5 Lien Note itself provided as follows:

The indebtedness evidenced by the Notes and the applicable Note Guarantees, respectively, is senior Indebtedness of the Company and Note Guarantors, respectively, ranks (i) equal in right of payment with all existing and future Pari Passu Indebtedness of the Company and Note Guarantors, as applicable, (ii) senior in right of payment to all existing and future Subordinated Indebtedness of the Company and Note Guarantors and (iii) structurally subordinated to all existing and future indebtedness and other liabilities of Subsidiaries that do not guarantee the Notes.  The Notes and the applicable Note Guarantees have the benefit of a security interest on the Collateral that, pursuant to the New Intercreditor Agreement, will be (i) junior in priority and subordinated to the Liens securing the First Priority Obligations, (ii) *pari passu* in priority to Liens securing the Other Pari Passu Obligations, (iii) senior in priority, pursuant to the Existing Intercreditor Agreement, to Liens securing Junior Lien Obligations (to the extent of the value of the Collateral) and (iv) senior to the Company's and the Note Guarantors' existing and future Subordinated Indebtedness . . . .

---

[19]     Attached as Ex. P to Khalil Decl.

[20]     Attached as Ex. Q to Khalil Decl.

1.5 Lien Notes Indenture at A-10.

20.     Thus, by June 1, 2012, the key characteristics of the 1.5 Lien Notes—

payment parity with senior indebtedness and a junior lien—were fully disclosed.  These

characteristics precisely matched the key characteristics of the current Second Lien Notes.

Neither BNY, which was indenture trustee for the Subordinated Notes at the time, nor any

Subordinated Noteholder voiced any objection the characterization of the 1.5 Lien Notes as

Senior Indebtedness.

21.     In November 2012, MPM issued $1.1 billion of 8.875% First-Priority

Senior Secured Notes due 2020 (the "First Lien Notes"), the proceeds of which were used by

MPM to repay the remaining portion of the 2006 Senior Secured Credit Facility and the Old

Second Lien Notes.  Momentive Performance Materials Inc., Current Report (Form 8-K), at 2

(Nov. 20, 2012).[21]  The repayment of the remaining Old Second Lien Notes triggered the

springing of the liens securing the Second Lien Notes.   Second Lien Notes Offering

Memorandum, at cover page.  As such, in connection with this transaction, MPM entered into

(i) a First Lien Intercreditor Agreement, dated as of November 16, 2012 (the "First Lien

Intercreditor Agreement"),[22] (ii) a Joinder and Supplement to the 1.5 Lien Intercreditor

Agreement, dated as of November 16, 2012, and (iii) an Intercreditor Agreement, dated as of

November 16, 2012 (the "Second Lien Intercreditor Agreement").[23]  Momentive Performance

Materials Inc., Current Report (Form 8-K), at 3-4 (Nov. 20, 2012).  The Second Lien

Intercreditor Agreement provides that the liens securing the Second Lien Notes are subordinate

and junior to the liens securing the First Lien Notes and the 1.5 Lien Notes.  Second Lien

---

[21]     Attached as Ex. R to Khalil Decl.

[22]     Attached as Ex. S to Khalil Decl.

[23]     Attached as Ex. T to Khalil Decl.

Intercreditor Agreement § 2.1. Although the creation of the junior "springing lien" securing the Second Lien Notes in November 2012 was thus a matter of public knowledge, neither BNY, which was indenture trustee for the Subordinated Notes at the time, nor any Subordinated Noteholder asserted that the creation of that lien had caused the Second Lien Notes to lose their status as Senior Indebtedness under the Subordinated Notes Indenture.

22.      In April 2013, MPM entered into (i) a $270 million asset-based revolving credit facility (the "ABL Facility") and (ii) a $75 million cash flow facility (the "Cash Flow Facility"). Momentive Performance Materials Inc., Current Report (Form 8-K), at 2 (Apr. 30, 2013).[24] Both the ABL Facility and the Cash Flow Facility are secured. *Id.* at 2-3. Certain of the liens securing the ABL Facility are subordinate and junior to liens securing the Cash Flow Facility and First Lien Notes, and a portion of the liens securing the Cash Flow Facility and First Lien Notes are subordinate and junior to liens securing the ABL Facility. *See id.* Specifically, MPM entered into an ABL Intercreditor Agreement, dated as of April 24, 2013 (the "ABL Intercreditor Agreement"),[25] which reflects that the ABL Facility is secured by, among other things, (i) first-priority liens on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) and (ii) second-priority liens on the Notes Priority Collateral (as defined in the ABL Intercreditor Agreement). *Id.* Similarly, the ABL Intercreditor Agreement reflects that the Cash Flow Facility is secured by, among other things, (i) first-priority liens on the Notes Priority Collateral owned by MPM and its domestic subsidiaries which are *pari passu* with the liens securing the First Lien Notes, (ii) second-priority liens on the ABL Priority Collateral owned by MPM and its domestic subsidiaries, which are junior to the liens securing the ABL Facility and *pari passu* with the liens securing the First Lien Notes, (iii) first-priority liens on Notes Priority

---

[24]       Attached as Ex. U to Khalil Decl.

[25]       Attached as Ex. V to Khalil Decl.

Collateral owned by certain foreign subsidiaries of MPM, which are senior to the liens securing the ABL Facility, and (iv) second-priority liens on the ABL Priority Collateral owned by such foreign subsidiaries of MPM, which are junior to the liens securing the ABL Facility. *Id.*

23.    MPM's public disclosure thus made clear that, with the creation of the ABL and Cash Flow Facilities, both those facilities and the First Lien Notes had the same key characteristics—payment parity with senior indebtedness and a junior lien—that Plaintiff contends have caused the Second Lien Notes to lose their status as Senior Indebtedness under the Subordinated Notes Indenture. Neither the then-serving indenture trustee for the Subordinated Notes nor any Subordinated Noteholder asserted that the ABL Facility, the Cash Flow Facility, and the First Lien Notes had lost their status as Senior Indebtedness by reason thereof.

24.    Finally, a resale prospectus filed with the SEC just weeks after this transaction closed (and after the "springing" of the lien securing the indebtedness represented by the Second Lien Notes) states that the Subordinated Notes "are subordinated to all our existing and future senior debt, including the 8.875% First-Priority Senior Secured Notes due 2020, the 10% Senior Secured Notes due 2020, the Second-Priority Springing Lien Notes due 2021 (together, the 'Senior Notes'), the ABL Facility . . . and the Cash Flow Facility" and further states:

> The [Subordinated] Notes and the Note Guarantees are our and the Note Guarantors' unsecured senior subordinated obligations and rank:
>
> - junior in right of payment to all our and the Note Guarantors' existing and future senior indebtedness, including the ABL Facility, the Cash Flow Facility, the Senior Notes [defined, as noted above, as including the Second Lien Notes] and the guarantees thereof;
>
> - equally in right of payment with all of our and the Note Guarantors' existing and future senior subordinated indebtedness; and

- senior in right of payment to all of our and the Note Guarantors' existing and future subordinated indebtedness.

The [Subordinated] Notes and the Note Guarantees are effectively subordinate in right of payment to all of our and the Note Guarantors' existing and future secured indebtedness, including indebtedness under the ABL Facility, the Cash Flow Facility, the Senior Notes and the guarantees thereof, to the extent of the value of the assets securing such indebtedness.

Momentive Performance Materials, Inc., Prospectus for Resale of $124,323,000 11½% Senior Subordinated Notes due 2016, at 8-9 (May 13, 2013) (the "Subordinated Notes Resale Prospectus").[26]

25.    The history of MPM's debt structure thus shows relative consistency over time in both the amount and structure.  At the end of 2008, $500 million of Subordinated Notes were behind

- approximately $1.2 billion of funded 2006 Senior Secured Credit Facility debt,

- approximately $1.5 billion of senior unsecured notes, and

- approximately $60 million of foreign local debt.

Total funded MPM Senior Indebtedness, for purposes of the Subordinated Notes Indenture, was approximately $2.74 billion.[27]

26.    Five years later, at the end of 2013, $382 million of Subordinated Notes were behind

- approximately $1.2 billion of funded senior secured debt, consisting of the First Lien Notes and borrowings under the ABL Facility and the Cash Flow Facility (collectively being in like amount and occupying the same relative position as the former 2006 Senior Secured Credit Facility), and

---

[26]    Attached as Ex. W to Khalil Decl.

[27]    Because the figures presented in the accompanying text have all been rounded for ease of presentation, the total Senior Indebtedness value shown does not reflect the mathematical result that would be obtained by adding the individual component elements listed in the preceding bullet points.  The same is true with respect to the presentation of equivalent information as of the end of 2013.

- approximately $250 million in 1.5 Lien Notes and $1.34 billion of Second Lien Notes (collectively being similar in amount and occupying the same relative position as the former senior unsecured notes), and

- approximately $46 million of foreign local debt (collectively being similar in amount occupying the same relative position as the former foreign local debt).

Total funded MPM Senior Indebtedness, for purposes of the Subordinated Notes Indenture, was

approximately $2.88 billion.

27. The modest, $140 million difference in aggregate debt above the

Subordinated Notes is partly attributable to the $118 million of Subordinated Notes that were

accepted in discounted exchanges in 2009 for roughly $50 million of Old Second Lien Notes,

which were later retired.[28] Clearly, MPM did not "layer" additional debt ahead of the

Subordinated Notes—$1.34 billion of Second Lien Notes effectively occupy the same place in

the MPM capital structure as the prior $1.5 billion of unsecured notes.  The legitimate

expectations of the Subordinated Noteholders have not been frustrated, and there most certainly

is nothing in the facts to inspire this Court to grant the Plaintiff's request to stand the entire MPM

debt structure on its head.

## <u>ARGUMENT</u>

**I.   CONTRARY TO PLAINTIFF'S ASSERTION, THE FOURTH PROVISO CANNOT BE CONSTRUED TO STRIP THE SECOND LIEN NOTES OF THEIR STATUS AS "SENIOR INDEBTEDNESS" FOR THE PURPOSES OF THE SUBORDINATED NOTES INDENTURE**

28. As noted above, the Subordinated Notes Indenture defined "Senior

Indebtedness" to exclude (by the Fourth Proviso) ***any Indebtedness or obligation*** of the

---

[28]    Other elements of that would affect the computation of total outstanding could include, at any time, exchange rate fluctuation, differing recourse to revolver facilities, as well as a slight increase in the amount of First Lien Notes issued over the amount of term loans under the 2006 Senior Secured Credit Facility (which would, in any event, reflect first lien indebtedness, which is irrelevant to Plaintiff's anti-layering contentions).

Company or any Restricted Subsidiary that by its terms is subordinate or junior in any respect to

**any other Indebtedness or obligation** of the Company . . . .”  Subordinated Notes Indenture

§ 1.01, Definition of “Senior Indebtedness” (emphasis added).  Plaintiff argues this means the

Second Lien Notes are not Senior Indebtedness because the lien securing them has a lower

priority than the liens on the common collateral they share with the First Lien Notes and the 1.5

Lien Notes.  This is not a proper reading of the Fourth Proviso.  While there is no dispute that the

**lien** securing the Second Lien Notes is junior to the **liens** securing the First Lien Notes and

the 1.5 Lien Notes, that fact is irrelevant under the Subordinated Notes Indenture’s definition of

“Senior Indebtedness.”

### A.    Textual Analysis of the Fourth Proviso Itself Does Not Support Plaintiff’s Construction

29.    The key phrase on which Plaintiff relies—“subordinate or junior in any

respect”—modifies “Indebtedness or obligation of the Company.”  Thus, only an “Indebtedness”

or an “obligation” of the Company that is subordinate or junior in any respect to another

“Indebtedness” or “obligation” of the Company falls within the exclusion.  But a lien—the

item Plaintiff contends is “subordinate or junior”—is neither “Indebtedness” nor an “obligation.”

The Subordinated Notes Indenture itself makes this abundantly clear.

30.    The Subordinated Notes Indenture contains a lengthy definition of

“Indebtedness” whose sole reference to a “lien” **distinguishes** it from “Indebtedness.”  It states,

in pertinent part:

> “Indebtedness” means, with respect to any Person . . . (1) the principal and
> premium (if any) of any indebtedness of such Person, whether or not contingent,
> (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or
> similar instruments or letters of credit or bankers’ acceptances . . . [plus] (2) to the
> extent not otherwise included, any obligation of such Person to be liable for, or to
> pay, as obligor, guarantor or otherwise, on the Indebtedness of another Person . . .
> [plus] (3) to the extent not otherwise included, Indebtedness of another Person
> **secured by a Lien** on any asset owned by such Person . . . .

18

Subordinated Notes Indenture § 1.01, Definition of "Indebtedness" (emphasis added).  The

definition's reference to "Indebtedness of another Person **secured by a Lien**" makes clear that a

Lien is **not** Indebtedness; rather, it is something that secures Indebtedness.  And it does so

without changing the priority of the Indebtedness (by "attaching" to an asset).

31.    The conclusion that a Lien is not Indebtedness is further confirmed by

(i) the Subordinated Notes Indenture's definition of "Lien"—phrased "with respect to any

**asset**"—as "any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in

respect of such asset," and (ii) the Subordinated Notes Indenture's definition of "Secured

Indebtedness" as "any Indebtedness secured by a Lien."  Subordinated Notes Indenture § 1.01,

Definitions of "Lien", "Secured Indebtedness".  This distinction between Indebtedness and a

Lien is further underscored by the fact that each is subject to its own set of covenants.  *Compare*

Subordinated Notes Indenture § 4.03 (detailing limitations on the incurrence of indebtedness)

and § 4.13 (the anti-layering provision, describing limitations on the incurrence of other "Senior

Subordinated Indebtedness"), *with* § 4.12 (describing limitations on the creation of Liens "on any

asset or property . . . securing Indebtedness").[29]

32.    Nor is a Lien an "obligation."  The Subordinated Notes Indenture defines

"Permitted Liens" to include "Liens" securing certain "obligations."  *See* Subordinated Notes

---

[29]    Tellingly (but not surprisingly), the Complaint fails to specify any language in the Second Lien Indenture or the Second Lien Notes stating that the ***indebtedness*** represented by the Second Lien Notes is subordinated or junior to the indebtedness represented by the First Lien Notes or the 1.5 Lien Notes.  The Complaint fruitlessly seeks to fill this void with references to the Second Lien Intercreditor Agreement, but no Second Lien Intercreditor Agreement provision cited in the Complaint states that the Indebtedness represented by the Second Lien Notes is subordinated.  (*See* Compl. ¶¶ 30-34.)  All of these provisions are standard second-lien intercreditor arrangements that deal exclusively with matters relevant for *lien* subordination.  In fact, the Fitch Report clearly distinguishes between the rights of secured creditors that may be waived through "silent second" intercreditor provisions and debt "subordination." Fitch Report at 5.

In thus dealing solely with lien subordination, doing so in conventional terms, and nowhere suggesting that the Indebtedness represented by the Second Lien Notes is subordinated, the Second Lien Intercreditor Agreement's structure precisely matches the terms of the subordination provision in the Subordinated Notes Indenture (§ 4.13). That provision uses the traditional language cited by the Fitch Report under which second lien debt is uniformly recognized as senior indebtedness.

Indenture § 1.01, Definition of "Permitted Liens", clauses (10), (12) and (27).  As with "Indebtedness," a Lien cannot both secure an "obligation" and itself be an obligation.

33.     The Subordinated Notes Indenture's use of the term "lien" is consistent with the usage of that term as a matter of common law.  A lien is not a debt, but rather it is a security for the payment of a debt.[30]  Black's Law Dictionary defines "lien" as a "legal right or interest that a creditor has in another's property, lasting usu. until a debt or duty that it secures is satisfied."  *Black's Law Dictionary* (9th ed. 2009).  The Subordinated Notes Indenture's usage is also consistent with the Bankruptcy Code, which defines a "lien" as a "charge against or interest in property to secure payment of a debt or performance of an ***obligation***."  11 U.S.C. § 101(27) (2010) (emphasis added).

**B.     Textual Analysis of the Full Definition of "Senior Indebtedness" Does Not Support Plaintiff's Construction**

34.     The correct construction of the Fourth Proviso excludes from "Senior Indebtedness" any Indebtedness subordinated in right of payment, whether such subordination is "expressly" stated or otherwise effectively contained in the "terms" of the Indebtedness.  This is the construction of the Fourth Proviso that comports with industry practice, is faithful to the base "payment subordination" definition of "Senior Indebtedness," and does not violate any rules of contractual construction.

35.     The base definition—*i.e.*, the paragraph at the beginning of the definition, that starts with the words "'Senior Indebtedness' means"—provides that Indebtedness will not be senior where (1) "the instrument creating or evidencing" the "Indebtedness" (2) "expressly

---

[30]     *S.E.C. v. Credit Bancorp., Ltd.*, 297 F.3d 127, 138 (2d Cir. 2002) (stating that a lien is a security interest in property); *Marine Midland Bank v. Marcal Enters., Inc.*, 398 N.Y.S.2d 782, 783 (N.Y. County Ct. 1977) (citing *Ansonia Nat'l Bank v. United States*, 147 F. Supp. 864, 865 (D. Conn. 1956)) ("In its broadest sense and common acceptation a lien is understood and used to denote a legal claim or charge on property, either real or personal, as security for the payment of some debt or obligation.").

provides that such obligations are subordinated in right of payment." This is the classic language used to express payment subordination.[31] Then there follow several carve-outs or provisos, including the Fourth Proviso, which states that "Senior Indebtedness shall not include . . . any Indebtedness or obligation of the Company or any Restricted Subsidiary that by its terms is subordinate or junior in any respect to any other Indebtedness or obligation of the Company or such Restricted Subsidiary, as applicable, including any Pari Passu Indebtedness." Read in context with the base definition, the words "in any respect" in the Fourth Proviso must be understood as referring to the payment subordination.[32] The Fourth Proviso is not confined to payment subordination "expressly" denominated as such in the "instrument creating or evidencing" the Indebtedness in question, but also includes payment subordination not expressly so denominated, but otherwise effected by the "terms" of the Indebtedness—whether those terms appear in the "instrument creating or evidencing" the Indebtedness or in another writing setting forth the terms of the Indebtedness.

36.     One example of such non-express payment subordination appears in the final phrase of the Fourth Proviso itself: "including any Pari Passu Indebtedness". The Subordinated Notes Indenture states that "'Pari Passu Indebtedness' means (1) with respect to the Company, the Securities [the Subordinated Notes] and any Indebtedness which ranks pari passu *in right of payment* to the Securities." Subordinated Notes Indenture § 1.01, Definition of "Pari Passu Indebtedness" (emphasis added). There could be Pari Passu Indebtedness that did *not*, by its express terms, state a subordination in right of payment to another MPM

---

[31]     It is well-established that "the hallmark of a second-lien financing is lien subordination and not debt subordination"—*i.e.*, that the second-lien debt is *not* subordinated in right of payment. Mark N. Berman & Jo Ann J. Brighton, *The Dura Decision: Junior Creditors Again Strike Out Interpreting the Elusive X-Clause What Might This Mean for Second-Lien Financings?* 27-2 Am. Bankr. Inst. J., Mar. 2008 at 30, 47.

[32]     Plaintiff would read the words "subordinate" and "junior" as if they meant "inferior," thereby authorizing an open-ended construction of "in any respect." But "subordinate" and "junior" are terms of art in the indenture usage, and when applied, as here, to "Indebtedness," are properly understood to refer to priority of payment.

21

Indebtedness, and thus would meet the base definition of "Senior Indebtedness."  By adding the

final phrase "including any Pari Passu Indebtedness," the Fourth Proviso makes clear that Pari

Passu Indebtedness is not Senior Indebtedness, thus underscoring that right of payment is the

focus of the Fourth Proviso.  Under the doctrine of *noscitur a sociis*, whereby the meaning of

doubtful words may be determined by reference to other words with which they are associated,

this proximately located phrase informs the meaning of "in any way" as likewise referring to

priority in right of payment.[33]

37.    Finally, if it had been the intention of the drafters to exclude from Senior

Indebtedness debt secured by junior liens—and this is plainly the focus of the Fitch Report

prominently featured in the Complaint—surely the definition of "Senior Indebtedness" would

have clearly and specifically so stated.

38.    The construction set forth above is clearly preferable to that proposed by

the Plaintiff.  This construction follows the lead of the base definition, which focuses upon

subordination in right of payment, and it avoids the absurd consequences of the Plaintiff's

construction, set forth in detail below.

C.    **Plaintiff's Construction Must Be Rejected Because
It Leads to Absurd Results**

39.    Perhaps the clearest indication of the error in the Plaintiff's construction is

the absurd results that it would produce.  Courts must avoid interpreting a contract in a manner

that would be "absurd, commercially unreasonable, or contrary to the reasonable expectations of

the parties."  *Landmark Ventures Inc. v. Wave Sys. Corp.*, No. 11 Civ. 8440, 2012 WL 3822624,

at *3 (quoting *In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 561 (N.Y. App. Div. 1st

---

[33]    "'*[N]oscitur a sociis*' provides that 'words grouped in a list should be given related meaning.'
Colloquially, 'a word is known by the company it keeps.'" *In re Motors Liquidation Co.*, 447 B.R. 142, 148 (Bankr.
S.D.N.Y. 2011); *see also In re Enron Creditors Recovery Corp.*, 380 B.R. 307, 322 (S.D.N.Y. 2008) (applying the
maxims *ejusdem generis* and *noscitur a sociis* to a bond indenture's subordination clause).

Dep't 2003));[34] *see also Med. Self Care, Inc. ex rel. Dev. Specialists, Inc. v. Nat'l Broad. Co.,*

*Inc.*, No. 01 Civ. 4191, 2003 U.S. Dist. LEXIS 4666, at *12 (S.D.N.Y. Mar. 28, 2003) ("A

contract must be construed, if possible, to avoid an interpretation that will result in an absurdity,

an injustice or have an inequitable or unusual result."); *Saffire Corp. v. Newkidco., LLC*, 286 F.

Supp. 2d 302, 308 (S.D.N.Y. 2003) (A contractual provision "may not be interpreted in a manner

which would render it an absurdity.").

       **1.**      **Plaintiff's Interpretation Would Afford No Tangible Anti-Layering
Protection to the Subordinated Notes and Would Merely Implement
an Economically Pointless and Absurd Distinction Favoring
Unsecured Indebtedness Over Secured Second Lien Indebtedness**

      40.     The underlying premise of the Complaint—that the Fourth Proviso is

meant to provide "anti-layering" protection to the Subordinated Notes and must be given effect

as such—is false.  According to the Plaintiff, "anti-layering" protection is created by the Fourth

Proviso precluding the issuance of junior lien debt that is *pari passu* with the rest of MPM's

indebtedness with respect to unencumbered assets.  Such a reading of the Subordinated Notes

Indenture, however, produces *no* meaningful anti-layering protection, but would simply create

meaningless economic distinctions that have no justification, serve no purpose, and contravene

issuer and investor expectations.  To the extent that the Fitch Report suggests otherwise, the

Fitch Report is hopelessly mistaken, and the Plaintiff's attempted reliance thereon is unavailing.

      41.     Specifically, the Subordinated Notes Indenture provides  that the

Subordinated Notes are "subordinated in right of payment . . . to the prior payment in full of all

existing and future Senior Indebtedness of the Company."  Subordinated Notes Indenture

§ 10.01.  Plaintiff concedes that, pursuant to this provision and the definition of "Senior

Indebtedness" in the Subordinated Notes Indenture, the Subordinated Notes are subordinated to

---

[34]     The Subordinated Notes Indenture is governed by New York law.  Subordinated Notes Indenture § 13.09.

unsecured indebtedness that is not subordinated *in right of payment* to any other Indebtedness or obligation of the Company or does not fall within one of the other exceptions to the definition of Senior Indebtedness (such as tax liability), because such non-subordinated unsecured indebtedness would constitute Senior Indebtedness.  Indeed, the Subordinated Notes Indenture makes this unmistakably clear in its Rules of Construction, which provide that "unsecured Indebtedness shall not be deemed to be subordinate or junior to Secured Indebtedness merely by virtue of its nature as unsecured Indebtedness." Subordinated Notes Indenture § 1.03(f).

42.    Accordingly, subject only to general limitations on the incurrence of indebtedness set forth in section 4.03 of the Subordinated Notes Indenture, there is no limit on the amount of unsecured indebtedness the Company could layer on top of the Subordinated Notes.  To the extent there is no express subordination in the instrument creating such indebtedness, all such indebtedness would rank senior to the Subordinated Notes and would be entitled to payment in full ahead of the Subordinated Notes.

43.    If the Subordinated Notes Indenture permits the layering of unsecured debt that is not subordinated in right of payment above the Subordinated Notes, there is no disadvantage to the Subordinated Noteholders if, instead of being wholly unsecured, that interposed debt—still not subordinated *in right of payment*—is secured.  Either way, the interposed debt will be able to satisfy its claims in full from the Debtors' assets before the Subordinated Noteholders can reach those assets to satisfy their own claims.  Although the Plaintiff may argue that its proposed construction would discourage the interposition of second lien debt, there is no advantage to the Subordinated Noteholders from such a result.  Additional layers of unsecured indebtedness still could be added above the Subordinated Notes, with covenant protections that would provide such indebtedness essentially the same superior access

24

to the Debtors' assets that would be enjoyed by secured debt that is *pari passu* with the rest of

MPM's secured indebtedness with respect to unencumbered assets.[35]

44.     The fact that the Fourth Proviso does not provide meaningful anti-layering

protection weighs heavily against the construction urged by the Plaintiff, which is grounded in

the erroneous assertion that such a construction was intended because it creates anti-layering

protection for the Subordinated Notes.  (*See* Compl. ¶ 40.)

45.     The patent absurdity of the Plaintiff's construction of the Fourth Proviso is

highlighted by the history of the Second Lien Notes, which were, in fact, unsecured at the time of

issuance in 2010[36] and only became secured in 2012 (without a change in interest rate) by virtue

of a springing lien.  By their terms, the unsecured Second Lien Notes were not subordinated in

right of payment to any other Indebtedness or obligation of the Company or its subsidiaries and,

accordingly, constituted "Senior Indebtedness" under the Subordinated Notes Indenture.

46.     The springing of a lien in 2012 clearly had been bargained for to ***improve***

the position of the holders of the Second Lien Notes, in consideration of which such holders

agreed to numerous additional obligations and limitations set forth in the Second Lien

Intercreditor Agreement.  However, under the Plaintiff's interpretation of the Subordinated Notes

Indenture, this event transformed the Second Lien Notes from Senior Indebtedness to some form

of subordinated debt *pari passu* in right of payment with the Subordinated Notes, without a

corresponding increase in the applicable interest rate.  No rational commercial party would ever

have agreed to such terms.

---

[35]     The possibility that the interest rate on such unsecured debt might be higher than the interest rate on second lien debt is hardly a "benefit" to the Subordinated Noteholders, and certainly cannot be seen as supporting Plaintiff's construction of the Fourth Proviso.

[36]     Prior to the springing lien becoming effective in 2012, the Second Lien Notes (then called the "Springing Lien Notes") were "unsecured obligations of the Company."  Second Lien Notes Indenture § 9.

47.     There is a further error in the Fitch Report and the Plaintiff's attempted reliance thereon.  The Plaintiff alleges, in its Complaint:

> Fitch put the capital markets on notice of the potential anti-layering "loophole" concerning second-lien debt.  The [Subordinated Notes] Indenture addresses and protects against this loophole by employing the very "in any respect" language identified in the Fitch Report in the [Subordinated Notes] Indenture's subordination provisions to prevent additional layers of debt from being senior in right of payment to the [Subordinated] Notes.

(Compl. ¶ 40.)  This allegation is false in several respects.  First, the supposedly curative language suggested by Fitch ***does not appear in the anti-layering provision*** of the Subordinated Notes Indenture.  Instead, section 4.13 uses the standard language regarding subordination in right of payment.

48.     Additionally, had the language suggested by the Fitch Report in fact been included in the anti-layering provision of the Subordinated Notes Indenture, it still would not have prevented the layering, on top of and senior to the Subordinated Notes, of unlimited amounts of debt that, like the Second Lien Notes when issued in 2010, was unsecured but equal in right of payment with MPM's secured indebtedness with respect to unencumbered assets.  Any argument that such unsecured debt would be "subordinate or junior in any respect" to any secured obligations of MPM merely by virtue of being unsecured would fail, because the Subordinated Notes Indenture's rules of construction include the following:  "unsecured Indebtedness shall not be deemed to be subordinate or junior to Secured Indebtedness merely by virtue of its nature as unsecured Indebtedness."  Subordinated Notes Indenture § 1.04(f).

49.     Plaintiff's mistaken recourse to the Fitch Report is further confirmation of the error in its construction of the Fourth Proviso.  It also underscores a pattern, discussed in Point I.D., *infra*, of inconsistency with other provisions of the Subordinated Notes Indenture.

       **2.**      **Plaintiff's Interpretation Would Mean the First Lien and 1.5 Lien Notes, and Indebtedness Under the ABL and Cash Flow Facilities, All Are Not Senior Indebtedness**

      50.      The 1.5 Lien Notes would fail to meet Plaintiff's definition of "Senior Indebtedness" because the lien securing the 1.5 Lien Notes is junior to the lien securing the First Lien Notes.  *See* 1.5 Lien Notes § 9 (lien securing 1.5 Lien Notes is "junior in priority and subordinated to the Liens securing the First Priority Obligations").  The First Lien Notes likewise would fail Plaintiff's definition, because the lien securing them (like the lien securing the 1.5 Lien Notes) is junior and subordinate to the applicable "Permitted Liens."  *See* First Lien Notes § 9; 1.5 Lien Notes § 9.  The liens securing the Indebtedness under the ABL and Cash Flow Facilities likewise would not be "Senior Indebtedness" because the ABL Facility is secured by, among other things, second-priority liens on the Notes Priority Collateral (as defined in the ABL Intercreditor Agreement), and the Cash Flow Facility is secured by, among other things, second-priority liens on the ABL Priority Collateral owned by MPM and its domestic subsidiaries, which are junior to the liens securing the ABL Facility, and second-priority liens on the ABL Priority Collateral owned by foreign subsidiaries of MPM, which also are junior to the liens securing the ABL Facility.  *See* Momentive Performance Materials Inc., Current Report (Form 8-K), at 2-3 (Apr. 30, 2013).

      51.      Thus, following Plaintiff's logic, the First Lien Notes, the 1.5 Lien Notes, the ABL Facility and the Cash Flow Facility are not Senior Indebtedness either and, in the event the collateral securing the obligations represented by any of such indebtedness proved insufficient to satisfy them in full, any deficiency claims by the holders of those notes would rank *pari passu* with the Subordinated Notes (***and*** the Second Lien Notes).

      52.      This absurd result precisely encapsulates the preposterous nature of Plaintiff's position.  Having been issued ***unambiguously*** as subordinated debt, having been

publicly described by MPM as "subordinated to all our existing and future senior debt, including

the 8.875% First-Priority Senior Secured Notes due 2020, the 10% Senior Secured Notes

due 2020, the Second-Priority Springing Lien Notes due 2021 (together, the 'Senior Notes'), the

ABL Facility . . . and the Cash Flow Facility," Subordinated Notes Resale Prospectus, at 8-9, the

Subordinated Notes would, according to Plaintiff, migrate inexorably up the capital structure and

become *pari passu* in right of payment with all Indebtedness heretofore identified as Senior

Indebtedness, thus putting the Subordinated Notes on equal footing with the deficiency claims of

secured debt.  Furthermore, if Plaintiff's formulation were credited, then under section 4.12 of

the Subordinated Notes Indenture, the Subordinated Notes would obtain equal and ratable

security under all liens securing the *not*-senior secured indebtedness, because such liens would

not constitute "Permitted Liens," giving the Subordinated Notes the most preferential access to

all encumbered assets.  All of this, according to Plaintiff, flows from the Fourth Proviso.  This is

utter nonsense.

        53.     So far as the Ad Hoc Committee can determine, this "result" was never

disclosed by the Debtors or identified by any rating agency or commentator as a possibility.

Indeed, such a result would be clearly at odds with the parties' intent evidenced by (among other

things) the 2013 Subordinated Notes Resale Prospectus, which state unequivocally that the

Subordinated Notes are subordinated in right of payment to the First Lien Notes, the 1.5 Lien

Notes, and the Second Lien Notes.  *See* Point II, *infra*.

        54.     Where, as here, a court is presented with competing constructions of a

disputed contract provision, the court should reject the construction that leads to unreasonable

results, and should adopt the construction that harmonizes all contract provisions.  *See, e.g.*,

*Convergent Wealth Advisors LLC v. Lydian Holding Co.*, No. 12 Civ. 1199, 2012 U.S. Dist.

LEXIS 82141, at *14 (S.D.N.Y. June 13, 2012) (court will not adopt an interpretation of a contract that leads to result that is "absurd" or "one that no reasonable person would have accepted when entering the contract").

### 3.     Plaintiff's Interpretation Is Disfavored Because It Would Create an Historical Default

55.     The Complaint urges an interpretation of the Subordinated Notes Indenture that necessarily would have created a default at the time the Springing Lien Notes became Second Lien Notes.  Under the Subordinated Notes Indenture, the Company's ability to grant liens was restricted.  Among other restrictions, pursuant to section 4.12 of the Subordinated Notes Indenture, if the Company or any of its restricted subsidiaries granted or suffered a lien on any of its property, the Subordinated Notes would be entitled to an equal and ratable security interest.  "Permitted Liens," however, constitute an exception to this requirement.  The definition of "Permitted Liens" includes a number of baskets, and the only basket under which the lien securing the Second Lien Notes could have been permitted is clause 6(B), which permits "Liens securing Senior Indebtedness."  *See* Subordinated Notes Indenture § 1.01, Definition of "Permitted Liens".

56.     As such, if the Plaintiff were correct, as soon as the second lien sprang in 2012 securing indebtedness (*i.e.*, the Company's obligations under the Second Lien Notes) that, according to Plaintiff, does not constitute Senior Indebtedness, a breach of the Subordinated Notes Indenture would have occurred.  Yet, neither the Plaintiff nor any of the Subordinated Noteholders have ever made such a claim.  It is unreasonable to urge an interpretation of the Subordinated Notes Indenture that leads to such a result.

### D.     Plaintiff's Construction Must Be Rejected Because It Is Inconsistent With Other Provisions of the Subordinated Notes Indenture

57.    Commentators have criticized bondholders' attempts "to exploit a flaw or imprecision in the drafting of [an indenture provision] and insist on a highly literal reading of the provision."[37]  This is precisely what Plaintiff is endeavoring to do here:  exploit a purportedly literal, though isolated and mistaken, reading of the Fourth Proviso to pervert the definition of "Senior Indebtedness" and thereby achieve an unfair and unintended result.  The courts have not been receptive to these wordsmithing endeavors.

58.    When construing the Subordinated Notes Indenture to determine the intent of the parties regarding the Fourth Proviso, the Court is required to follow a holistic approach and examine that provision in the context of the agreement as a whole.  Subordination provisions "should . . . be considered . . . within the context of the entire agreement, which . . . is more reflective of the parties' intent[.]"  *In re Tribune Co.*, 472 B.R. 223, 255 (Bankr. D. Del. 2012) (interpreting subordination provision in indenture).  Where, as here, a litigant has a "purely semantic" argument, subordination provisions cannot be viewed in isolation, but must be construed so that "their interpretation makes . . . sense once the context of the terminology being interpreted is restored."  *In re Envirodyne Industries, Inc.*, 29 F.3d 301, 305 (7th Cir. 1994).  The Second Circuit has followed this rule as well.  *See Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136, 139-40 (2d Cir. 2005) (interpreting subordination provision in indenture).[38]  Evaluated with this principle in mind, it is clear that the "in any respect" language in the Subordinated Notes Indenture does not mean that

---

[37]    Marcel Kahan & Edward Rock, *Hedge Fund Activism in the Enforcement of Bondholder Rights*, 103 Nw. U. L. Rev. 281, 287 (2009).

[38]    *See generally T.G.I. Friday's Inc. v. Nat'l Rests. Mgmt., Inc.*, 59 F.3d 368, 373 (2d Cir. 1995) ("[I]t is axiomatic that, when interpreting a contract, the court generally must consider the contract as a whole so that it may give significance to each term."); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) ("By examining the entire contract, we safeguard against adopting an interpretation that would render any individual provision superfluous."); *Galli v. Metz,* 973 F.2d 145, 149 (2d Cir. 1992) ("[W]hen interpreting this contract we must consider the entire contract and choose the interpretation . . . which best accords with the sense of the remainder of the contract.") (internal citation omitted).

the Second Lien Notes fall outside the definition of "Senior Indebtedness" in the Subordinated

Notes Indenture.

59.    Most obviously, Plaintiff's construction would clash with other provisions

of the Subordinated Notes Indenture that expressly allow the granting of liens to secure Senior

Indebtedness without reference to, and without limitation based upon, the priority of such liens.

*See* Subordinated Notes Indenture § 1.01, Definition of "Permitted Liens" (6)(B) (allowing

"Liens securing Senior Indebtedness").  There is nothing in the definition of "Permitted Liens"

that suggests the granting of such a Permitted Lien could cause what was previously

unquestionably Senior Indebtedness to lose its seniority.

60.    While Plaintiff may argue that its construction of the meaning and effect

of the Fourth Proviso can be "harmonized" with the definition of "Permitted Liens" by saying

that a Permitted Lien securing Senior Indebtedness is a lien that is not junior to another lien, that

is an ***extraordinarily material deviation*** from the obvious sense of the definition of Permitted

Liens.  In effect, Plaintiff asserts that the Fourth Proviso not only usurps the entire definition of

"Senior Indebtedness" but also modifies and dominates the definition of "Permitted Liens,"

although it does not appear in that definition.  Such a deviation from the obvious meaning surely

would have been reflected ***explicitly*** in the definition of "Permitted Liens," rather than being left,

as Plaintiff suggests, to be inferred by an unsuspecting reader from an entirely different

definition in the Subordinated Notes Indenture.  Plaintiff thus asks the Court to override by

"inference" definitions of "Permitted Liens" and "Senior Indebtedness" that both employ

standard formulations used where payment subordination, rather than lien subordination, is the

operative concept, and lien priority is irrelevant.[39]

---

[39]    "'Permitted Liens' means, with respect to any Person . . . Liens securing Senior Indebtedness."
Subordinated Notes Indenture § 1.01, Definition of "Permitted Liens".  "'Senior Indebtedness' means all

61.    Plaintiff's construction also is inconsistent with the lien covenant, section 4.12 of the Subordinated Notes Indenture.  That covenant specifies that the Company and its Restricted Subsidiaries[40] shall not allow the creation of any Lien on any of their assets or property unless the Subordinated Notes are at least "equally and ratably secured"—but then states that this general direction "shall not require the Company or any Restricted Subsidiary to secure the [Subordinated Notes] if the Lien consists of a Permitted Lien."  Subordinated Notes Indenture § 4.12.  Plaintiff would jettison the straightforward sense of this provision, and substitute instead a reading under which a junior lien securing Senior Indebtedness is not a Permitted Lien, and therefore, if such a lien is granted, as was the case here, the Subordinated Notes must be equally and ratably secured by it.  Undoubtedly aware of the extraordinary and unwarranted nature of such a result, Plaintiff makes no mention of it in its Complaint, but it would be the clear and inescapable consequence of the construction Plaintiff would place on the Fourth Proviso.  And the consequences would be more absurd still, because, as shown above, under Plaintiff's construction, the First Lien Notes and the 1.5 Lien Notes also fail the definition of "Senior Indebtedness," meaning that the liens securing those obligations also would have to be shared equally and ratably with the Subordinated Notes.

62.    The upshot of Plaintiff's construction is that the Subordinated Notes would be secured with respect to the lien collateral *pari passu* with the First Lien Notes and would have lien priority over the 1.5 Lien Notes and the Second Lien Notes, whose liens with

---

Indebtedness . . . of the Company or any Restricted Subsidiary . . . unless the instrument creating or evidencing the same or pursuant to which the same is outstanding expressly provides that such obligations are subordinated in right of payments to any other Indebtedness of the Company or such Restricted Subsidiary."  Subordinated Notes Indenture § 1.01, Definition of "Senior Indebtedness".

[40]    "Restricted Subsidiaries' means, with respect to any Person, any Subsidiary of such Person other than an Unrestricted Subsidiary [any Subsidiary of the Company so designated by the Board of Directors of such Person in the manner provided by the Subordinated Notes Indenture] of such Person.  Unless otherwise indicated in this Indenture, all references to Restricted Subsidiaries shall mean Restricted Subsidiaries of the Company."  Subordinated Notes Indenture § 1.01, Definition of "Restricted Subsidiary".

32

respect to the lien collateral are inferior to the lien securing the First Lien Notes.  As noted by a

leading expert, Xtract Covenant Intelligence,[41] "[i]f senior secured second lien debt could

actually rank behind senior subordinated debt, and in particular to such debt that was already

outstanding, the disclosure would have stated such an important, and highly unusual, point."[42]

As demonstrated below, none of MPM's public disclosure did that.

> 63.     It also bears mention that the foundational premise of Plaintiff's entire

theory—the transformation of the Second Lien Notes from senior to *pari passu* upon the creation

of the lien securing the Indebtedness represented by the Second Lien Notes—is contrary to the

second paragraph of section 10.16 of the Subordinated Notes Indenture, which provides that

> [T]he holders of Senior Indebtedness of the Company may, at any time and from
> time to time, without the consent of or notice to the [Subordinated Notes
> Indenture] Trustee or the [Subordinated Notes] Holders, without incurring
> responsibility to the [Subordinated Notes Indenture] Trustee or the [Subordinated
> Notes] Holders and without impairing or releasing the subordination provided in
> this Article 10 or the obligations hereunder of the [Subordinated Notes] Holders
> to the holders of the Senior Indebtedness of the Company, do any one or more of
> the following:  . . . (ii) sell, exchange, release or otherwise deal with any property
> pledged, mortgaged or otherwise securing Senior Indebtedness of the Company
> . . . .

In other words, section 10.16 allows a holder of Senior Indebtedness to deal in any way with

property securing such Senior Indebtedness.  For example, a holder of secured Senior

Indebtedness could agree to release its liens or to subordinate them to liens securing other debt.

This is entirely logical, because subordinated indebtedness is economically indifferent to whether

indebtedness that is senior to it in right of payment is secured or unsecured; all such indebtedness

must be paid in full before any value reaches the subordinated debt.  Importantly, in 2006, when

---

[41]     Xtract Covenant Intelligence reviews "almost every new bond and leveraged loan that comes to market" to
provide research and reports "on special situations, market events and the latest covenant trends[.]"  Covenant
Intelligence, Xtract Research, http://xtractresearch.com/pre/covenant-intelligence (last visited July 12, 2014).

[42]     Xtract Covenant Intelligence, *Momentive's Senior Subordinated Notes:  Are The Second Lien Notes
"Senior Indebtedness"* (Apr. 21, 2014), at 3 (attached as Ex. X to Khalil Decl.).

the Subordinated Notes were issued, MPM's Senior Indebtedness included $1.5 billion of

unsecured notes, so the benefits of section 10.16 were plainly intended to flow as well to

unsecured Senior Indebtedness.

64.     In clear contravention of the assurance provided by section 10.16,

Plaintiff's construction of the Fourth Proviso, overlaid with the plain language of section 10.16,

would mean that a holder of secured Senior Indebtedness could agree to subordinate its liens or

waive them entirely without affecting its priority in right of payment, but that a holder of

unsecured Senior Indebtedness could not agree to obtain a junior lien to secure its Indebtedness.

This is an absurd and illogical reading of the Subordinated Notes Indenture.  Far from

recognizing the latitude specifically granted by section 10.16 to holders of Senior Indebtedness,

which Plaintiff concedes the Second Lien Notes were when issued in 2010, Plaintiff proposes, in

contravention of the Subordinated Notes Indenture, to levy a severe penalty against the Second

Lien Noteholders for doing what that indenture permits them to do.

## II.    EXTRINSIC EVIDENCE OF PRIOR STATEMENTS AND CONDUCT ALSO CONFIRMS THAT THE PARTIES INTENDED THE SECOND LIEN NOTES TO CONSTITUTE "SENIOR INDEBTEDNESS" AND TO NOT FORFEIT THAT STATUS AS A CONSEQUENCE OF THE SPRINGING LIEN

65.     It is clear from (1) MPM's public disclosures and (2) the history of

MPM's capital structure, including the Subordinated Notes,[43] that both MPM and its creditors,

including the Subordinated Noteholders, intended and understood at all times that the Second

Lien Notes were and are "Senior Indebtedness" under the Subordinated Notes Indenture.

---

[43]     Although not admissible in order to create ambiguity, extrinsic evidence is admissible to assist the Court in interpreting the meaning of a written contract.  *Envirodyne*, 29 F.3d at 305 (*citing* 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.12, pp. 272-73 (1990)).

**A.     The 2009 Exchange Offer for the Subordinated Notes Shows that Neither MPM nor the Subordinated Noteholders Believed the Existence of a Junior Lien Caused Secured Indebtedness to Fail the Subordinated Notes Indenture's Definition of "Senior Indebtedness"**

66.     The Complaint misleadingly seeks to create the impression that the Second Lien Notes represent new and unprecedented debt incurred by MPM in direct contravention of the Subordinated Notes Indenture four years after the execution of that indenture and the issuance of the Subordinated Notes thereunder.[44]  In fact, MPM issued $200 million of Old Second Lien Notes in June 2009, eighteen months before it issued the Second Lien Notes.  The Old Second Lien Notes were expressly denominated senior indebtedness of MPM and equal in right of payment to roughly $1.3 billion of term loans, revolving loans and synthetic letters of credit issued under the 2006 Senior Secured Credit Facility.  The Old Second Lien Notes, however, were secured by a lien that was junior to the liens securing the 2006 Senior Secured Credit Facility.[45]  The key features of the Old Second Lien Notes thus precisely mirror those presented here:  a secured Indebtedness not subordinated in right of payment secured by a junior lien.

67.     The circumstances surrounding the issuance of the Old Second Lien Notes show beyond peradventure that neither MPM nor the Subordinated Noteholders subscribed to the bizarre and unprecedented construction of "Senior Indebtedness" now put forth by Plaintiff.  In

---

[44]     To this end, the Complaint twice alleges that the Second Lien Notes were not issued until "four years after" the Subordinated Notes were issued, (Compl. ¶¶ 1, 26), and also alleges that in conjunction with the purchase of MPM from General Electric in 2006, "[t]here was no debt issued at the time with a subordinate or junior lien on any of the Debtors' assets," (*id.* ¶ 13).

[45]     The Old Second Lien Intercreditor Agreement specifies that the liens securing the Old Second Lien Notes and the guarantees thereof are junior and subordinate to the liens securing the 2006 Senior Secured Credit Facility. *See* Old Second Lien Intercreditor Agreement § 2.1.

The Old Second Lien Notes (in section 9 thereof) contained the following statement:  "The Securities and Guarantees have the benefit of a security interest in the Collateral that, pursuant to the Intercreditor Agreement, is junior in priority and subordinated to the Liens securing the First Priority Obligations with respect to all Collateral, and is further subject to Permitted Liens and the exceptions provided in the Security Documents."

May 2009, MPM extended an offer to the holders of certain of its debt securities, including

Subordinated Notes, to exchange those securities for the Old Second Lien Notes, which were to

"rank in parity with all existing and future senior indebtedness of [MPM] and senior to all

existing and future subordinated indebtedness of [MPM]."[46]  The exchange offer for the Old

Second Lien Notes was oversubscribed, and roughly 24% of the Subordinated Notes were

exchanged in the offer *at a 60% discount*.[47]  The willingness of the Subordinated Noteholders to

exchange their Subordinated Notes at this steep discount would not have made sense if the

Subordinated Noteholders subscribed to the position now advanced by Plaintiff and believed that

the Old Second Lien Notes, by virtue of being secured by a junior lien, were not Senior

Indebtedness under the Subordinated Notes Indenture but rather were *pari passu* with the

Subordinated Notes.[48]

> **B.      MPM's Disclosures Regarding the Second Lien Notes, All Made with
> Full Knowledge of the Terms of the Subordinated Notes Indenture,
> and the Absence of Any Objection to that Disclosure by Subordinated
> Noteholders, Show that Neither MPM nor the Subordinated
> Noteholders Believed the Existence of a Junior Lien Caused Secured
> Indebtedness to Fail the Subordinated Notes Indenture's Definition of
> "Senior Indebtedness"**

68.      While the definition of "Subordinated Indebtedness" in the Second Lien

Indenture does not expressly name the Subordinated Notes, the Second Lien Notes Offering

Memorandum clearly states that the Second Lien Notes "will rank senior in right of payment to

the Company's and Note Guarantors' existing and future subordinated indebtedness, including

---

[46]       Momentive Performance Materials Inc., Current Report (Form 8-K), at 2 (May 12, 2009).

[47]       Momentive Performance Materials Inc., Current Report (Form 8-K), at Exhibit 99.1 (June 10, 2009).

[48]       The 1% difference in coupon between the 12.5% interest rate of the Old Second Lien Notes and the 11.5% interest rate of the Subordinated Notes would not have accounted for the eagerness of Subordinated Noteholders to incur the 60% discount on the exchange.

the Company's existing senior subordinated notes [*i.e.*, the Subordinated Notes]." Second Lien

Notes Offering Memorandum, at cover page, 11, 55.

69.     Thereafter, in 2011, MPM offered to exchange a portion of the still

unsecured private Second Lien Notes, still known as Springing Lien Notes, for publicly

registered (but still not secured) notes.  Describing the "Ranking" of the Second Lien Notes, the

Exchange Offer stated as follows:

> Prior to and following the Springing Lien Trigger Date, the [Second Lien] Notes,
> like the Old [Second Lien] Notes, and the guarantees will be senior indebtedness
> of the Company and the Note Guarantors, respectively, and will rank:
>
> - equal in right of payment with all existing and future senior
>   indebtedness of the Company and the Note Guarantors,
>   respectively, [and]
>
> - senior in right of payment to all existing and future subordinated
>   indebtedness of the Company and the Note Guarantors, including
>   any of the Company's existing subordinated notes and guarantees
>   thereof . . . .

Momentive Performance Materials, Inc., Offer to Exchange, at 12 (May 12, 2011).

70.     Once issued, the Second Lien Notes themselves plainly stated that they

(i) are "senior Indebtedness of the Company," (ii) after the springing of the Second Lien, will be

"senior secured obligations of the Company," and (iii) are "senior in right of payment to all

existing and future Subordinated Indebtedness of the Company and Note Guarantors[.]"  Second

Lien Notes Indenture at A-1-10.  Neither the Subordinated Notes Indenture Trustee nor any

Subordinated Noteholder objected to or questioned in any way the accuracy of these disclosures,

all of which are squarely inconsistent with the position now urged by Plaintiff.

    **C.**    **The 2013 Subordinated Notes Resale Prospectus Shows that Neither MPM nor the Subordinated Noteholders Believed the Existence of a Junior Lien Caused Secured Indebtedness to Fail the Subordinated Notes Indenture's Definition of "Senior Indebtedness"**

71.    While still known as the Springing Lien Notes, the Second Lien Notes, by their terms, provided that they would spring into second priority secured debt as soon as the Old Second Lien Notes were retired (the "Triggering Event").  The Triggering Event occurred in November 2012.[49]  According to Plaintiff, the Triggering Event caused previously Senior Indebtedness (the Springing Lien Notes) to be transformed into subordinated indebtedness ranking *pari passu* with the Subordinated Notes in right of payment.  No disclosure of this extraordinary purported transformation was made by the Company at that (or any other) time.

72.    More importantly, on May 13, 2013—long after the Triggering Event had occurred and the Second Lien Notes became secured by the second priority springing lien—the Company issued a prospectus to facilitate the resale of Subordinated Notes by the Subordinated Noteholders.  That prospectus expressly and unequivocally warned the potential purchasers that the Subordinated Notes are subordinated to the Second Lien Notes:

> ***The Notes are subordinated to*** all our existing and future senior debt, including the 8.875% First-Priority Senior Secured Notes due 2020, the 10% Senior Secured Notes due 2020, ***the Second-Priority Springing Lien Notes due 2021*** (together, the "Senior Notes"), the ABL Facility (as defined herein) and the Cash Flow Facility (as defined herein) . . . .

2013 Subordinated Notes Resale Prospectus, at cover page.  Again, neither the Subordinated Notes Indenture Trustee nor any Subordinated Noteholder objected to this disclosure.  They surely would have done so if they in fact believed "the Second Priority Springing Lien Notes due 2021" [*i.e.*, the Second Lien Notes], secured by the second priority springing lien, were not "Senior Indebtedness" but were in fact *pari passu* with the Subordinated Notes.  It is thus fair to

---

[49]    *See* Momentive Performance Materials Inc., Current Report (Form 8-K), at 2 (Nov. 20, 2012) (describing discharge of Old Second Lien Notes).

infer that neither MPM nor the Subordinated Noteholders subscribed to the construction now advanced by Plaintiff.

73.    Given the very high standards for accuracy that the Securities Act imposes on the issuers of public securities, MPM's statements in all of the disclosure documents cited above should be given significant weight.  *See, e.g., In re World Com, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 656 (S.D.N.Y. 2004) ("[t]he Securities Act 'was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce . . .'") (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976)).

## III.    PLAINTIFF'S INTERPRETATION OF THE FOURTH PROVISO HAS BEEN REJECTED BY MARKET EXPERTS

74.    The interpretation put forth by Plaintiff has been rejected by the experts in the debt market as a "logical conundrum" that is "odd" and "completely counter" to the Debtors' capital structure.  As these experts have observed, this strained interpretation, if true, would frustrate the legitimate expectations of the market.

75.    Covenant Review, LLC, a leading authority on bond and loan covenants that has provided detailed covenant analysis on over 3,000 bonds, has noted that the Plaintiff's "technical interpretation" of the Senior Indebtedness definition leads to "inconsistent and unreasonable results."[50]  The Covenant Review analysts questioned the "logical conundrum" stemming from Plaintiff's interpretation, asking "how is it possible that senior unsecured debt will not be deemed to be subordinate or junior to the First Lien Notes but if that same debt is secured by a second lien or a 1.5 lien on the collateral securing the First Lien Notes then such

---

[50]    Covenant Review, *Momentive Performance:  Is Any Series of Senior Secured Notes Not "Senior Indebtedness" Under the Senior Subordinated Notes?* 6 (Apr. 25, 2014) ("Covenant Review Analysis") (attached as Ex. Y to Khalil Decl.).

debt will arguably be subordinated or junior to the First Lien Notes (and by virtue of clause (4) of the 'Senior Indebtedness' definition, *pari passu* in right of payment to the Sub Notes)?"[51]

76.    Covenant Review has also specifically rejected Plaintiff's interpretation of the Rule of Construction set forth in section 1.04(f) of the Subordinated Notes Indenture, concluding that it "should more appropriately be interpreted as meaning (unless context otherwise requires) that a class of debt will not be deemed to be subordinate or junior to another class of debt merely by virtue of any security provided for either such class of debt."[52]

77.    Xtract Covenant Intelligence agrees that Plaintiff's position leads to "an odd result to put it mildly:  senior secured debt recovering equally with senior subordinated debt."[53]  Xtract Covenant Intelligence has concluded that "even without reviewing the terms of the Second Lien Notes, we believe that the clause '*subordinate or junior in any respect*' modifies '*any Indebtedness or obligation*', and that it does not purport to, nor should it be construed to, describe levels of lien priority."[54]  After reviewing the relevant documents, Xtract Covenant Intelligence concluded that Plaintiff's interpretation would "run completely counter to the express terms of the Second Lien Notes, the Second Lien Indenture and the related disclosure documents[.]"[55]

## IV.    PLAINTIFF'S CLAIM IS BARRED BY THE DOCTRINES OF LACHES AND ESTOPPEL

78.    Finally, Plaintiff's claim based upon its newly offered interpretation of the Subordinated Notes Indenture is barred by the doctrines of laches and estoppel.  The doctrine of

---

[51]    Covenant Review Analysis, at 4.

[52]    Covenant Review Analysis, at 5.

[53]    Xtract Covenant Intelligence, *Momentive's Senior Subordinated Notes:  Are The Second Lien Notes "Senior Indebtedness"* (Apr. 21, 2014), at 2.

[54]    *Id.*

[55]    *Id.*

laches was "developed as an equitable defense based on the Latin maxim *vigilantibus non dormientibus aequitas subvenit* (equity aids the vigilant, not those who sleep on their rights)." *Stone v. Williams*, 873 F.2d 620, 623-24 (2d Cir. 1997), *vacated on other grounds*, 891 F.2d 401 (2d Cir. 1989). The defense of laches bars a claim if the defendant can show that (1) "the plaintiff in asserting her rights was guilty of unreasonable delay" and (2) that the delay "prejudiced the defendants." *Id.* The Subordinated Notes Indenture Trustee unreasonably failed to object to repeated statements by the Company, including those discussed in Point II, *supra*, in MPM's prospectuses, the Old Second Lien Notes and the Second Lien Notes, all of which clearly assert that the Second Lien Notes are senior to the Subordinated Notes and all of which are plainly incompatible with the interpretation of the Fourth Proviso now offered by Plaintiff. Investors purchased the Second Lien Notes in reliance on such statements.

79.     "It is the reasonableness of the delay rather than the number of years that elapse which is the focus of the inquiry." *Stone*, 873 F.2d at 624; *see also Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ. 7203 (DLC), 2006 WL 1012939, *33-34 (S.D.N.Y. Apr. 19, 2006) (finding that plaintiff "failed to present a tenable explanation for why it made no objection, either formal or informal" to defendant's development of a line of products allegedly using plaintiff's trademarked name while defendant promoted the products for two years). Here, the Subordinated Notes Indenture Trustee and the Subordinated Noteholders had ***multiple opportunities over the past five years*** to assert the construction of the Fourth Proviso now offered by Plaintiff, and utterly failed to do so. A plaintiff's financial ability and ready access to legal services also renders a delay unreasonable. *See Juicy*, 2006 WL 1012939 at *34 (noting that plaintiff could afford counsel, and in fact, was retaining outside trademark counsel for several years prior to suit). The Subordinated Notes Indenture Trustee and the Subordinated

Noteholders are sophisticated entities with the ability to access and pay for legal counsel to institute action.

80.      The Subordinated Notes Indenture Trustee unreasonably failed to object to the Company's explicit disclosures with respect to the Old Second Lien Notes in 2009. *See supra* at Point II.A.   The Subordinated Notes Indenture Trustee also unreasonably failed to object to the Company's explicit disclosures in connection with the Exchange Offer for the private Second Lien Notes announced in 2011, and the 2013 Subordinated Notes Resale Prospectus, which stated unequivocally that the Subordinated Notes are subordinated and junior in right of payment to the Second Lien Notes.   Furthermore, the Subordinated Notes Indenture Trustee also unreasonably failed to object to the securing of the Second Lien Notes by the springing second lien—if, as it now asserts, this created an event of default under the Subordinated Notes Indenture.   Investors necessarily relied on this silence and inaction when they purchased the Second Lien Notes or when they exchanged the Subordinated Notes for the Old Second Lien Notes.

81.      The Subordinated Notes Indenture Trustee's unreasonable delay was clearly prejudicial to the Second Lien Noteholders.   The Second Lien Noteholders have invested $1.16 billion in the Second Lien Notes, at an interest rate lower than that for the Subordinated Notes, in reliance on statements that their securities had priority in the right to payment *vis-a-vis* the Subordinated Notes.   MPM is also prejudiced by the Subordinated Notes Indenture Trustee's delay because raising this argument for the first time in the context of the Debtors' bankruptcy impairs the Debtors' ability to achieve an orderly reorganization under bankruptcy protection. Therefore, the Complaint for declaratory relief is barred by the doctrine of laches.

82.     It is also clear that the claim is barred by the doctrine of estoppel.

Estoppel is a principle by which a party is precluded from denying, or asserting the contrary of,

any material fact that, by its words or conduct, either affirmative or negative, the party has

intentionally or negligently induced another, who had a right to rely upon such words or conduct,

to believe and act upon, thereby changing positions in such a way that he or she would suffer

injury if a denial or contrary assertion were allowed. *Triple Cities Const. Co. v. Maryland Cas.*

*Co.*, 176 N.Y.S.2d 292, 295 (N.Y. 1958). The elements of estoppel are (1) lack of knowledge or

means to ascertain the truth as to the facts in question; (2) reliance on the words or conduct of the

party to be estopped; (3) good faith by the party claiming the estoppel; and (4) a resulting

materially prejudicial change in position by the party claiming the estoppel. *See River Seafoods,*

*Inc. v. JPMorgan Chase Bank*, 796 N.Y.S.2d 71, 74 (N.Y. App. Div. 1st Dep't 2005). "The

purpose of equitable estoppel is to preclude a person from asserting a right, to the disadvantage

of another person, after having led the other person to form the reasonable belief that the right

would not be asserted." *Gulbin v. Moss-Gulbin*, 856 N.Y.S.2d 743, 744-745 (N.Y. App. Div. 3d

Dep't 2007) (internal citation omitted).

83.     A person may be estopped by his own silence when he has a duty to speak

and he fails to do so. *Besicorp Grp. Inc. v. Enowitz*, 652 N.Y.S.2d 366, 369 (N.Y. App. Div. 3d

Dep't 1997); *see also Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725-26

(2d Cir. 2001). "Silence in the face of an explicit contrary assumption by an innocent party may

constitute a concealment of facts or a false misrepresentation for estoppel purposes." *Price v.*

*Fox Entm't Grp., Inc.*, No. 05 Civ. 5259, 2007 U.S. Dist. LEXIS 6081, at *16 (S.D.N.Y. Jan. 26,

2007) (quoting *Gen. Elec. Capital Corp. v. Eva Armadora, S.A.*, 37 F.3d 41, 45 (2d Cir. 1994)).

84.    As shown above, there was clearly a duty for the Subordinated Notes Indenture Trustee and the Subordinated Noteholders to contradict the express statements by MPM regarding the subordinated nature of the Subordinated Notes.  Indeed, section 10.16 of the Subordinated Notes Indenture specifically recites that the Second Lien Noteholders, among others, are entitled to rely upon the subordination of the Subordinated Notes:

> Each Holder by accepting a Security acknowledges and agrees that the foregoing subordination provisions are, and are intended to be, an inducement and a consideration to each holder of any Senior Indebtedness of the Company, whether such Senior Indebtedness was created or acquired before or after the issuance of the Securities, to acquire and continue to hold, or to continue to hold, such Senior Indebtedness and such holder of such Senior Indebtedness shall be deemed to have relied on such subordination provisions in acquiring and continuing to hold, or in continuing to hold, such Senior Indebtedness.

In the face of the investment of well over a billion dollars in the Second Lien Notes, including in part at a 60% discount to par by holders of roughly $118 million of Subordinated Notes, plus over a billion dollars more invested in the First Lien Notes and 1.5 Lien Notes, with not the slightest indication from Plaintiff, its predecessors, or any Subordinated Noteholder, it is clear that the elements of estoppel are met.

## CONCLUSION

For all of the foregoing reasons, WSFS and the Ad Hoc Committee respectfully request that the Court dismiss the Complaint in its entirety.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Dated:  July 14, 2014
        New York, New York

**PRYOR CASHMAN LLP**

/s/ Seth H. Lieberman
Seth H. Lieberman
Patrick Sibley
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036-6569
Telephone:(212) 421-4100
Facsimile: (212) 326-0806
slieberman@pryorcashman.com
psibley@pryorcashman.com

*Attorneys for Wilmington Savings Fund Society, FSB,*
*as successor indenture trustee*

- and -

**MILBANK, TWEED, HADLEY & MᶜCLOY LLP**

/s/ Dennis F. Dunne
Dennis F. Dunne
Samuel A. Khalil
Michael L. Hirschfeld
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:       (212) 530-5000
Facsimile:       (212) 822-5670
ddunne@milbank.com
skhalil@milbank.com
mhirschfeld@milbank.com

*Attorneys for Ad Hoc Committee of Second Lien Noteholders*